```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
 4                                         :
                 Plaintiff,                :
 5      v                                  :
                                           :
 6    BIONPHARMA, INC.,                    :    NO. 18-1962-LPS
                                           :    NO. 19-1067-LPS
 7               Defendant.                :
      ------------------------------------
 8    SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
                                           :
 9               Plaintiff,                :
        v                                  :
10                                         :
      AMNEAL PHARMACEUTICALS, LLC,         :
11                                         :    NO. 19-678-LPS
                 Defendant.                :
12                              - - -

13                         Wilmington, Delaware
                         Monday, February 1, 2021
14                       Bench Trial - Volume A

15                              - - -

16    BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge

17                              - - -
      APPEARANCES:
18

19              MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  MEGAN E. DELLINGER, ESQ.
20
                    and
21
                WILSON SONSINI GOODRICH & ROSATI
22              BY:  WENDY L. DEVINE, ESQ., and
                     KRISTINA M. HANSON, ESQ.
23                   (San Francisco, California)

24                    and

25    Valerie J. Gunning              Brian P. Gaffigan
      Official Court Reporter         Official Court Reporter
```

1     APPEARANCES:

2

3                    WILSON SONSINI GOODRICH & ROSATI
                     BY:  NATALIE J. MORGAN, ESQ.
                          (San Diego, California)
4

5                         and

6                    WILSON SONSINI GOODRICH & ROSATI
                     BY:  GRANVILLE C. KAUFMAN, ESQ., and
                          TY W. CALLAHAN, ESQ.
7                         (Los Angeles, California)

8                              Counsel for Silvergate
                               Pharmaceuticals, Inc.
9

10                   MORRIS JAMES, LLP
                     BY:  KENNETH L. DORSNEY, ESQ., and
11                        CORTLAN S. HITCH, ESQ.

12                        and

13                   TAFT STETTINIUS & HOLLISTER, LLP
                     BY:  ROSHAN P. SHRESTHA, Ph.D., ESQ., and
14                        ANDREW M. ALUL, ESQ.
                          (Chicago, Illinois)
15
                               Counsel on behalf of Bionpharma, Inc.
16

17                   YOUNG CONAWAY STARGATT & TAYLOR, LLP
                     BY:  ANNE SHEA GAZA, ESQ.,
18                        KAREN L. PASCALE, ESQ., and
                          SAMANTHA G. WILSON, ESQ.
19
                          and
20
                     MADDOX EDWARDS, PLLC
21                   BY:  STEVEN MADDOX, ESQ.
                          JEREMY EDWARDS, ESQ.
22                        MATTHEW RUEDY, ESQ., and
                          KAVEH SABA, ESQ.
23                        (Washington, District of Columbia)

24                             Counsel on behalf of
                               Amneal Pharmaceuticals, LLC
25

```
 1                            - oOo -

 2                    P R O C E E D I N G S

 3                 (REPORTER'S NOTE:  The following bench trial was

 4       held remotely, beginning at 9:04 a.m.)

 5                 THE COURT:  Good morning, everybody.

 6                 (The attorneys respond, "Good morning, Your

 7       Honor.")

 8                 THE COURT:  We're ready to begin.  This first

 9       morning, let me have plaintiffs put their appearances on the

10       record, please.

11                 MS. DELLINGER:  Good morning, Your Honor.  This

12       is Megan Dellinger from Morris Nichols on behalf of the

13       plaintiff.  And with me are my co-counsel, from Wilson

14       Sonsini, Wendy Devine, Natalie Morgan, Tina Hanson, Ty

15       Callahan, and Clay Kauffman.

16                 MS. DEVINE:  Good morning, Your Honor.

17                 THE COURT:  Thank you.  Good morning to all of

18       you.

19                 Who is there for Bionpharma?

20                 MR. HITCH:  Good morning, Your Honor.  On behalf

21       of Bionpharma, it's Cortlan Hitch from Morris James.  And

22       with me I have my co-counsel, Andrew Alul and Roshan

23       Shrestha from Taft, Stettinius & Hollister.

24                 MR. ALUL:  Good morning, Your Honor.

25                 THE COURT:  Good morning.
```

```
 1                    And who is there for Amneal, please?
 2                    MS. GAZA:  Good morning, Your Honor.  It's Anne
 3      Gaza from Young Conway on behalf of Amneal.  I am joined
 4      today by colleagues Karen Pascale and Samantha Wilson, as
 5      well as Steve Maddox, Jeremy Edwards, Kaveh Saba, and Matt
 6      Ruedy of Maddox Edwards.  And we're joined today also by
 7      Bryan Sommese, the Director of Global IP for Amneal.
 8                    THE COURT:  Great.  Good morning.
 9                    MR. MADDOX:  Good morning, Your Honor.
10                    THE COURT:  Good morning to all of you.
11                    And I assume we have our TRIALanywhere folks
12      there.  Who is going to be our assistant there?
13                    THE TRIALanywhere HOST:  Hi, Your Honor.  It's
14      J.D. English.
15                    THE COURT:  Good morning.  Thanks for being with
16      us.
17                    Okay.  Well, we're ready on our end to get
18      started.  Are there any issues that plaintiffs wanted to
19      raise?
20                    MS. DEVINE:  Your Honor, we did have one issue
21      with the slides from Bionpharma's opening statements.
22                    THE COURT:  Okay.
23                    MS. DEVINE:  And that's DDX-1021.  Would Your
24      Honor like us to put it up on the screen?  Would that be
25      helpful?
```

```
 1                    THE COURT:  Probably, yes.  Thank you.
 2                    MS. DEVINE:  I apologize.  We don't --
 3                    THE COURT:  I don't know what the issue is, of
 4       course.  If you think --
 5                    MS. DEVINE:  Of course.  Of course.
 6                    THE COURT:  -- that's fine.
 7                    MS. DEVINE:  We're going to pull it up right
 8       now.
 9                    MR. MADDOX:  Where is it?  There isn't any
10       document on the screen.
11                    THE COURT:  No, they haven't displayed anything
12       yet.
13                    MR. MADDOX:  Sorry.  Thank you.
14                    THE COURT:  No, that's fine.  We're just waiting
15       for that to be arranged.
16                    Is this it, Ms. Devine?
17                    MS. DEVINE:  This is it, Your Honor.
18                    THE COURT:  Okay.
19                    MS. DEVINE:  So the issue here is Bionpharma
20       does not have invalidity issue.  The single issue in those
21       matters vis-à-vis Bionpharma's infringement.  And we
22       received this slide in the disclosure of demonstratives.
23                    We talked about it last night, and I'm still
24       uncertain exactly what the purpose of this slide is, but it
25       does cause us some concern that it discusses invalidity and
```

1    that is not an issue in the case.

2         So I wouldn't say we're objecting to the use of

3    the slide per se, however, we do want to raise it such that

4    we're not waiving any objection to any discussion of a

5    defense that is not at issue in the case.

6              THE COURT:  All right.  Thank you.

7         I'll hear from Bionpharma.

8              MR. ALUL:  Your Honor, Andy Alul for Bionpharma.

9         We are not raising an invalidity defense at

10   trial.  This slide is simply a qualification.

11        We refer to, and we're going to be referring

12   throughout trial, to Silvergate's claims in this case as

13   narrow.  But, Your Honor, they're narrow for purposes of

14   infringement.  And we want -- we certainly don't want to

15   prejudice Amneal because it's argued that the claims are

16   actually broad for purposes of invalidity.

17        And that might seem counterintuitive, but it's

18   actually not because they're two separate inquiries.  And

19   the fact they're broad from invalidity is because of the

20   comprising transitional phraseology in the claims.

21        So claims can be narrow for purposes of

22   infringement and broad for invalidity, and that's really the

23   only point we're trying to make here.  We're not arguing an

24   invalidity defense.  It's just qualifying our representation

25   the claims are narrow.

1          We don't want to prejudice Amneal, who is

2     raising an invalidity defense, in any way by saying the

3     claims are narrow, narrow, narrow, which could we looked at

4     as potentially undercutting their invalidity defense, and we

5     don't want to do that.

6               THE COURT:  Okay.  Thank you.

7               Ms. Devine, anything further?

8               MS. DEVINE:  No, Your Honor.

9               THE COURT:  Okay.  I've been put on notice of

10    the two competing concerns about the slide.  There really

11    isn't an objection.  I don't find the slide per se

12    objectionable.  I doubt there is going to be argument that

13    is objectionable.

14              What would be objectionable is if suddenly

15    Bionpharma presses an invalidity defense that is not the

16    case, but I am confident that is not going to happen.

17              So thank you for bringing it to my attention,

18    and, you know, I don't think there is anything for me to

19    rule on at this point.

20              Is there anything further, Ms. Devine?

21              MS. DEVINE:  No, thank you, Your Honor.

22              THE COURT:  Okay.  Any issues Bionpharma wanted

23    to raise?

24              MR. ALUL:  No, Your Honor.  We're ready to

25    proceed.

1          THE COURT:  Okay.  How about Amneal?

2          MR. MADDOX:  Your Honor, yes, there are a few --

3     there's not frankly any disputes except for one.  There are

4     a few agreements reached that we would like to just put on

5     the record and let you know about.

6          Ms. Wilson?

7          MS. WILSON:  Thank you, Mr. Maddox.  Good

8     morning, Your Honor.  Samantha Wilson for Amneal.

9          I have two housekeeping matters, as Mr. Maddox

10    referenced.  The first is regarding Rule 52(c) motions.  The

11    parties have agreed and would propose to the Court that any

12    Rule 52(c) motion be presented at the conclusion of trial

13    without any waiver.

14         THE COURT:  That's fine.  Thank you for raising

15    that.

16         MS. WILSON:  Thank you, Your Honor.

17         And the second housekeeping matter is deposition

18    designations.

19         Further to Your Honor's guidance at our Friday

20    conference regarding submitting them to Your Honor rather

21    than playing them at trial, the parties have agreed to that,

22    and have agreed to submit them on Friday along with the time

23    allocations for each party.

24         And we further agreed to facilitate this in

25    order to, to exchange all designations this Wednesday, meet

1   and confer on any disputes, and should we have any, the

2   parties will follow Your Honor's joint letter and

3   procedures.

4               And, finally, we are still discussing how to

5   address exhibits that may -- that could come in through a

6   deposition designation, and we'll report back.

7               THE COURT:  All right.  I'm a little concerned

8   about the depositions timing.  What is the likely amount of

9   time that is going to be allocated for the deposition?

10  Friday is our last day we are scheduled to be together.  You

11  might otherwise run out of time.

12              So give me some help on that, Ms. Wilson.

13              MS. WILSON:  Your Honor, I hope to defer to my

14  colleagues, Mr. Maddox and Mr. Ruedy, as to the expected

15  time allocations for those matters.

16              THE COURT:  Okay.  Thank you.

17              MR. MADDOX:  Your Honor, that actually kind of

18  leads us to another issue.

19              There has been an issue that arose Friday night

20  after the court closed.  There was an issue with respect to

21  the general motion.

22              THE COURT:  Mr. Maddox, I'm going to have to

23  stop you.  The sound is very poor quality on your end.

24              Mr. English, is there anything you can help us

25  with?

```
 1                    THE TRIALanywhere HOST:  Steve, if you can just
 2   lean in and really speak at the microphone on your laptop.
 3   You're sitting back and you are not very clear.
 4                    MR. MADDOX:  Sorry.
 5                    Is this better, Your Honor?
 6                    THE COURT:  Maybe a little bit, but,
 7   Mr. English, you hear what I'm hearing; right?
 8                    THE TRIALanywhere HOST:  Yes.  Steve, do you
 9   have a headset handy?
10                    MR. MADDOX:  No, but I can get one just very
11   soon.
12                    MR. ALUL:  Or a phone.
13                    MR. MADDOX:  Or I can do it on a phone.
14                    THE TRIALanywhere HOST:  Why don't we have you
15   just dial in, Steve.
16                    MR. MADDOX:  Can I try one last thing?
17                    THE COURT:  Sure.
18                    MR. MADDOX:  How about now?  Is that better?
19                    THE COURT:  That may be a little clearer.  I
20   think probably the phone or the headphones in the long
21   run will help, but why don't you try to explain what you
22   were going to explain and I'll see if I can ...
23                    MR. MADDOX:  So -- well, there are two remaining
24   points, and the last one relates back to the deposition
25   designations.
```

1        The first one, to put on the record here,

2   everyone in their opening is going to be referring to the --

3   or the accused formulation.  So before openings begin, we

4   will have to take up questions of sealing with the Court.

5        Now, one of the witnesses we have designated

6   is a witness named Gerold Mosher.  He is the vice president

7   of product development for plaintiff, and he was a 30(b)(6)

8   witness on the invention and conception, reduction to

9   practice, and a bunch of other sort of hard core issues.

10       And several days before the pretrial conference,

11  they indicated that they were going to call him as a live

12  witness.  And so after the pretrial conference, it was last

13  Thursday, they said they were going to call him as a live

14  witness, and at which point we said we can do it after

15  direct.  We're happy to do it on cross so you don't have to

16  call him back.

17       And then the next day, after court closed, we

18  got an email saying, we're not going to call him and you

19  can't have him.  We're not making him come.

20       Now, we had developed trial strategy in light of

21  him being here, apparently after that first cross of this

22  witness.  And our current situation is now that is out the

23  window because of Friday night they pulled him and they told

24  us the first time that the vice president is not an officer,

25  and they can prove it.

```
 1                  We're asking how you would like us to present it
 2    to you, if you want to entertain a motion, what would you
 3    like to do.
 4                  THE COURT:  All right.  So we will, in the long
 5    run, have to deal with the sound.  I got what you said, but
 6    it is a little bit more challenging than we're all going to
 7    want, but let's see if we can work through these issues.
 8                  So the sealing we will come to.  But in terms of
 9    this witness, I think you said is Mr. Mosher, is it you have
10    a request that I order them to bring him live?  Is that
11    essentially what you are asking for?
12                  MR. MADDOX:  That is what we would like.  What
13    we were -- we had every reasonable expectation until Friday
14    to have him come, and it did not happen.
15                  THE COURT:  Okay.  Ms. Devine, are you the one
16    that is going to address this issue for the plaintiffs?
17                  MS. DEVINE:  Yes, Your Honor.
18                  THE COURT:  Can you hear well enough what
19    Mr. Maddox was saying?
20                  MS. DEVINE:  I think so, and we discussed it on
21    the phone yesterday, so I believe I have a handle on it.
22                  THE COURT:  Okay.  Go ahead.
23                  MS. DEVINE:  So Dr. Mosher is one of two
24    inventors of the patents at issue.  He carries the title
25    vice president at Azurity, which is the parent company of
```

1   Silvergate, and he is not an officer of the company and he

2   is not a director.

3                   I can put up on the screen -- and Mr. McLain,

4   would you put up the corporate information.

5                   I just pulled this off of Massachusetts's

6   Secretary of State website yesterday, so it's not --

7                   THE COURT:  All right.  Hold on.  Let me.

8                   MS. DEVINE:  -- not an officer.

9                   THE COURT:  Let me interrupt you.

10                  MS. DEVINE:  Sure.

11                  THE COURT:  Is it your contention you can't make

12  him appear?

13                  MS. DEVINE:  It's my contention that there is no

14  reason to make him available and that it would be

15  prejudicial.

16                  So the actual way that it happened was we listed

17  him in the pretrial order as may call by deposition or live.

18  Defendants asked us, as a courtesy, to indicate if we were

19  going to call him.  There was an agreement that that would

20  be a non-binding statement, and we stated that we did intend

21  to.

22                  Then we got into a dispute about whether we

23  would have to submit duplicative testimony.

24                  Can you hear me, Your Honor?  It sounds like

25  we're having trouble.

```
 1                    THE COURT:  Well, it sounds like there is
 2    interference now.
 3                    MS. DEVINE:  Can you turn the volume?  I think
 4    it's interfering.
 5                    Sorry.  We turned the volume up to try to hear
 6    Mr. Maddox better and now --
 7                    THE COURT:  Right.
 8                    MS. DEVINE:  Is that better, Your Honor?
 9                    THE COURT:  I think so.
10                    MS. DEVINE:  Okay.
11                    THE COURT:  If not, I will let you know.
12                    MS. DEVINE:  Okay, great.
13                    THE TRIALanywhere HOST:  For those folks that
14    aren't speaking, could you mute?  That might help.  I
15    apologize.
16                    THE COURT:  Yes.  Thank you.  That's a good
17    suggestion.  Thank you.
18                    MS. DEVINE:  So what happened, Your Honor, is we
19    put in the pretrial order we may call him live or depo.  We
20    were considering calling him live; he's the inventor.  We
21    might want to call him live.
22                    We have another live corporate witness,
23    Mr. Beckloff, who is actually Dr. Mosher's supervisor, who
24    we are calling live as our first witness this morning.
25                    As we were considering whether we wanted to, we
```

1    learned that we have 15 hours for trial, we learned that

2    we had to put on duplicative evidence, so as a courtesy,

3    we made a non-binding statement to defendants that we

4    were, at that point, yes, seriously considering calling

5    him live.

6         We got an email from defendants the day

7    before we told him that we decided not to call him live --

8    and Mr. McLain, can we pull up that email -- that shows

9    that  our understanding was that that was a non-binding

10   agreement.

11        As you can see here, it states, Plaintiff has

12   indicated, in the third paragraph, that it currently intends

13   to call Dr. Mosher live.  Not plaintiffs have submitted to

14   calling Dr. Mosher live, not we are building our trial

15   strategy around Dr. Mosher being there live.

16        And it also says that regardless of whether we

17   call him live, they're playing their depo designation.  And

18   I have to point out, they have designated two hours of

19   testimony from Dr. Mosher.  They had a full and fair

20   opportunity to depose him as the inventor.  It was a

21   30(b)(6) witness on invention issues.  He is not a

22   high-level executive, he supervises a team of five people.

23        And one of the things that influenced our

24   decision to not call him live is there have been some recent

25   events at the company that need his attention unrelated to

```
 1    this case.  He runs product development at a small company,

 2    he is very busy, and we decided that, given that his

 3    testimony would be almost, in its entirety, non-duplicative

 4    of what his boss, Mr. Beckloff, will testify about, that we

 5    did want not want to call him live.  And I asked --

 6                THE COURT:  Hold on.

 7                You meant to say it would be duplicative; right?

 8                MS. DEVINE:  Duplicative, yes.  Exactly.

 9                And I asked defendants yesterday if they were

10    citing some sort of rule that indicated that we are required

11    to call him live, and they said no, that they were just

12    looking for the discretion of the Court to --

13                THE COURT REPORTER:  I'm sorry.  I'm sorry.  I

14    completely -- it blanked out.  I could not hear anything

15    that Ms. Devine said.

16                THE COURT:  Brian, just the last sentence or

17    two?

18                THE COURT REPORTER:  The last part said, "And

19    they said no, that they were just looking for the discretion

20    of the Court to," and then it blanked out.

21                MS. DEVINE:  To order -- yes.  To order us to

22    bring him live to trial.

23                Sorry about that.

24                And so the fact of the matter is they took a

25    full day deposition of Dr. Mosher.  He lives in Kansas.
```

1    They knew he would not be subject to a trial subpoena.   So

2    they could not have planned their case and their trial

3    strategy on some sort of live deposition of.

4              If they are permitted to do an adverse direct of

5    him, clearly we're going to want to do a direct of him, too,

6    which is going to affect our trial time.

7              And it will be prejudicial to the company to

8    have to give him up given the recent events that do require

9    his attention.

10             THE COURT:  All right.

11             Mr. Alul, by the way, do you have anything to

12   say on these issues?

13             MR. ALUL:  Your Honor, I do.  And if those folks

14   who aren't speaking, like Mr. Maddox and Ms. Devine, can

15   mute because I am -- the sound is just not really that great

16   today.  And I'm hoping if people do mute --

17             Thank you.

18             So, Your Honor, we feel the same way Mr. Maddox

19   does about this.  In the lead up to the final pretrial

20   order, we reached -- both sides reached an agreement to

21   disclose who they were going to call to testify live at

22   trial.

23             And plaintiffs took a little bit to tell us,

24   but they eventually did, and Dr. Mosher was one of those

25   witnesses, and we both, Amneal and Bionpharma, planned our

1   trial strategy accordingly around this.

2           And Amneal's team worked hard on a

3   cross-examination for him.  There is a critical piece of

4   evidence, Your Honor, that we wanted to bring -- get

5   admitted in evidence through Dr. Mosher.  It's a citizen's

6   petition that Silvergate filed with the FDA that essentially

7   says that the buffer limitation of the asserted claims

8   doesn't have a range of equivalents.

9           And he is one of the few witnesses that they --

10  from Silvergate who can authenticate this.  At his

11  deposition, he said he has seen the document before, he is

12  familiar with it, he has heard of it.

13          And now they don't want to bring him live,

14  and our experts are going to be relying on that citizen

15  petition, we'd like to get it moved into evidence, and we

16  got an objection to that particular citizen petition based

17  on authenticity from plaintiffs.

18          So that is yet another reason why it's thrown a

19  wrench into our trial strategy.  And we don't think there's

20  any harm in requiring Silvergate to have him testify live.

21  It's just, it's an hour, two hours out of his time.  He

22  sits in front of a computer screen in Kansas.  He is not

23  flying anywhere.

24          So we're with Amneal on this, Your Honor.

25          THE COURT:  All right.  Thank you.

1              Ms Devine, are you, in fact, objecting to the

2     admission of this citizens' petition?

3              MS. DEVINE:  So we did ask defendants last night

4     how they intend to authenticate the citizen's petition, and

5     we didn't get a response.

6              I do note that Mr. Beckloff, who will be

7     testifying this morning, also was deposed about the

8     citizens' petition, and it could be authenticated through

9     him.

10             If it will moot this issue, we will waive any

11    objection to the authenticity of the citizens' petition.

12             As a note --

13             THE COURT:  All right.

14             MS. DEVINE:  Sorry.

15             THE COURT:  Hold on.  Can you hear me?

16             MS. DEVINE:  Yes.

17             THE COURT:  If it does not moot the issue, what

18    is your position as to whether the witness this morning can

19    authenticate it?

20             MS. DEVINE:  I believe he can authenticate.

21             THE COURT:  Okay.  You were going to say

22    something else then.

23             MS. DEVINE:  Yes.  On meet and confer yesterday,

24    I asked Mr. Maddox and Mr. Alul, you know, when they

25    intended Dr. Mosher to go up.  I was told that it's intended

1     that Dr. Mosher would go up during Amneal's case on

2     obviousness.  So it's not clear to me how Bionpharma has

3     any interest in Amneal's case on obviousness given that

4     Bionpharma does not have an obviousness defense.

5               And I also note that under Federal Circuit law,

6     inventor testimony is not relevant to obviousness.

7               So I don't understand why they would build an

8     obviousness strategy around his testimony.

9               THE COURT:  All right.  Thank you.

10              Mr. Maddox, we're coming back to you.

11              First on the citizens' petition issue.

12    Mr. Maddox, I assume you wanted it submitted as well.

13              Does what Ms. Devine has said about some other

14    witness today allowing it to be authenticated and admitted,

15    does that take care of that part of the issue?

16              MR. MADDOX:  I don't believe it does, but the,

17    the issue for me is much larger than this one document.

18              If you would look at the, at the email that

19    Ms. Devine put up?  And could we focus on that middle

20    paragraph where she highlighted the first sentence.

21              This was Thursday afternoon.

22              They were telling us they intended to call him.

23    And what we were saying was, look, why don't we wait until

24    he is done and figure out if there is anything left to

25    designate.  Maybe it will all be covered in live.

```
 1                    This is, as Ms. Devine said, it's two hours to

 2      do this by deposition.  And we just, we very much object to

 3      the after business, Friday before Monday trial begins -- I

 4      don't care that they don't call him.  That's fine.  I don't

 5      care that they have a trial schedule and time concerns,

 6      that's fine.  But an adverse direct doesn't come out of

 7      their time.

 8                    The timing of this after the representations of

 9      what they intended to do is troubling.

10                    And -- I'm sorry.  Can you hear me better now,

11      by the way?

12                    THE COURT:  I can hear you better, yes.

13                    MR. MADDOX:  Okay.  Great.  A colleague brought

14      me a microphone.

15                    And, you know, if this was going to be an

16      issue about whether he is an officer or not, it could have

17      surfaced and been dealt with one way or the other, perhaps,

18      at the pretrial conference.  But three days before the

19      pretrial conference, they gave him on the list of the

20      witnesses they intended to call live, and they still, as of

21      Thursday, wanted to do that.

22                    THE COURT:  Right.  Let me --

23                    MR. MADDOX:  This is prejudicial to us.

24                    THE COURT:  So I agree it's prejudicial.  I

25      agree it's troubling.  I'm surprised that we're having this
```

1    dispute at this hour, but nonetheless, can you point to

2    anything in the pretrial order that says they can't do

3    this?

4              It seems to me they listed this witness as a

5    "may call."  They now contend there is a live dispute as to

6    whether I even have authority, you know, any power to order

7    him to appear.  So maybe we're back to where you started.

8    Maybe I need to get some, you know, quick letter briefing or

9    something.

10             I mean, evidently your position is it's

11   discretionary with me.  I don't know that Ms. Devine agreed

12   with that.  I think she has taken the position I can't order

13   what you want as unfair as it may be.

14             Can you point to something in the pretrial order

15   that they violated, or is it just, you know, it's an awfully

16   strange decision for them to make so late in the day during

17   trial?

18             MR. MADDOX:  Well, it's simply more than

19   strange.  It would be, I would say, unclean hands.

20             I don't think they get to do this and then say,

21   now we'll try to tell you.  Now we'll debate whether his is

22   an officer.

23             I mean, I think there comes a point where, you

24   know, you don't get to make those arguments.

25             THE COURT:  So the objection is maybe waived.

1                    MR. MADDOX:  Yes.

2                    THE COURT:  All right.  Ms. Devine, respond to

3     that.

4                    MS. DEVINE:  Well, we were never asked if he

5     was an officer.  There was an assumption.  So setting that

6     aside, the pretrial order we agreed, paragraph 33, that,

7     "The parties will identify by email to the opposing parties

8     the witnesses they intend to call and the order in which

9     they will be called and whether those witnesses will be

10    called live or by deposition by 8:00 p.m. two calendar days

11    before the witness will be called to testify."

12                    We told them three calendar days before trial

13    started so according to the agreed schedule for this

14    exchange of information between the parties we were more

15    than timely.

16                    THE COURT:  Did you ever give them any hint that

17    you were -- can you hear me?

18                    MS. DEVINE:  Yes, I can.

19                    THE COURT:  Did you ever give them any hint or

20    suggestion that you were reserving the right to argue that

21    the Court lacks authority to order Dr. Mosher to appear?

22                    MS. DEVINE:  Well we told them that when we

23    were considering bringing him live that our indication was

24    non-binding and that we were still considering it.  They

25    never attempted to serve a trial subpoena.  They never

1    attempted to tell us that they believed that the Court could

2    order him to appear live.

3              It just never was part of the discussion.

4              Honestly, when we told them that we were not

5    going to bring him live, we had a meet and confer that night

6    and Amneal's team told my team that they had suspected all

7    along they we wouldn't bring him live yet we never had any

8    discussion about a trial subpoena or anything else.

9              THE COURT:  All right.  I guess we have to spend

10   time on this.

11             Go back to what you were going to show me.  What

12   is it that you think was publicly available that should

13   allow me to find they were respectfully on notice that this

14   individual is not an officer and therefore they should have

15   known I could not order him to appear live.

16             MS. DEVINE:  Sure.  We have a document that is a

17   printout from yesterday from the Massachusetts Secretary of

18   State.

19             And could you please pull that up.  Thank you.

20             That lists the officers and directors of the

21   corporation.  As you can see there are five.

22             In truth, presently there are only three.  So

23   some of these people are not presently officers.  But none

24   of these people is Dr. Mosher.

25             THE COURT:  All right.  Mr. Maddox, why

1   shouldn't I say you should have known this and figured it

2   out long ago?

3                MR. MADDOX:  Because we deposed as a 30(b)(6)

4   witness the Vice President of Product Development.  There

5   was never an indication as we were going back and forth

6   about witnesses they're going to call live and live that he

7   was not an officer.  It is certainly reasonable to go at

8   least and saying he is the vice president.  We shouldn't

9   have to go to corporate records for every witness that they

10  say they're going to bring live and see in the event that

11  they pull a Friday night switch-a-rue that we had the power

12  over the weekend to try to make him come.  That shouldn't

13  be how we should be expected to act.

14               On the subject of being expected to act, we will

15  never know but it is telling I submit that until we told

16  them that listen we're going to do an adverse and we'll do

17  it at the time of our cross, as a courtesy to them and to

18  the witness, then they pulled him.  And said he was no

19  longer available.

20               If -- I'm not sure what else I was supposed to

21  do.  Was I supposed to lay allow, wait until they bring

22  him and by the way say I'm going to need this guy in two

23  days for an adverse direct and listen to people say, well,

24  why didn't you tell us and we could have done this all at

25  once?

1          If we don't get a chance to do our adverse

2    direct, it certainly would affect I think how a lot of

3    people are going to conduct themselves pretrial in terms of

4    the witnesses convenience and civility.

5          THE COURT:  Mr. Maddox, at this point if I lack

6    the authority to order the witness to appear live, help me

7    understand how prejudicial it is to you that you would I

8    guess use the depositions and I presume you would be able to

9    make an argument that I should draw some inferences against

10   the plaintiff based on their failure to present this

11   witness that you built your case to some extent around.  Why

12   is that combination not, you know, adequately remedial,

13   particularly if I lack the authority to do what you are

14   asking me to do?

15          MR. MADDOX:  Okay.  Two things, Your Honor.

16          First of all, if I'm permitted to argue

17   inferences, that's better than not being permitted to argue

18   inferences.

19          But one of the issues in the case is, we say,

20   how obvious this invention was and how non, non-inventive

21   it was.  It was not an innovation.  It was a repackaging --

22          And there is Dr. Mosher whose deposition

23   exhibit, that testimony was very candid and it came out that

24   frankly he had not done liquid solutions before.  And he

25   said some very candid things about what he thought was new.

1  And that's really going to be at the centerpiece of our

2  obviousness case, with or without him.

3          But we think that, you know, as you sit amongst

4  experts arguing about ionization and giving you 70 slides of

5  why they can turn this into a question of physics, that you

6  should see the actual inventor and what someone who is

7  actually looking at the problem, how he operated and we feel

8  that --

9          THE COURT:  Ms. Devine alludes to some case law

10  that may suggest the inventor's testimony is not relevant to

11  obviousness.  Do you have a response to that?

12          MR. HITCH:  I'm not saying it makes it obvious.

13  I'm saying he is the only witness, by the way as compared to

14  the other corporate witness, he is the only witness who had

15  anything to do with the invention.  He is the only person

16  you will hear from who is on the ground.

17          And as a 30(b)(6) witness, his testimony about

18  various aspects of his invention, he is not just an inventor

19  he is the Rule 30(b)(6) witness on conception, reduction to

20  practice, on the contents of the patent, on citizens

21  petition Mr. Alul alluded to and several other topics.

22          It's not just tell me, Mr. Inventor, what do you

23  think?

24          It's Silvergate's position is so-and-so, isn't

25  it?

```
 1                    THE COURT:  Okay.  Mr. Alul, is there anything
 2      you wanted to add?
 3                    MR. ALUL:  No, Your Honor.  I certainly disagree
 4      with the, with Ms. Devine's characterization of the lead-ups
 5      to the events on Friday but I know Your Honor has heard a
 6      lot of arguement on this so I will spare Your Honor any
 7      further argument on this issue.
 8                    THE COURT:  All right.  Ms. Devine, anything
 9      further you want to add?
10                    MS. DEVINE:  Only that we would object to such
11      an inference and at least we permitted to letter brief it.
12                    THE COURT:  You have alluded to something at
13      the company happening that you think it would be unfortunate
14      at least for Dr. Mosher to be taken away from.  Is that
15      something I should understand happened since Friday, close
16      of business?
17                    MS. DEVINE:  Yes.  I believe it happened on
18      Thursday, perhaps Wednesday.  And that was when we -- it's
19      Thursday and I learned of it on Friday.
20                    THE COURT:  All right.  Well, thank you.
21                    MS. DEVINE:  Your Honor, I just want to point
22      out, I apologize, I am on the West Coast.  So when they say
23      close of business, I didn't wait until the evening time.
24      I'm running on a different schedule, and I know that is
25      neither here nor there but just to give you some context for
```

1   when I sent the message.

2           THE COURT:  No, given that we're all seeing each

3   other in virtual space, I have no idea where anybody is or

4   what time it is.  So ...

5           Well, this is an unfortunate dispute to arise

6   this late before trial and now interfering with our start

7   of the substantive part of the trial, but at this point,

8   with certain conditions that I'm going to state and certain

9   rights that I'm going to reserve for the plaintiff, I am

10  granting the defendant's request and I am hereby ordering

11  that Dr. Mosher be produced as a witness at this trial if

12  the defendants continue to want to have him appear live,

13  which I understand they do as of this moment.

14          I believe that I have authority to do this

15  because as I understand it, Dr. Mosher's title is vice

16  president.  He was produced as a 30(b)(6) witness on behalf

17  of the party to give testimony during trial.

18          If I'm wrong about that and I don't have

19  authority, I think I have at least what I would call

20  apparent authority given the way this case was litigated in

21  the very late hours which the plaintiffs first raised an

22  objection and any suggestion that the Court lacked authority

23  to order this witness to be here live.

24          If that one is wrong, I hereby find that the

25  plaintiff has waived the opportunity to press its objection

1    that the Court lacks authority given how this issue arose

2    at the last minute, the highly prejudicial impact to the

3    defendants and all the other arguments that have made this

4    morning.

5             I would further add that as the fact-finder in

6    this case, given what I now understand about Dr. Mosher's

7    likely testimony and role, I'm very interested in hearing

8    his testimony.  And if I don't hear his testimony, I'm

9    certainly going to permit any fair arguments to be made

10   including, you know, drawing -- the request to draw

11   reasonable inferences.

12            When I say adverse inference, I don't mean

13   it like in the context after jury trial where the Court

14   instructs the jury, for instance, they have to or may find

15   some adverse fact.  I mean I'm the fact finder here and I'm

16   telling you based on what I have already heard that I am

17   going to be surprised if Dr. Mosher is not brought here.

18   And I am certainly open to the argument that there is some

19   reason that the plaintiffs don't want me to hear his

20   testimony.  Maybe it has to do with this late arising event

21   at the company, I don't know, but I will certainly, if and

22   when he appears, fully and fairly evaluate his testimony and

23   any arguments that are made from it.

24            All that said, the plaintiff has the right to

25   move to quash.  So if you really think that I don't have

1    the authority that it appears to me I have, you better get a

2    motion in quickly before the time that the defendants want

3    to call the witness live.  And I will certainly entertain

4    that on the hope the defendants will be given enough time

5    and notice that they can write a quick response.  And then

6    if I need to reevaluate this decision based on a fuller

7    record and better understanding of the law, I'll be happy

8    to do that.

9              Any questions about that, Ms. Devine?

10             MS. DEVINE:  No, Your Honor.

11             THE COURT:  Mr. Maddox?

12             MR. MADDOX:  No, Your Honor.

13             THE COURT:  And Mr. Alul?

14             MR. ALUL:  No, Your Honor.

15             THE COURT:  Okay.  I am now increasingly

16   concerned about your agreement on depositions.  I'm very

17   reluctant to wait until Friday to find out how much time

18   you want to use on depositions.  You have a limited amount

19   of time and now we are using much of it on argument this

20   morning.

21             I guess that is where we started.  What, what

22   is the general universe of how much time you might spend on

23   depositions?  What am I agreeing to if I agree that you are

24   going to be able to submit them for me to read after the

25   rest of the trial?

1          MS. DEVINE:  Your Honor, may I speak about it?

2          THE COURT:  Sure.

3          MS. DEVINE:  So as an initial matter, we

4    disagree with Mr. Maddox's statements regarding agreement on

5    deposition.  We began disclosing our deposition designations

6    as required by the pretrial order on Thursday and we have

7    one hour and 50 minutes.

8          That triggered their need to disclose counters

9    to object to exhibits that we are submitting through

10   deposition designations.  And we received, you know, no

11   objections.  So we are of the opinion that our deposition

12   designations are disclosed.  We had intention to play them

13   today or tomorrow.

14         And when Your Honor said to go ahead and submit

15   them, we were going to submit them at the end of the trial.

16         We think that the exhibits that are within

17   there are now going to be admitted.  We haven't received

18   objections.  So our deposition designations are complete.

19         Amneal approached us and said let's push this

20   off.  We said we were open to that.  And we have discussed

21   it.  We're not necessarily objecting to Amneal deciding

22   their deposition designations later but ours are complete.

23         THE COURT: All right.  Mr. Maddox.

24         MR. MADDOX:  May I speak?

25         THE COURT:  Yes, please.  Go ahead.

1              MR. MADDOX:  Whatever the state of their

2     depositions, first of all, it was Ms. Wilson who announced

3     what was an agreement as to how to go forward, so I think

4     Ms. Devine may be a little confused.  But certainly, if

5     there is no longer an agreement, as to how that can be -- I

6     can't quite tell if Mr. Devine was saying, and so we're in

7     trouble or something.

8              But Ms. Wilson?

9              THE COURT:  Ms. Wilson, you started this morning

10    by saying there is an agreement.  Your understanding is

11    there is an agreement on this; right?

12             MS. WILSON:  Your Honor.  Yes, it was my

13    understanding.  Oh, I may have jumped a little bit.

14             It was my understanding that following some

15    initial exchange of deposition designations that the parties

16    agreed to a specific and truncated exchange schedule with

17    the goal of submitting the deposition designations on

18    Friday.

19             THE COURT:  Ms. Devine, does somebody on your

20    side disagree with that?

21             MS. DEVINE:  The way it happened was we

22    disclosed ours.  They proposed this new procedure and we

23    said that's fine but ours are what they are, and, you know,

24    we understand that you are going to object to any exhibits

25    that we're putting in through them now, according to the

1      procedure as we discussed as a compromise.

2              As I said, we're fine with them giving up their

3      disclosures later and modifying the pretrial order in that

4      sense, but what I don't think we agreed to and what I don't

5      want to have happen is for them to come to us on Thursday,

6      give us brand new objections to things we disclosed last

7      week.

8              THE COURT:  All right.  Someone for Amneal.

9              MR. MADDOX:  Your Honor?

10             THE COURT:  Yes, go ahead.

11             MR. MADDOX:  I don't hear her saying we don't

12     have an agreement, but at some level let's get to solving

13     the problem that I think you are concerned about which is

14     six hours of deposition shoved in your desk on a Friday and

15     someone telling you, by the way, there is no court today

16     because we're all out of time.

17             So may I suggest this at least for Amneal?

18             Now that we know there will be an adverse direct

19     of Dr. Mosher, would you give us 24 hours and we will come

20     up with an estimate of the amount of time of designated

21     depositions we expect?

22             THE COURT:  Well, in that, you are going to have

23     to confer with plaintiffs on whether they're going to move

24     to quash, what I ordered with Dr. Mosher they may keep that

25     issue in the air.

1    MR. MADDOX:  It could be subject to your

2    granting a motion to quash but there are just so many ways

3    to deal with this.  We don't want to submit two hours of

4    deposition testimony if it turns out we get the witness.

5    THE COURT:  Right.  Well, what I for sure don't

6    want to do and am not going to do is go over your 14 hours

7    a side, so if it's an hour and 50 minutes of deposition for

8    plaintiff and two hours for defendant, whatever, that is

9    coming out of your 14 hours.

10    MR. MADDOX:  Yes.

11    THE COURT:  So I suppose to some extent I

12    should be less concerned it's you all that are running the

13    risk.

14    MR. MADDOX:  That's correct.

15    THE COURT:  I would like to, I would like to

16    have a good understanding of the factual record before I

17    move on to another case which I hope to do after finishing

18    my week with all of you.  So putting it off to Friday is

19    one thing but putting it off until Friday and having a

20    whole bunch of disagreements and disputes on Friday about

21    what really happened is not an appealing situation to me.

22    So let's say this.  Let's revisit tomorrow

23    morning so that is basically 24 hours, we'll revisit

24    tomorrow morning where we are.  I will hope that you have

25    figured all of this out on depositions and you can give me a

1    concrete answer as to here is how many hours of deposition

2    testimony we proposed for you to take under advisement and

3    read or watch in your own time, subtract it from the

4    14 hours.  And if that, if it's not agreed or it is

5    otherwise no longer appealing to me, then I'll just make

6    you play it over the course of this week and we'll do it

7    the old fashioned way for me.

8              Any questions about that, Mr. Maddox?

9              MR. MADDOX:  Yes.  One question.  I beg your

10   pardon.  It's about time.  I understand the time.  My

11   question is, is our motion this morning or our application

12   this morning, or with respect to Dr. Mosher, does that come

13   out of our time?

14             THE COURT:  It depends on what the pretrial

15   order says.  When I have a chance, I'll take a look.  I

16   don't know if you put in there that we're charging you based

17   on who is arguing or if we are charging on who raised the

18   issue.  So --

19             MR. MADDOX:  Well --

20             THE COURT:  -- someone can look that up.

21             MR. MADDOX:  -- we'll look it up.  And if it

22   does, I would like to argue about that.

23             THE COURT:  Okay.  You will have the opportunity

24   to do that.

25             All right.  I know we still have the sealing

1    issue but was there anything else that Amneal wanted to

2    raise?

3              MR. MADDOX:  Nothing from Amneal, Judge.

4              THE COURT:  All right.  So in terms of sealing,

5    evidently the issue is going to come up possibly as early as

6    openings.  I guess I just want to ask, if, I think you all

7    e-mailed me your slides for the openings.  Is there a way

8    we can do this where we keep things open at least for the

9    openings if I take a short break and go make sure I have

10   those slides in front of me as you're speaking or is that

11   not really doable?

12             Who thinks they need to get into confidential

13   information the public can't see during opening?

14             MR. MADDOX:  Amneal does.

15             THE COURT:  Okay.  I think plaintiffs are

16   raising their hand, too.

17             And you all can't be done effectively by just

18   selecting me to what is on the paper in front of me; right?

19             MR. ALUL:  That's correct, Your Honor.  This is

20   Andy Alul for Bionpharma.

21             We did that at the May 5th hearing last year in

22   connection with defendants' motion for leave to file early

23   dispositive motions.

24             And we were able to successfully do that there,

25   but I just think now, now that we're at trial we're just

1    going to be getting into the heart of the matter right off

2    the bat and that really focuses on the intimate details of

3    our formulation information.  And as we mentioned during the

4    pretrial conference, Your Honor, prosecution of this family

5    of patents is still open.  So ...

6              THE COURT:  Right.  Is there, would all three of

7    you be able to have at least some portion of your opening to

8    the public?  Mr. Alul, yes?

9              MR. ALUL:  It's going to be very little, Your

10   Honor.  It's going my first three or four slides I'm going

11   to discuss, and then I'm going to be jumping right in.

12             THE COURT:  Okay.  For plaintiff?

13             MS. MORGAN:  Good morning, Your Honor.  This is

14   Natalie Morgan.  Hi.

15             THE COURT:  Good morning.

16             MS. MORGAN:  There is a part of mine that could

17   be open to the public.  I just fear that it would be rather

18   disruptive to then stop partway through, seal the courtroom,

19   and then continue.  But if that is your preference, I would

20   be happy to accommodate.

21             THE COURT:  Okay.  That is my preference.  The

22   TRIALanywhere folks I think are pretty good about moving

23   public in and out, and we will not charge the time it takes

24   for that, you know, which is usually a minute or two.

25             MS MORGAN:  Thank you, Your Honor.  Then I will

1    just pause and indicate it at that time.

2                   THE COURT:  Right.  You will need to do that.

3                   Mr. Maddox, anything similar?

4                   MR. MADDOX:  Yes.  I think there is a part of

5    it, the back part of it that I can, that I can do that.

6                   THE COURT: All right.  Yes.  If you all just

7    let me know.

8                   And, Mr. English, you are with us; right?

9                   THE TRIALanywhere HOST:  Yes, Your Honor.

10   You just indicate who should be removed and I will remove

11   them.

12                   THE COURT:  Okay.  I guess should ask you all

13   that.  Is it going to be adequate to remove the public?  I

14   think that if you look on the screen, there should be an

15   indication of the public line.

16                   The burden, I guess what I want to say, is on

17   the parties to tell me if once we remove the public, you see

18   anyone else listed there that you have concerns with.  At

19   that point, it should be court employees and those involved

20   in the trial, but if there is somebody else that you think,

21   you know, you have concerns with, you have to let me know.

22                   To the extent you already know that, let me know

23   that now.

24                   MR. MADDOX:  We do have the -- I saw it earlier

25   that the gentleman, the in-house counsel from plaintiff was

1    the subject of our dispute earlier about disclosure.  If he

2    is part of the public, that would be fine.

3                THE COURT:  Okay.  Ms. Morgan, do you agree

4    that individual would be moved out, when we move the public

5    out?

6                MS. MORGAN:  I believe, to Your Honor's order,

7    yes.  I mean, we maintain we would like him to be present,

8    but pursuant to Your Honor's order, yes.

9                THE COURT:  Right.  And in agreeing to what I

10   have said, you are not giving up your objection, I

11   understand.

12               Okay.  So someone will have to work with

13   Mr. English to make sure that he knows the right person

14   to remove when we say we're removing the public as well.

15               All right.  Any other issues from anyone before

16   we begin with opening statements?

17               MS. MORGAN:  No, Your Honor.

18               MR. ALUL:  No for Bionpharma.

19               THE COURT:  All right.  Then we'll hear from, it

20   appears to be Ms. Morgan.  We'll hear from plaintiffs first.

21   If everyone else could be on mute.  And, Ms. Morgan, we do

22   have the public with us and you will let me know when it is

23   time for me to have them muted.

24               I'll just say for the record, the reason we

25   will be closing court from time to time during the trial

1    is because I am persuaded that confidential business

2    information of the parties is going to be discussed, needs

3    to be discussed in a way to make the record meaningful for

4    me and it would be highly prejudicial to the parties for

5    that information to become public.  A lot of it I think

6    will be competitively sensitive and should not in fairness

7    be disclosed to potential competitors or members of the

8    public or anyone who is not under the protective order in

9    the case.

10                   So with that, Ms. Morgan, you may proceed when

11   you are ready.

12                   MS. MORGAN:   Thank you, Your Honor.

13                   Good morning, Your Honor.  As I said before,

14   I'm Natalie Morgan for the plaintiff, Silvergate

15   Pharmaceuticals.

16                   I'd like to begin by telling you a bit about the

17   history of Silvergate that is relevant to the issues to be

18   decided.

19                   Silvergate was a small company formed in 2010

20   upon the idea that the drug substances that are available to

21   treat the serious diseases that afflict adults should be but

22   are not readily available in a form that is suitable for

23   children.

24                   Silvergate recently merged with alike minded

25   company focused on providing pharmaceutical options for the

1    elderly.

2              Together, they have formed Azurity.  One of

3    those drugs Silvergate brought to market, enalapril is what

4    we're here today.  The earliest dosage form of enalapril

5    approved by the FDA was called Vasotec.  It is an ACE

6    inhibitor, which stands for angiotensin converting enzyme

7    inhibitor.  And it is used to treat very serious diseases

8    including systemic high blood pressure and congestive heart

9    failure that are potentially fatal or risk factors for other

10   potentially fatal diseases.

11             Vasotec, however, was only available as a tablet.

12             Now, as you will hear, Your Honor, from a

13   practicing physician and professor of pediatrics, Dr. Mahan,

14   children including infants frequently suffer from these

15   diseases and they can benefit from treatment with enalapril

16   but they can't take pills or they don't know how to take

17   them.

18             Thus, what did doctors and patients do when only

19   enalapril tablets were able to treat these serious diseases?

20   Well, they would go to a compounding pharmacy.  A

21   compounding pharmacy takes a tablet, crushes it, typically

22   using a mortar and pestle, and then they take the resulting

23   powder from crushing the tablet, and they combine it with a

24   liquid that can then be administered to the ailing child.

25             Now, you may ask, what is wrong with that?

1          Well, you will hear from Dr. Mahan and

2    Dr. Graham Buckton, a scientist with decades of experience

3    in pharmaceutical formulation, that there were several

4    problems.

5          The process of compounding could introduce

6    contaminants in resulting compounded liquid.  The tablet

7    form was not designed to protect the stability of the active

8    ingredient from degradation once it was crushed and combined

9    with the liquid resulting in potentially less effective

10   dosing.

11         And if you have ever tried to crush a pill in

12   a mortar and pestle, you know very well that the result is

13   different-sized particles that may or may not completely or

14   evenly dissolve in the liquid resulting in inconsistent

15   doses from the compounded form over time.

16         Think for a moment about the worse case

17   scenario.  This is used in a one-month old babies with heart

18   disease, so any risk of overdose is simply unacceptable.

19         And because there are many ingredients in a

20   tablet, and often many ingredients in the liquid that is

21   crushed -- that crushed tablets is dissolved in, the

22   substance administered to the patient contain many, many --

23   that may interact leading to instability, degradation, and

24   other issues.

25         Now, the Court will hear the testimony of

1    Mr. Michael Beckloff, one of the founders of Silvergate.

2              As Mr. Beckloff will explain, he and his

3    cofounders, all of whom have decades of experience in

4    pharmacy and drug development, they recognize that an

5    improved liquid formulation of enalapril for the treatment

6    of sick children was necessary.  So after significant

7    work and investment, including a partnership in oversea

8    laboratory, in 2013, Silvergate received FDA approval for

9    Epaned Kit.  That was 28 years after the FDA approved

10   Vasotec, the salt tablet.

11             The kit was easier to use and safer than the

12   previous crushed tablet option.

13             It was just distributed, as the name indicates,

14   a kit with two bottles as you see here.  One bottle

15   contained dry powder.  It was enalapril and excipients.  The

16   other contained sweetened liquid.

17             As you will hear, the kit was designed to be

18   mixed together in a multistep specific process by the

19   pharmacy delivering the prescription to the patient.

20             In the hospital, this would occur in the

21   hospital pharmacy and be delivered to the hospitalized

22   patient.  Outside the hospital, this would occur at like

23   a retail pharmacy, shortly before the caregiver or the

24   patient received the medication.

25             As you will hear from Mr. Beckloff and

1    Dr. Buckton, it was important that the kit be mixed shortly

2    before dispensing to the patients because once the enalapril

3    was placed in the liquid, the stability and thus the

4    efficacy of the product is very limited.

5            Moreover, you will hear from several of our

6    witnesses in addition to the limited stability, there were

7    drawbacks of the Epaned Kit.  Pharmacists still had to mix

8    the powder and the liquid in the very specific FDA approved

9    manner which carried with it the risk of pharmacist error,

10   such as an improperly mixed liquid which could overdose or

11   underdose the patient, the introduction of contamination,

12   poor inconsistent mixing.

13           Improperly constituted liquids are a particular

14   concern with enalapril because it was has a very narrow

15   therapeutic range.

16           As you will hear from Dr. Mahan, this means

17   that the dose delivered to the patient must be precise.  Too

18   little, and there is no therapeutic efficacy.  Too much, and

19   there can be catastrophic results.

20           In addition, the short life -- shelf life of the

21   kit meant that patients had to revisit the pharmacist often

22   to get a new prescription.

23           And it couldn't be delivered premixed to the

24   pharmacy.  The kit still had multiple excipients that were

25   necessary to create a powder and liquid for reconstitution

1    to a liquid form.

2              Thus, while Silvergate was proud of what it

3    accomplished with the Epaned Kit, it sought to make a better

4    kit.

5              As will you hear from Mr. Beckloff, Silvergate's

6    first attempt to develop a kit did not require the second

7    bottle of sweetened diluent but rather can be distributed by

8    a single bottle of powder to which the pharmacist could

9    simply add water and then dispense this as a liquid.

10             And this was an improvement over the existing

11   kit.

12             Now, while -- pardon.  While work towards this

13   "just add water" product was ongoing, Silvergate learned

14   from the FDA that the FDA felt a ready-to-use liquid would

15   be far safer than any kit.

16             Based on that understanding, Silvergate

17   abandoned its work on its "just add water," and, instead,

18   began working on a ready-to-use product that was stable

19   enough to be manufactured as and distributed as a liquid.

20             After significant work, the result was the

21   Epaned Ready To Use product that received NDA approval in

22   September of 2016.

23             For context, that was 31 years after FDA

24   approval of the Vasotec solid tablets.

25             That ready-to-use product is subject to these

1    litigations.  It's covered by several patents, four of which

2    are at issue in this trial.

3              Defendants Bionpharma and Amneal are each

4    seeking to bring a generic version to market many years

5    before the 2036 expiration of those patents.

6              Epaned, which is the ready-to-use formulation,

7    is a significant improvement over every enalapril liquid

8    dosage option that came before.  It's manufactured and

9    distributed as a single bottle containing a liquid that

10   needs no mixing, no shaking, or other manipulation by the

11   pharmacist or anyone else.

12             As the ready-to-use description implies, it's

13   ready for the patient to use from the time Silvergate

14   delivers the bottle -- delivers the bottled drug to the

15   pharmacy.

16             In addition, Epaned has a 36-month shelf life as

17   opposed to the only 60 days that the kit was good for after

18   constitution.

19             As you will hear from Mr. Beckloff and our

20   expert economist Dr. Jesse David, Silvergate's ready-to-use

21   formulation has not only been successful sales-wise and more

22   successful than the kit, it's actually surfaced the kit

23   sales and in total revenues.

24             And the market demand for the ready-to-use was

25   so great that it supported a higher price as well.  Thus,

1   not only did more patients than ever before use Epaned, they

2   were willing to pay more to do so.

3              At this time, Your Honor, the courtroom needs to

4   be sealed pursuant to your orders.

5              THE COURT:  Okay.  We'll stop the clock for the

6   moment.  And, Mr. English, let us know when you have

7   escorted the public out and the other individual -- are we

8   ready to exclude the individual as well, Ms. Morgan?

9              Ms. Morgan, I think we -- the individual

10  representative or individual associated with the plaintiffs

11  needs to leave now too; right?  Consistent with my order?

12             MS. MORGAN:  Consistent with your order, yes,

13  Your Honor.

14             THE COURT:  Mr. English, do you know who that

15  is?

16             THE TRIALanywhere HOST:  Is that Mr. George?

17             MS. MORGAN:  Yes.

18             THE TRIALanywhere HOST:  Okay.

19             (Following portion ordered sealed by the Court,

20  bound separately.)

21             THE TRIALanywhere HOST:  They have all rejoined.

22             THE COURT:  Thank you very much.

23             Ms. Morgan.

24             MS. MORGAN:  Thank you, Your Honor.

25             As I said, turning now to invalidity.

1          Only Amneal has raised any invalidity defense.

2    Bionpharma has none.

3          And Amneal has not asserted anticipation.  Only

4    obviousness.

5          As I'm sure Your Honor knows, obviousness

6    tests has been set out by the Supreme Court, and there are

7    just a few points to keep in mind as you consider Amneal's

8    obviousness case.

9          First, Amneal has to prove its obviousness

10   defense by clear and convincing evidence.

11         That is a higher burden than the preponderance

12   of the evidence standard for infringement.

13         Second, the question of obviousness must be

14   viewed in light of all the teachings in the prior art.  Not

15   just a few cherry-picked references that Amneal's expert

16   prefer to highlight.

17         Third, real-world evidence, called objective

18   indicia of nonobviousness or secondary considerations, are

19   required to be considered and have been referred to as --

20   referred to often as the most cogent evidence of

21   nonobviousness of an invention.

22         I referred to some of that earlier, to the

23   sales and pricing that patients are willing to pay.

24         Fourth, hindsight must be avoided.  The Supreme

25   Court and Federal Circuit have repeatedly said that using

1    hindsight for ex-post reasoning is inappropriate when

2    considering obviousness.  That means you cannot take the

3    invention as a blueprint and go back and piece together the

4    prior art to make the invention.

5         Because the obviousness analysis must be

6    performed from the viewpoint of a person of ordinary skill

7    in the art at the time the invention was made, you can

8    consider the prior art existed at the time, but the person

9    of ordinary skill in the art is not aware of the invention.

10        So what does Amneal combine to claim that the

11   invention was obviousness -- was obvious?

12        You will hear from Amneal's experts that they

13   have to piece together four and five references in order to

14   cover all of the elements of the asserted claims.

15        Their combinations are shown here on the screen.

16        Silvergate's position is that this fails for a

17   number of reasons.  And I just want to preview just a few.

18        The first fatal flaw in Amneal's obviousness

19   case is a lack of motivation to combine.

20        This is an absolute requirement under the law.

21   There must be something in the prior art that motivates a

22   person of ordinary skill in the art to combine the known

23   elements in the manner claimed to make the invention.

24        Listen carefully to the evidence, and whether

25   the art known at the time of the invention on the whole

1   suggests combining the sources Amneal has identified or

2   suggests something different.

3           Does what was known in the art actually

4   discourage a person of ordinary skill in the art away

5   from trying to make a liquid formulation?  Does the prior

6   art suggest that attempting to make a liquid formulation

7   is unlikely to be productive to achieve the necessary

8   24-month stability?

9           You will hear that the prior art Amneal was

10  trying to piece together just doesn't fit.

11          You will hear that rather than the presence of

12  kit reconstitution providing motivation or impetus to create

13  a ready-to-use formulation, the presence of a kit on the

14  market was an indication that a ready-to-use formulation

15  simply was not viable.

16          You will hear that there is a preference for

17  creating a ready-to-use formulation over compounding or

18  reconstituted formulation but that is if you can create a

19  ready-to-use.

20          And that is because the shelf life and stability

21  requirements for a ready-to-use are much longer.  There is

22  simply no motivation to revisit the known instability of

23  enalapril in solution and the other formulation hurdles

24  involved once a reconstituted kit was successfully on the

25  market as here.

1          The pieces just don't fit.

2          Now, another problem that Amneal has is it used

3   impermissible hindsight in piecing the four and five

4   references together.

5          So even if Amneal can push all the pieces

6   together to show you that they can identify each element of

7   the claimed invention among the pieces, ask yourself, did

8   Amneal actually identify anybody proposing that same course

9   of action at the time of the invention?

10          Did anyone follow that course of action at the

11   time of the invention?

12          Are there reasons being offered to put these

13   pieces together being laid out for the first time anywhere

14   by Amneal's experts because that can't be found anywhere in

15   the prior art?

16          And is Amneal and its experts proposing a

17   particular course of action because they are using the

18   invention as a map?

19          Well, all of that is hindsight, and that is

20   improper.

21          And if you hear that a person of ordinary skill

22   in the art would have expected to do something different

23   than what we can see was actually done in the prior art, ask

24   why?  Because that, too, is improper hindsight.

25          Another problem Amneal has is the

1   unpredictability in this art.

2               A lack of reasonable expectation of success.

3               In other words, could a person of ordinary skill

4   in the art predict the ingredients needed to achieve a

5   liquid from enalapril -- a liquid form of enalapril that

6   would be stable for the required 24-month shelf life?

7               The answer is no.

8               And why?  You will hear that because the prior

9   art had multiple times the number of excipients in its

10  tablet and reconstituted formulations.

11              You will see this in the course of the evidence,

12  and it's from the prosecution history.

13              Excipients are everything other than the active

14  ingredient in enalapril.

15              Listen carefully.

16              Does Amneal's expert identify in the prior art

17  any direction of which of these excipients to pick, to

18  arrive at stable liquid formulations?

19              Or does Amneal's expert choose an excipient from

20  the first column and the second column without any real

21  explanation or identified direction from the prior art to

22  arrive at the invention?

23              Are we all hearing those selections for the

24  first time in the course of this trial, and are we hearing

25  them because Amneal and its experts were taught the claimed

1     invention by Silvergate?

2           Amneal also has a problem that its obviousness

3     theory is not meaningful different from what the Examiner

4     already considered in prosecution.  And because we're

5     litigating the issued patents, we know that they are

6     presumed valid over that art.

7           For example, you will hear from Dr. Buckton that

8     the Epaned Kit, which was the reconstituted formulation you

9     heard about earlier, was already considered by the Examiner,

10    and the ready-to-use formulation was found patentable and

11    nonobviousness -- nonobvious over that.

12          So Amneal has that hurdle as well.

13          Now, I must go back to one last invalidity

14    argument that Amneal raises.

15          Amneal asserts that because the stability

16    limitation highlighted here in yellow says at least

17    12 months, that these claims are not enabled or properly

18    described because a person of ordinary skill in the art

19    would not know how to make a formulation that has to be

20    stable for an infinite period, from 12 months to infinity,

21    according to Amneal.

22          Again, you will hear from Dr. Buckton that

23    this doesn't make any sense from the viewpoint of a person

24    of ordinary skill in the art in the context the invention.

25          The proper question is, is there an apparent,

1    albeit not precisely known, upper limit?

2              Dr. Buckton will explain that in the art of

3    pharmaceutical formulation, and particularly with respect

4    to enalapril formulations, there is absolutely such an

5    inherent limit.

6              No person of ordinary skill in the art would

7    think you could make an enalapril formulation indefinitely

8    stable.

9              As you will hear from Mr. Beckloff, Silvergate

10   continues to strive to better the options for pediatric

11   treatments, and has now merged to become Azurity, serving

12   both children and the elderly in its continuing commitment

13   to fill their unmet medication.

14             Silvergate is proud of its Epaned Ready To Use

15   formulation, and its effort to create a superior product for

16   which the market -- for the market, which is why we're here

17   to defend Silvergate's patents.

18             Thank you, Your Honor.

19             THE COURT:  Thank you.  Thank you very much.

20             All right.  We're hear from defendants.

21             (Pause.)

22             MR. ALUL:  Good morning, Judge.  Andy Alul for

23   Bionpharma.  I'm just waiting on my slide deck to pop up.

24             THE COURT:  That's fine.  And keep in mind, we

25   are in open court at this point.

```
 1              MR. ALUL:  Thank you, Your Honor.  And so I'm
 2    going to go a little bit slower than I normally was going
 3    to go, just because I'm going to be weaving in and out of
 4    confidential information.  I'm going to try to respond to
 5    Your Honor's directive to try to make sure that we leave
 6    unsealed those portions that don't implicate Bionpharma's
 7    confidential information.
 8              So I'll probably take a few more minutes than I
 9    had budgeted, but I will definitely make it happen.
10              THE COURT:  Okay.  Thank you.
11              MR. ALUL:  And, Your Honor, just for the sake of
12    brevity and getting past some initial confidential
13    information, I'm going to jump to Slide 1016 in my deck.
14              THE COURT:  Okay.
15              MR. ALUL:  And I'm trying -- no.
16              Alex?
17              THE COURT:  Maybe you want to unshare the screen
18    somehow while you get there.
19              MR. ALUL:  Yes.
20              IT OPERATOR:  I'm here, Mr. Alul.  Yes?
21              MR. ALUL:  Okay.  I'm not able to, I'm not able
22    to really navigate the slides, and I'm not able to jump to
23    Slide 1016.
24              There was I think -- okay.
25              All right.  We'll see if this works.
```

1          Okay, Your Honor.  My first few slides, Your

2     Honor, are just background slides, and I think the Court

3     already has some background.  So just to get to the heart of

4     the matter, I'm going to jump to Slide 1016.

5          Six ways from Sunday, Your Honor.  It's an

6     expression people use to convey that something has been done

7     or changed extensively, thoroughly in every way imaginable.

8     And we respectfully submit, Your Honor, that it is a very

9     accurate characterization of just how much Bionpharma has

10    designed around Silvergate's patents in this case.

11         Because, Your Honor, there are no less than --

12         THE COURT:  This is the part you don't want the

13    public to see; right?

14         MR. ALUL:  No, no.  This is -- this is okay.

15    This is just listing the limitations.  This just lists the

16    limitations.  Yes.

17         THE COURT:  You go right ahead.

18         MR. ALUL:  So there are six different reasons we

19    don't infringe Silvergate's claims.

20         And I will note this, Your Honor.  In its

21    opening, Silvergate pitched this -- or characterizes

22    Bionpharma's noninfringement as simply just a matter of two

23    limitations.  That is actually not true because there are

24    six different reasons we don't infringe their claims.  There

25    are six elements our product don't meet.

1            First of all, Your Honor, all of the claims call

2    for a buffer that comprises two different qualitative

3    elements:   Citric acid and sodium citrate.

4            Bionpharma omitted those compounds from its

5    ANDA product in its entirety.   So we don't meet the citric

6    acid element of what the parties refer to as the buffer

7    limitation, and we don't meet the sodium citrate element of

8    the buffer limitation.

9            We also necessarily, Your Honor, don't meet the

10   quantitative elements of these formulations.   These are

11   concentrations ranges.

12           So not only are citric acid and sodium citrate

13   required to be present in the accused product, they're

14   required to be present at specific concentrations that

15   Silvergate claims.

16           And so because we don't have either compound, we

17   certainly can't meet the quantitative elements.

18           So there are four different reasons right there.

19           The next, Your Honor, all of the claims require

20   a preservative that is sodium benzoate, and it's also

21   required in a specific concentration.

22           We don't use sodium benzoate.   We don't have it.

23   There is no dispute there.   And we certainly can't meet the

24   quantitative element of the preservative limitation as well.

25           So we have six different reasons why we don't

1    infringe.

2              And as a matter of fact, Your Honor, last summer

3    Silvergate conceded no literal infringement, and there is a

4    stipulation on file to that -- on that point.

5              At this point, Your Honor, I'm going to need to

6    seal the courtroom.

7              THE COURT:  Okay.  We'll wait for Mr. English to

8    do that for us, please.

9              And that includes Mr. George; correct, as well,

10   Mr. Alul?

11             MR. ALUL:  Yes.  Yes, Your Honor.

12             (Following portion ordered sealed by the Court,

13   bound separately.)

14             THE TRIALanywhere HOST:  Everyone has rejoined

15   the court.

16             THE COURT:  Thank you.

17             MR. ALUL:  May I proceed, Your Honor?

18             THE COURT:  Yes.

19             MR. ALUL:  So, Your Honor, next up is our

20   second legal defense, which is amendment-based estoppel.

21             And here, this sort of ties in with the

22   discussion I had a few minutes ago about the prior art being

23   very populated with enalapril liquid formulations.

24             And you can see here, what we have here on this

25   slide, is the original claim 1 that was filed with the '603

1    application, which is the application that issued into the

2    first of the Epaned patents, the '008 patent.  And all the

3    patents-in-suit claim priority to the '603 application.  And

4    this is original claim 1 that was submitted with the

5    original application.

6              As you can see out of the gate, Silvergate knew

7    it wasn't going to be able to secure broad claim.  That is

8    why it filed for relatively narrow claims.

9              I mean, we see here as claim 1 is, you know, an

10   oral liquid formulation comprising specific ingredients at

11   specific concentrations.

12             So what happened during prosecution, Your

13   Honor?

14             Our expert, Dr. Chris Morton, is going to walk

15   the Court through the prosecution, explain that on September

16   2016 there was an Office Action issue where the -- all of

17   the claims, all 20 of the application claims, were rejected

18   as obvious.

19             And shortly after that, it was in January 2017,

20   yet a second Office Action came down, and the same

21   obviousness rejection was leveled our expert is going to

22   explain.

23             In addition, the Examiner rejected the claims

24   as indefiniteness -- as indefinite because of the term

25   "stable".  The Examiner felt that the term "stable" in the

1    claims was not defined and, therefore, it rendered the

2    claims ambiguous.

3               What did Silvergate do in response?

4               Your Honor, our expert is going to explain,

5    Silvergate essentially did -- it did four things.

6               First thing it did is -- and it may by hard to

7    see in this underlined language at the bottom, Your Honor,

8    but what it did was it, to address the Examiner's

9    indefiniteness rejection, it defined stable.

10              And that is this, this underlined "wherein"

11   language in this slide.

12              That was to address, again, the '112

13   indefiniteness rejection.

14              With respect to obviousness, Your Honor, what

15   Silvergate did was it amended the buffer limitations of

16   independent claims 1 and 12 to require sodium citrate at a

17   specific concentration.

18              Now, there were three independent claims, 1, 12,

19   and 20.  20 was the narrower independent claim.  The buffer

20   limitation of that claim, the evidence will show, Your

21   Honor, already required sodium citrate dihydrate and citric

22   acid.

23              So in effect what Silvergate did was it lifted a

24   limitation from a narrower claim and added it to the broader

25   claims.

```
 1                And under Federal Circuit case law, Your Honor,

 2     it's the Deering Precision vs. Vector case, that's 347 F.3d,

 3     1326, that is a narrowing amendment for all of the

 4     application claims.

 5                And next, Your Honor, our expert is going to

 6     explain -- our expert is going to walk the Court through

 7     that February 2017 amendment in response to the Office

 8     Actions and point out to the Court that Silvergate did two

 9     additional things.

10                No. 1.  We concede, Your Honor, Silvergate did

11     try to distinguish its claims from the prior art based on

12     stability.

13                Bionpharma doesn't dispute that.  Our expert

14     Dr. Chris Morton isn't going to dispute that.

15                What Bionpharma did in addition to that, though,

16     separate and independent from that, as our expert is going

17     to explain and as some of the highlighted passages in my

18     next few slides show, it independently -- it distinguished

19     the claims from the prior art based on the specific

20     components and concentrations in the claimed elements.

21                And here we have a passage that shows where

22     Silvergate argued that there was no reason to single out the

23     specific components at the requisite concentrations.  That

24     is one way to distinguish the prior art.

25                Next, Your Honor, this is a slide that
```

1   Ms. Morgan talked about during her opening statement.

2         This was an excerpt in the amendment response.

3   It's table where Silvergate provides in the first two

4   columns the components of the prior art liquid formations of

5   enalapril, and then compares it with the components of the

6   claimed formulation.

7         And then in a paragraph right below it,

8   Silvergate argues:  "In contrast to the prior art

9   formulations, the formulation of the present claims has

10   only four ingredients along with enalapril and water."

11         And our expert is going to explain, Your Honor,

12   that this isn't just distinguishing the claims from the

13   prior art based on the specific components, which included,

14   Your Honor, sodium citrate, it goes beyond that.  Our expert

15   is going to explain that a reasonable competitor would

16   interpret this as a disclaimer.

17         Ms. Morgan said there was nothing in the

18   prosecution history saying our invention did this, did this.

19   The prior art -- our invention is not this.  This is the

20   language Ms. Morgan is looking for.

21         "In contrast ... the formulations of the present

22   claims has only four ingredients along with enalapril and

23   water."

24         And so our position is any accused products that

25   don't contain the specific four ingredients recited in the

1   claims -- and actually one of those ingredients, Your Honor,

2   sucralose, came out of the independent claims at the request

3   of the Examiner, it's in the dependent claims, but any

4   formulations that don't contain those three or four

5   ingredients plus enalapril and water, Your Honor, have been

6   disclaimed.

7           So that's our, that's our argument-based

8   estoppel defense right there.

9           Next slide, Your Honor, is just an additional

10   passage in that amendment which shows where Silvergate

11   argued "The prior art does not provide any expectation that

12   any particular combination would be successful for stable

13   enalapril oral liquid formulation, much less any expectation

14   that the combination of enalapril, citric acid, sodium

15   citrate" -- so there is Silvergate calling out sodium

16   citrate and citric acid and all the components to

17   distinguish the claims from the prior art based on the

18   composition of the formulation claims.

19           And so, Your Honor, I'm sorry, but I'm getting

20   to the point right now where I need to seal the courtroom.

21           THE COURT:  Okay.  Mr. English, if you could do

22   that for us, please.

23           (Following portion ordered sealed by the Court,

24   bound separately.)

25

1              THE TRIALanywhere HOST:  The court is open,

2    everyone has rejoined.

3              THE COURT:  Thank you.  So Mr. Alul has

4    concluded Bionpharma's opening statement, and before we hear

5    from Amneal, we're going take a short break.  We'll try to

6    keep it to around 10 minutes, 15 at the most.  So we'll be

7    in a recess.

8              Thank you.

9              (Brief recess taken.)

10             *      *      *

11             (Proceedings reconvened after recess.)

12             THE COURT:  Okay.  Are we ready to go?

13             THE TRIALanywhere HOST:  Yes.

14             THE COURT:  Okay.

15             THE TRIALanywhere HOST:  Yes, Your Honor.

16             THE COURT:  Okay.  We'll hear from Amneal,

17   please.

18             MR. MADDOX:  Your Honor, I've kind of moved some

19   things around so that the first part of my opening is going

20   to need to be sealed.  But I will get to a point, and then

21   from there on out, we'll be open.

22             THE COURT:  Okay.

23             MR. MADDOX:  So we can seal the Court for the

24   present.

25             THE COURT:  All right.  Thank you for doing

1      that.

2              Mr. English, please tell us once you have moved

3      the appropriate people out.

4              (Following portion ordered sealed by the Court,

5      bound separately.)

6              THE COURT:  Thank you.  You may proceed.

7              MR. MADDOX:  Now, with respect to obviousness,

8      it's important to keep in mind here we are not dealing with

9      rocket science.  We are dealing with the de Vogue standard

10     chemistry of making solutions.  This is not a cutting edge

11     of any kind of innovation.  It hasn't been since decades

12     ago, if not a century ago.

13             There is almost nothing new under the sun here.

14             And we begin with what Silvergate, through its

15     30(b)(6) witness, Dr. Mosher, testified were the two

16     inventive aspects or discoveries within the claimed

17     formulation we just looked at.

18             First, we said he was -- he believes he was the

19     first to discover that enalapril in solution is most stable

20     at a pH of approximately 3.

21             Second, he said he thought it was inventive of

22     him to have calculated the amount of citric acid and

23     sodium citrate to be used in the citrate buffer; which he

24     acknowledges was well known, citrate buffers; that would

25     maintain the pH at 3.

1          Now, neither is correct, or at least meaningful

2     within the framework of the patent laws.

3          There were multiple publications in the prior

4     art about the most stable solutions of enalapril being pH

5     of approximately 3.

6          It's true.  Maybe Dr. Mosher thought he was

7     the first one to discover it.  Maybe he didn't read the

8     literature.  But the fact is it had been out there in the

9     prior art for some time.

10          In terms of calculating the amounts of citric

11     acid and sodium citrate needed for a citrate buffer to

12     maintain pH of 3, that -- even in high school science.  It

13     was a simple, routine process commonly known and executed by

14     lab techs.

15          And we'll see this notebook Dr. Mosher's

16     notebook, you'll see the two-page entry where he performed

17     this routine procedure to get the 1.82 and .16, and there

18     was nothing inventive about this.

19          We should note that Dr. Mosher until this time

20     had never worked on an oral liquid dosage form.  This was

21     his first time in a new subfield.  And maybe he, maybe he

22     thinks it's new to him.  We're not questioning his

23     integrity.  We're simply saying he is mistaken about these

24     two.

25          So when you take that out, you say, well, what

1    is left to be new about this invention?

2              And there are hardly anything left.  The two

3    things left are the preservative, in this case the sodium

4    benzoate, and the second thing would be the -- I guess the

5    unexpected stability results.

6              So let me turn first to the preservative.

7              Now, when you begin with the public being known

8    maximum stability of enalapril at a pH of 3, it would be

9    obvious to a person of ordinary skill in the art, and it

10   is, indeed, obvious, as Dr. Mosher testified, that -- and

11   reflected in the documents of Silvergate -- that the

12   potassium sorbate preservatives of the Epaned Kit would

13   be unsuitable, and the parabens in the kit would be

14   unsuitable.

15             The parabens were known not to be effective

16   at this pH of 3, and potassium sorbate had a degradation

17   problem.

18             And so a POSA who began with the kit and looked

19   at these and tried, tried them, and would see the same

20   problem.

21             Now, at this point you will hear from

22   Silvergate how sodium benzoate would have been impossible

23   for a person of ordinary skill to arrive at in light of

24   the dozens or hundreds of theoretical other possibilities

25   for substances that could or perhaps could be used as a

1    preservative.

2          It might tell you something, however, that for

3    Dr. Mosher in his first time around at this, he did not

4    consider or screen or test any other preservatives.  He

5    simply went with the obvious choice.

6          There was no consideration or evaluation of

7    hundreds or even a handful of candidates.  He had to get

8    the job done, as a POSA would.  Even as a newcomer to oral

9    liquid formulation, Dr. Mosher knew that there was nothing

10   exotic or inventive about choosing a preservative.  He did

11   what every POSA would do.  He chose one of the most

12   well-known, safest choices:  sodium benzoate.

13         But even if a POSA would have decided for some

14   reason to start by looking at the universe of substances

15   that might be useful as preservatives, the evidence will

16   show that at the target pH, that quickly would have narrowed

17   down to a small handful, which could have been evaluated by

18   a lab tech's routine testing.

19         The unexpected stability.

20         This is the part of that response, and the

21   lawyers for Silvergate with the Patent Office, claimed that

22   it unexpectedly, the combination of it, led to unexpectedly

23   longer stability.

24         The problem is that was not the truth.  It was

25   absolutely expected.  And Dr. Mosher knew it.  That is

1    where in his declaration he didn't say it was unexpected.

2    Only the lawyers said that he said that it was unexpected.

3              It was absolutely expected.  It was why

4    Dr. Mosher adjusted the buffer so that the pH would be 3.

5    He says he discovered it, it was known, it didn't really

6    much matter.

7              Dr. Mosher knew that by going for the most

8    stable pH, you would improve the stability of the enalapril

9    solution.  That was the whole point of it.  To have longer

10   stability that everyone knew you would need for a

11   ready-to-use product.

12             Finally, we do hear Silvergate's suggestion from

13   time to time that the inventions must not have been obvious

14   because no one introduced ready-to-use enalapril solution

15   before Silvergate did the Epaned Kit.

16             That argument, however, runs into the reality,

17   you'll hear that from our experts, that in a relatively

18   small market, only Silvergate was in a position to pull

19   out the Epaned Kit as an alternative at the same time it

20   launched a ready-to-use solution.

21             Everyone else had to consider what that small

22   market would look like with the Epaned Kit in it and their

23   potential ready-to-use product.  Only Silvergate had the

24   economic luxury and power to take the Epaned Kit out of

25   the analysis.  And no, it is not surprising that's what it

1    did.

2           But it is not an indication of people -- excuse

3    me, of it being nonobvious.  It's an indication of market

4    power and the size of the market and the types of

5    investments needed.

6           In the end, going from a kit with Epaned powder

7    and water to selling Epaned powder in water in one jar did

8    not require any innovation.  It really only required the

9    ability to withdraw the kit from the market.

10          As to the ready-to-use solution, the need for

11   long stability was well known, the maximal stability pH of

12   enalapril in solution was well known, and everything else

13   follows from there to a person of ordinary skill in the

14   art.

15          At bottom, what we're looking at here is

16   repackaging, not scientific invention.  And certainly not

17   the universal claim that Silvergate's experts are trying to

18   turn this into through their Doctrine of Equivalents.

19          Thank you.

20          THE COURT:  Thank you very much.

21          We'll now turn to the plaintiffs to call their

22   first witness.

23          MS. MORGAN:  Thank you, Your Honor.

24   Silvergate's first witness will be Michael Beckloff.

25          THE COURT:  Okay.

Beckloff - direct

```
1              MS. MORGAN:  Good morning.  Can everyone hear me

2     okay.

3              THE COURT:  Yes.  Is Mr. Beckloff there?

4              Ah, I see him.

5              THE WITNESS:  Yes, I'm here.

6              THE COURT:  We need to administer an oath.

7              MS. MORGAN:  Mr. Beckloff, would you please

8     introduce yourself?

9              THE WITNESS:  I'm Michael Beckloff.  I'm the

10    Chief Development Officer for Azurity Pharmaceuticals.

11             THE COURT:  Okay.  Good morning, Mr. Beckloff.

12    We need to administer an oath this morning.

13             Mr. Looby, go ahead.

14             ... MICHAEL BECKLOFF, having been first duly

15    affirmed, was examined and testified as follows ...

16             THE COURT:  Thank you, Mr. Looby.

17             Thanks again, Mr. Beckloff, for being here.

18             And, Ms. Morgan, you can now proceed.

19             MS. MORGAN:  Thank you.

20                       DIRECT EXAMINATION

21    BY MS. MORGAN:

22    Q.    Mr. Beckloff, are you currently employed?

23    A.    I am.

24    Q.    And by whom?

25    A.    Azurity Pharmaceuticals.
```

Beckloff - direct

1    Q.      What is your position?

2    A.      I'm the chief development officer for Azurity.

3    Q.      And what do you do as the chief development officer?

4    A.      I'm in charge of our R&D, our regulatory, and our

5    medical affairs groups.

6    Q.      How long have you been with Azurity?

7    A.      Since we were acquired in May of 2019.

8    Q.      Where did you work prior to Azurity?

9    A.      Silvergate Pharmaceuticals.

10   Q.      And can you just briefly explain the relationship

11   between Azurity and Silvergate?

12   A.      Silvergate was acquired by CutisPharma, and then the

13   merged companies were renamed as Azurity Pharmaceuticals.

14   Q.      So, Mr. Beckloff, I understand that you prepared some

15   slides today to assist with your testimony?

16   A.      I have.

17   Q.      Is that what is showing?

18   A.      It's the title slide that is showing, yes.

19   Q.      Thank you.

20           MS. MORGAN:   Let's go -- next slide, please.

21   BY MS. MORGAN:

22   Q.      So looking at PDX-101, can you please explain what

23   this slide is showing?

24   A.      This is just my background, education, and my work

25   experience.

1  Q.      And can you please describe your educational

2  background?

3  A.      I have a couple of degrees from the University of

4  Kansas with a focus in the biological sciences.

5  Q.      And can you please describe your work history prior

6  to joining Azurity?

7  A.      In 1976, I started working in our consulting

8  company, Beckloff Associates, where we had a couple hundred

9  of clients across, across the globe, all focused in drug

10  developments.

11          I sold that company to Cardinal Health in 2004

12  where we continued to grow the business and focus on drug

13  development consulting for Cardinal Health.

14          And then in 2010, I cofounded Silvergate

15  Pharmaceuticals, and I was the chief development officer

16  with Silvergate.

17          And then as I said, in 2019, I became the

18  chief development officer for Azurity Pharmaceuticals.

19  Q.      How many years in total have you worked in the

20  pharmaceutical industry?

21  A.      About 40.  My first job in the industry, I was 17.

22          MS. MORGAN:  Let's go to the next slide.

23  BY MS. MORGAN:

24  Q.      Looking at PDX-102.  When was Silvergate founded?

25  A.      Silvergate was founded in 2010.

Beckloff - direct

```
 1    Q.      And can you please describe how Silvergate came
 2    about?
 3    A.      Well, with my involvement in Beckloff Associates and
 4    Cardinal Health consulting businesses, I had a lot of
 5    contacts across the industry.  And in 2008, I met with
 6    representatives of Children's Mercy, the Institute for
 7    Pediatric Innovation, the Kauffman Foundation, and the
 8    University of Kansas, and we formed a collaboration to work
 9    on developing a very underserved patient population, which
10    pediatric patients.
11    Q.      And then what happened?
12    A.      We tried to develop that business.  We took, we took
13    that business to Cardinal Health and suggested Cardinal
14    Health would want to support this collaboration and, and
15    help us develop pediatric-appropriate medicines.  Cardinal
16    Health turned that down.
17            Later, Frank Segrave, one of the cofounders of
18    Silvergate, left Cardinal Health, and called me to inquire
19    if I would be interested in starting a pharmaceutical
20    company focused only on pediatric patients.  And I said yes,
21    and we formed the company.
22    Q.      What was Silvergate's --
23            MS. MORGAN:  Turning to the next slide, please.
24    Looking at PDX-103.
25    BY MS. MORGAN:
```

1    Q.      What was Silvergate's mission?

2    A.      Well, our mission was really to bring high-quality

3    pediatric-appropriate medicines to the industry.  It's a

4    greatly underserved patient population.  We really wanted

5    to change the way pediatric medicine is delivered in this

6    country, and we wanted to be able to provide the pediatric

7    patients that deserve the best care with the best medicines

8    to do that.

9            And that is what we set out to do.

10   Q.      Why did you think those needs were unmet?

11   A.      You know, as a society, we do -- you know, we put

12   children in high esteem, but actually the regulatory

13   burdens to bring pediatric medicines to the market,

14   pediatric-specific medicines to the market, is quite large.

15   And companies typically are not willing to overcome those

16   regulatory burdens.

17   Q.      So you mentioned Cardinal Health passed on the

18   opportunity.  Why do you think that was?

19   A.      I think largely because of the regulatory burdens and

20   the trailing obligations that FDA requires for pediatric

21   studies postapproval.  Those studies are very complex and

22   difficult to execute in this type of patient population.

23           MS. MORGAN:  Let's go to the next slide.

24   BY MS. MORGAN:

25   Q.      Looking at PDX-104.  Can you explain what we're

Beckloff - direct

1    looking at here?

2    A.       This is our first product, our Epaned Kit.

3    Q.       And taking a step back for just a second.

4             You mentioned earlier that Silvergate merged

5    with another company to become Azurity?

6    A.       Yes.

7    Q.       Who did they merge with?

8    A.       CutisPharma is the company that we merged with.

9             MS. MORGAN:  Can we go back to PDX-102.

10   BY MS. MORGAN:

11   Q.       Can you just briefly describe how and why the

12   marriage came about between Silvergate and CutisPharma?

13   A.       CutisPharma was a company that was focused on

14   compounding kits primarily for the geriatric patient

15   population, which was another very -- is a very underserved

16   patient population in this country.

17            Silvergate was focused exclusively on pediatric

18   medicine so we had sort of both ends of these highly

19   underserved patient populations.  It made perfect sense to

20   bring the companies together.

21            We brought, we brought the companies together

22   and formed Azurity where we continue to work on drugs in

23   pediatrics and geriatrics.

24   Q.       Thank you.

25            MS. MORGAN:  Now let's go back to PDX-104,

1    please.

2    BY MS. MORGAN:

3    Q.      So talking about the Epaned Kit, Silvergate's first

4    product.   What is the active ingredient?

5    A.      Enalapril maleate.

6    Q.      And what is enalapril?

7    A.      It's an ACE inhibitor for controlled hypertension.

8    Q.      And how serious are the diseases for which enalapril

9    is indicated?

10   A.      They're very serious.   Uncontrolled hypertension, as

11   we have all heard, can result in severe medical problems or

12   the damages over time.

13   Q.      And you mentioned that the Epaned Kit was a powder

14   for reconstitution, I think.   Can you briefly describe how

15   the kit was provided to the pharmacist, to the patient?

16   A.      The kit was provided as a diluent and a powder and

17   bottled, provided to the pharmacist as a kit in the box,

18   both bottles would come in the box.

19           As a pharmacist received the prescription, a

20   diluent would be added to the bottle, and that would be

21   provided to the patient.

22   Q.      Were there any reported problems stemming from the

23   pharmacist's reconstitution of the kit?

24   A.      We had a number of issues over time that, that were

25   reported to us.   We had issues where the wrong diluent was

Beckloff - direct

1    used.   We had issues where there were contamination issues,

2    where it turned out to be the fibers from the pharmacist's

3    sweater.   We had reports of foreign matter in the -- in the

4    powders that turned out to be items that people had used to

5    poke a hole in the index seal on the top.

6              So we had a number of issues.

7    Q.      And prior to the Epaned Kit, was enalapril available

8    as a treatment option?

9    A.      It was available as a treatment option but only in a

10   tablet form.

11   Q.      And what was the brand name under which that was

12   sold?

13   A.      Vasotec.

14   Q.      And in this solid tablet form, is that suitable for

15   children?

16   A.      No, it's, it's not because small children really

17   don't have the ability to swallow tablets.   But in addition,

18   the doses are very difficult to obtain from a tablet.   You

19   have to cut it or you have to crush it or you have to

20   manipulate it in some way to get the appropriate dose for

21   the patient.

22   Q.      Well, what is the most typical way of putting it in a

23   form that was suitable for a delivery to a child?

24   A.      Typically it would be a compounded liquid.

25              MS. MORGAN:   Let's go to the next slide,

Beckloff - direct

1    PDX-105.

2    BY MS. MORGAN:

3    Q.     Can you just briefly describe what doctors or

4    pharmacists did with the enalapril tablets to put it in a

5    suitable form for children?

6    A.     The physicians would write the prescription for

7    liquid enalapril, provide that to the pharmacist.  The

8    pharmacist would then take tablets, count the number of

9    tablets out and crush -- typically crush them in a mortar

10   and pestle as you see here.

11          The powder would then be put into the bottle and

12   some type of diluent added to the bottle.

13   Q.     Are there drawbacks to compounding?

14   A.     There is a -- there are many drawbacks to

15   compounding.

16          So it depends on the accuracy of counting the

17   tablets.

18          It depends on the accuracy of making sure that

19   any of the utensils that are used to compound the product

20   are not contaminated with other drugs.

21          It depends on accurately adding powders to the

22   bottle.

23          And then accurately adding the appropriate

24   amount of diluent to the bottle.

25   Q.     And can parts of the tablet also not be consistently

1    crushed up?

2    A.    No.   They would be typically, you know, chunks of

3    tablets that -- you know, it's hard to get it a consistent

4    particle size.

5            MS. MORGAN:   Let's go to the next slide,

6    PDX-106.

7    BY MS. MORGAN:

8    Q.    So when Silvergate set out to make the drug, what, in

9    general, are the formulation options for Silvergate?

10   A.    Well, this slide shows the formulation options with

11   solutions being the most desired formulations, and then down

12   through various formulation options to reconstituted powder

13   with a diluent.

14   Q.    And as you progress down the chart and we get to the

15   reconstituted, why are those at the bottom?

16   A.    Well, those particular formulations are prone to

17   potential mix-ups as we discussed with our kit in the

18   compounding or the formulating at the, at the pharmacy.

19   Q.    Are they typically easier to formulate, though?

20   A.    Typically easier to formulate because, primarily

21   because of stability issues.

22   Q.    So even this hierarchy, why did Silvergate develop a

23   reconstituted product for enalapril?

24   A.    When we began our collaboration, we, we modeled the

25   reconstituted powder from, from drugs that we knew were

Beckloff - direct

1    pediatric formulations, common pediatric formulations in the

2    pharmacy.

3    Q.     And were there also stability problems with

4    enalapril?

5    A.     There were stability issues with enalapril once

6    reconstituted.  It had a 60-day shelf life.

7    Q.     Well, put another way, is there a reason that

8    enalapril went the reconstituted path for your first product

9    as opposed to going for refrigerated solution related to

10   stability?

11   A.     Right.  I mean, enalapril --

12              MR. RUEDY:  Objection, Your Honor.  Matthew

13   Ruedy for Amneal.  We're getting into expert opinion here.

14              THE COURT:  Ms. Morgan.

15              MS. MORGAN:  Your Honor, I'm asking about

16   choices they made when they were developing their own

17   product.  This is squarely within his personal knowledge as

18   the chief development officer of Azurity.

19              THE COURT:  Mr. Ruedy.

20              MR. RUEDY:  It seems like he is expounding into

21   the realm of actual analysis of stability results, and in

22   my opinion, it's flowing into expert testimony.

23              THE COURT:  All right.  I'm going to overrule

24   the objection.  I understand him giving the testimony from

25   his perspective having lived through this experience and

Beckloff - direct

1    given his position.

2              I am, however, starting to have some problems

3    with the audio.  Mr. English, if you don't mind coming back,

4    I don't know if you have been hearing some interference with

5    Ms. Morgan and Mr. Beckloff.

6              Any thoughts?

7              THE TRIALanywhere HOST:  Yeah.  She is in a

8    conference room and it's very dependent on the microphone,

9    and the HVAC system seems to be picking it up a little bit.

10   So as long as you can just be on the microphone and if they

11   can turn off any microphones overhead.  I know that was the

12   original layout of that room.

13             MS. MORGAN:  I believe the microphones are

14   turned off overhead.  If this is better, I will keep it

15   very, very close to my mouth.  I was worried that I was

16   perhaps too loud for you.

17             THE COURT:  I am sorry to ask you to do that,

18   but that seems fine.

19             MS. MORGAN:  No problem.  I can do that.

20             I also was having intermittent issues with

21   Mr. Beckloff's testimony, that -- breaking up a little bit.

22             THE COURT:  Mr. English.

23             THE TRIALanywhere HOST:  I had no issues with

24   Mr. Beckloff.

25             Did you, Your Honor?

 1                    THE COURT:  Occasionally, yes.

 2                    THE TRIALanywhere HOST:  Yeah, I think it's the

 3      battle between the two systems.

 4                    THE COURT:  Okay.  Thank you.

 5                    THE TRIALanywhere HOST:  So just take your time.

 6      Go slow.

 7                    THE COURT:  Go ahead.

 8                    MS. MORGAN:  Okay.

 9      BY MS. MORGAN:

10      Q.    I think my last question was, I didn't get it -- have

11      answered, so if I can go back to that.

12                    I believe the question was if in choosing to go

13      to reconstituted route, if stability of enalapril, problems

14      related to stability was one of the reasons you chose to go

15      constituted?

16      A.    Right.  So we chose to develop the kit so that we

17      would have a commercially viable shelf life for the

18      product.

19      Q.    Okay.  And why is having a commercially viable shelf

20      life important, and how does stability relate to that?

21      A.    Well, when you put a product into the distribution

22      channels, it goes to many places and it requires time.

23                    So some of, some of the product might be in a

24      pharmacy for a period of months or maybe years, and we

25      wanted to make sure that it would remain stable for at least

Beckloff - direct

1    two years, and -- which is what we were targeting.

2    Q.      And does stability impact that?

3    A.      Absolutely.

4    Q.      Just a couple more questions about the Epaned Kit and

5    then we can move on.

6            Do you recall what the FDA approved for the

7    lower limit of the stability specification for the Epaned

8    Kit?

9    A.      90 percent.

10   Q.      And do you recall what the pH of the Epaned Kit was?

11   A.      I believe it was 4.

12           MS. MORGAN:  I'd like to pull up PTX-287.

13   BY MS. MORGAN:

14   Q.      And I believe it's in your binder, Mr. Beckloff, if

15   you would like to look at it.  You can use the screen if you

16   would like.

17           Have you seen PTX-287 before?

18   A.      Yes.

19   Q.      And were you involved in the preparation of this

20   document?

21   A.      Yes, I was.

22   Q.      And was this created in the ordinary course of

23   Silvergate's business?

24   A.      It was.

25           MS. MORGAN:  Could you please turn to page

1    SLVGT-EPA-102439 of this document.

2            And you can highlight the paragraph, the second

3    text from the bottom.   Thank you.

4            Blow that up.   Thank you.

5    BY MS. MORGAN:

6    Q.    And can you just please confirm for us the pH of the

7    kit?

8    A.    PH of approximately 4 is obtained.

9    Q.    Thank you.   Thank you.

10           And is Epaned Kit the only enalapril product

11   that Silvergate developed?

12   A.    No, we had other, other products under development

13   for enalapril.

14   Q.    So do you now have another Epaned product on the

15   market?

16   A.    We do.

17           MS. MORGAN:   I'd like to pull up PDX-107.

18   BY MS. MORGAN:

19   Q.    What is this slide showing?

20   A.    This is our Epaned solution, ready-to-use solution.

21   Q.    And what form does this come in?

22   A.    It comes in a stable, ready-to-use formulation or

23   single bottle that does not require constitution.

24   Q.    Liquid form?

25   A.    Liquid form, yes.

Beckloff - direct

1    Q.      And what did the FDA approve for the lower limit of

2    the stability specification for Epaned?

3    A.      90 percent.

4    Q.      And what stability does Silvergate actually meet for

5    the Epaned Ready To Use?

6    A.      We have three years of stability in the product.

7    Q.      And for the lower limit of stability, the percent?

8    What do you actually have?

9    A.      90.

10   Q.      I'm sorry?

11   A.      90.

12   Q.      So we'll come back to this product, but let's briefly

13   move to another product.   Sorry, to another topic.

14           Are you familiar with the term "orphan drug

15   exclusivity"?

16   A.      I am.

17   Q.      What does the term refer to?

18   A.      It refers to the amount -- the seven years of

19   exclusivity that FDA will grant an orphan-designated product

20   once, once it is approved.

21   Q.      And did Silvergate discuss orphan drug exclusivity

22   with the FDA as part of its development of the Epaned Kit?

23   A.      Yes.

24   Q.      Were you granted orphan drug exclusivity for the

25   Epaned Kit?

Beckloff - direct

1    A.      We were not.

2              MS. MORGAN:   Let's look at PTX-246.

3    BY MS. MORGAN:

4    Q.      Have you seen this before?

5    A.      I have.

6    Q.      And what is it?

7    A.      This is an exclusivity request that was included in

8    our NDA for the Epaned solution, the ready-to-use product.

9    Q.      And were you involved in preparing this document?

10   A.      I was.

11   Q.      And what is this document talking about?

12             And I'd like to focus on the second and third

13   paragraphs.

14   A.      It's, it's discussing the fact that we did not

15   receive orphan exclusivity for our Epaned powder, and going

16   on to discuss that the FDA had informed us that had we had

17   a ready-to-use product, that they would have granted us

18   exclusivity because they would have considered it to be

19   clinically superior from a safety point of view to

20   extemporaneously prepared products, such as compounded

21   products or reconstituted products.

22   Q.      And was that in a January 27th, 2014, meeting?

23   A.      Yes.

24   Q.      Were you present at that meeting?

25   A.      I was.

Beckloff - direct

1           MS. MORGAN:  Okay.  I'd like to look at the

2    paragraph following that, please.

3    BY MS. MORGAN:

4    Q.    Can you please explain what we're talking about here?

5    A.    On March 14th of 2014, we had an NDA debriefing

6    meeting with FDA regarding our Epaned powder product and

7    discussed the fact that Silvergate was advised -- or they

8    advised Silvergate at the time that we would have been

9    granted exclusively had we had a ready-to-use formulation

10   because -- and considered clinically superior from its

11   safety perspective to compounded or extemporaneously

12   prepared products.

13   Q.    And that was, you said, on March 4th, 2014 (sic)?

14   A.    Yes.

15   Q.    But you didn't have a ready-to-use product at that

16   time?

17   A.    No.  We did not have it.  Did not.

18           MS. MORGAN:  Can we look at PTX-317, please.

19           Oh, I'm sorry.

20   BY MS. MORGAN:

21   Q.    Did you say you were present at the March 14th, 2014?

22   A.    Yes.  Yes.

23           MS. MORGAN:  Okay.  Let's now look at PTX-317,

24   please.

25           And can you also pull up PTX-318.

Beckloff - direct

```
 1    BY MS. MORGAN:

 2    Q.       Do you recognize these documents?

 3    A.       I do.

 4    Q.       And what are they?

 5    A.       The first document is minutes of the January 27th

 6    meeting that we had with the FDA office of orphan drug

 7    products where we discussed the exclusivity issue for Epaned

 8    powder.

 9                 And the second is the minutes -- are the minutes

10    from the NDA follow-up meeting that we had with the division

11    regarding the NDA.

12    Q.       So are PTX-317 and 318 the meeting minutes from the

13    two meetings that we were just looking at in the previous

14    document?

15    A.       Yes, they are.

16    Q.       And were you involved in the preparation of the

17    PTX-317?

18    A.       Yes.

19    Q.       And did you receive PTX-318 as part of ordinary

20    course of Silvergate's business?

21    A.       Yes.

22                 MS. MORGAN:   And let's turn now to -- actually,

23    I want to go back -- can you please pull up PTX-215.

24    BY MS. MORGAN:

25    Q.       And do you --
```

Beckloff - direct

1          MS. MORGAN:  Actually, sorry.  PTX-219.  Can't

2    read my writing.

3    BY MS. MORGAN:

4    Q.      And do you recognize this document?

5    A.      Yes.  I do.

6    Q.      What is it?

7    A.      It is part of our NDA for Epaned Ready To Use.

8    Q.      And were you involved in the preparation of those

9    documents?

10   A.      Yes.

11         MS. MORGAN:  Can we please go to the page

12   labelled SLVGT-EPA-102143.

13             And in the second table at the bottom.

14   BY THE WITNESS:

15   A.      Um-hmm.

16   Q.      Let's just look at the HPLC assay line.

17   A.      Yes.

18   Q.      Is that referring -- is that related to the

19   specifications to the product?

20   A.      Yes.

21   Q.      Okay.  And acceptance criteria column.  Is that --

22   are those the acceptance criteria for the FDA?

23   A.      Yes, they are.

24   Q.      Okay.  And -- oh.  What is lower acceptance criteria

25   for the FDA?

1    A.       90 percent HPLC.

2    Q.       And looking at the conditions for long term, the

3    5 percent Celsius plus or minus, 3 -- sorry, 3 degrees

4    Celsius, do you see that?

5    A.       Yes.

6    Q.       What is the lower limit for the conditions?

7    A.       It says 97.9.

8    Q.       And is that the condition that the Epaned Ready To

9    Use products --

10   A.       I'm sorry.  Could you repeat that?

11   Q.       Is that the requirement --

12           THE COURT:  Ms. Morgan, let me interrupt you.

13   We're having increasing difficulty hearing you.

14           Mr. English?

15           MS. MORGAN:  I'm so sorry.  I did not hear you,

16   Your Honor.

17           THE COURT:  Okay.  I'm talking to Mr. English.

18   We're having trouble hearing you.

19           MS. MORGAN:  Oh.

20           THE TRIALanywhere HOST:  I'm going to have to

21   take them in a breakout room and work with them, Your Honor,

22   to try to get anywhere with it because it's all -- the

23   system on their end is a video conference system, so it's

24   all stuff they have to adjust on their end.

25           THE COURT:  I'm not ready for a lunch break, but

1    let's take a short recess.  We'll turn the clock off and

2    we'll see if --

3                    MR. ALUL:  Your Honor, Andy Alul for Bionpharma.

4                    I apologize to interrupt.  I didn't -- just

5    maybe this might help.

6                    I'm hearing -- I don't know if anybody else

7    is, but I'm hearing a lot of interference coming from

8    Ms. Morgan's microphone.  I don't know if it's the setup

9    over there or what's going on, but every time she speaks,

10   there is a lot of static coming through.

11                   I don't know if anybody else is experiencing

12   that, and I don't know if that has any relation to the

13   problem as to why we can't hear her very well, but I just

14   wanted to point that out.

15                   THE COURT:  Okay.  Well, thank you for that.

16   And, Mr. English, just let Mr. Looby know when you think we

17   may be able to proceed.

18                   THE TRIALanywhere HOST:  Okay.  I'm going to

19   open the breakout room for everybody.

20                   THE COURT:  All right.  Thank you.  I'm going to

21   step out.

22                   (Brief recess taken.)

23                   *      *      *

24                   (Proceedings reconvened after recess.)

25                   THE COURT:  Okay.  What do you think?

Beckloff - direct

 1             MR. RUEDY:  We switched on the overhead

 2    microphone we think it's a lot better.  You be the judge,

 3    sir.

 4             THE COURT:  I will let you know if it gets

 5    difficult again.  Ms. Morgan, let's try again.

 6             MS. MORGAN:  Thank you Your Honor.  Apologies.

 7    Hopefully, we fixed it.

 8    BY MS. MORGAN:

 9    Q.     So, resuming, we were talking about PTX-219 and we

10    had just looked at the HPLC assay acceptance criteria from

11    the FDA, the lower end of 90 percent.  And so my question

12    now is:  When you actually tested the Ready-to-Use

13    formulation, was it more stable than the FDA requirements?

14    A.     The assay at a higher percent, yes.

15    Q.     And what was that percent?

16    A.     97.9 as the lower volume.

17    Q.     Thank you very much.  Okay.

18             So now I would like to go back to our slide and

19    to PDX-107.

20             So talking about the Ready-to-Use, when did

21    Silvergate decide to develop the Ready-to-Use version of

22    Epaned?

23    A.     So we had the meetings with the FDA and we discovered

24    that had we had a Ready-to-Use formulation, we would have

25    received orphan exclusivity for this patient population.  So

Beckloff - direct

1    essentially as we were working from the meeting through the

2    parking lot, we decided that Ready-to-Use formulations were

3    the preferred formulations of FDA and we began working on

4    that.

5    Q.      Did you have another an Enalapril product that you

6    were work working on at the time?

7    A.      We did.  We had a just-add-water formulation where we

8    would have powder and just add water as a diluent.

9    Q.      So let's go back to PDX-106, please.  So looking at

10   the hierarchy here that you talked about earlier, where did

11   the just-add-water kit that you were working on at the time

12   of the FDA meeting fall with respect to the kit that was

13   already on the market?

14   A.      It was one, one notch above where we were with the

15   reconstituted product with the other diluent.

16   Q.      So did you continue with development of the

17   just-add-water kit?

18   A.      No.  We discontinued that altogether.

19   Q.      And why did you decide to abandon that project?

20   A.      Well, it was clear what the FDA's preference was, so

21   we wanted to move forward with Ready-to-Use formulations.

22   Q.      Was the Ready-to-Use formulation going to be more

23   challenging than the just add water?

24   A.      Yes.

25   Q.      So who is principally responsible for developing the

1    Ready-to-Use product?

2    A.    Dr. Mosher is our VP of drug development.  It's his

3    job.

4    Q.    And what was your role with regard to the development

5    of the Ready-to-Use formulation?

6    A.    Oversight.  You know, stay in the loop, understand.

7    Go with the project and look at regulatory pathways.

8    Q.    And who made the final decision on the aspects of the

9    Ready-to-Use formulation, the RNDA assays?

10   A.    Dr. Wu.

11   Q.    And in your role at the company, are you familiar

12   with Silvergate's patents for the Ready-to-Use formulation?

13   A.    Yes.

14   Q.    So can you please look in your binder at PTX-1, 2, 3

15   and 4.  They are also up on the screen for you.  And can you

16   tell me what these are?

17   A.    These are our patents.

18   Q.    Related -- are they related to the Ready-to-Use

19   formulation?

20   A.    Yes.

21   Q.    And in your role at the company, are you also

22   familiar with the file histories for these four patents?

23   A.    Yes.

24   Q.    And if you look at PTX-5, 6, 7 and 8 in your binder,

25   are those the file histories related to these patents?

Beckloff - direct

1    A.      Yes, they are.  Yes.

2    Q.      Thank you.

3                MS. MORGAN:  Your Honor, at this time I'd like

4    to ask the courtroom be sealed because we're going to be

5    talking about sensitive financial information that is not

6    available to the public at Silvergate.

7                THE COURT:  All right.  Is there any objection

8    to that?  Mr. Ruedy, any objection?

9                MR. RUEDY:  No.  No, Your Honor.

10                THE COURT:  All right.  All right.  Since

11   there's sensitive information that's not public, we will put

12   this part under seal.  Let us know when that is complete.

13                (Following portion ordered sealed by the Court,

14   bound separately.)

15                THE TRIALanywhere HOST:  The courtroom is

16   reopened.  Everyone has rejoined.

17                THE COURT:  Thank you.

18                MS. MORGAN:  So now let's turn to PTX-42, 98,

19   301, and 447.

20   BY MS. MORGAN:

21   Q.      Have you seen this document before?

22   A.      I have.

23   Q.      What are they?

24   A.      These are portions of our NDA for the ready-to-use

25   product.

Beckloff - direct

1    Q.      And were you involved in the preparation of the NDA

2    for the ready-to-use?

3    A.      I was.

4              MS. MORGAN:   And let's also take a look at

5    PTX-219 and 480.

6    BY MS. MORGAN:

7    Q.      And what are these?

8    A.      These are also portions of our NDA for our

9    ready-to-use product.

10   Q.      And does Silvergate prepare the NDA for the

11   ready-to-use product as part of the ordinary course of

12   business?

13   A.      Yes.

14             MS. MORGAN:   Okay.   Let's take a look now at

15   PTX-325 and 330.

16   BY MS. MORGAN:

17   Q.      Do you recognize these documents?

18   A.      I do.

19   Q.      What are they?

20   A.      These are -- this is a pre-IND meeting request that

21   we made to the cardiorenal division.

22   Q.      Both documents are?

23   A.      One is the briefing package, sorry, that accompanied

24   the -- or was provided to the FDA after the request.

25   Q.      And were you involved in the preparation of the

Beckloff - direct

1    materials for Silvergate's pre-IND?

2    A.      I was.

3    Q.      Were these created as part of the ordinary course of

4    Silvergate's business?

5    A.      They were.

6            MS. MORGAN:  Let's take a look now at PTX-319.

7    BY MS. MORGAN:

8    Q.      What is this document?

9    A.      This is a letter from the FDA from Dr. Stockbridge

10   granting our meeting.

11   Q.      For the pre-IND?

12   A.      For the pre-IND.

13   Q.      And did you receive these minutes?

14   A.      I did.

15   Q.      And were these kept as part of Silvergate's business

16   records for the ordinary course of its business?

17   A.      Yes.

18           MS. MORGAN:  Okay.  Let's take a look now at

19   PTX-224, 267, and 268.

20   BY MS. MORGAN:

21   Q.      Do you recognize these?

22   A.      I do.

23   Q.      What are they?

24   A.      These are package inserts for our products.

25   Q.      And is -- and we can blow up any part you like, but

1    are these for the ready-to-use?

2    A.     Yes.   They're all for the ready-to-use.

3    Q.     And were you involved in the preparation of the

4    package inserts?

5    A.     I was.

6    Q.     And were these package inserts specifically created

7    and kept as part of the ordinary course of Silvergate's

8    regular business activities?

9    A.     Yes.

10                MS. MORGAN:   All right.   Let's turn now to

11   PTX-249.

12   BY MS. MORGAN:

13   Q.     What is PTX-249?

14   A.     This is our ready-to-use dossier, formulary dossier.

15   Q.     And were you involved in the preparation of this

16   document?

17   A.     I'm sorry.   Would you repeat that?

18   Q.     Sure.   Were you involved in the preparation of

19   PTX-249?

20   A.     Yes.

21   Q.     And was it created as part of the ordinary course of

22   Silvergate's business?

23   A.     Yes, it was.

24                MS. MORGAN:   Let's go now to PTX-337.

25   BY MS. MORGAN:

Beckloff - direct

1    Q.      And do you recognize this document?

2    A.      I do.

3    Q.      What is it?

4    A.      This is a white paper that we prepared for healthcare

5    professionals regarding our ready-to-use product.

6    Q.      And were you involved in its preparation?

7    A.      I was.

8    Q.      And was this created as part of Silvergate's regular

9    business activity?

10   A.      Yes.

11           MS. MORGAN:  Let's look now at PTX -- 32- --

12   yes, 326.

13   BY MS. MORGAN:

14   Q.      Do you recognize this document?

15   A.      I do.

16   Q.      What is this?

17   A.      This is a presentation that was conducted by FDA

18   regarding pediatric dosage form development.

19   Q.      And did Silvergate receive this document from the

20   FDA?

21   A.      Yes.  It's a public document.

22   Q.      And does Silvergate normally, because, in the

23   ordinary course of its business, obtain such documents from

24   the FDA for its business conduct?

25   A.      Yes.

                        Beckloff - direct

 1                    MS. MORGAN:  And, actually I'm sorry.  I need to

 2      go back to PTX-224 and 267.

 3                    And can you blow up the top left-hand paragraph

 4      on both documents?

 5      BY MS. MORGAN:

 6      Q.      Is this, this related to the kit or the ready-to-use?

 7      A.      These are ready-to-use.

 8                    MS. MORGAN:  Let's scroll down and look at the

 9      dosage form --

10      BY THE WITNESS:

11      A.      Oh, I'm sorry.  One is powder and one is the

12      ready-to-use.  I didn't see the powder referred to.  Yes.

13      Q.      Okay.  I just wanted clear that up.

14                    MS. MORGAN:  And then let's also look at 268.

15      PTX-268.

16                    And let's, again, pull up the upper right-hand

17      corner down to the dosage and strength.

18                    There we go.  Perfect.

19      BY MS. MORGAN:

20      Q.      And is this one ready-to-use or the kit?

21      A.      It's the ready-to-use.

22      Q.      Okay.  Thank you.  All right.  Thank you now.  That

23      was a lot of documents.  Let's move on to a different

24      topic.

25                    Who is the target demographic for the Epaned

1   Ready To Use formulation?

2   A.      The target demographic, really, pediatric patients

3   that were unable to swallow, as well as adults that could

4   not swallow.  And even we had military personnel that

5   returned from overseas with PTSD, those kind of things, that

6   were unable to swallow a tablet.

7   Q.      And did the target demographic also include users of

8   the Epaned Kit?

9   A.      Yes.

10  Q.      And did the target demographic include users of

11  compounded products?

12  A.      It did.

13  Q.      So what features of the ready-to-use formulation did

14  Silvergate tout in the marketplace?

15  A.      Well, you didn't have to compound, and you didn't

16  have to reconstitute, and the product was stable for a long

17  period of time.

18  Q.      So is it safer?

19  A.      It was safer because it didn't have to be

20  reconstituted or compounded.  It didn't -- yes.

21          MS. MORGAN:  Okay.  Let's look at PTX-293.

22  BY MS. MORGAN:

23  Q.      What is this that we're looking at?

24  A.      This is an email from Larry Carbone to -- I'm sorry,

25  Jake Olson at Skywalk Pharmacy in Milwaukee, one of our good

1   customers.

2   Q.      And are you also included on this email?

3   A.      I am.

4   Q.      And looking at Mr. Olson's email on page

5   SLVGT-EPA-53059.  What is being discussed here?

6   A.      He was asking if we would provide a document showing

7   the differences between the Epaned powder product versus the

8   new Epaned Ready To Use product so that he would explain the

9   differences to his staff as well patients and other

10  healthcare providers.

11  Q.      And did Silvergate prepare such a document?

12  A.      We did.

13  Q.      Did you prepare it?

14  A.      I participated in the preparation and development,

15  yes.

16  Q.      Let's look at PTX-248.  What is this?

17  A.      This is the document that we provided to explain the

18  differences between the oral, our Ready-to-Use product and

19  the powder.

20  Q.      And just briefly describe what the differences were

21  that you highlighted.

22  A.      We highlighted the longer expiration date as compared

23  to the reconstituted powder.  We talked about the fact that

24  we no longer needed a diluent and that it had -- it had

25  fewer excipients and additives, and we also highlighted that

Beckloff - direct

1   we had numerous discussions with the FDA where they had

2   indicated the Ready-to-Use is the preferred formulation to

3   prevent pharmacy mixups.

4              THE COURT:  To prevent what?

5              THE WITNESS:  Pharmacy mixups.

6              THE COURT:  Thank you.

7   BY MS. MORGAN:

8   Q.    So let's talk now about the commercial performance of

9   the Ready-to-Use Epaned product.

10             As chief development officer at

11  Silvergate, do you communicate with folks in the industry

12  regarding the needs of pediatric medicine?

13  A.    Yes.

14  Q.    And do you have such communications regarding the

15  Epaned Ready To Use product?

16  A.    Yes.

17  Q.    And what's your understanding of the industry's

18  response to the Epaned Ready To Use product?

19  A.    It has been very well received.

20  Q.    And as part of Silvergate's ordinary course of

21  business, does Silvergate gather and keep correspondence

22  with third parties in the industry regarding Silvergate's

23  product?

24  A.    We do.

25  Q.    Why is that?

1    A.      Well, we would like to understand what the industry

2    is thinking, both negative or positive, so that we can

3    assess sort of what the patient population needs might be or

4    healthcare provider needs might be.

5    Q.      And what is your role with respect to that industry

6    feedback?

7    A.      Well, I would take that information and understand

8    whether -- whether or what types of adjustments we might

9    need to make in order to take, take that into account.

10   Q.      So are you regularly apprised of industry feedback?

11   A.      Yes.

12   Q.      Let's look at PTX-296.  And what are we looking at?

13   What is this?

14   A.      This is an e-mail from Karl Kappler to me.  It's

15   an e-mail he sent to me, and this is regarding a meeting

16   that he had had with New York Medical -- New York University

17   Medical Center and sort of what the feedback had been.

18   Q.      And what is Karl Kappler's title, if you remember?

19   A.      Karl Kappler is director of our clinical information.

20   Q.      And did Mr. Kappler regularly keep you informed of

21   feedback received from the industry such as this from the

22   NYU Medical Center?

23   A.      Yes.

24   Q.      And is this an example of industry feedback that you

25   had been kept aware of?

Beckloff - direct

1   A.      It is.

2   Q.      Okay.

3   A.      Yes.

4   Q.      So let's take a look at what that feedback was.   If

5   we can take a look at -- right there:   "Hi, Mike."

6           Can you tell me what the feedback was from the

7   NYU Medical Center?

8   A.      Well, what they had said is that they do send --

9   okay.   This is from Joanna Tracy at the New York Medical,

10  Children's Medical Center, and she was confirming that they

11  send their hypertensive kids home with a liquid enalapril if

12  it's required for treatment.   And that --

13  Q.      And --

14  A.      I'm sorry.   Go ahead.

15  Q.      No.   Finish your answer, please.   Go ahead.

16  A.      No.   I was just saying that she was I think

17  commenting how she wasn't very happy with compounded

18  products and she was very much looking forward to using our

19  Ready-to-Use product.

20  Q.      If we can go to the forward of this.   Is that what

21  you were informed of --

22  A.      Yes.

23  Q.      -- Mr. Kappler?

24  A.      Yes.

25  Q.      Okay.   Let's look at PTX-299.   And have you seen

Beckloff - direct

1    PTX-299 before?

2    A.     I have.

3    Q.     And what is this?

4    A.     This is an e-mail from Eric Tolley, who is one of our

5    field sales managers, and he's discussing a meeting that

6    took place between Karl Kappler and Phoenix Children's

7    Hospital, and it was very positive.

8    Q.     All right.  And do you recognize the Silvergate

9    e-mail extensions?

10   A.     I do.  Those are Silvergate extensions, yes.

11   Q.     And is this another example of the industry feedback

12   that you had been kept apprised of in your role at

13   Silvergate?

14   A.     Yes.

15   Q.     So let's talk about the feedback provided in this

16   document.  If we can go to the paragraph that starts -- yes,

17   thank you, and highlight the, "We are taking advantage."

18   A.     Right.  So --

19   Q.     See about halfway down?  That paragraph there?

20   A.     Yes.  This is Yolanda Douthard, and she's talking

21   about the fact that they, they are using Silvergate products

22   and are happy, happy to -- that were out there.  And she's

23   also explaining her concerns for patients and families that

24   are forced to cut or crush solid meds when there's no, no

25   other option available, and she's concerned for the safety

1    of the patients.

2    Q.    And can you please read for us what Ms. Douthard

3    exact concern was?

4    A.    It's mostly around just the safety and not being able

5    to get the exact doses that the patients require.

6    Q.    Okay.  Let's turn to the next document, PTX-292.  And

7    do you recognize this document?

8    A.    I do.  I do.

9    Q.    And can you tell us generally what it is?

10   A.    This is a document from Larry -- this is an e-mail

11   from Larry Carbone to Frank Segrave, Barry Bernard, Bill

12   Rampy and Nicole Frederickson at Silvergate regarding an

13   interaction that Larry had had with Dr. Lechner at Walter

14   Reed Army Hospital.

15   Q.    And do you recognize the Silvergate e-mail extension?

16   A.    I do.

17   Q.    And can you just tell us briefly the rolls of the

18   people with the Silvergate e-mail extensions?

19   A.    Frank Segrave, co-founder, president, CEO of

20   Silvergate Pharmaceuticals.  Barry Barnard was our CFO.

21   Bill Rampy was our vice president of managed care and

22   government relations and Nicole Frederickson was our VP of

23   marketing.

24   Q.    And is this another example of industry feedback that

25   you would be regularly kept apprised of?

Beckloff - direct

1   A.       It is.

2   Q.       Okay.  So if we go to the original e-mail, and can

3   you highlight the, this is good news part that begins the

4   sentence?  And can you please tell us the good news that

5   Brent Lechner was talking about?

6   A.       He was talking about that it was good news especially

7   for -- especially for military personnel in extended area

8   pharmacies and where it may not be convenient to get a

9   prescription filled and also just the nature of the military

10  in that they're constantly moving and that it would be a big

11  benefit to have this product available.

12  Q.       And by this product, are you referring to the Epaned

13  Ready To Use?

14  A.       That's correct.

15  Q.       So let's now talk about the Epaned Ready To Use in

16  terms of market performance.

17           Has the Epaned Ready To Use surpassed the Epaned

18  Kit?

19  A.       Yes.

20  Q.       In terms of unit sales, how does the Epaned Ready To

21  Use and Epaned Kit compare?

22  A.       The Ready-to-Use far exceeds units of the powder

23  kit.

24  Q.       And in terms of total revenue, how does the Epaned

25  Ready To Use and Epaned Kit compare?

1   A.      The Ready-to-Use far exceeds the powder kit revenues.

2   Q.      And has the market been willing to pay more for the

3   Ready-to-Use than for the kit?

4   A.      It has, yes.

5   Q.      How much for the kit?  What was the kit's price?

6   A.      The kit's price was approximately $285 per unit.

7   Q.      And what's the Ready-to-Use price currently?

8   A.      It's around $490 per unit.  There may have been a

9   recent price increase.

10  Q.      Why do you think -- I'm sorry.  Please continue.

11  A.      490.  490, I believe.

12  Q.      Okay.  And why do you think the market is willing to

13  pay more for the Ready-to-Use?

14  A.      I believe it's a superior product.  You don't have to

15  reconstitute it and it has very good shelf life.

16  Q.      Had Silvergate's Ready-to-Use product been a success

17  in the marketplace?

18  A.      Yes.

19  Q.      And do you consider the product to be successful?

20  A.      Absolutely.

21              MS. MORGAN:  Thank you, Mr. Beckloff.

22              THE COURT:  All right.  If that's the end of the

23  direct, we're going to take a lunch break at this point

24  before we begin cross-examination.  I only need about a

25  half-hour, so we'll aim for about 1:30.  But we'll take a

Beckloff - cross

```
 1    recess until then.  See you in a bit.  Thank you.

 2                  MR. RUEDY:  Thank you, Your Honor.

 3                  (Luncheon recess taken.)

 4                        -  -  -

 5                  Afternoon Session, 1:38 p.m.

 6                  THE COURT:  All right.  Good afternoon,

 7    everyone.  I am ready if you all are.  We'll have

 8    cross-examination if you are ready.

 9                  MR. RUEDY:  Yes.

10                      CROSS-EXAMINATION

11    BY MR. RUEDY:

12    Q.     Good afternoon, Mr. Beckloff.  My name is Matthew

13    rude.  We have not had a chance to be introduced, but I am

14    counsel for Amneal in this case.

15                  On your direct examination, you testified about

16    liquid oral formulations.

17                  Do you recall that testimony?

18    A.     Yes.

19    Q.     But you're not actually a formulator, are you, Mr.

20    Beckloff?

21    A.     I'm not a formulator.

22    Q.     And so you don't claim to be an expert in the field

23    of formulation; right?

24    A.     Not in the field of formulation, no.

25    Q.     Okay.  And with respect to the Epaned oral solution
```

1    in particular, for the technical aspects of formulation, you

2    deferred to Dr. Mosher; right?

3    A.      Yes.

4    Q.      And so you didn't personally come up with any aspect

5    of the formulation for the Epaned oral solution; is that

6    right?

7    A.      Except the dosage form, right.  The Ready-to-Use

8    concept.

9    Q.      But as far as the choice and amount of excipients in

10   the Epaned oral solution, you didn't develop those; is that

11   right?

12   A.      Correct.

13   Q.      The excipients were chosen by Dr. Mosher; right?

14   A.      True.

15   Q.      And the amount of the excipients in the Epaned oral

16   solutions were also selected by Dr. Mosher; right?

17   A.      Yes.

18   Q.      Okay.  And just for the record, you're not named as

19   one of the inventors of any of the four patents in this

20   case; is that right?

21   A.      That's correct.

22   Q.      Now, turning to Silvergate's first product, Epaned

23   Kit, that was actually the first product that Silvergate

24   developed; is that correct?

25   A.      That's correct.

Beckloff - cross

1    Q.      And that's was approved in 2013?

2    A.      Yes.

3    Q.      The active ingredient in the Epaned Kit was enalapril

4    maleate?

5    A.      Yes.

6    Q.      And enalapril maleate has been an approved drug for a

7    long time.  Since 1985, in fact?

8    A.      It has been approved in tablet form, yes.

9    Q.      Yes.  Since at least the mid-1980s.  Would you agree?

10   A.      I believe so.  I don't know the exact date.

11   Q.      But certainly far before the introduction of the

12   Epaned Kit by Silvergate; correct?

13   A.      Yes.

14           MR. RUEDY:  Now, I'd like to actually turn to

15   one of your demonstratives, PDX-104.  If you could,

16   Mr. Roberts.

17   BY MR. RUEDY:

18   Q.      Do you see that?

19   A.      I can.

20   Q.      Okay.  And so what you have on this slide, that is

21   actually the Epaned Kit Product; correct?

22   A.      That's correct.

23   Q.      And on the right-hand side, you've have got a box for

24   the Epaned Kit that, you know, would contain the bottle for

25   the powder and a bottle for the diluent; right?

Beckloff - cross

```
 1   A.      Yes, as well as the PI.

 2   Q.      Right.  And -- but the PI, meaning the product

 3   instructions, or the label; correct?

 4   A.      No, the package insert.

 5   Q.      Sure.  Package insert.

 6           And so the Epaned powder bottle in the middle

 7   here, that contains one milligram per milliliter of

 8   enalapril maleate; right?

 9   A.      It contains -- when it's reconstituted, yes.

10   Q.      Sure.  And so in order to use this product, a

11   pharmacist had to open up the box -- or the bottle in the

12   middle, open the bottle on the left, pour the diluent into

13   the Epaned powder bottle and then shake; right?

14   A.      Yes.

15   Q.      And the diluent for the Epaned Kit on the left-hand

16   side, that bottle says Ora-Sweet SF.

17           Do you see that?

18   A.      I do.

19   Q.      That's actually a proprietary diluent from a company

20   called Perrigo; right?

21   A.      It is a commercially available diluent, yes.

22   Q.      Right.  And Silvergate had to pay license fees in

23   order to use that diluent, to Perrigo; correct?

24   A.      We purchased the product.  I don't know if you would

25   call it license fees.
```

Beckloff - cross

1   Q.      Okay.  So backing up a bit.

2           When Silvergate first chose to explore an

3   enalapril product, it first modeled it after it after

4   antibiotics that were already available; correct?

5   A.      After children's antibiotics, yes.

6   Q.      Yeah.  And these were antibiotics that were to be

7   reconstituted as well; right?

8   A.      Correct.

9   Q.      And when Silvergate was first developing its first

10  enalapril product, you never, you never thought of making a

11  ready-to-use oral solution; right?

12  A.      Right.  We had not, not understood FDA's position on

13  ready-to-use formulations at that time.

14  Q.      Okay.  And so you went, you went straight to a

15  product for reconstitution; correct?

16  A.      Correct.  That was our first product.

17  Q.      Okay.  So in this stage, you, you took an enalapril

18  maleate, which was a well-known drug as you said, and you

19  decided to formulate it into this kit product; right?

20  A.      Correct.

21  Q.      Okay.  I want to talk a bit about the oral solution

22  product.

23           MR. RUEDY:  And if Mr. Roberts could also pull

24  up PDX-107, please.

25  BY MR. RUEDY:

Beckloff - cross

1    Q.      Do you see that, Mr. Beckloff?

2    A.      I do.

3    Q.      And on the right-hand side, now you have your

4    demonstrative for the Epaned oral solution; right?

5    A.      Correct.

6    Q.      Okay.  And both of these products have the same exact

7    active ingredient; right?

8    A.      They do.

9    Q.      And once they're ready to be administered, they

10   contain the same amount of enalapril maleate; right?

11   A.      Yes, they do.

12   Q.      And both products are indicated for hypertension?

13   A.      Correct.  For pediatric hypertension.

14   Q.      Well, let me ask you this, then.  Isn't it true that

15   both these products are not just prescribed for children but

16   they're also indicated for adults?

17   A.      Yes, that's correct.

18   Q.      Okay.  So both of these products aren't just for

19   kids; they're, they're -- they can be for patients of many

20   different ages; right?

21   A.      Yes.  For anyone that needs this type of formulation,

22   yes.

23   Q.      Okay.  And the FDA actually found the Epaned oral

24   solution to be bioequivalent to the kit product; correct?

25   A.      Yes.

Beckloff - cross

1    Q.      And then once Silvergate decided that it was going

2    to move on and market the oral solution product, it no

3    longer had to pay the -- for the diluent to Perrigo; right?

4    A.      Actually, we continued to pay Perrigo.

5    Q.      So I'd like to turn to your idea of coming up with a

6    ready-to-use form of Epaned.

7            You mentioned on direct that it came from an

8    idea between you and other people at Silvergate and the FDA;

9    right?

10   A.      We were told by the FDA that had we had a

11   ready-to-use formulation, that they would have given us

12   orphan drug exclusivity.

13   Q.      So you didn't actually come up with the ready-to-use

14   idea yourself, did you?  It was the FDA; right?

15   A.      It was the FDA that suggested a ready-to-use

16   formulation would have had orphan exclusivity.  Orphan drug

17   exclusivity.

18   Q.      And you decided, after that meeting with the FDA, to

19   start developing a ready-to-use product; right?

20   A.      Yes.

21   Q.      In fact, you mentioned on your direct examination,

22   you decided in the parking lot after that meeting to make

23   the ready-to-use solution; right?

24   A.      We decided in the parking lot to see if it was

25   possible to make a ready-to-use solution.

Beckloff - cross

1    Q.      And the reason that you decided to pursue a

2    ready-to-use solution was to try to obtain seven years of

3    market exclusivity; is that right?

4    A.      It was to obtain market exclusivity but also to

5    recognize that FDA considered it as safer -- a clinically

6    superior product based on safety.

7    Q.      And just so we're clear here, we're talking about

8    orphan exclusivity, and in particular, market -- seven years

9    of market exclusivity associated with orphan exclusivity;

10   right?

11   A.      Yes.

12   Q.      After you left the FDA meeting and you decided to

13   make the ready-to-use solution, you had Dr. Mosher formulate

14   the product; right?

15   A.      Right.  We had -- we asked Dr. Mosher to see if he

16   would be able to formulate a ready-to-use product.

17   Q.      Okay.  So after the FDA meeting, you met with --

18   presumably met with Dr. Mosher and you sent him on the

19   task of creating a ready-to-use formulation; correct?

20   A.      Correct.

21   Q.      So the oral solution product, that was approved in

22   2016; right?

23   A.      Yes.

24   Q.      And once Silvergate received approval for the Epaned

25   oral solution product, it then actually discontinued the

Beckloff - cross

1    Epaned Kit Product; right?

2    A.      Right.  We began to market the solution.  Yes, the

3    ready-to-use product.

4    Q.      Right.  But once you started marketing the

5    ready-to-use solution, you actually discontinued selling the

6    Epaned Kit Product; isn't that correct?

7    A.      That's correct.  For the superior product, the

8    ready-to-use.

9    Q.      So we were just speaking a bit about orphan drug

10   status; correct?

11   A.      Yes, we were.

12   Q.      All right.  And you mentioned on your direct that

13   the FDA said that you could receive seven years of market

14   exclusivity; right?

15   A.      Had we had a ready-to-use product, yes.

16   Q.      And you do have a ready-to-use product; correct?

17   A.      That's correct.

18   Q.      But ultimately, the FDA did not actually grant orphan

19   drug market exclusivity for the Epaned oral solution

20   product; right?

21   A.      That's correct.

22   Q.      You didn't mention that during your direct

23   examination, did you?

24   A.      I don't believe so.

25   Q.      Now, in order to get orphan drug exclusivity, it

Beckloff - cross

1    would have been required that the FDA have found that the

2    Epaned oral solution was clinically superior over the Epaned

3    Kit Product; right?

4    A.      That's correct.

5    Q.      But the FDA did not actually make a determination on

6    whether the Epaned oral solution was actually clinically

7    superior to the Epaned Kit; right?

8    A.      That's correct.

9    Q.      The FDA also did not make a determination about

10   whether the Epaned oral solution had a safety advantage over

11   the Epaned Kit Product; right?

12   A.      That is correct.

13   Q.      Now, turning back just a bit to the Epaned Kit that

14   was approved in 2013.

15   A.      Yes.

16   Q.      Back then, you actually tried to get orphan drug

17   exclusivity for the Epaned Kit Product; right?

18   A.      Correct.

19   Q.      And the FDA denied that request; right?

20   A.      The FDA denied the request and said that if we had

21   had a ready-to-use product, they would have granted us

22   market exclusivity, orphan drug exclusivity.

23   Q.      Right.  But at the time, the FDA found that the

24   Epaned Kit was not clinically superior over the compound

25   product; right?

Beckloff - cross

1    A.       Over extemporaneously prepared products, correct.

2    Q.       So just so I'm clear, back before 2013, the approval

3    process for the Epaned Kit, Silvergate tried to get orphan

4    drug exclusivity; right?

5    A.       Yes.

6    Q.       And that was denied based on comparison between the

7    Epaned Kit Product and compounded in enalapril; right?

8    A.       It was based on extemporaneously prepared products,

9    which would include compounded products as well as

10   reconstituted product.

11   Q.       Now, Mr. Beckloff, you spoke about compounding during

12   your direct examination; right?

13   A.       Correct.

14   Q.       Now, the Epaned Kit did not actually have to be

15   compounded; right?

16   A.       It had to be reconstituted.

17   Q.       Right.  But it didn't have to be compounded; right?

18   A.       Not compounded from tablets, correct.

19   Q.       Right.  And as we've discussed before, to make the

20   Epaned Kit, all you have to do is add the diluent to the

21   powder and shake the bottle.  Right?

22   A.       You had to add the diluent to obtain the proper drug

23   concentrations, correct.

24   Q.       Right.  There was no crushing of tablets.

25   A.       That's correct.

Beckloff - cross

1    Q.      Now, I'd like you to turn --

2            MR. RUEDY:  Or sorry.  Mr. Roberts, if you would

3    put up on the screen DTX-2166.

4            MS. MORGAN:  Counsel, can we open the binders

5    now?

6            MR. RUEDY:  Yes, you may.

7            THE COURT:  Thank you.

8    BY MR. RUEDY:

9    Q.      And, Mr. Beckloff, do you have the document in front

10   of you?

11   A.      I do.

12   Q.      Great.  Can you tell me if you recognize this

13   document?

14   A.      I do.

15   Q.      What is this?

16   A.      This is one of our product information sheets,

17   marketing material.

18   Q.      Well, let me back up a bit.  Silvergate engaged in

19   promotion for the Epaned oral solution; right?

20   A.      Yes.

21   Q.      And it also had done so previously with the Epaned

22   Kit product; right?

23   A.      Yes.

24   Q.      And let's start with the Epaned Kit product.

25           Silvergate had a sales force for the kit

Beckloff - cross

1    product; right?

2    A.      Yes.

3    Q.      And when the Epaned Kit was discontinued, Silvergate

4    sales force moved on to promoting the Epaned oral solution;

5    right?

6    A.      Yes.

7    Q.      And as part of Silvergate's promotional efforts, it

8    did some detailing to physicians; right?

9    A.      Yes.

10                   MR. RUEDY:  All right.  So in this

11   document I would like, if you could, Mr. Roberts, and go to

12   DTX-0002.

13   BY MR. RUEDY:

14   Q.      Mr. Beckloff, if you could let me know when you are

15   there?

16   A.      I'm there.

17   Q.      Okay.  So at the top of this page, we have a chart

18   that's entitled FDA approved medications differ from

19   extemporaneously compounded drugs.

20                   Do you see that?

21   A.      I do.

22   Q.      All right.  And it has two columns; right?

23   A.      Yes, it does.

24   Q.      Okay.  And the first column is Epaned oral solution;

25   right?

Beckloff - cross

1    A.     Yes.

2    Q.     And the chart is comparing Epaned oral solution to

3    extemporaneously compounded enalapril?

4    A.     Yes.

5    Q.     So, Mr. Beckloff, this is a promotional piece for the

6    Epaned oral solution; right?

7    A.     Yes, I believe so.

8    Q.     And let's make sure.  If you could flip through the

9    front pages of the document or wherever you need to go to

10   confirm that, please.

11   A.     Yes.

12   Q.     Okay.

13   A.     Thank you.

14   Q.     All right.  Going back to the chart here on the

15   second page, this ad was released after the product was --

16   I'm sorry.  Let me strike that.

17          This promotional piece was used for the Epaned

18   oral solution after it was approved; right?

19   A.     Correct.

20   Q.     And so at that point, the kit already existed; is

21   that right?

22   A.     The kit existed, yes.

23   Q.     Right.  But in this chart, in this promotional piece

24   by Silvergate, it's just comparing the Epaned oral solution

25   to extemporaneously compounded enalapril suspensions; is

Beckloff - cross

1    that?

2    A.      Yes.

3    Q.      And going down this chart here, it says under the

4    column Epaned oral solution, it has a checkmark, FDA

5    approved; right?

6    A.      Correct.

7    Q.      Epaned Kit would have been FDA approved; right?

8    A.      Yes.

9    Q.      And so if the chart contained the Epaned Kit here as

10   well, there would be a checkmark there as well; is that

11   right?

12   A.      I believe so, yes.

13   Q.      Okay.  And just to shortcut there, there's a number

14   of rows here.  On the left-hand side it says, meet FDA

15   standards for potency and purity.

16                   Do you see that?

17   A.      Yes.

18   Q.      FDA approved labeling.  Yes?

19   A.      Yes.  Enalapril required compliance with FDA's CGMPs.

20                   Do you see that?

21   A.      Yes.

22   Q.      And CGMPs is good manufacturing; right?

23   A.      Yes.  Good manufacturing practices.

24   Q.      The following row, sourcing of active ingredient

25   approved by FDA, very last row.

1              Do you see that?

2    A.      Yes.

3    Q.      So if the Epaned Kit was -- had been included in this

4    chart, it would have, it would have met all of the criteria

5    on the left-hand side column; is that right?

6    A.      Yes.  It was an FDA approved product.

7    Q.      Right.  But it also met FDA standards?

8    A.      As part of the approval process, yes.

9    Q.      Right.  And the Epaned oral solution also had an FDA

10   approved labeling?

11   A.      Mm-hmm.

12   Q.      Right?

13   A.      Yes.

14   Q.      And the Epaned oral solution also complied with the

15   FDA's good manufacturing practices; right?

16   A.      Yes.

17   Q.      And the Epaned oral solution active ingredient was

18   also approved by the FDA; right?

19   A.      Correct.

20   Q.      Now, Mr. Beckloff, I want to go to one of the

21   documents that you raised on your direct.  It's PTX-318.

22              Are you there, Mr. Beckloff?

23   A.      I am.

24   Q.      Okay.  Great.  And just to refresh here, this is the

25   FDA meeting minutes from March 14th, 2014; is that right?

1    A.    Yes.

2    Q.    Okay.  And you were present at this meeting?

3    A.    I was.

4    Q.    And in addition to yourself, there were a number of

5    attendees from the FDA as well; right?

6    A.    There were a number of attendees from the FDA, yes.

7    Q.    Right.  And this, this meeting was specifically about

8    enalapril; right?

9    A.    It was about enalapril.  In general, pediatric

10   products developed.

11   Q.    But the scope of this meeting was to discuss

12   Silvergate's enalapril product; right?

13   A.    The scope of the meeting was to talk about sort of

14   the recap of the FDA approval process.

15   Q.    They actually made a presentation at this meeting;

16   right?

17   A.    We did.

18   Q.    Okay.  And you personally made that presentation?

19   A.    I'm sorry?

20   Q.    And you personally made that presentation?

21   A.    Yes, I believe so.  I believe that's correct.

22   Q.    Okay.  And just so I'm clear, these are the -- these

23   are the FDA notes through that meeting?

24   A.    Yes.

25   Q.    If we could go to the second page, please.  And for

Beckloff - cross

1    the record, the Bates number at the bottom right-hand corner

2    is SLVGT-EPA_00030007.

3    A.      Got it.  Okay.

4    Q.      All right.

5    A.      Mm-hmm.

6    Q.      And so the middle of the page, it has got a

7    discussion section.

8            Do you see that?

9    A.      Yes.

10   Q.      And then it says, introductions were made and a brief

11   overview presentation was made by M. Beckloff.

12           Do you see that?

13   A.      I do.

14   Q.      Okay.  So that's a true statement; right?  You made a

15   presentation?

16   A.      I did.

17   Q.      Okay.  So following that paragraph, there's a

18   statement that says, the follow highlights -- the following

19   are the highlights of the discussion.  And I would like to

20   point your attention to item number three.  And I will just

21   read it for the record here.

22           It says, the FDA does not know the true extent

23   of safety issues associated with compounded or

24   extemporaneously prepared product.  They are not aware of

25   this as a major issue.

Beckloff - cross

1              Do you see that?

2    A.       I do.

3    Q.       Okay.  And so what the FDA was saying there is that

4    they don't think that compounded extemporaneously prepared

5    products and safety is a major issue for them; is that

6    right?

7    A.       No.  I disagree with that.

8    Q.       Okay.  But this is the FDA's statement; right?

9    A.       Yes.  This is one of the sad realities of compounded

10   products in that the FDA has no real vision on adverse

11   events associated with improperly compounded or

12   extemporaneously prepared product.

13   Q.       So are you saying the FDA is wrong here?

14   A.       I'm saying the FDA has no vision on safety issues

15   with compounded or extemporaneously prepared products.

16   Q.       All right.  So I would like to turn back to the first

17   page here and I touched on this briefly.

18              And the FDA, the list of meeting attendees there

19   you have, and I will represent this, you've got three

20   offices of the FDA.  You've got seven divisions from the FDA

21   and 14 medical doctors; is that right?

22   A.       That's correct.

23   Q.       And these were the meeting notes that they made; is

24   that right?

25   A.       Yes.

Beckloff - cross

```
1   Q.      And you're saying you don't agree with their

2   statement about compounded or extemporaneously prepared

3   products; is that right?  Is that what you are saying?

4   A.      I'm saying that that is not what they said.  I'm

5   saying that they told us that they did not have vision on

6   the extent of safety issues associated with compounded or

7   extemporaneously prepared products.

8   Q.      I want to touch on, quickly on one last document that

9   you used on your direct.  I would like to go to PTX-246.

10              Mr. Beckloff, do you recognize this document?

11  A.      I do.

12  Q.      Okay.  And turn to the second paragraph here.  At the

13  end, or, sorry, backing up, the second paragraph talking

14  about the exclusivity for the Epaned Kit; right?

15  A.      Yes.  This -- the second paragraph?

16  Q.      Yes.

17  A.      Yes.

18  Q.      Okay.  And it says -- well, you know what?  Let me

19  move on from this.

20              MR. RUEDY:  I would like Mr. Roberts to pull up

21  DTX-2159.

22  BY MR. RUEDY:

23  Q.      And, Mr. Beckloff, do you recognize this document?

24  A.      Yes, I do recognize it.  Did you say which -- 2150.

25  Got it, got it.
```

Beckloff - redirect

1    Q.      Sorry, Mr. Beckloff.  It's not in your binder.

2    You'll have to look the a the screen.

3    A.      Oh, okay.  Sorry.  Yes.

4    Q.      And what is this document?

5    A.      This is a citizens' petition.

6    Q.      And this was a citizens' petition submitted to the

7    FDA by Silvergate for the Epaned oral solution product;

8    right?

9    A.      You know, I would have to read it, if that's true or

10   not.  Epaned.  It's pretty small, so that's why I'm --

11   Epaned oral solution, yes.

12   Q.      And so this is the citizens' petition that was

13   submitted by Silvergate; right?

14   A.      Yes, on behalf, by -- by Dr. Andres.

15   Q.      All right.  And if you go to the last page of the

16   document, please.  If you look at the bottom, there's a cc

17   line.  You were cc'd on this document; right?

18   A.      That is correct, yes.

19              MR. RUEDY:  Your Honor, no further questions.

20              THE COURT:  Okay.  Redirect?

21              MS. MORGAN:  Yes, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MS. MORGAN:

24   Q.      Mr. Beckloff, do you know why the FDA did not give

25   orphan drug exclusivity for the Ready-to-Use product?

1    A.    Yes.  It was because they made a determination that

2    pediatric hypertension was no longer an orphan disease

3    because -- primarily because of the childhood obesity

4    epidemic in this country.

5    Q.    What does it mean to be an orphan disease?

6    A.    Less than 200,000 cases annually.

7    Q.    So if I'm understanding you correctly --

8    A.    Oop.

9    Q.    I'm sorry.  Go ahead.

10   A.    I missed your question there.

11   Q.    So if I'm understanding --

12   A.    No, no.

13          THE COURT:  Are you finished, Mr. Beckloff, with

14   your answer?

15          THE WITNESS:  I am, but I couldn't hear Natalie.

16          MS. MORGAN:  Can you hear me now?

17          THE WITNESS:  I can.

18          MS. MORGAN:  Okay.

19   BY MS. MORGAN:

20   Q.    So if I understand you correctly, then when the FDA

21   denied orphan drug exclusivity, the childhood obesity

22   problem had increased to be over that 200,000 population

23   ceiling; is that correct?

24   A.    That is correct.

25   Q.    All right.

1      MS. MORGAN:  Now, turning to a -- and if we can

2  go to the second page of the document, SLVGT-EPA-3007.

3      And can you please blow up point number 3,

4  paragraph 3.

5      THE WITNESS:  Yes.

6      MS. MORGAN:  And I think you were trying to

7  explain your view of the FDA's statement here.

8      MS. MORGAN:  And can you please highlight the

9  words "which may be due to the way the safety data is

10 collected by the sponsor companies."

11     THE WITNESS:  Yes.

12     MS. MORGAN:  And then the following sentence,

13 "The FDA does not believe they would be able to discern

14 safety reports."

15 BY MS. MORGAN:

16 Q.    Can you just explain if this is what you were talking

17 about and what your understanding is of the evidence

18 regarding the safety of compounded products?

19 A.     Yes.  This was indicating that the FDA didn't feel

20 like they had vision of -- to the extent that compounded

21 products and extemporaneously prepared products were

22 safety issues from the existing FDA safety database, the

23 MedWatch.

24 Q.    And can you explain what that is referring to?

25 A.     That is referring to a collected database where all

1    adverse events are reported to the FDA.  But in the case of

2    compounded products, they're not reported, generally not

3    reported.

4    Q.    Do you know why that is?

5    A.    They don't fall under the approved drug regulations.

6              MS. MORGAN:  Okay.  Thank you, Your Honor.

7              At this time, I have no further questions for

8    Mr. Beckloff, but I would like to move exhibits we used with

9    Mr. Beckloff into evidence.

10             THE COURT:  All right.  We'll do in that just a

11   minute.  I just have a few questions for Mr. Beckloff.

12             We'll split my time equally between the sides,

13   and you can each have a follow-up if you want to.

14             MS. MORGAN:  Certainly.

15             THE COURT:  Ms. Morgan, could you put the

16   PDX-106, that pyramid back up for us?

17             MS. MORGAN:  Certainly.

18             THE COURT:  Thank you.

19             Mr. Beckloff, you remember this pyramid; right?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Thank you.

22             The RTU product, ready-to-use product, which bar

23   does it fall in on this pyramid?

24             THE WITNESS:  It would be the third, the third

25   from the top.

Beckloff - Court questions

1          THE COURT:  Refrigerated solutions?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  Thank you.

4          And then do you remember you were asked some

5   questions about after you met with the FDA and you were in

6   the parking lot?

7          Do you remember that?

8          THE WITNESS:  Yes, I do.

9          THE COURT:  It was not clear to me.  Was that

10  the first time that Silvergate thought about pursuing a

11  ready-to-use product?

12         THE WITNESS:  I think it was the first time that

13  we fully understood the extent that the FDA cared about the

14  ready-to-use formulations as being safer products as

15  compared to reconstituted product.

16         THE COURT:  Was it, to your knowledge, an idea

17  that you or anyone at Silvergate had thought about pursuing

18  prior to that time in the parking lot?

19         THE WITNESS:  No, we hadn't, we hadn't thought

20  about the solution, the ready-to-use solutions.  We were

21  focused on the just add water, reconstituted powders at that

22  time.

23         THE COURT:  Okay.  Thank you.  That was all my

24  questions.

25         Ms. Morgan, any follow-up?

```
 1                    MS. MORGAN:  No, Your Honor.

 2                    THE COURT:  Okay.  Mr. Ruedy, any follow-up.

 3                    MR. RUEDY:  No questions.  But, Your Honor, I'd

 4      like to move into some evidence after the plaintiffs have.

 5                    THE COURT:  We will get to that momentarily.

 6                    Ms. Morgan, you go first, please.

 7                    MS. MORGAN:  Certainly, Your Honor.

 8                    I'd like to move into evidence the following PTX

 9      exhibits.  And I'll just read the numbers since they are all

10      PTX:

11                    1, 2, 3, 4, 5, 6, 7, and 8, 29, 31, 34, 37, 42,

12      98, 219, 224, 246, 248, 249, 250, 251, 252, 253, 254, 255

13      through 259, 267, 268, 287, 292 and 293, 296, 299, 301, 317

14      through 319, 325, 326, 329, 330, 337, 477, and 480.

15                    THE COURT:  Any objection?

16                    MR. RUEDY:  No, Your Honor.

17                    THE COURT:  Okay.  Those are all admitted.

18      Thank you.

19                    (Above-mentioned exhibits admitted into evidence.)

20                    THE COURT:  Mr. Ruedy, any for you?

21                    MR. RUEDY:  Yes.  Amneal moves in DTX-2159 and

22      DTX-2166.

23                    THE COURT:  Any objection?

24                    MS. MORGAN:  No, Your Honor.

25                    THE COURT:  Okay.  Those are admitted as well.
```

```
 1                    (DTX-2159 and DTX-2166 admitted into evidence.)

 2                    THE COURT:  Mr. Beckloff, I think we are done

 3      with you for now.  Thank you very much for your time.

 4                    THE WITNESS:  Thank you very much, Your Honor.

 5                    (Witness excused.)

 6                    MS. MORGAN:  Thank you.

 7                    THE COURT:  All right.  Plaintiff may call its

 8      next witness.

 9                    MS. MORGAN:  Dr. Stephen Byrn will be our next

10      witness.

11                    THE COURT:  Okay.

12                    We'll swear the witness.

13                    ... DR. STEVEN R. BYRN, having been first duly

14      affirmed, was examined and testified as follows ...

15                    THE COURT:  Thank you very much.

16                    And thank you, Dr. Byrn.  Thank you for being

17      with us.

18                    Counsel, you may proceed when you are ready.

19                    THE WITNESS:  Thank you.

20                    MS. MORGAN:  And I just want to raise, in case

21      defendants wish to seal the courtroom, as indicated on our

22      slides, these do contain confidential information.

23                    THE COURT:  All right.  You are not going to

24      start with that, though, are you, Ms. Morgan?

25                    MS. MORGAN:  Not at the very beginning.  But we
```

Byrn - direct

1    do pretty, pretty quickly.

2              THE COURT:  Okay.

3              MR. ALUL:  Your Honor, I would hope that they

4    would notify us and the Court when they're going to do

5    that.

6              THE COURT:  Right.  I mean, Ms. Morgan, you can

7    do that.  I assume you have some background and introduction

8    of the witness; right?

9              MS. MORGAN:  I do.  I just wanted to give

10   defendants notice so that they could act accordingly.

11             THE COURT:  Okay.  Well, we'll also assume that

12   you will let us know yourself before you know we're moving

13   into the confidential material.

14             MS. MORGAN:  Yes.  Yes, I will.

15             THE COURT:  Okay.  Thank you.

16                  DIRECT EXAMINATION

17   BY MS. MORGAN:

18   Q.    Good afternoon.  I suppose it is, for most everyone

19   on video.

20             Dr. Byrn, can you please introduce yourself to

21   the Court?

22   A.    Yes.  My name is Steve Byrn.  I am a professor at

23   Purdue University.

24   Q.    And what were you asked to do in this case?

25   A.    I was asked to review the patents and the documents

1    and make a determination of infringement, whether

2    Bionpharma's products were infringing the patents of

3    Silvergate.

4    Q.     Thank you.  And did you prepare slides to assist your

5    testimony in this case?

6    A.     Yes.

7    Q.     Okay.  And is that what is showing on the screen?

8    A.     Yes, it is.

9    Q.     Okay.  Let's take a look at the first one.

10          I'd like to talk a bit about your background

11   before we dig into the substance.

12          Can you please tell us first what is PTX-472

13   that is referred to on this slide, PDX-201?

14   A.     That is my curriculum vitae.

15   Q.     Thank you.

16          And what is showing here on this slide?

17   A.     So this is showing my education and the positions I

18   held and some information about publications.

19   Q.     Can you please tell us your educational background?

20   A.     Yes.  I graduated with a chemistry degree in 1966.

21          And then a Ph.D. from the University of Illinois

22   in 1970.

23          And did post-doctoral work at UCLA in 1972.

24          And then I went directly to Purdue as an

25   assistant professor, and then associate, and then full

Byrn - direct

1    professor.

2                    And I have been at Purdue since 1972.

3    Q.      And how many publications do you have?

4    A.      I have nearly 200 publications and a wide range of

5    areas listed there:  formulation, stability, medicinal

6    chemistry.  And I'm also the coauthor of leading books in

7    the field of solid-state chemistry.

8                    MS. MORGAN:  Let's go to the next slide.

9    BY MS. MORGAN:

10   Q.      So talking about PDX-202.  Can you please tell us

11   what awards you received?

12   A.      I've received a number of awards from the American

13   Association of Pharmaceutical Scientists.  This is the main

14   organization for pharmaceutical scientists, formulators,

15   analytical chemists, drug development.

16                   I received a Dale Wurster Award in Formulation.

17   It's the highest award that can be given in formulation.

18   It's given every two years.

19                   And I also received the Grant Award and the

20   Health Award.

21                   And I'm a member of the American Association of

22   Pharmaceutical Scientists.

23                   And I have been an editor on numerous editorial

24   advisory boards.

25   Q.      And tell us a bit about the commercial ventures you

Byrn - direct

1    have been involved in?

2    A.    I am also an entrepreneur.  My wife and I started a

3    company in 1991 called SSCI.  It grew to 100 people.

4              And we sold it in 2006 and started another

5    company called Improved Pharma.

6              And I have also worked on a number of regulatory

7    issues.

8              I've been chair of the Pharmaceutical Sciences

9    Advisory Committee of the FDA.

10             And chair of several expert committees at the

11   United States Pharmacopeia.

12   Q.    And have you performed any consulting or expert work

13   outside of what you have already described?

14   A.    Yes.  I have been an expert in about 15 trials and

15   also done numerous depositions.

16   Q.    And have you been previously qualified as an expert

17   and testified in patent cases before?

18   A.    Yes.  Those 15 trials were all patent cases, and I

19   was qualified as an expert.

20   Q.    And did any of those cases involve liquid

21   formulations?

22   A.    Yes.  At least two of them involved liquid

23   formulations.

24   Q.    And have you also personally worked on formulating a

25   liquid formulation of enalapril, the active ingredient in

Byrn - direct

1    the products at issue in this case?

2    A.      Yes.  You can see I got the Global Health Award from

3    AAPS, and that is in part because we have a large program in

4    Africa.  And in Kenya, they were grinding up tablets, adding

5    water, and using those to dose children as described by

6    Dr. -- or Mr. Beckloff.

7                And so we started doing a number of stability

8    studies on Kenyan tablets to see how stable that procedure

9    was and long a product would last.

10   Q.      Are you being compensated for your work related to

11   this case?

12   A.      Yes.

13   Q.      And is your compensation related at all to the

14   outcome of this case?

15   A.      No, not at all.

16               MS. MORGAN:  Your Honor, at this time,

17   Silvergate offers Dr. Byrn as an expert qualified in

18   pharmaceutical formulation and chemistry and ask that you

19   find he's qualified to provide expert testimony.

20               THE COURT:  Any objection?

21               MR. ALUL:  No objection from Bionpharma, Your

22   Honor.

23               THE COURT:  Okay.

24   BY MS. MORGAN:

25   Q.      So let's turn now and talk about your work specific

Byrn - direct

1     to this case.

2               MS. MORGAN:  Next slide, please.

3     BY MS. MORGAN:

4     Q.     Can you please explain, what is PDX-203?

5     A.     These are the asserted claims of the patents-in-suit

6     against Bionpharma.

7     Q.     And can you --

8     A.     These are patents in the -- sorry.  The patents in

9     the asserted claims.

10    Q.     And can you please tell us, what is PTX-3?

11    A.     That's U.S. Patent 10,039,745.

12    Q.     And what's PTX-4?

13    A.     That's U.S. Patent 10,154,987.

14    Q.     And if we refer to the asserted claims, can we

15    understand that the claims, the 4, 7 and 10 of the '454

16    patent and 20, 23 and 30 of the '987 patent are what we're

17    referring to for your testimony?

18    A.     Yes.

19    Q.     Okay.

20    Q.     Let's go to the next slide, slide PDX-304.

21               So showing PDX-204 and using claim 4 of the

22    '745 patent as an example, can you just explain generally

23    what the '745 patent claims that are asserted in this case

24    cover?

25    A.     Yes.  So it covers a stable oral liquid formulation

1    and then there are four (iiii), four components to that.

2                           One is enalapril or a pharmaceutically

3    acceptable salt or solvate.

4                      Two is a buffer comprising citric acid and

5    sodium citrate with different amounts.

6                      Three is a sodium benzoate in different amounts.

7                      And four is water.

8                      And then the formulation is stable at five plus

9    minus three degrees Centigrade for at least 12 months, and

10   the stable oral liquid formulation has about 95

11   weight/weight or greater of the initial enalapril amount and

12   about five weight/weight or less total impurity or related

13   substances at the end of the given storage period and then

14   claim 4 comes in and says the stable oral liquid formulation

15   of claim 1, wherein the formulation does not contain

16   mannitol.

17   Q.    So do the asserted claims of the '745 patent

18   generally cover an oral liquid formulation with the various

19   components you've described?

20   A.    Yes.

21   Q.    And how about, let's go to the next slide.  Looking

22   at the '987 patent with the claim 20 as an example, can you

23   tell us just at a high level how the claim, asserted claims

24   of the '987 patent differ from the '745?

25   A.    Well, these are essentially they're the same claims

Byrn - direct

1    except the '987 starts out, a method of treating heart

2    failure in a subject.  So these are method claims for heart

3    failure.

4    Q.    Okay.  So at a high level, are the '987 asserted

5    claims directed for methods of treatment using the

6    formulation?

7    A.    That's correct.  Using all of those components that

8    are covered in the previous patent, the '745.

9    Q.    Okay.  So referring again to your binder, looking at

10   PTX-1 and PTX-2.

11   A.    Okay.  I've got them.

12   Q.    Are these two patents the two patents related to the

13   patents-in-suit against Bionpharma?

14   A.    These are two previous patents to the

15   patents-in-suit.

16   Q.    The '008?  Sorry.  Go ahead.

17   A.    Excuse me.  Go ahead.

18   Q.    No, please.  Finish your answer.

19   A.    And these have the same specification as the

20   patents-in-suit.

21   Q.    That was my very next question.  And did you also

22   consider all four patent histories for the four patents

23   we've discussed, the two in suit and the two that are

24   related?

25   A.    Yes.  The bio history sort of covers the prosecution

Byrn - direct

1    of all four patents.

2    Q.     Okay.  Now, at a high level and without discussing

3    any confidential information, just how did you form your

4    opinion regarding infringement by bio farm mass ANDA

5    product?

6    A.     So I reviewed these patents and then I reviewed the

7    ANDA, the ANDA of Bionpharma and some of the materials

8    related to these issues and did an analysis and came up with

9    my conclusion.

10   Q.     And what was your conclusion?

11   A.     That Bionpharma infringed all of the claims of these

12   patents -- of the asserted claim, either literally or under

13   the Doctrine of Equivalents.

14   Q.     Thank you, Doctor.

15          Now I'm going to switch gears and I am going to

16   talk about Bionpharma's ANDA product.

17          THE COURT:  Sir?

18          MR. ALUL:  Your Honor, objection.  I would like

19   to point out there's a stipulation of no literal

20   infringement with the Court on file.

21          MS. MORGAN:  Actually, Your Honor, each claim

22   limitation is evaluated individually, and if you will -- the

23   witness' statement was that each limitation is met either

24   literally or under the Doctrine of Equivalents.

25          It's true that we do not assert that any claim

Byrn - direct

1    as a whole is literally infringed, but you must evaluate

2    each claim limitation individually and the witness'

3    statement was that each claim limitation is met either

4    literally or under the Doctrine of Equivalents.

5             MR. ALUL:  Your Honor, I don't have a realtime

6    feed here, but I will withdraw the objection.  I will take

7    Ms. Morgan's representation.

8             THE COURT:  Okay.  And there is no literal

9    infringement theory with respect Bionpharma; is that

10   correct?

11            MS. MORGAN:  Not with respect to an entire

12   claim, but individual elements of a claim may still be met

13   literally.

14            THE COURT:  Okay.  That's not what you object

15   to?

16            MR. ALUL:  That's correct, Your Honor.

17            THE COURT:  Okay. That's fine.  We'll move on.

18   Thanks.

19   BY MS. MORGAN:

20   Q.    So anyway, as I was saying, we're now moving into

21   confidential information.  I just wanted to give notice.

22            THE COURT:  Okay.  Let's give us a moment and

23   we'll ask Mr. English, please move the public and anybody

24   that needs to be out.

25            (Following portion ordered sealed by the Court,

Byrn - cross

1   bound separately.)

2             THE TRIALanywhere HOST:  Everyone rejoined.

3             THE COURT:  Okay.  Thank you.

4             MS. MORGAN:  Shall I open the exhibits yet?

5             MR. ALUL:  Please.  I was going to ask that both

6   the witness and opposing counsel open our binders up.

7             MR. ALUL:  To speed things up, can the hot seat

8   operator put up DTX-1019, please.

9             THE COURT:  All right.  Dr. Byrn has his copy.

10  Ms. Morgan, do you have yours?

11            MS. MORGAN:  I do.  And I'm here, Your Honor.

12  I'm just sitting down.

13            THE COURT:  Not a problem.  I think you can

14  proceed.

15            MR. ALUL:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. ALUL:

18  Q.    Good afternoon, Dr. Byrn.  My name is Andy Alul.  We

19  met late last year at your deposition.  I would like to ask

20  you a few questions.  You reviewed the deposition transcript

21  of Janice Cacace; correct?

22  A.    Yes.

23  Q.    And from your review of that, would you agree that

24  Janice Cacace is not a Bionpharma employee?

25  A.    I didn't review that carefully, but I understood from

Byrn - cross

```
 1    what you said -- I mean, I didn't review that in detail, but

 2    I heard what you said.

 3    Q.    Okay.  Let's go to -- let's go to page 35 of the

 4    transcript, lines 2 through 4.  Maybe this refreshes your

 5    recollection.

 6              "Question:  So other than through your work at

 7    CoreRx, do you have any relationship with Bionpharma?

 8              "Answer:  No."

 9              Does that refresh your recollection?

10    A.    Well, I heard what you said, yes, but I don't know

11    the arrangements between CoreRx and Bionpharma, but I think

12    it, you know, stands on its own, what it's saying.

13    Q.    Okay.  But I'm asking you:  Do you have any evidence

14    whatsoever that Janice Cacace is an employee of Bionpharma?

15    A.    No, I don't have any independent evidence.

16    Q.    Okay.  And is there anything in the transcript that

17    you recollect that you read that suggests that she was a

18    Bionpharma witness?

19    A.    No, but there's nothing -- they didn't really explain

20    the relationship between the company, but I didn't see

21    anything in the transcript.

22    Q.    Okay.  You've been serving -- we can take down the

23    1019.

24              You've been serve ago an expert witness in

25    federal civil litigation for approximately the last
```

Byrn - cross

1    30 years; is that correct?

2    A.    Correct.

3    Q.    Okay.  And all of the cases you've served as an

4    expert on have been intellectual property suits or otherwise

5    related to pharmaceutical drug patent suits; is that

6    correct?

7    A.    I may have done some work on antitrust suits but they

8    related to patents.

9    Q.    Okay.  And for approximately 90 percent of those

10   cases where you provided testimony, you were serving as an

11   expert on the brand side; is that correct?

12   A.    Although that's correct, our Africa program is very

13   heavily focused on generic products.

14   Q.    Sir, sir, with all due respect, I've got a very

15   limited amount of time here.  If you want to expound on

16   anything, you can do it on redirect with your counsel.  I'm

17   just asking for direct answers to my questions, please?

18   A.    Okay.

19   Q.    You have never had primary responsibility for

20   formulating a drug that has received regulatory approval; is

21   that correct?

22   A.    I've never worked for a company, that's correct, that

23   got -- marketed drugs that got regulatory approval.

24   Q.    Okay.  Just so the record is clear, you have never

25   had primary responsibility for formulating a drug that has

Byrn - cross

1    received regulatory approval; is that correct?

2    A.       That's correct.

3    Q.       Thank you.

4             And so you've never had primary responsibility

5    for formulating a drug that has actually been

6    commercialized; is that correct?

7    A.       Not primary responsibility, but I've done a whole lot

8    of consulting on drugs that have been commercialized.

9    Q.       Okay.  And you have never formulated any liquid

10   products using sodium benzoate as a preservative; is that

11   correct?

12   A.       I mean, I've taught about that, but I've never done

13   it.

14   Q.       You've never formulated a pharmaceutical liquid

15   dosage form using citric acid and sodium citrate as buffers;

16   is that correct?

17   A.       Again, I've thought about it but I've never done it.

18   Q.       Sir, I'm not asking about your teaching endeavors.

19   I'm just asking you straightforward questions and these are

20   susceptible to yes or no.

21             MS. MORGAN:  Objection.  Your Honor, if we can

22   just ask Mr. Alul to please just bring his voice down a

23   little.  He's yelling.  I think he's being a little

24   aggressive with the witness.  I don't think that's

25   necessary.

 1                 THE COURT:  I was --

 2                 MR. ALUL:  Part of it, Your Honor, that -- I'm

 3      sorry.  Go ahead.

 4                 THE COURT:  I'm going to overrule the objection.

 5      I think we're just all at different volume levels and we're

 6      not quite sure who can hear what.

 7                 And, Dr. Byrn, if you could really focus on

 8      answering the question that's asked and only the question

 9      that's asked and then on redirect, you may be asked some

10      further elaboration, that would help.  Okay?

11                 THE WITNESS:  Okay.

12                 THE COURT:  Thank you.  Go ahead.

13                 MR. ALUL:  Thank you, Your Honor.

14      BY MR. ALUL:

15      Q.     You have never formulated a pharmaceutical liquid

16      dosage form using citric acid and sodium citrate as buffers;

17      is that correct?

18      A.     Yes, correct.

19      Q.     Okay.  You have never formulated --

20                 MR. ALUL:  I'm sorry.  At this point, Your

21      Honor, I need to seal the courtroom if that's okay.

22                 THE COURT:  It is okay.  Just wait a moment and

23      tell us when that is done, please.

24                 (Following portion ordered sealed by the Court,

25      bound separately.)

Byrn - cross

```
 1              THE TRIALanywhere HOST:  The courtroom is open
 2      again.
 3              THE COURT:  Thank you.
 4      BY MR. ALUL:
 5      Q.      Dr. Byrn, could you please turn to PTX-5.  It should
 6      be the second volume of your exhibit binders.
 7      A.      Oh, okay.
 8      Q.      This is the '603 application prosecution history that
 9      you looked at with Ms. Morgan; correct?
10      A.      Correct.
11      Q.      Okay.  I'd like you to turn to -- and I'm going to
12      use these -- the Bates numbers on the bottom right-hand
13      corner, I'm just going to use the last three digits for
14      brevity?
15      A.      Okay.
16      Q.      Can you turn to 858?
17      A.      Okay.
18      Q.      Now, this is the amendment to the claims that
19      Silvergate made in the February 2017 amendment and response
20      that you were looking at with Ms. Morgan; correct?
21      A.      Correct.
22      Q.      Okay.  Now, let's just focus on the -- on claim 1 and
23      particularly the buffer limitation.
24      A.      Okay.
25      Q.      Okay.  Now, I just would like you to focus on the
```

Byrn - cross

1   literal scope of this claim element.  Okay?

2   A.    Okay.

3   Q.    All right.  You don't dispute that after the

4   amendment -- I'm sorry.

5        You don't dispute that the amendment narrowed

6   the literal scope of this claim element; correct?

7   A.    That's not correct.

8   Q.    Why is that not correct?

9   A.    Because I stated that this -- these are equivalent

10  systems.

11  Q.    Okay.  Sir, I'm not focusing on any Doctrine of

12  Equivalents issues.  I'm just focusing on the literal scope

13  of the claim.

14        You understand what "literal scope" means;

15  correct?

16  A.    I do.

17  Q.    Okay.

18  A.    But I cannot agree.

19  Q.    And why don't you agree?

20  A.    Because the 1.8, 2 milligram per mL citric acid and

21  then you add .15 milligram per mL, so a small additional

22  amount, but then you, down below you adjust the pH to 3.5,

23  you get the same ratio of citric acid/sodium citrate with or

24  without that addition.

25  Q.    Okay.  Let's try it this way.

Byrn - cross

```
 1    A.      Essentially, that's saying that.  I did say
 2    essentially the same ratio.
 3    Q.      You don't dispute after this amendment, a formulation
 4    that does not include about 0.15 milligrams per milliliter
 5    sodium citrate dihydrate would not literally infringe the
 6    claim whereas before the amendment it would literally
 7    infringe the claim, assuming all other limitations are
 8    literally met?
 9    A.      I -- to me, it's the -- an equivalent buffer.  I'm,
10    I'm -- from a professor's viewpoint and a skill of the art,
11    it is an equivalent buffer because it has the same molecules
12    in there.
13    Q.      Sir, with all due respect, I was not asking about
14    equivalent scope.  I was not asking about equivalency.  I'm
15    just asking you about literal scope.
16            I'm just asking about whether or not this
17    amendment narrowed the literal scope of the buffer
18    limitation.  That's all I'm concerned with.
19            Can you -- can we agree that this amendment
20    of adding 0.15 milligrams per milliliter sodium citrate
21    dihydrate narrowed the literal scope of this element?
22    A.      Maybe I should ask what you mean by "literal."
23    Q.      So you don't understand what "literal scope" is?
24    A.      Well, if you look at it from a chemical viewpoint,
25    it doesn't narrow the literal scope.  The chemicals are the
```

1    same in there regardless of whether you add that addition

2    or not.

3    Q.      Okay.  So it's your position that the additional

4    0.15 milligram per milliliter sodium citrate dihydrate did

5    not narrow the literal scope of this element?

6    A.      I think I called them equivalent or similar buffers.

7    I forget my exact statement on direct.

8    Q.      So in your, in your opinion, an accused product that

9    met all of these limitations but did not have the about

10   0.15 milligram per milliliter sodium citrate dihydrate would

11   still literally infringe this claim.  Is that what you are

12   saying?

13   A.      From my chemical standpoint, it would add exactly the

14   same chemicals in there.  So essentially they're the same

15   chemicals.  There will be slightly different amounts, but it

16   would be essentially the same chemical.  Because if you have

17   1.82 milligrams of citric acid, that is going to equilibrate

18   to a certain proportion when the pH is 3.5.

19           If you add in another .15 milligrams sodium

20   citrate, maybe that brings it up to 1.9 something.  But then

21   they're going to equilibrate to exactly the same ratio.  So

22   you are going to have the same molecules in the same ratio,

23   very slightly different amounts.

24           To me, that seems like they're equivalent

25   buffers.

Byrn - cross

1    Q.      Okay.  Let's turn to PTX-3 in your exhibit binder.

2    A.      I guess what I said on direct was there were --

3    Q.      Sir --

4            THE COURT:  Doctor, you have answered the

5    question.

6            MR. ALUL:  We're moving on.

7            Let's go to PTX-3.  Let's go to claim 1.

8    BY MR. ALUL:

9    Q.      Okay.  The second element, little (ii), that's the --

10   recites the buffer element; correct?

11   A.      Correct.

12   Q.      Okay.  And the buffer, the buffer element or

13   limitation gives the ratio of citric acid and sodium citrate

14   in these claimed formulations; correct?

15   A.      Yes.

16   Q.      Okay.  One of the characteristics of a buffer is a pH

17   range over which it maintains more or less a constant pH;

18   correct?

19   A.      Correct.

20   Q.      You agree that buffer capacity is the quantitative

21   measure of the resistance to change of pH of a solution

22   containing a buffering agent; correct?

23   A.      It's hard to define buffer capacity in complex

24   systems.  The term "buffering capacity" is normally used

25   for simple buffers.

Byrn - cross

Q.      Okay.

A.      I think that is generally correct, but I don't think

it's -- I think it's dangerous to apply to complex systems

like we have here.

Q.      Okay.  The buffer capacity of a buffer generally

depends on the concentration of the species of the buffer in

the solution; correct?

A.      Correct.  But we had multiple buffers in this system.

Q.      Sir, I'm just asking you to answer my questions

directly, please, respectfully.

        For simple buffers, the higher concentration of

the buffer, the higher the concentration of buffer species;

correct?

A.      For simple buffers, that is correct.

Q.      Okay.  When the buffer ratio is 3.5 milligrams per

milliliter of citric acid and 1.2 for sodium citrate, the

buffer species concentration is higher than when the

concentration of the buffer is 0.8 milligrams per milliliter

citric acid and 0.1 milligram per milliliter per sodium

citrate.  Is that correct?

A.      That's correct.

Q.      Okay.  And the higher concentrations of citric acid

and sodium citrate would translate into more buffer species

concentration; correct?

A.      Correct.  There would be more citric acid molecules

                         Byrn - cross

 1    in sodium citrate.

 2    Q.      And the buffer capacity for a simple buffer is

 3    directly proportional to the buffer species concentration;

 4    correct?

 5    A.      That's correct for a simple buffer.

 6    Q.      Okay.  Turning back to PTX-3, claim 1 of the '745

 7    patent requires a certain concentration of sodium benzoate;

 8    correct?

 9    A.      Yes.

10    Q.      Okay.  The pH of Epaned is less than 3.5; correct?

11    A.      I'm not sure I know the exact pH of Epaned, the

12    marketed product.  I think it's between 3 and 3.5, but I

13    don't know what it is.

14    Q.      But it falls within 3 or 3.5; correct?

15    A.      Correct.

16    Q.      And that's -- as you've testified earlier, that's

17    the optimal pH for the claimed formulations; correct?

18    A.      Correct.

19    Q.      Okay.  In a solution of pH between 3 and 3.5, sodium

20    benzoate converts to benzoic acid and is likely to be

21    present as benzoic acid; correct?

22    A.      Correct.

23              MR. ALUL:  Okay.  Your Honor, at this point in

24    time, I'd like to -- we're going to have to reseal the

25    courtroom, please.

Byrn - cross

| 1  | THE COURT:  All right.  And you think you are |
| 2  | still on pace to finish in, say, the next ten minutes? |
| 3  | MR. ALUL:  I probably need a little more time. |
| 4  | I can't remember when I started but I thought it was -- |
| 5  | THE COURT:  That's fine.  I think it's probably |
| 6  | best that we stop.  It is 5:30 at this point. |
| 7  | MR. ALUL:  Understood. |
| 8  | THE COURT:  And there will probably be some |
| 9  | redirect.  So we've had a fairly productive day as it is. |
| 10 | So I'll turn the clock off. |
| 11 | Just a couple of housekeeping points. |
| 12 | For the benefit of the court reporter and the |
| 13 | record, when we are in a sealed session, those portions of |
| 14 | the transcript are, of course, sealed until further Order of |
| 15 | the Court.  They can be shared only with those who are under |
| 16 | the protective order and were present or permitted to be |
| 17 | present during that part of the proceedings. |
| 18 | Tomorrow, I'm going to push the start back to |
| 19 | 9:00 o'clock again tomorrow.  I think we're expecting |
| 20 | some more snow here.  That will slow me down a bit in the |
| 21 | morning, I expect, but I should be available at 9:00 |
| 22 | o'clock, and I should be available until 5:30 again |
| 23 | tomorrow. |
| 24 | Any questions or issues, Plaintiffs, before we |
| 25 | break for the night? |

Byrn - cross

1              MS. MORGAN:  No, Your Honor.

2              THE COURT:  And defendants?

3              MR. ALUL:  No, Your Honor, not from Bionpharma.

4              MR. MADDOX:  Not from Amneal, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              Thank you, Dr. Byrn.  We'll see you in the

7    morning.

8              Good night, everyone.

9              MR. ALUL:  Good night.

10             MS. MORGAN:  Thank you.

11             (Proceedings adjourn at 5:34 p.m.)

12

13        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

14

15                          /s/ Brian P. Gaffigan
                          Official Court Reporter
16                          U.S. District Court

17

18

19

20

21

22

23

24

25