*sealed and confidential*

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

    SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
4                                         :
              Plaintiff,                   :
5    v                                    :
                                          :
6    BIONPHARMA, INC.,                    :    NO. 18-1962-LPS
                                          :    NO. 19-1067-LPS
7              Defendant.                  :
    ------------------------------------
8    SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
                                          :
9              Plaintiff,                  :
    v                                     :
10                                         :
    AMNEAL PHARMACEUTICALS, LLC,          :
11                                         :    NO. 19-678-LPS
              Defendant.                   :
12                              - - -

13                        Wilmington, Delaware
                         Monday, February 1, 2021
14             *Bench Trial - Volume A - Sealed Portions*

15                              - - -

16   BEFORE:       HONORABLE LEONARD P. STARK, Chief Judge

17                              - - -
    APPEARANCES:
18

19             MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:  MEGAN E. DELLINGER, ESQ.
20
                       and
21
               WILSON SONSINI GOODRICH & ROSATI
22             BY:  WENDY L. DEVINE, ESQ., and
                    KRISTINA M. HANSON, ESQ.
23                  (San Francisco, California)

24                     and

25   Valerie J. Gunning              Brian P. Gaffigan
    Official Court Reporter          Official Court Reporter

*sealed and confidential*

1    APPEARANCES:

2

3              WILSON SONSINI GOODRICH & ROSATI
               BY:  NATALIE J. MORGAN, ESQ.
                    (San Diego, California)
4

5                       and

6              WILSON SONSINI GOODRICH & ROSATI
               BY:  GRANVILLE C. KAUFMAN, ESQ., and
                    TY W. CALLAHAN, ESQ.
7                   (Los Angeles, California)

8                       Counsel for Silvergate
                        Pharmaceuticals, Inc.
9

10             MORRIS JAMES, LLP
               BY:  KENNETH L. DORSNEY, ESQ., and
11                  CORTLAN S. HITCH, ESQ.

12                      and

13             TAFT STETTINIUS & HOLLISTER, LLP
               BY:  ROSHAN P. SHRESTHA, Ph.D., ESQ., and
14                  ANDREW M. ALUL, ESQ.
                    (Chicago, Illinois)
15

                        Counsel on behalf of Bionpharma, Inc.
16

17             YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  ANNE SHEA GAZA, ESQ.,
18                  KAREN L. PASCALE, ESQ., and
                    SAMANTHA G. WILSON, ESQ.
19

                        and
20

               MADDOX EDWARDS, PLLC
21             BY:  STEVEN MADDOX, ESQ.
                    JEREMY EDWARDS, ESQ.
22                  MATTHEW RUEDY, ESQ., and
                    KAVEH SABA, ESQ.
23                  (Washington, District of Columbia)

24                      Counsel on behalf of
                        Amneal Pharmaceuticals, LLC
25

*sealed and confidential - Silvergate*

1                          - oOo -

2                  P R O C E E D I N G S

3              (Following portion ordered sealed by the Court,

4      contained herein.)

5              THE TRIALanywhere HOST:  Okay.  The public line

6      and Mr. George have been removed from the meeting and put

7      into the waiting room.

8              THE COURT:  Okay.  Thank you.

9              And before we get started, Mr. English,

10     Ms. Morgan, while I'm understanding her, it seems there is

11     an occasional dropped syllable or two.  I don't know if you

12     are hearing any interference like that.

13             THE TRIALanywhere HOST:  Can you move the

14     microphone down a little bit?

15             MS. MORGAN:  Certainly.

16             THE TRIALanywhere HOST:  Yeah.  Because I think

17     you were --

18             MS. MORGAN:  Is that better?

19             THE TRIALanywhere HOST:  -- you were missing it.

20             MS. MORGAN:  Okay.  And, Your Honor, please feel

21     free to tell me if you can't hear what I'm saying and I will

22     readjust.

23             THE COURT:  I certainly will.  And I heard, I

24     heard what you were saying.  It was just an occasional

25     syllable.  So if we can make it better and hopefully we have

*sealed and confidential - Silvergate*

1    all the better.

2                    Okay.  We'll turn the clock back on, and you can

3    proceed when you are ready.

4                    MS. MORGAN:  Thank you.

5                    All right.  So now let's talk about

6    infringement, beginning with Amneal.

7                    There are 15 claims asserted against Amneal

8    across four patents:  the '008, '442, '745, and '987

9    patents.

10                   Two patents essentially cover the oral liquid

11   formulation, two other patents cover methods of using the

12   formulation to treat diseases.

13                   What you are seeing on the screen is a claim of

14   one of the patents.

15                   Amneal agrees the only dispute with respect to

16   infringement is whether the buffer limitation, which is

17   similar across the patents, whether the buffer limitation of

18   these claims is met by Amneal's ANDA product.

19                   There is no dispute that the other limitations

20   of the asserted claims are met.

21                   Yet Amneal admittedly has a buffer.

22                   First, regarding a buffer.  You will hear that

23   the purpose of a buffer in Silvergate's patented formulation

24   is to adjust and maintain the pH of the formulation.

25                   Amneal's ANDA product meets that limitation

*sealed and confidential - Silvergate*

1    under the Doctrine of Equivalents.  Important, Amneal

2    represented to the FDA that one of the excipients in their

3    ANDA product is a buffer, and that their product has a

4    pH that meets the claim requirement of being between 3 and

5    3.5.

6              Now, Dr. Buckton will explain that pH, which is

7    maintained by the buffer, impacts the chemical stability of

8    a liquid.  In other words, without maintaining stability

9    for the required period of the shelf life of the drug, you

10   can damage the safety and efficacy of the product because

11   the drug can degrade to become toxic or can degrade such

12   that the active ingredient is lost, making it ineffective

13   for the intended treatment.

14             So what does Amneal use to maintain this pH and

15   achieve the required stability?  Malic acid.

16             And Silvergate will show that malic acid in the

17   amount Amneal uses is equivalent to the claimed buffer under

18   the Doctrine of Equivalents.

19             Bionpharma is in a similar boat.

20             There are six claims across two patents asserted

21   against Bionpharma:  The '745 and '987 patent.

22             One covers the formulation and one the method of

23   treatment.

24             And what we're looking at here is a claim of the

25   '745 patent.

*sealed and confidential - Silvergate*

1          Now, Bionpharma agrees that the only dispute

2     with respect to infringement is, similar to Amneal, whether

3     the buffer limitation is met, and there is a second issue,

4     whether the preservative limitation is met.  Both are

5     highlighted here in the limitations of the example claim on

6     the screen.

7          There is no real dispute with respect to the

8     other limitations as these two limitations highlighted

9     are the only limitations that Bionpharma's expert has

10    disputed.

11         But Bionpharma has a buffer and a preservative

12    in their ANDA product.

13         Now, Bionpharma would have us all believe it

14    doesn't have a buffer because it doesn't call anything in

15    its formulation a buffer.  But you will hear testimony

16    from Dr. Stephen Byrn, another scientist with decades of

17    experience in pharmaceutical formulation, that as a matter

18    of basic chemistry principles, there is absolutely a buffer

19    in Bionpharma's solution.

20         You see, he will tell you that Bionpharma has

21    two ingredients in its product, maleate and sodium

22    hydroxide, that instantaneously react in solution to form a

23    buffer.  He can identify it chemically, and he will explain

24    it on a molecular level.

25         And Dr. Byrn will show you Bionpharma documents

1    that indisputably show that there is a buffer in

2    Bionpharma's ANDA product that is adjusting and maintaining

3    the pH of the product, and that it is doing it in the same

4    way chemically as the claimed buffer.  And that Bionpharma

5    also achieves a stable product using their buffer.

6            It reminds me of that saying:  If it looks like

7    a duck, swims like a duck and it quacks like a duck, you

8    know.

9            So Silvergate will show maleate and sodium

10   hydroxide Bionpharma uses produces a buffer that is

11   equivalent to the claimed buffer under the Doctrine of

12   Equivalents.

13           Now, Bionpharma argues that applying Doctrine of

14   Equivalents to its -- to it would vitiate the claims.

15           The doctrine of claim vitiation is not an

16   exception to the Doctrine of Equivalents but asks for a

17   legal determination that no fact-finder determine two

18   elements to be equivalent.

19           As Your Honor I'm sure knows, a claim cannot be

20   vitiated simply by noting that the equivalent substitute is

21   outside the claim limitation's literal scope.  That is

22   precisely why the doctrine exists.

23           But when the accused products contains the

24   antithesis of the claimed product, that is vitiation.

25           And far from having the antithesis of a buffer,

*sealed and confidential - Silvergate*

1    you will hear from Dr. Byrn that Bionpharma does, indeed,

2    have a buffer.  Chemically, molecularly, and evidence of the

3    effects of the buffer are painted all over its ANDA despite

4    Bionpharma's efforts to refrain from calling any specific

5    ingredient by the name "buffer."

6                There is no vitiation.

7                Now, as I mentioned, Bionpharma also asserts

8    that it does not infringe the preservative limitation in the

9    claims.

10               Here, Bionpharma admits plainly in its document

11   that it has a preservative.  It labels ingredients as such.

12               It's a combination of methylparaben and

13   propylparaben.  But Bionpharma claims that this is not

14   equivalent to the claimed sodium benzoate preservative.

15               Dr. Byrn will explain that the function of

16   sodium benzoate is to act as preservative to perform that

17   function by exerting antimicrobial effects at a pH of less

18   than 3.57, which is pH solution, in order to achieve the

19   result of insignificant microbial --

20               You will hear that Bionpharma's preservative

21   performs this exact function in the same way to achieve the

22   same results.

23               Bionpharma chose a combination of

24   methylparaben and propylparaben because of their

25   antimicrobial effectiveness.  And Bionpharma's testing

*sealed and confidential - Silvergate*

1   showed that they effective at a pH of less than .5 with

2   significant degradation.

3           In short, the combination of propylparaben and

4   propylparaben is equivalent to the claimed buffer.

5           Thus, both the of buffer and preservative

6   limitations are met under the Doctrine of Equivalents, and

7   all of their limitations are infringed literally by the

8   ANDA product.

9           Now, turning to in its arguments against the

10  Doctrine of Equivalents, both defendants assert that the

11  Doctrine of Equivalents can not be applied to their

12  respective buffers because Silvergate is estopped by the

13  prosecution history of the patents.

14          THE COURT:  And Ms. Morgan, let me stop you

15  there.

16          MS. MORGAN:  Yes.

17          THE COURT:  Can that argument be made in public

18  or not?

19          MS. MORGAN:  I believe I do -- I do refer to

20  elements of ingredients of their formulation again.

21          THE COURT:  Okay.  All right.  Then go forward.

22          You can proceed.  We'll stay in the sealed

23  session.

24          MS. MORGAN:  Okay.  I was trying to determine if

25  I could eliminate it.

*sealed and confidential - Silvergate*

1          THE COURT:  Okay.  Well, think about it going

2     forward, but at this point, I don't want to slow you down

3     any further.

4          MS. MORGAN:  Thank you.  Thank you, Your Honor.

5          Let me talk about amendment-based estoppel.

6          Looking at the amendment on this screen, this is

7     the amendment in question, and particularly the underlined

8     portion:  The "and about .15 milligram per milliliter sodium

9     citrate dihydrate."

10          The Court will hear from two separate and

11     independent pharmaceutical formulators that what defendants

12     claimed to be narrowing amendment is actually swapping out

13     one buffer system for an equivalent buffer system.  It's not

14     there.

15          Second, even if the swapping of the equivalent

16     buffer systems was narrowing, the Court will hear that there

17     was no reason other than -- that there was a reason other

18     than for patentability for the amendment.

19          And the applicants never pointed to the

20     amendment for any argument to obtain allowance, nor could

21     they have, as you will hear.

22          By contrast, they did make other amendments that

23     applicants specifically explained were to obtain allowance

24     of the claims.

25          Third, the Court will hear that even if the

*sealed and confidential - Silvergate*

1    amendment could be narrowing and related to patentability,

2    the tangential relation exception applies here.  That is a

3    case-by-case, specific analysis, and it asks if the reason

4    for the amendment bears no more than a tangential relation

5    to the equivalent in question, then estoppel cannot be

6    applied.

7              The equivalent in question for Amneal is malic

8    acid.

9              For Bionpharma, it's the buffer formed from

10   maleate and sodium hydroxide.

11             Listen carefully because the defendants cannot

12   identify any reason for the amendment that relates to either

13   equivalent buffer.

14             Now, Your Honor, I believe that the -- no,

15   actually, I will continue to refer to ingredients.

16             So now for argument-based estoppel.

17             There must be a clear and unmistakable surrender

18   of subject matter for argument based estoppel to apply.

19             This is a high bar, as I'm sure Your Honor

20   knows.

21             Simple arguments and explanations do not

22   surrender claim scope.  Thus, arguments to the Patent

23   Office should be read for their full context both within

24   the written submission to the Patent Office and within the

25   context of the entire back and forth before a determination

*sealed and confidential - Silvergate*

1    on whether there has been such a clear and unequivocal

2    disavowal can be made.

3                For example, the applicants never told the

4    Patent Office the invention is this, not that.

5                In short, there simply was no clear and

6    unequivocal disavowal.

7                Now, this is the end of the defendants' defenses

8    to the Doctrine of Equivalents for the buffer limitation.

9    Silvergate will show that they simply do not apply.  But I

10   need to briefly address one additional argument that

11   Bionpharma alone raises because it applies to the

12   preservative limitation.

13               Bionpharma argues that Silvergate disclosed the

14   combination of methylparaben and propylparaben in its

15   patent specification and, therefore, such a preservative is

16   dedicated to the public, cannot infringe under the Doctrine

17   of Equivalents.

18               Again, as I'm sure Your Honor knows, the

19   disclosure dedication doctrine is different from the

20   invalidity doctrines of enablement and written description

21   which Bionpharma does not assert here because they don't

22   have any invalidity defenses.

23               Whether a person of ordinary skill in the art

24   could implement the equivalent without undue experimentation

25   is not a disclosure for dedication to the public purposes.

*sealed and confidential - Silvergate*

1    The inquiries are different.  For there to be a dedication

2    to the public, the unclaimed subject matter must have been

3    identified by the patentee as an alternative to what is

4    claimed.

5            But the Court will hear that the specification

6    does not identify the combination of methylparaben and

7    propylparaben as an alternative to sodium benzoate, which is

8    the claimed preservative.

9            While the specification does, indeed, identify

10   a long laundry list of potential preservatives that include

11   methylparaben in one place and propylparaben in another,

12   neither that laundry list nor other taste-testing data

13   reported in the patent discloses the specific combination

14   much methylparaben and propylparaben as an alternative to

15   sodium benzoate.

16            Disclosure dedication requires something more

17   specific that is lacking here, as Dr. Byrn will explain.

18            Now, turning to invalidity.

19            And, Your Honor, at this time, the courtroom

20   could be revealed.

21            THE COURT:  Okay.  Thank you.  Let's pause for a

22   moment.  And, Mr. English, if you could let the public and

23   the other individual back in.

24            (Silvergate sealed portion ends.)

25                    *    *    *

*sealed and confidential - Bionpharma*

 1                THE TRIALanywhere HOST:  Okay.  The courtroom is

 2     sealed.

 3                THE COURT:  Thank you very much.  You may

 4     proceed.

 5                MR. ALUL:  Thank you, Your Honor.

 6                So just to finish on this slide.  There are

 7     six different reasons why we don't literally infringe, and

 8     Silvergate relies on the Doctrine of Equivalents to satisfy

 9     all six missing limitations, which we respectfully submit is

10     a stretch, Your Honor, and an improper use of the Doctrine

11     of Equivalents.

12                There is Federal Circuit case law out there that

13     says, look, the DOE is not the second step of every

14     infringement inquiry.

15                And as we will see, Silvergate actually --

16     Silvergate's claims are very narrow from an infringement

17     standpoint, but -- hang on.

18                Okay.  There we are.

19                So my next slide, Your Honor, summarizes

20     Silvergate's contentions with respect to our product.

21                With respect to the buffer limitation,

22     Silvergate alleges that maleate acid, which is present in

23     our product, because we formulate our product with enalapril

24     maleate, which is a salt.  It's a salt of the active

25     ingredient.

*sealed and confidential – Bionpharma*

1            The allegation is that the maleate portion of

2     that dissolves and dissociates in our ANDA product and

3     combines with sodium hydroxide that we add in the final

4     few steps of our formulation process to in situ form this

5     maleate acid, sodium maleate buffer system in our product.

6            The contention that Silvergate levels against us

7     with respect to the preservative limitation, Your Honor, is

8     that the methylparaben and propylparaben that we use in our

9     product admittedly as preservatives is equivalent to the

10    claimed sodium benzoate.

11            Now, Your Honor, before I give the Court a

12    preview of our defenses, I think it is worth providing us a

13    little bit of a backdrop how it was that Bionpharma was able

14    to design around Silvergate's patents so extensively.  And

15    really there are two reasons, Your Honor.

16            One, ingenuity.  Bionpharma actually figured out

17    something that Silvergate didn't appreciate when it filed

18    for its Epaned patents.

19            And that is if you formulate your enalapril

20    liquid formulation just right, you don't need a buffer.  And

21    that is something that Silvergate never appreciated.  And

22    because as our expert is going to show, Silvergate intended

23    to claim enalapril liquid formulations with a strong

24    independent buffer.

25            The second reason, Your Honor, is -- that we

*sealed and confidential - Bionpharma*

1    are able to design so extensively around Silvergate's

2    patents is because of the prior art.  And because of the

3    prior art -- well, first of all, enalapril, Your Honor, is

4    an old drug.  It was approved back in 1985.  It is off

5    patent.  It was originally marketed, as Silvergate's counsel

6    explained in her opening, by Merck under the trade name

7    Vasotec as a tablet formulation.

8              Over time, there were -- there arose demands in

9    certain patient populations for more easily administrable

10   enalapril formulations, and the prior art responded.

11             And there were a plethora of liquid formulations

12   of enalapril published in the prior art.

13             Why do I say this?

14             I say this, Your Honor, because out of the gate,

15   at the Patent Office, Silvergate knew it wasn't going to be

16   able to secure broad claim coverage for its Epaned product.

17   And we'll see that shortly.

18             Our next slide.

19             And, Your Honor, we spoke about this this

20   morning.  It's just a qualification.  I'm going to be

21   referring to the claim as narrow.  They are narrow for

22   infringement purposes.  For invalidity purposes, they're

23   actually quite broad.  And that is because the comprising

24   phraseology right after the preamble of each claim, which

25   means, as the experts will acknowledge, that the claims

*sealed and confidential - Bionpharma*

1    contain not only what is recited but can contain more of

2    what is recited and a whole lot of other things.

3              So it's not actually inconsistent to

4    characterize the claims as narrow for infringement purposes

5    but broad for invalidity purposes.

6              Okay.  Now on to our defenses.

7              First up, Your Honor, is our

8    disclosure-dedication defense.

9              I'm sorry, first up is a summary of our

10   defenses.  We have three legal defenses in play:  disclosure

11   dedication, amendment-based estoppel, argument-based

12   estoppel.

13             We have two factual defenses.  What they allege

14   is that the buffer in our product is actually not equivalent

15   to the claimed buffer limitations, as well as we don't --

16   the methylparaben and propylparaben that we used is not

17   equivalent to the sodium benzoate.

18             Your Honor, we also have a claimed vitiation

19   defense, which is technically a legal defense, but I lump it

20   in here because it is related to the factual defenses

21   concerning the buffer limitation.

22             Okay.  First up, Your Honor, is our disclosure

23   dedication legal defense.

24             And all of the claims require sodium benzoate as

25   a preservative at specific concentrations.

*sealed and confidential - Bionpharma*

1          We use methylparaben and propylparaben.

2          Our expert, Your Honor, is going to walk the

3  Court -- the next slide shows our formulation where the

4  Court can see where we use methylparaben and propylparaben

5  as our preservatives.

6          Our expert, Your Honor, Dr. Chris Morton,

7  is going to be walking the Court through the common

8  specification of the patents and pointing out where, where

9  in the common specification there is a disclosure that

10  methylparaben and propylparaben are suitable alternatives

11  for the claimed sodium benzoate.

12          And, Your Honor, we're looking at the Column 10,

13  the portion of the economist specification that actually

14  talks about what preservatives are and provides exemplary

15  preservatives.

16          Preservatives include methylparaben,

17  propylparaben, and their salts, and then sodium benzoate.

18          And, Your Honor, our expert is going to actually

19  bring some perspective from the standpoint of the person of

20  ordinary skill in the art to this.  Because, of course, a

21  common specification needs to be read from the perspective

22  of the POSA.

23          And our expert, Dr. Morton, Your Honor, is going

24  to explain that a POSA looking at this would know two things

25  about methylparaben and propylparaben.

*sealed and confidential - Bionpharma*

1          No. 1.  They were the most commonly used paraben

2     preservatives.

3          And, No. 2, Your Honor, they were almost always

4     used together.

5          So with that piece of factual information,

6     our expert is going to explain, just from this paragraph

7     here, it was clear to a POSA when looking at this that

8     methylparaben and propylparaben were disclosed together as

9     non-salts as suitable alternatives to the claimed sodium

10    benzoate.

11         And my next few slides, Your Honor, disclose

12    additional portions of the specification that describe

13    methylparaben and propylparaben.  At Column 12, you can

14    see it says, "in some embodiments, the preservatives are a

15    mixture of parabens."

16         And it actually discloses the concentration

17    range, Your Honor.  Not that this is a requirement for our

18    disclosure-dedication defense, but it just -- it's

19    additional icing on the cake as far as we're concerned.

20         It says they can be present between

21    1.2 milligrams per milliliter and about 1.3 milligrams per

22    milliliter.

23         Well, as it turns out, Your Honor, that --

24    the -- I'm sorry.

25         As it turns out, the amount of methylparaben

1    and propylparaben in our product fall rights in that range.

2    It's at 1.26 milligram per milliliter squared.  Again, not

3    a requirement for disclosure dedication that the exact

4    concentration of the preservatives we use be disclosed, but

5    it's in there as well.

6              Next, Your Honor, our expert is going to take

7    us to Example C of the common specification.  And here,

8    our expert is going to explain that Silvergate actually, in

9    its R&D leading up to its patents, developed an enalapril

10   formulations that used methylparaben and propylparaben.

11             And here, in Example C, as we can see,

12   particularly the right-hand excerpt on this slide, on 1029,

13   shows liquid formulations that were prepared with

14   methylparaben and propylparaben salts, the sodium salts of

15   methylparaben and sodium propylparaben.

16             Now, our expert is going to explain, Your

17   Honor, that the reason why these were prepared as salts

18   is because methylparaben and propylparaben are actually

19   lipophilic.  They're fat-loving compounds.  They're hard

20   to dissolve in an aqueous formulation.  And all of the

21   formulations we're talking about, the claimed formulation,

22   Bionpharma's ANDA product, they are all aqueous; i.e.,

23   water-based.

24             So one of two ways to get methylparaben and

25   propylparaben into an aqueous formulation is to convert them

*sealed and confidential – Bionpharma*

1    as salts, at which point they readily dissolve.  And that is

2    what Bionpharma -- that is what Silvergate did in its R&D in

3    these specific example formulations at Example C.

4              The expert evidence is going to show at trial,

5    Your Honor, though, that a POSA looking at this would know

6    that actually within these liquid formulations,

7    methylparaben and propylparaben dissolve and dissociate from

8    the sodium and are present as the free acid or non-salts,

9    methylparaben and propylparaben by themselves.

10             Our expert is also going to explain that a

11   POSA would know that in these formulations that it is

12   methylparaben and propylparaben, the non-salt, that are

13   exerting their antimicrobial activity.

14             So, Your Honor, our second legal defense is the

15   estoppel arguments.  And at this point we can unseal the

16   courtroom for the next few slides.

17             THE COURT:  Okay.  Mr. English.

18             (Bionpharma sealed portion ends.)

19                  *    *    *

20             THE TRIALanywhere HOST:  The courtroom is

21   sealed.

22             THE COURT:  Thank you.

23             Mr. Alul, you may proceed.

24             MR. ALUL:  Okay.  Thank you, Your Honor.  Let me

25   just get to the slide I wanted to get to.

*sealed and confidential - Bionpharma*

1          Okay.  Here we are.

2          Next up, Your Honor, is our first factual

3     defense.  And this slide summarizes Silvergate's contention

4     regarding the buffer limitation and the elements of the

5     buffer limitation.

6          Again, Silvergate's contention is that the --

7     you know, Silvergate concedes we don't have a separate

8     independent bunch.  The allegation is that the enalapril

9     maleate that we formulate our product with, the active

10    ingredient, the maleate portion of that dissociates from

11    enalapril and our liquid formulation and reacts with sodium

12    hydroxide that we add in the final few steps of our ANDA

13    product to adjust the pH, to get it to the 3.3, which is the

14    target pH of our formulation.

15         And that in situ, this maleic acid, sodium

16    maleate buffer systems forms.  That is the contention from

17    Silvergate and its expert.

18         Our expert, Dr. Chris Morton, is going to

19    explain there are two problems with this.

20         The first problem is there is no evidence this

21    happens in our ANDA product.  Nothing but unsupported

22    testimony from Silvergate's expert, Dr. Byrn.  No

23    experimental evidence, even though they could have --

24    Dr. Byrn could have confirmed this via experimental

25    evidence.  There is nothing but Dr. Byrn's unsupported

*sealed and confidential – Bionpharma*

1    opinion that this happens in our ANDA product.

2         In fact, our expert is going to explain that

3    it's equally plausible and probably more likely that the

4    maleate portion, the maleic acid portion of our enalapril

5    salt, doesn't completely dissociate from the enalapril; that

6    it stays associated with the enalapril, and it's not free to

7    react with any sodium hydroxide.

8         And certainly not to the tune of the .236

9    milligrams per milliliter that Silvergate's expert says that

10   completely dissociates from the enalapril salt.

11        Second, Your Honor, even if there is some maleic

12   acid that is dissociated from the enalapril, from our -- the

13   enalapril in our formulation, our expert is going to explain

14   that the sodium hydroxide that is added in the final few

15   steps of our ANDA product could react with other acidic

16   components in our formulation, not just maleic acid;

17   including enalapril itself which is acidic; including the

18   paraben preservatives we use to lesser extent because of the

19   pH; including something in the flavoring.

20        So our expert is going to explain that

21   Silvergate and its expert have not carried their burden with

22   respect to actually proving that this alleged maleic acid,

23   sodium maleate buffer system exists in Bionpharma's ANDA

24   product.

25        Next, Your Honor, is the second problem.

*sealed and confidential - Bionpharma*

1    Even if Dr. Byrn's theory is true, that all of

2    the maleic acid from the enalapril salt dissociates and

3    reacts with sodium hydroxide to form this buffer, this

4    alleged buffer in our ANDA product, even if it is true, it

5    is not equivalent.

6    It is not equivalent under the traditional

7    function way result test, it's not equivalent under a

8    substantial differences test.

9    Under a function-way-result, Your Honor, our

10   expert is going to explain to the Court that the actual

11   proper function of the buffer limitation in Silvergate's

12   claims is to maintain pH beyond any pH maintenance provided

13   by any acid dissociated from an enalapril salt which, in

14   turn, protects the enalapril during shelf life and in the

15   stomach.

16   Where does our expert get that?  From the

17   intrinsic record.

18   Our expert is going to walk the Court through

19   the intrinsic record and explain that what Silvergate

20   intended to claim was a separate independent buffer

21   component to strongly resist changes in pH.

22   How do we know that?

23   Well, we know from the claims, Your Honor.

24   Our expert is going to go to claim 1 of the

25   first -- of these patents, the '008 patent.  As you can see,

*sealed and confidential - Bionpharma*

1    enalapril maleate is the required active ingredient in the

2    '008 and '442 patents.

3              Thus, our expert is going to explain under

4    Dr. Byrn's own theory, Your Honor, the claimed formulations

5    would inherently contain a maleic acid, sodium maleate

6    buffer.  Because under Dr. Byrn's own theory, our expert is

7    going to explain, the maleic acid portion of the maleate --

8    enalapril maleate would dissociate in the claimed

9    formulations, react with certain basic components, like

10   sodium citrate, and form this buffer that would inherently

11   exist in the claimed formulations.

12             This is all under Dr. Byrn's theory if it's

13   correct.

14             Despite that, Silvergate intended to claim a

15   separate independent buffer to strongly maintain pH, to

16   protect the active during shelf and in the stomach.

17             And with respect to protect it in the stomach,

18   Your Honor, that evidence -- or the support for that is

19   going to come from the citizen's petition what Silvergate

20   told the FDA about why the claimed citric acid and sodium

21   citric buffer was so critical to their invention.

22             But same situation for the claims of the '745

23   and '987 patents that are asserted against us, Your Honor.

24             Silvergate in these patents broadened the scope

25   of the buffer -- of the active ingredient limitation to

*sealed and confidential - Bionpharma*

1  cover enalapril or a pharmaceutically acceptable salt.

2        There is no dispute that includes enalapril

3  maleate.  So for -- or at least some of the elements fall

4  within the claimed formulations of the '745 and '987 patent,

5  many of them, there is going to be, under Dr. Byrn's own

6  theory, a maleic acid, sodium maleate sodium buffer system

7  that inherently exists.  Despite that, Silvergate intended

8  to claim a separate independent buffer.

9        Our expert is going to walk the Court through

10  the common specification, including the examples, Your

11  Honor, all of the examples use enalapril maleate, an

12  independent buffer limitation -- an independent buffer that

13  is usually citric acid and sodium citrate.

14        And our expert is going to explain that this --

15  in addition -- you know, that in these examples under

16  Dr. Byrn's own theory, there would exist an inherent maleic

17  acid, sodium maleate buffer system, but the claim -- the

18  specification requires an independent buffer.

19        And our expert is going to go even further,

20  Your Honor, and explain that there is actually no written

21  description in these patents, in the common specification.

22  There is no written description that acid dissociated from

23  an enalapril salt by itself can serve as a suitable buffer

24  in the claimed formulations.

25        MS. MORGAN:  I'm sorry, Your Honor, but this --

*sealed and confidential - Bionpharma*

1   but that is exactly the concern that we raised this morning.

2   He is interjecting a validity issue into the case, the

3   description.

4               MR. ALUL:  Your Honor --

5               THE COURT:  Go ahead.

6               MR. ALUL:  Your Honor, that is not true.  In

7   claim construction, certainly the Court can consider written

8   description arguments if -- depending on how a claim is

9   construed, and I know we're not the only claim construction,

10  but determining the proper function of the buffer limitation

11  claim is analogous to claim construction.  You can look at

12  these common specification, and claims can't be construed in

13  a way that -- that covers subject matter that is not

14  described in the patents.

15              And so we -- it's our position that written

16  description is, is relevant to claimed construction.

17              It's also relevant, Your Honor, to determining

18  what the proper function of the buffer is for the Doctrine

19  of Equivalents limitation.

20              THE COURT:  All right.  Ms. Morgan, your

21  position is noted.  I'm going to permit the defendant,

22  Bionpharma, in this case, to make the argument.  They're not

23  going to ask you to invalidate your patents based on this

24  argument.  That would be impermissible.  But -- and I don't

25  know if they will have evidence to support it, and you can

*sealed and confidential - Bionpharma*

1      certainly object in the evidentiary case.  But I'm going to

2      permit him to make the argument.

3                    Go ahead, Mr. Alul.

4                    MS. MORGAN:  Thank you, Your Honor.

5                    MR. ALUL:  Thank you, Your Honor.

6                    Next, Your Honor, our expert is going to

7      explain that the claimed buffer limitation and the alleged

8      equivalent of our product function in substantially

9      different way.

10                   And for that, Your Honor, our expert is going

11     to point the Court to these numerical ranges or these

12     quantitative elements of the buffer limitation.

13                   And our expert is going to explain that what a

14     POSA would understand these to mean is that citric acid and

15     sodium citrate are present in the claimed compositions at

16     specific concentrations.

17                   But our expert is going to go one step further

18     and explain that a POSA would understand that these

19     concentrations signify a specific concentration of buffer

20     species in the claimed formulation; i.e., the specific

21     concentration of citric acid and citrate ions present in

22     the claimed formulation to neutralize any base or acid that

23     is added to the formulation or that is generated over time.

24                   And just a little footnote, Your Honor, that is

25     really the concern with pharmaceutical drug products and why

*sealed and confidential - Bionpharma*

1   you include a buffer limitation, not so much that somebody,

2   after it's been formulated and bottled up and sealed and put

3   on a shelf, is going to be adding acid or base to the

4   formulation.  That's not -- that is generally not -- that is

5   not going to happen.

6            The concern here, Your Honor, and the reason why

7   you have a buffer in these products is because over time,

8   certain components of these formulations, like the

9   excipients, may degrade into acidic or basic compounds that

10  want to raise or lower the pH.

11           And so that is why you have a buffer in your

12  product.  Depending on how you formulate it.

13           And so our expert is going to explain that these

14  concentration ranges signify a certain concentration of

15  citric acid and citrate ions that are present in the claimed

16  formulation and able to neutralize any acid or base.

17           And our expert is going to actually calculate

18  for the Court the buffer species concentration of the

19  claimed buffer limitations, as well as the alleged buffer

20  in Bionpharma's ANDA product, this citric -- maleic acid,

21  sodium malate buffer system.

22           And our expert is going to explain to Your

23  Honor that the comparison isn't even close.  The claimed

24  formulations maintain pH with buffer species anywhere

25  between 2.24 to 10-and-a-half times that of the buffer

*sealed and confidential - Bionpharma*

1   species concentration of the, of the alleged buffer in our

2   product.  And that, therefore, that translates into a

3   substantially different result, and the result is that the

4   claimed buffers have a much higher buffer capacity.

5          And our expert is going to explain, Your Honor,

6   buffer capacity is basically the capacity of a formulation

7   because of its buffer to resist changes in pH.

8          And that buffer species concentration is a good

9   indication of buffer capacity, and that based on that, the

10  buffer capacity of the claimed formulations is a lot higher

11  than the buffer capacity of Bionpharma's ANDA product owing

12  to what Silvergate alleges is the equivalent buffer in our

13  product.

14         Next, Your Honor, even under a substantial

15  differences test, our expert is going to explain that we are

16  substantially different.

17         And the reason why they're -- our expert is

18  going to explain, and this is going to require a little

19  bit of background knowledge, what is an acid?  Our expert

20  is going to explain -- or the experts, both experts, can

21  explain, acids are basically compounds in aqueous -- in

22  water that donate hydrogen ions.  Bases are compounds in

23  water that accept hydrogen ions.

24         And that for a buffer, you essentially want, the

25  experts are going to explain, a weak acid and its conjugate

*sealed and confidential - Bionpharma*

1    base.

2              Maleic acid, Your Honor, it turns out, is a

3    stronger weak acid than citrate acid.  And our experts are

4    going to explain, it doesn't line up with the pH of

5    Bionpharma's ANDA product, which is approximately 3.3.

6              And our experts can explain that because there

7    is this difference between how strong maleic acid is and

8    the pH of our formulation, the equilibrium in our product

9    between maleic acid and sodium maleate shifts all the way

10   to the sodium maleate such that in our ANDA product, if

11   Dr. Byrn's theory is true, there's hardly any maleic acid

12   present to neutralize any -- any components that degrade and

13   become basic over time.

14             Our expert is going to explain that in contrast,

15   the claimed formulations, which have, you know, an ideal pH

16   of 3 to 3.5, the Epaned formulation has a pH between, I

17   think it's around 3.3, there citric acid lines up very

18   nicely with the pH.  And that is why they chose citric acid

19   and sodium citrate, because its lines up well with the

20   optimal pH of these types formulations.  And because of

21   that, you have a nice even split between citric acid and

22   sodium citrate.

23             So that if any components degrade and become

24   acidic or basic over time, you have two different arms:  a

25   citric acid arm and a sodium citrate arm to neutralize the

*sealed and confidential - Bionpharma*

1      pH and stop it from going up or going down.

2                  Next up, Your Honor, is our second factual

3      defense, that we don't have an equivalent preservative.

4                  And here, Your Honor, our expert is going to

5      explain that the methylparaben and propylparaben we use in

6      our product are substantially different than the claimed

7      sodium benzoate.

8                  Here's some depictions of our structure, the

9      different structures.  Our expert is going to walk the Court

10     throughout these differences and how they translate into

11     different physical and chemical properties.

12                 An important one of which is one that I

13     mentioned earlier, which is that methylparaben and

14     propylparaben are very lipophilic, they're hard to get in

15     new aqueous formulations considerations and that is an

16     important consideration for a formulator, where a sodium

17     benzoate is, it's a hydrophilic salt, it easily dissolves in

18     aqueous liquids.

19                 Next, Your Honor, our expert is going to explain

20     that methylparaben and propylparaben actually exert their

21     antimicrobial activity in radically different ways than the,

22     than the claimed sodium benzoate.  And this was actually

23     apparent from the prior art literature.

24                 Our expert is going to explain that

25     methylparaben and propylparaben exert their antimicrobial

*sealed and confidential - Bionpharma*

1    activity by interrupting transport processes in the

2    membrane of the microorganism, which causes the -- yeah, the

3    microorganism to basically rupture its membrane and leak

4    contents outside or interrupt transport going in.

5            Or it was known that methylparaben and

6    propylparaben enter the microorganism and inhibit DNA and

7    RNA synthesis and kill the microorganism that way.  And

8    because of that, they were known as bacteriocidal or

9    fungicidal.  They kill microorganisms whereas sodium

10   benzoate, Your Honor, it was known from the literature, our

11   expert is going to explain, sodium benzoate, it exerts an

12   antimicrobial activity by entering the microorganism and

13   interrupting with a pathway that generate glucose, which the

14   microorganisms need for energy.

15           So it doesn't kill the microorganisms, it just

16   inhibits their growth.  And that is why they are referred to

17   as bacteriostatic and fungistatic.

18           Your Honor, I expect there is not going to be

19   a lot of dispute between the experts regarding these

20   differences and physical and chemical properties and

21   antimicrobial properties.

22           The issue is going to be, is that relevant?  And

23   we respectfully submit it is relevant.  They operate in

24   substantially different ways and yield substantially

25   differently results, and they're just substantially

 1    different under the traditional substantial differences

 2    test, such that a finding of equivalence should not be

 3    found.

 4              And with that, Your Honor, unless the Court has

 5    any questions, at the conclusion of trial, we're going to be

 6    requesting a judgment of noninfringement.

 7              THE COURT:  Okay.  No questions at this time.

 8              We're going to take a short recess before we

 9    hear any further closing.

10              Remind me, Mr. Alul, are we in open court or are

11    we not?

12              MR. ALUL:  We're in closed court.  We should be

13    in closed court, Your Honor, so we can open up.

14              THE COURT:  Let's open up.  And then I'll say

15    again, we're going to take a short break.

16              (Bionpharma sealed portion ends.)

17                     *     *     *

18              THE TRIALanywhere HOST:  Okay.  The courtroom is

19    sealed.

20              THE COURT:  Okay.  Thank you.

21              Go ahead.

22              MR. MADDOX:  Okay.

23              Your Honor, like Bionpharma, we're here on a

24    purely Doctrine of Equivalents case because the 1.9

25    milligrams per milliliter of maleic acid that is a buffer in

*sealed and confidential - Amneal*

1    our product is substantially different from the claimed 1.82

2    of claim -- of citric acid, and .15 of sodium citrate, which

3    is a 2 -- it's an acid conjugate-based system known

4    throughout the world for decades as a citric buffer.

5             In the world of buffers, maleic acid is about as

6    far as one could get from the claimed citric buffer; and in

7    particular, if one is looking to make an enalapril solution

8    with the pH of what was known as the optimal stability pH of

9    about 3, give or take.

10            First, Amneal chose a product, a buffer, that

11   was a single acid buffer instead of the acid-based type

12   system in the claim.

13            Second, Amneal chose a single acid that was not

14   in any claim.  And, indeed, was not even in among the dozens

15   of buffering agents listed as potentials in the

16   specification.

17            In order for Amneal, or frankly anyone, to take

18   advantage of the publicly known optimal stability of pH 3

19   about for an enalapril solution, there was nothing else that

20   Amneal or anyone else could have done.

21            Here, in these patents, Silvergate went out of

22   its way to specifically define the particular buffer

23   system it claimed with particular amounts.  They calibrated

24   their buffer system, which is a, a common process from

25   high school chemistry on up, and they had to respond to the

*sealed and confidential - Amneal*

1    Patent Examiner's demand to prove that these particular

2    amounts of these particular ingredients were critical to

3    why their proposed invention was not obvious over the prior

4    art.

5              Now, I know you have heard already about

6    prosecution history estoppel, and you have seen many slides.

7    I would just like to put one -- I'd just like to put one

8    piece of the prosecution history up.

9              I didn't plan to, but, Mr. Roberts, could you

10   put that up?  I can -- obviously if people have an objection

11   to it, but you will see it's -- if we go in listing claim 1,

12   this is from the prosecution history.

13             This is the amendment that our prosecution

14   history estoppels are largely centered on.

15             As you can see, the underlined addition of "and

16   about .15 milligrams per milliliter sodium citrate

17   dihydrate."  That is where the action is.

18             And without going hammer and tong, because you

19   are going to get it from four different experts, I would

20   just point out that this -- we say this was narrowing

21   amendment because what used to be anything with

22   1.82 milligrams of citric acid, and nothing else or whatever

23   else would infringe it now, it's narrowing the scope.

24             You will hear from their Dr. Buckton that in

25   his analysis of estoppel, it doesn't matter whether it's a

*sealed and confidential - Amneal*

1    narrowing amendment.  He doesn't think about it that way,

2    which is up to him.

3              But we and the Court have to think about it that

4    way because that is what the law is.

5              We'll also be fighting about whether it is

6    related to patentability.  And you will learn that before

7    this -- the Office Action that gave rise to this amendment,

8    the Examiner said:  Listen, I would like to see -- I'm

9    rejecting it as obvious, I would like to see evidence of the

10   criticality of the amounts and specific ingredients here to

11   it being something nonobvious over the prior art.

12             And so this amendment was made and Silvergate

13   mounted an unexpected results campaign with unexpected --

14   allegedly unexpected stability arising from the specific

15   amounts of these two.  They amended their claims to be the

16   two acid-based system and that those particular amounts in

17   the two acid-based system are what led to the allegedly

18   unexpected results.

19             Their entire response, including a declaration

20   from Mr. Mosher, who we hope to see later, was devoted

21   to showing the Patent Office that with this particular

22   combination of citric acid and citric dihydrate in the

23   amounts done, there was this allegedly unexpected result of

24   better stability.

25             Now, you will see also that the data they

*sealed and confidential - Amneal*

1    submitted for this was limited to formulations with these

2    two acid-based systems.

3         They did not try to show any criticality of a

4    single acid.  They devoted it entirely to what was now the

5    amended claim.  So we say this was an amendment related to

6    patentability.

7         You will hear from Dr. Gemeinhart from us on

8    that.  And so now I'd like to talk a little bit about

9    factual equivalency.

10        Dr. Buckton is going to give you a

11   function-way-result analysis.  And what it really is is more

12   or less a rhetorical device for a sort of, it's so abstract

13   that it becomes sort of meaninglessly circular.

14        He will tell you that the purpose -- I'm sorry,

15   the function of a buffer is to maintain the pH.

16        Well, the function of every buffer is to

17   maintain the pH.  That is what every -- that's what a buffer

18   is.  If you've got a buffer, it is maintaining pH.  It

19   becomes circular.

20        And then he says, well, the way it does this is

21   neutralizing additional protons or positive hydrogen ions

22   and additional hydroxide, so OH negative ions.  Again, this

23   is the way that every single buffer on the face of the earth

24   operates.

25        He has taken this to such a level of abstraction

*sealed and confidential - Amneal*

1   that it is going to cover any buffer no matter 1, 2, the

2   citric, non-citric, it doesn't matter.  If you have a

3   buffer, you have his function and way.  And you're subject

4   to this patent.

5           And the net effect of this is that the patent

6   kind of gets sort of rewritten to say, you're infringing if

7   you've got an enalapril solution with any kind of buffer so

8   long as the solution maintains at around .3 -- a pH of 3, or

9   3 to 5.

10          And that's not their invention, basically.  They

11  didn't -- they shouldn't be having monopoly power over all

12  solutions that have a pH of -- all enalapril solutions that

13  have a pH of 3.

14          So we think the function-way-result of Dr.

15  Buckton is something that you are going to want to look at

16  with a critical eye.

17          But we're not going to take you through

18  ionization by lawyers now, so we'll leave that for the

19  expert witnesses.

20          And I can turn to obviousness.

21          This is the part where we can open up the

22  courtroom again.

23          THE COURT:  Okay.  Let's give Mr. English a

24  moment to do that, please.

25          THE TRIALanywhere HOST:  The courtroom is now

*sealed and confidential*

202

Beckloff - direct

1    open and everyone has joined.

2                    (Amneal sealed portion ends.)

3                         *    *    *

4              MS. MORGAN:  Thank you.

5                    DIRECT EXAMINATION

6    BY MS. MORGAN:

7    Q.     So first I would like to talk about some documents

8    related to the commercialization of the Ready-to-Use

9    formulation.  As part of Silvergate's ordinary course of

10   business, does Silvergate gather and keep information

11   regarding the financial performance of its products, and

12   specifically, the Ready-to-Use product?

13   A.     Yes.

14   Q.     And why is that?

15   A.     So we wanted to understand our business and

16   implications of sales and so forth.

17   Q.     And as chief development officer of Silvergate,

18   what's your role with respect to receiving or reviewing

19   financial data regarding the company's products?

20   A.     I would -- I would receive all the financial

21   information and review it as part of the normal course of

22   business.

23   Q.     Let's take a look at PTX-254 and 255.  And I believe

24   you also have these in your binder, so feel free to take a

25   look at them.  Have you seen these before?

*sealed and confidential*
Beckloff - direct

1    A.      I have.

2    Q.      And just generally, what are they?

3    A.      These are financial reporting documents that we used

4    in Silvergate for the powder and the ready-to-use.

5    Q.      And are these documents that Silvergate keeps in the

6    ordinary course of its business?

7    A.      Yes.

8    Q.      Let's take a look at PTX-34, 251 and 252, if you can

9    fit all three up there on the screen.

10            And did Silvergate regularly receive reports

11   from companies like IMS in the industry regarding

12   prescriptions?

13   A.      Yes.

14   Q.      And that's in the ordinary course of Silvergate's

15   business?

16   A.      Yes.

17   Q.      And what are we looking at here in PTX-34, 251 and

18   252?

19   A.      These are IMS data that of the market.

20   Q.      And did Silvergate obtain and keep these reports in

21   the ordinary course of its business?

22   A.      Yes.

23   Q.      Let's take a look at PTX-250 and 259, please.  And

24   have you seen these before?

25   A.      Yes.

*sealed and confidential*

204

Beckloff - direct

1    Q.      What are they?

2    A.      These were again our financial reporting documents.

3    Q.      And are these documents that Silvergate has created

4    and kept in the ordinary course of its business?

5    A.      Yes.

6    Q.      Okay.  Let's take a look at PTX-253 and 258.  And can

7    you tell us what these are?

8    A.      These are my R&D budget for Silvergate across all of

9    the products that we had under development.

10   Q.      And did Silvergate regularly prepare R&D budgets as

11   part of the ordinary course of its business?

12   A.      We did.

13   Q.      Okay.  As part of Silvergate's ordinary course of

14   business, did Silvergate prepare or have prepared by third

15   parties presentations regarding the overall financial

16   performance of the company?

17   A.      Yes.

18   Q.      Why do you do that?

19   A.      We wanted to establish valuations of the company,

20   what our valuation would be.

21   Q.      And as chief development officer, what's your role

22   regarding those types of documents?

23   A.      I was involved in, you know, the meetings to discuss

24   this, what products were in the R&D pipeline, also the

25   comment on drafts.

*sealed and confidential*

205

Beckloff - direct

1   Q.      Let's take a look at PTX-29 and PTX-329.  Do you

2   recognize these documents?

3   A.      I do.

4   Q.      What are they and, specifically, in PTX-29, if you

5   scroll down to SLVGT-EPA-100528.

6   A.      This was an e-mail that we received from -- flashing

7   through here.  These are, these are presentations that we

8   prepared.  The one e-mail came up.

9   Q.      You can go back to the top if you would like.

10  A.      Okay.

11  Q.      Can you go back to the top of the e-mail, please?

12  A.      Okay.  So this is an e-mail from Kevin McNeil and Lee

13  Rank, and Lee Rank had helped us prepare presentation really

14  for J.P. Morgan, J.P. Morgan.  This was a corporate overview

15  for meetings that we had at J.P. Morgan.

16  Q.      Okay.  And so looking at the presentation within

17  PTX-29 and the presentation in PTX-329, are these

18  presentations that Silvergate prepared or had prepared as

19  part of its regular course of business?

20  A.      Yes.

21  Q.      Let's take a look at PTX-31 and 256.  And do you

22  recognize these documents?

23  A.      I do.

24  Q.      And what are they?

25  A.      These were valuations that were prepared by

*sealed and confidential*

Beckloff - direct

1    Collective Acumen and Jefferies to assess the value of

2    Silvergate, the value.

3                   THE COURT:  All right.  I have to stop you, Ms.

4    Morgan.  Do you have any thought?

5                   THE TRIALanywhere Host:  Can they turn the

6    microphone sensitivity a little bit in the room?

7                   MS. MORGAN:  Ours?

8                   THE TRIALanywhere HOST:  Yes, because it's

9    trumping what the witness is saying there.  And, Mr.

10   Beckloff, just try not to trail off at the end of your

11   sentences.

12                  THE WITNESS:  Okay.  I will do my best.

13                  THE TRIALanywhere HOST:  Yes.  I do the same

14   thing.

15                  THE COURT:  Everyone else on mute.

16                  THE TRIALanywhere HOST:  Yes.  Everybody else is

17   muted.

18                  MS. MORGAN:  We're trying, Your Honor.  I'm

19   sorry.

20                  Try the volume on the mic.  Try the volume.

21                  Just keep going.

22                  MS. MORGAN:  I'm going to spell my name and

23   you tell me if I'm still loud enough.  N-a-t-a-l-i-e,

24   M-o-r-g-a-n.

25                  We turned it down about five clicks, and if you

*sealed and confidential*
207
Beckloff - direct

1   can still hear me, we can try this.

2           THE COURT:  I could hear fine.

3           Mr. English, do you think that is worth a try?

4           THE TRIALanywhere HOST:  Yes.

5           MS. MORGAN:  And I actually can't hear His Honor

6   now.

7           THE TRIALanywhere HOST:  Yeah.  So you are

8   getting the HVAC noise.  So turn the microphone down another

9   five clicks because you are still very strong.

10          MS. MORGAN:  Okay.  Turn it down some more, and

11  I will keep spelling my name.

12          So the microphone controls both ways?

13          Oh, you are turning the volume down.  Ah.  Okay.

14  Okay.

15          I guess what we're attempting to turn down

16  controls both our ability to hear and this.  But our IT

17  person knows how to control just this (pointing overhead).

18  We've called him.  He is here.

19          I apologize.

20          We need the volume up so we can hear and the mic

21  down.  And I will just spell my name until we kind of find a

22  good level of the volume both ways.

23          Ready?  Yes?

24          N-a -- not yet?  Okay.

25          IT OPERATOR:  Go ahead.

*sealed and confidential*

Beckloff - direct

```
 1                MS. MORGAN:  N-a-t-a-l-i-e, M-o-r-g-a-n.

 2                N-a-t-a-l-i-e --

 3                THE TRIALanywhere HOST:  Turn it down.

 4                MS. MORGAN:  I'm sorry?  Can you turn the volume

 5      up so we can hear them because I can't hear them now.

 6                Can you talk, JD?

 7                THE TRIALanywhere HOST:  Yes.  You sound very

 8      good.

 9                MS. MORGAN:  Okay.  So N-a-t-a-l -- still good?

10                THE TRIALanywhere HOST:  Yes, you sound good.

11                MS. MORGAN:  Okay.  Thank you.

12                THE COURT:  Thank you.

13                Mr. Beckloff, why don't we ask you to spell

14      either Ms. Morgan's name or your name so we can check.

15                THE WITNESS:  Michael.  M-i-c-h-a-e-l, Beckloff,

16      B-e-c-k-l-o-f-f.

17                THE COURT:  That was a little hard to hear.

18                Mr. English, what do you think?

19                THE TRIALanywhere HOST:  Yes.  It was a little

20      bit of her microphone background picked up some noise there

21      that cut him off, but he was coming through okay,

22      Mr. Beckloff was.

23                THE COURT:  All right.  Well, let's try again.

24      So I mean not the spelling.

25                THE WITNESS:  Yes.  Sorry.
```

*sealed and confidential*

209

Beckloff - direct

1           THE COURT:  Go ahead, Ms. Morgan.

2           MS. MORGAN:  Thank you very much.

3    BY MS. MORGAN:

4    Q.     Okay.  I think the question in hand was, what is

5    PTX-31 and PTX-256?

6           Let's start there, Mr. Beckloff.  What are

7    these?

8    A.     These were presentations prepared by Collective

9    Acumen and Jefferies regarding Silvergate's valuations.

10   Q.     And are these documents that Silvergate had prepared

11   in the ordinary course of its business?

12   A.     Yes.

13          MS. MORGAN:  Now, can we look at PTX-37 and

14   PTX-257.

15   BY MS. MORGAN:

16   Q.     And what are these?

17   A.     These are presentations, internal presentations, that

18   we provided for the company, as well as internal training

19   presentations for the RTU launch.

20   Q.     And does Silvergate regularly prepare internal

21   presentations as part of its ordinary course of business?

22   A.     Yes.

23   Q.     For what purposes?

24   A.     To provide the employees with business updates

25   regarding the company, and to train our sales personnel as

1    the products were approved and launched.

2                    MS. MORGAN:  Thank you.

3                    We can unseal the courtroom, Your Honor.

4                    THE COURT:  Thank you.  We'll do that.

5                    (Silvergate sealed portion ends.)

6                         *    *    *

7                    MS. MORGAN:  May I proceed?

8                    THE COURT:  Yes.

9                    MS. MORGAN:  Okay.  Thank you.

10   BY MS. MORGAN:

11   Q.     Turning to the next slide.  Okay.  Looking at

12   PDX-206, so, first, what is PTX-478?  And I believe you have

13   a larger document in your binder if you need to look at it.

14   A.     Yes.  This is the Bionpharma -- well, maybe I'd

15   better -- yes.  This is the Bionpharma section of the ANDA,

16   the ANDA labeled 2.3.2 drug product.  So it's a drug product

17   part of the Bionpharma ANDA that's submitted to the FDA.

18   Q.     Thank you.

19                    And can you please tell us what we're looking at

20   here, Table 1 from BION-ESOL-231?

21   A.     Yes.  This is the quantitative unit composition of

22   the enalapril maleate oral solution of Bionpharma, one

23   milligram per mL.

24   Q.     And are these the ingredients that you evaluated in

25   Bionpharma's ANDA product listed under the column heading

*sealed and confidential*

211

Byrn - direct

1   ingredients?

2   A.      Yes.   This is part of the information evaluated.

3   Q.      Okay.   Now let's turn to the asserted claims.   Let's

4   go to the next slide.

5           Looking at PDX-207 now, can you please explain

6   for us what you understand to be the standard for literal

7   infringement.

8   A.      Yes.   When I evaluated these documents and the

9   claims, I understand that literal infringement, the claim of

10  the properly construed to determine its scope and meaning

11  and the claim as properly construed must be compared to the

12  accused product.   And for literal infringement, the patentee

13  must prove that the accused product meets all limitations of

14  the asserted claims.

15  Q.      And did you evaluate individual elements of the

16  asserted patents for literal infringement?

17  A.      Yes.

18  Q.      And can you please turn to docket number 170 in your

19  binder?

20  A.      Okay.

21  Q.      And actually, can you please put up on the screen for

22  everybody DI 170.

23          Did you review and use DI 170?

24  A.      Yes.

25  Q.      Okay.   And let's turn to page 4 of this document.

*sealed and confidential*

Byrn - direct

1            Did you review and use the sections at the

2    bottom starting, Silvergate's claims with respect to

3    Bionpharma, that continues onto the next page?

4    A.      Yes.  Yes, I did.

5    Q.      Okay.  Let's go to PDX-208.  Oh, sorry, PDX-208.

6    Back to the slide.  Thank you.

7            And what are we looking at here?  What is this

8    chart illustrating?

9    A.      These are the claim limitations, the elements

10   literally infringed and not in dispute.

11   Q.      And can you tell us -- thank you.

12           And can you tell us the last column, what that

13   is referring to?

14   A.      That's referring to that docket we were just looking

15   at, DI 170.  It's referring to the various paragraphs in

16   that document.

17   Q.      All right.  The various undisputed facts in that

18   document?

19   A.      That's correct.

20   Q.      Okay.  Let's look at PDX-209.  And is this the same,

21   just additional claim limitation?

22   A.      Yes, it is.

23   Q.      And so you have asterisks at both in the bottom row

24   and then a reference to Dr. Mahan.  Can you explain why that

25   is?

*sealed and confidential*

Byrn - direct

1   A.      Yes.  For this element, I talked to doctor manual

2   processing, and I'm not a medical doctor, so he assured me

3   that the therapeutically equivalent amount was literally

4   infringed and it wasn't in dispute either.

5   Q.      And did you also review the product label yourself?

6   A.      Yes, I did, as a pharmacist and professor, and it's

7   clear that that claim limitation is infringed.

8   Q.      And has Bionpharma's expert, Dr. Morrison, asserted

9   that any of these elements that you've identified on PDX-208

10  and 209 are not infringed?

11  A.      No, he hasn't.

12  Q.      All right.  Let's go to PDX-210, please, the next

13  slide.

14          So I think you mentioned that there are elements

15  that are met under the Doctrine of Equivalents, so looking

16  at PDX-210, can you please identify those limitations for

17  us?

18  A.      Yes.  Those limitations, they're in both patents, and

19  both limitations are there.

20          The buffer limitation, as I summarized, a buffer

21  comprising about 0.8 to about 3.5 milligrams per mL citric

22  acid and about 0.1 to about 0.8 milligrams per mL sodium

23  citrate.  That, based on my analysis is infringed under

24  Doctrine of Equivalents, and also the preservative

25  limitation, about 0.7 to about 1.2 milligrams per mL sodium

*sealed and confidential*
                                                                    214
                          Byrn - direct

1    benefit so weight is infringed under the Doctrine of

2    Equivalents.

3    Q.      Okay.

4             MR. ALUL:  Your Honor, Andy Alul.  I just want

5    to make sure the record is clear.

6             It's our position the claim limitations by

7    themselves can't be infringed.  They can be met.  Only

8    claims in their entirety can be infringed.  I just want to

9    put that on the record.  I don't have an objection right now

10   at the moment.

11            THE COURT:  Okay.  Ms. Morgan, anything you want

12   to say about that?

13            MS. MORGAN:  I think the witness is not a

14   lawyer, so he's explaining his opinions the best that he

15   can.  He's talking about specific limitations and how they

16   are met in his view, so I think his testimony is what it

17   is.

18            THE COURT:  All right.

19            MR. RUEDY:  I'm sorry, Your Honor.

20            THE COURT:  I was going to say you will all have

21   a chance to question him as well, and I think at this point,

22   I understand what is being presented.

23            MR. ALUL:  Thank you, Your Honor.  Understood.

24            THE COURT:  All right.

25   BY MS. MORGAN:

*sealed and confidential*
Byrn - direct

1    Q.      So, thank you, Doctor.

2            So with the buffer and the preservative

3    requirements in mind, let's turn to a brief review of the

4    technology in this case.  Next slide, please.  PDX-211.

5            So what are we looking at here?

6    A.      So these are the five elements of the technology that

7    we need to understand and based on my analysis, these are

8    the technology concepts that I dealt with.  Acids and bases,

9    pH and pKa, buffers, stability and preservatives.

10   Q.      Okay.  So first, tell us, what's an acid?

11   A.      An acid is a molecule, a compound that donates

12   protons using a bronze, that definition.

13   Q.      And what is a base?

14   A.      A base, again, using that definition, is a molecule

15   or compound that picks up proton.

16   Q.      Let's go to the next slide.  Looking at PDX-212, can

17   you please generally explain what the pH of a solution

18   represents?

19   A.      Yes.  So first we start on the left.  You see on the

20   bottom left there's a lot of proton, so that is acidic.

21   That's an acidic species.

22            And then on the upper part, you have just a few

23   protons.  That's a base species.  And you actually take the

24   negative log or the number of protons and that gives you the

25   pH.  And in between the systems where you have a lot of

1    protons and a few protons, that's the neutral condition, pH

2    seven.  That's like water, the neutral water.

3    Q.    Let's go to the next slide.  Looking at PDX-213, do

4    we now know what the optimal pH for enalapril in a solution,

5    such as a solution described in the patent?

6    A.    Yes.  This slide showing that, and it states that the

7    optimum pH is 3 to 3.5.  That is the pH at which you achieve

8    the long term stability.  It's in the acid region, but it's

9    the optimum pH.

10   Q.    And are there different categories of as acids and

11   bases?

12   A.    Yes.  There are both weak and strong acids and weak

13   and strong bases.

14   Q.    And what's the difference between strong acids and

15   bases and weak acids and bases?

16   A.    Well, strong acids give up their protons very easily

17   and give a lot of them, and the same thing with strong

18   bases, pick up proton very easily, like hydroxide.  They're

19   very reactive with protons and pick up protons, and then

20   weak acids and weak bases are not as strong.

21   Q.    Let's look at the next slide.  So looking at PDX-214,

22   what are we looking here?

23   A.    So this is assimilation of when happens you pour acid

24   into an empty vial.  The solution goes in and creates a lot

25   of hydrogen ions, which lowers the pH down to the acidic

*sealed and confidential*

217

Byrn - direct

1   region.

2                    And then the next step, we're adding base,

3   and when we add base, the pH starts to rise because we're

4   taking the protons out of the system.  And then at the end,

5   the acids and bases equilibrate and we end up with the pH,

6   the optimal pH in this case, the pH that achieves the long

7   term stability.

8   Q.    So in the end, whether you have a strong or weak acid

9   or base, is there any real difference in how they actually

10  function in solution?

11  A.    No.  It's the portions of those that determine what

12  pH it would reach if they can't.

13  Q.    Let's look at PDX-215.  So can you explain in PDX-215

14  what is a buffer?

15  A.    So on the left -- I'm trying to go what the buffer

16  is.  On the left panel is a system where the buffer is on --

17  where the system is unbuffered, and the left, the far left

18  vial has protons, a lot of protons in it, no buffer, so it

19  has a very low pH, so the bars should be down at the bottom.

20  And I'm not sure whether we have the animation working, but

21  we can come back.

22                   So with a lot of protons, we have a very low pH,

23  with no buffer.  With a lot of hydroxide, we have a very

24  high pH.

25                   And then if we move over to the buffer system,

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 56 of 143 PageID #: 5973
*sealed and confidential*
218

Byrn - direct

1    if we now take out, if the buffer consumes some of the

2    excess proton, and here I'm showing four of them with

3    batches taken out, then the pH rises, because there are not

4    as many protons that rises more towards the middle range.

5    And the same with the base system.  If you take out a few of

6    the hydroxide, the pH will fall and you will end up with,

7    again, a pH at the optimum pH.

8              So the buffer system is set up to take out

9    protons or hydroxide and cause us to reach an optimum pH.

10   And so that's what those buffer components are doing.

11   Q.     Let's go to PDX-216.  So how are acids and bases

12   converted into buffers?

13   A.     So there are two ways to make a buffer.  The first

14   way is to mix the acid and the salt to the baths.  We'll

15   just call a conjugate base.  It's on the left.

16             So we mix citric acid and sodium citrate.  And

17   sodium acid is the weak acid.  Sodium citrate is the weak

18   base.  But if we mix those two molecules, then they will

19   react in solution and create a buffer as shown on the

20   right.

21             And so on the right side under citric acid you

22   see we have an OH, we have OHs.  Those are acidic.  Those

23   are donating groups.  And on the far right we have sodium

24   citrate, a sodium ionic in place of one of the protons.

25   That sodium citrate on the far left is citric acid.

*sealed and confidential*
Byrn - direct

1          Those equilibrate by donating a proton back and

2     forth to create the buffer.  So when excess hydrogen ions

3     appear in the solution, the sodium citrate, the one on the

4     right, has an O and A, it can react with a proton and go to

5     the left and consume that proton.

6          When hydroxide is in solution, it will react

7     with a citric acid and go to the right to create the sodium

8     citrate.

9     Q.     And I think you mentioned the word conjugate base.

10    Can you explain what that is?

11    A.     Yes.  The conjugate base is created from the acid, so

12    sodium citrate is a conjugate base, and it's conjugated.

13    It's created from the acid typically by adding sodium

14    hydroxide.

15    Q.     Let's go to the next slide.  Looking at PDX-217, what

16    is this showing that's different from the prior slide?

17    A.     This is a second way of creating a buffer.  So you

18    don't always have to mix the acid and the conjugate base.

19    You can put the acid in and then add sodium hydroxide in

20    what's called a substoichiometric amount.

21          And that --

22    Q.     Let me stop you there.  What does that word mean,

23    substoichiometric amount?

24    A.     So it's, so it's less than the stoichiometry of the

25    citric acid.  It's fewer molecules.

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 58 of 143 PageID #: 5975
*sealed and confidential*
220
Byrn - direct

1           So if we have a million molecules of citric

2    acid, we might only add 500,000 sodium hydroxide molecules.

3    So a sub, not enough to totally react with all the citric

4    acid.

5    Q.      Okay.  Please continue your explanation.

6    A.      And so this is a well-known way to make buffers

7    and I'm showing the reaction here.  I'm showing the

8    reaction.

9           In this case, we have citric acid on the left

10   reacting with a substoichiometric amount of sodium

11   hydroxide.  So that then produces sodium citrate, the far

12   right molecule, but there's some citric acid that's left

13   over.

14          So you have -- you have -- and if we go back to

15   the previous slide, we can see you have the same molecules,

16   citric acid and sodium citrate.  And if you go to the next

17   slide again.  On the right in the blue squares, you create

18   the sodium citrate and that forms the buffer with the

19   unreacted citric acid.

20          And then down below, I've just shown it in

21   abbreviated form showing H two A reacts with sodium

22   hydroxide to give water, plus HA and NA plus A.  And HA

23   and NA plus A are the buffer system, the acid and the

24   conjugate.

25   Q.      So if I'm understanding, the equation at the bottom

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 59 of 143 PageID #: 5976
*sealed and confidential*
221
Byrn - direct

1   is representing what you can do with any weak acid in a

2   substoichiometric amount of the strong base; is that

3   correct?

4   A.      That's correct.

5   Q.      Okay.  Well, let me rephrase.  Any weak acid to reach

6   the proper pH; is that right?

7   A.      That's correct.  When you do this addition, you are

8   measuring th pH so you achieve the right pH for the buffer.

9   So you set the buffer system at the appropriate pH.

10  Q.      And so what happens if you add acid to the solution

11  or if you add additional base?

12  A.      Then the acid or base will be consumed by the buffer

13  and you won't change the pH very much.  So you will be able

14  to maintain a constant pH that's based on the composition of

15  the acid and base.  The citric acid and the sodium citrate

16  in this case.

17              MS. MORGAN:  Let's go to the next slide.

18  BY MS. MORGAN:

19  Q.      So looking at PDX-218.  What are the pKa values for

20  citric acid and sodium citrate?

21  A.      So I'm showing -- here, I'm showing pKa with the

22  brackets and pH in the center panel.  And citric acid has

23  three carboxylic acid groups, so it has three different

24  protons.  And those protons have different strengths,

25  different ease of donation, and thus the pKa.

*sealed and confidential*

222

Byrn - direct

1            The pKa is equal to the pH when done in

2    equal proportion of base and acid from Henderson and

3    Hasselbalch.  But it works okay just to say the pKa tells

4    you how strong the acid is.

5            So the strongest acid on citric acid is pKa of

6    3.1 and next is 4.8 and the next is 6.4.

7            And then the brackets show the range at which

8    those groups can buffer.  They show the range of plus or

9    minus 2 pKa or pH units around the central pKa.  So, for

10   example, a pKa 3.1, the bracket goes from 1.1 to 5.1 plus or

11   minus 2, around 3.1.

12           And then I put the bar, I put the bar, the

13   optimum pKa across in yellow.  And you can see by looking at

14   this bar that that is between the brackets of the first two

15   pKas of citric acid, so those two pKas will buffer this

16   system -- can be used to buffer this system at pH 3 to 3.5.

17   Q.    Does the pKa that equals 6.4 have any real buffering

18   effect when the pH is 3 to 3.5?

19   A.    No, that's too weak an acid.  It's outside the range

20   of 3 to 3.5.

21           MS. MORGAN:  Okay.  So let's look at the next

22   slide.

23   BY MS. MORGAN:

24   Q.    So looking at PTX-219.  What are we looking at here?

25   Can you explain this?

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 61 of 143 PageID #: 5978
*sealed and confidential*
223
Byrn - direct

1    A.      Yes.   This is related to what I was talking about

2    previously.   This is called the Henderson-Hasselbalch

3    Equation, and the best way to think about this is on the

4    left panel.

5              Let's imagine that the pH of the solution was a

6    pKa.

7              Then that means that there is an equal amount --

8    because pH=pKa, if we have solve that equation, we have an

9    equal amount of A minus and HA.   When pH=pKa and we solve

10   the equation, we find an equal amount of HA and the A-.

11             When pH=pKa plus 2, we have a hundred times

12   different in HA and A- because the log of 2 is 100.   The log

13   of 100 is 2, pardon me.

14             So the pH=pKa concept allows us to draw those

15   brackets on the previous, on the previous chart.

16   Q.      Okay.   So you mentioned earlier that buffers prevent

17   changes in pH when small quantities of acid and bases are

18   added.

19             So why does pH matter in pharmaceutical liquid

20   formulation?

21   A.      Well, the pH, the proton or the hydroxide can react

22   with the drug and destroy it, render it unstable.   It's not

23   the acting molecule, it's some other molecule.   And that

24   molecule may have adverse effects, may not treat the

25   patient.   It doesn't work properly.

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 62 of 143 PageID #: 5979
*sealed and confidential*
224
Byrn - direct

1    Q.       So we have heard the term "stability" a lot today.

2    Why is stability important in a pharmaceutical formulation?

3    A.       So for stability, we need to have a formulation

4    that retains the molecule of the drug in its proper form

5    throughout the shelf life of the product so that when you

6    use it, either at the start and the end of the shelf life,

7    it's the same molecule and it has the same effect on the

8    body.

9    Q.       Okay.   Thank you.

10             MS. MORGAN:   Let's turn now to preservatives.

11   Let's go to PDX -- oh, thank you.

12   BY MS. MORGAN:

13   Q.       Looking at PDX-20, what is a preservative?

14   A.       So I made this slide.   This is showing on the left a

15   system where you have a preservative in a petri dish, and

16   you can see there are no bacteria or fungi growing.

17             And then on the right, we had no preservative,

18   and you can see that there are fungi and bacteria growing,

19   some of which could be toxic molecules, dangerous microbes

20   or fungi.

21   Q.       And what is an antimicrobial preservative?

22   A.       So an antimicrobial preservative prevents microbes

23   from growing such as -- well, let's take salmonella.

24             If you don't use a preservative, you could have

25   salmonella growing in some of these solutions, and that

*sealed and confidential*

225

Byrn - direct

1   would be very toxic to children and it can cause fatality.

2            So it's important in solution formulations to

3   have a preservative.

4   Q.    And could it also be damaging to the efficacy of the

5   product?

6   A.    Of course.  Because, again, if the -- if they're

7   bacteria, that patients would be caused to have diarrhea and

8   lose the product.  There are all kinds of factors that can

9   come into play.

10  Q.    Okay.  Thank you, Doctor.  Let's move on now.

11           MS. MORGAN:  Turning to PDX-221.

12  BY MS. MORGAN:

13  Q.    What does this slide show?

14  A.    This slide shows part of my analysis of infringement.

15  And this shows a person of skill in the art.

16           And on the left side, you could have -- a person

17  of skill in the art could have a Ph.D. in formulation and

18  not a lot of experience, or they could have a bachelor's

19  degree in pharmacy or related areas and at least 5 years

20  experience.

21  Q.    And then could you talk about what is at the bottom

22  as well?

23  A.    Yes.  And then a POSA would have experience with

24  excipients as well as drug formulation, therapeutic

25  applications, and would also collaborate with a medical

*sealed and confidential*
226

Byrn - direct

1    doctor.

2    Q.      Thank you.  And did you use this definition in your

3    analysis of this case?

4    A.      Yes.

5    Q.      And are you a person of ordinary skill in the art?

6    A.      Yes.

7              MS. MORGAN:  Let's turn to the next slide.

8              Oh, actually.  Sorry.  Go back one.

9    BY MS. MORGAN:

10   Q.      Has this definition been agreed to by both parties?

11   A.      Well, it hasn't completely been agreed to.  But it's

12   very -- my definition is very similar to Dr. Morton.  And

13   even if I did my analysis using his definition, I would come

14   to those same conclusions.

15             MS. MORGAN:  Let's go to the next slide.

16   BY MS. MORGAN:

17   Q.      So looking at PDX-222, what does this slide show?

18   A.      This slide shows the joint claim construction chart,

19   and the one claim that had -- one phrase, pardon me, that

20   had an agreed-upon construction.

21   Q.      And did you use that construction of "about" meaning

22   "approximately" in your analysis?

23   A.      Yes, I did.

24   Q.      And how did you approach claim terms without an

25   expressly agreed-upon meaning?

*sealed and confidential*

227

Byrn - direct

```
 1    A.       I used the clear and ordinary meaning for those

 2    terms.

 3    Q.       Thank you.  Let's turn now to your infringement

 4    analysis.

 5               THE COURT:  Actually, before we get into that,

 6    let's take a break.  About 15 minutes.

 7               MS. MORGAN:  Certainly.

 8               THE COURT:  Okay.  About 15 minutes, then we'll

 9    return.  Bye-bye.

10               (Brief recess taken.)

11               *     *     *

12               (Proceedings reconvened after recess.)

13               THE COURT:  All right.  I'm ready to proceed if

14    you all are.

15               MS. MORGAN:  Yes, Your Honor.

16               MR. ALUL:  Yes, Your Honor.

17               MR. MADDOX:  Yes.

18               THE COURT:  Go ahead.

19    BY MS. MORGAN:

20    Q.       Okay.  Before we move on, Dr. Byrn, you were just

21    talking about PDX-222?

22    A.       Yes.

23    Q.       And I just want to confirm that the joint claim

24    construction chart that you used for claim construction, is

25    it DTX-1074?
```

*sealed and confidential*

Byrn - direct

1    A.      Yes, it is.

2    Q.      Okay.  Now, let's go to the next subject and talk

3    about specifically the buffer limitation.

4            So looking at PDX-223, I believe we looked at

5    this earlier; right?

6    A.      Yes, we did.

7    Q.      This is, again, from PTX-478 at BION-ESOL-231.

8            So looking here at Table 1 of the ingredients of

9    Bionpharma's ANDA, can you please identify for us what is

10   the buffer that Bionpharma has.

11   A.      Yes.  So Bionpharma creates a buffer using that

12   reaction No. 2 by reacting enalapril maleate with sodium

13   hydroxide.  And that creates the buffer -- the maleate

14   buffer in that enalapril is the active ingredient, the drug

15   molecule.

16   Q.      Thank you, Doctor.  So if I understood you correctly,

17   despite enalapril maleate being listed as the active

18   ingredient, the enalapril maleate part of that is used for

19   the buffer; is that correct?

20   A.      That's correct.  The maleate is, and I have some

21   slides, but it is a well-known acid-buffer-forming species.

22   So it can -- it will act as a buffer, and then enalapril is

23   the acting drug, the acting moiety.

24   Q.      Okay.  So let's talk about how you identified --

25   actually can you explain a little bit more about the process

*sealed and confidential*

229

Byrn - direct

1   of how you get a buffer?

2   A.      Again, this is what --

3   Q.      From --

4   A.      -- I covered earlier.

5           So if you take maleate, maleic acid, maleate,

6   and add sodium hydroxide, then that will react with the acid

7   protons and create a buffer system exactly in the same way

8   that citric acid with sodium hydroxide creates a buffer.

9           MS. MORGAN:   Okay.  So to start, let's go to the

10  next slide.

11  BY MS. MORGAN:

12  Q.      Looking at PDX-224, what is PTX-476 that is cited on

13  this slide?

14  A.      This is part of the ANDA, the ANDA.  And it is the

15  part of the labeling section of the ANDA of Bionpharma's

16  ANDA label.

17  Q.      Okay.  And we're looking at BION-ESOL-87.

18          So can you please explain the significance of

19  this information as it relates to your opinions?

20  A.      So as I was explaining, the enalapril is the active

21  ingredient.  And so this statement says each 1 mL contains

22  1 milligram of enalapril maleate equivalent to

23  0.764 milligrams of enalapril.

24          So the enalapril, part of the enalapril maleate

25  is .764 milligrams.  And then the total rate is 1, so I show

*sealed and confidential*

230

Byrn - direct

1    below 1 minus .764 leaves .0236 milligrams of maleic acid,

2    maleic compound.

3    Q.     And is that --

4    A.     And that is true of the dissociation of the enalapril

5    maleate.  When you dissolve enalapril maleate, it

6    dissociates into its components.  That is a basic principle

7    of salt chemistry.  So when the solution is made of

8    enalapril maleate, the components separate and are

9    dissociated.

10   Q.     And is the maleic compound what reacts with the

11   sodium hydroxide?

12   A.     That is correct.  The first drops of sodium hydroxide

13   react with the maleic compound.

14   Q.     Okay.  Thank you.

15          MS. MORGAN:  Let's go to the next slide.

16   BY MS. MORGAN:

17   Q.     So looking at PDX-225, which, again, is the table

18   we were just looking at at PTX-478 at BION-ESOL-231.

19   What is the amount of sodium hydroxide -- or what is the

20   concentration of sodium hydroxide in Bionpharma's ANDA

21   product?

22   A.     So sodium hydroxide here on this slide is shown as a

23   pH adjuster.  So that is -- in effect, that's the process.

24   It is changing the pH by taking protons out.

25          So this is just confirming the role of sodium

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 69 of 143 PageID #: 5986
sealed and confidential
231

Byrn - direct

1    hydroxide in the system.

2    Q.      And what is the concentration of it?  Can you tell?

3    A.      I calculated the concentration from the batch

4    records.

5            Here, it says QS, which means quantum satis,

6    which means add the right amount of sodium hydroxide but no

7    more.

8            So in this case, they added the right amount

9    of sodium hydroxide to get to the optimum pH.  And in that

10   process, they created a buffer.

11           MS. MORGAN:  Okay.  Let's look at those batch

12   records.

13           Can we go to the next slide.

14   BY THE WITNESS:

15   A.      So these are --

16   Q.      Okay.  Looking at --

17   A.      Sorry.

18   Q.      That's okay.

19           Let me ask, because I know you are probably

20   going to answer the question I'm going to ask.

21           Looking at PDX-2267, first tell me, please, what

22   PTX-492, 494, and 495 are?

23   A.      These are the various batch records for different

24   preparations; three different runs where they prepared

25   the -- Bionpharma prepared the formulation.

*sealed and confidential*

Byrn - direct

1   Q.      And is this what you used to determine the amount of

2   sodium hydroxide that they actually used?

3   A.      Yes, because in that ANDA, these runs are the runs

4   that are submitted to the FDA that verify that they're

5   making the product.

6   Q.      Did you prepare a summary of the information you used

7   from the batch records?

8   A.      Yes, I did.

9           MS. MORGAN:  Let's look at the next slide.

10  BY MS. MORGAN:

11  Q.      So PDX-229, is this your summary?

12  A.      Yes.  So all three of the batch records used

13  120 liters of solution.

14          And then in two of them, they added 95 grams of

15  sodium hydroxide, one they added 100 grams.

16          And then just by dividing, I can calculate the

17  milligrams per mL, and it's either .030 or .032 for those

18  three batches.

19  Q.      And can you please confirm that this summary comes

20  from BION-ESOL -- sorry.  Let me start over.

21          Can you please confirm that this information

22  comes from PTX-492, BION-ESOL-1783, PTX-494, BION-ESOL-1852,

23  and PTX-495 at BION-ESOL-196 and 197 because it's cut off on

24  the slide.

25  A.      Yes.  Sorry.

*sealed and confidential*

233

Byrn - direct

1      Yes.  I can confirm that.

2  Q.      Thank you.

3              Okay.  And so looking at the end concentration

4  of NaOH, what did you do with that?

5  A.      So then I can use that to calculate the buffer

6  formulation or describe the buffer formulation further.

7  Q.      Okay.

8  A.      A couple -- yes, the -- yes.

9  Q.      So what, just to recap, is the Bion pharma buffer

10  that you analyzed for the Doctrine of Equivalents?

11  A.      Sorry.  Can you repeat that question?

12  Q.      Certainly.  So to recap our discussion, what is the

13  buffer that is in Bionpharma's ANDA formulation that you

14  analyzed for the Doctrine of Equivalents?

15  A.      Sure.  It's the buffer created from reacting maleic

16  acid with the sodium hydroxide.

17  Q.      Okay.

18  A.      And maleic acid is formed by association of enalapril

19  maleate.

20              MS. MORGAN:  Let's go to the next slide.

21  BY MS. MORGAN:

22  Q.      Looking at PDX-228.  What standards did you apply in

23  your analysis for evaluating infringement under the Doctrine

24  of Equivalents?

25  A.      So this shows that I -- the two analyses that I

*sealed and confidential*

234

Byrn - direct

1   applied, one was a function-way-result test and one was the

2   insubstantial differences test.

3           I applied both of these to the chemistry that

4   I've just outlined.

5   Q.     Thank you.

6           MS. MORGAN:  Let's go to the next slide.

7   BY MS. MORGAN:

8   Q.     Looking at PDX-229.  Can you just summarize what

9   your conclusion was with respect to buffer under the

10  function-way-result test?

11  A.     Yes.  I determined that the function of Bionpharma's

12  maleate buffer was the -- was that it adjusted and

13  stabilized the pH.  And the way it did it was it removed

14  excess hydrogen and hydroxide ions, and the result was a

15  stable product at the optimum pH.

16          MS. MORGAN:  Let's go to the next slide.

17  BY MS. MORGAN:

18  Q.     And can you please summarize your conclusion

19  regarding buffer under the insubstantial differences test.

20  A.     Yes.  And also under that test, the maleic acid,

21  sodium maleate buffer formed from the maleic acid and sodium

22  hydroxide in the claimed buffer are insubstantial.  Because

23  you can make the buffer either way.  It's just an

24  alternative way of making the buffer.

25  Q.     Thank you, Doctor.

Byrn - direct

1                       Now, let's talk first about the function.

2     Can we go to the next slide.

3     A.      Yes.

4     Q.      So looking first at the function, does the patent

5     support your opinion?

6     A.      Yes.  The patent supports my opinion that the -- that

7     this buffer adjusts and stabilizes the pH.

8     Q.      Go to the next slide.  Looking at PDX-232, and what

9     are we looking at here?

10    A.      This is an excerpt from the specifications of the

11    patent, and it says, buffering agents maintain the pH of the

12    liquid enalapril formulation.  So it's setting out exactly

13    the analysis that I performed, that the buffering agents

14    maintain the pH of the enalapril.

15    Q.      And is that from PTX-1 at column 13, lines 5 through

16    7?

17    A.      Yes.

18    Q.      Okay.  Let's go to the next slide.

19                      And looking at PDX-233, what does this show?

20    A.      This is a statement for -- of one of Bionpharma's

21    witnesses, Dr. Cacace, and she agreed that you can adjust

22    the pH in multiple ways and using a buffer is one of the

23    ways to adjust pH and just supporting that the sodium

24    hydroxide malic acid is one of the ways to adjust pH.

25    Q.      Let's go to the next slide.

*sealed and confidential*

236

Byrn - direct

1          Looking at PDX-234, first of all, what is

2     PTX-497?

3     A.     It's the Handbook of Excipients, and that's a major

4     volume that pharmaceutical scientists use to understand

5     various excipients like malic acid.

6     Q.     And is this a reliable authority?

7     A.     Yes, absolutely.

8     Q.     And so can you tell us how the handle book of

9     pharmaceutical excipients supports your opinion regarding

10    function, that it's the same between the Bionpharma buffer

11    and the claimed buffer?

12    A.     Yes.  It's saying a malic acid --

13          MR. ALUL:  Your Honor, I just have an objection

14    about slide 233.  It characterizes Dr. Cacace as a

15    Bionpharma witness.  In fact, she's not.  She's a

16    third-party witness.  She's a witness for a company called

17    CoreRx, who is Bionpharma's contract manufacturer.

18    Q.     All right.

19          MS. MORGAN:  Your Honor, pursuant to the

20    pretrial order, we provided these slides last night.

21    Counsel is obligated to raise any objection.  And pursuant

22    to the pretrial order, any objections not provided this

23    morning that could have been raised based on the face of the

24    slides are waived.

25          MR. ALUL:  Your Honor, I'm just clarifying our

*sealed and confidential*

Byrn - direct

1    position on this issue.  Dr. Cacace is not a Bionpharma

2    witness and it will be evident from her deposition

3    transcript as such.

4              THE COURT:  Okay.  Well, I think if you're

5    stating any objection, it's an objection to a slide and that

6    is waived.  Obviously, you'll have a chance to ask questions

7    of any witness that's coming up, including this one.  So

8    overruled.  Let's move on, please.

9    BY MS. MORGAN:

10   Q.    I'm sorry.  I think your answer was interrupted, so

11   let me repeat.  How does the Handbook of Pharmaceutical

12   Excipients support your opinion that the function of

13   Bionpharma's buffer and the claimed buffer are the same?

14   A.    Well, it's stating that malic acid is a buffering

15   agent, so it's saying it has the same function that the

16   citric acid has.

17   Q.    And let me ask you to just go back one slide for a

18   housekeeping matter.  Regarding the Cacace testimony for the

19   record that you referred to on PDX-233, was that from the

20   transcript of the Cacace deposition at page 26, lines 22

21   through page 27, line 19?

22   A.    Yes.

23   Q.    Thank you.

24         Okay.  So can you please advance one slide, back

25   to PTX-234.  Okay.

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 76 of 143 PageID #: 5993
*sealed and confidential*
238

Byrn - direct

1          And is there evidence from Bionpharma's ANDA

2    that also supports your conclusion that the function between

3    the two buffers is the same?

4    A.      Yes.

5    Q.      Can you go to the next slide.  Looking at PDX-235,

6    again, have we seen this table several times now today?

7    A.      Yes.

8    Q.      Okay.  And it's from Bionpharma's ANDA?

9    A.      That's correct.

10   Q.      Okay.  Looking at Table 1 of the ANDA again, which is

11   from PTX-478, BION-ESOL-231, can you please tell us how this

12   table supports your opinion that Bionpharma's buffer has the

13   same function as the claimed buffer?

14   A.      Yes.  It's saying that sodium hydroxide is a pH

15   adjustment, so it's adjusting the pH of the buffer,

16   playing the role in creating a buffer by the mechanism,

17   too.

18   Q.      Let's go to the next slide.  And looking at PDX-236,

19   referring to PTX-478 at BION-ESOL- 246 to 247, can    you

20   tell us how this supports your opinions regarding function?

21   A.      Yes.  This is part of Bionpharma's ANDA also and

22   they're saying here, they are really talking about

23   sodium hydroxide.  They didn't use hydrochloric acid, so

24   they are saying it's a functional component for the

25   formulation pH, and it was added to adjust the pH to a

*sealed and confidential*

Byrn - direct

1  predetermined target.

2  Q.      And what does this further confirm for you?

3  A.      It has further confirmed that Bionpharma has used a

4  pH -- pardon me, used sodium hydroxide to adjust the pH to

5  the optimum pH for the buffer system.

6  Q.      Now, I see that this also mentions hydrochloric acid.

7            Does this have any role in Bionpharma's

8  ANDA product?

9  A.      No.  They didn't use hydrochloric acid in any of

10 their batches.  I reviewed the batch record and we didn't

11 use hydrochloric acid.

12 Q.      Okay.  Let's go to the next slide.

13            Looking at PDX-237, which comes from -- which is

14 referring to PTX-498, can you please tell us what PTX-498

15 is?

16 A.      It's the Bionpharma Pharmaceutical Development

17 Report.  It's part of an ANDA.

18 Q.      And this is referring to PTX-498 at BION-ESOL-606 to

19 607.

20            Can you please tell us how this supports your

21 opinion regarding the function being the same between the

22 two buffers?

23 A.      Yes.  Again, it's saying that same thing, that the pH

24 adjustment is performed using .1 normal sodium hydroxide and

25 then it's also saying these excipients are used to adjust

1    the final pH as needed.

2    Q.      Okay.  So let's go to the next slide.  So looking at

3    PDX-238, we're at the end of your conclusion regarding

4    function.

5            Let's move on to way.  Let's look at PDX-239.

6    Can you tell us -- just remind us, what is the way in which

7    Bionpharma's buffer and the claimed buffer function that's

8    the same?

9    A.      So this is like those bottles that I was showing.

10   The way is it takes these hydrogen ions or the hydroxide

11   ions out of solution, and so that way it prevents the pH

12   from deviating very much from the optimum pH.

13   Q.      Let's go to the next slide.  Looking at PDX-40, it

14   looks like we -- this looks familiar to something we looked

15   at earlier, but can you explain how this specifically

16   relates to your opinions regarding the way being the same in

17   which the two buffers operate, function?

18   A.      Yes.  This is on the right side and this is showing

19   citric acid, but, again, let's say there were excess protons

20   as shown on the right side with this equation.  The

21   conjugate base, the ONA, would react with that said

22   proton and form citric acid.  So it's a way of scavenging

23   protons.  This is the way citric acid will work.  And I

24   will show subsequently that malic acid will work the same

25   way.

*sealed and confidential*

241

Byrn - direct

1   Q.      Let's go to the next slide.  So looking at PDX-241,

2   again, we kind of touched on this earlier, it looks like,

3   but explain now how this is similar or different to what you

4   talked about earlier in your opinion.

5   A.      So this summarizes what I've been testifying.  So on

6   the left side, we have malic acid coming in from the

7   enalapril maleate and then we're adding sodium hydroxide

8   in a substoichiometric amount to make a buffer, and so

9   that is what happens to the bottle as I've been testifying

10  about.

11          And then if we look at the molecule, on the

12  left, we have a malic acid molecule, so it's a carboxylic

13  acid reacting with a substoichiometric metric amount of

14  sodium hydroxide.  It produces water.  There's -- and then

15  in the blue box is the buffer.  It's the leftover malic acid

16  plus the sodium maleate.  That makes the buffer that can

17  scavenge the protons or hydroxide ions from the solution.

18          And then down below I've just shown the same

19  equation I showed earlier where reacting an HA with a

20  substoichiometric amount of sodium hydroxide producing

21  water, leaving some HA and then having the sodium A minus

22  the conjugate phase.

23          And --

24  Q.      And that --

25  A.      That's my chemistry analysis.

sealed and confidential
Byrn - direct

1    Q.      And so is this what is happening in Bionpharma's ANDA

2    product to create a buffer?

3    A.      That's correct.  This is how Bionpharma creates a

4    buffer.

5    Q.      Okay.  Let's look at the next slide.

6            So looking at PDX-242, which again refers to the

7    table we've been looking at all day at PTX-478, BION-ESOL-

8    231, can you please explain the chemical sequence of events

9    in order that happened in Bionpharma's ANDA product with

10   reference to the ingredients in Table 1?

11   A.      Sure.  So I've been explaining this.  It's just a

12   summary.  So enalapril and the other ingredients are

13   dissolved, and then at the end, sodium hydroxide, the bottom

14   component, is added to adjust the pH to the proper pH, and

15   that achieved the optimum pH and the stability of the

16   product.  If you didn't do that step, you wouldn't have a

17   stable formulation.  You wouldn't be able to bring the

18   product on the market.

19   Q.      So I think you mentioned earlier absorbing excess H

20   plus or H minus ions.  Can you explain what you mean by that

21   with respect to Bionpharma's ANDA buffer system?

22   A.      So Bionpharma's ANDA pharma system has both conjugate

23   bases and acids.  So like I showed in the bottles, if

24   there's an excess of protons, the conjugate bases will take

25   them out.  If there's an excess of hydroxide, the conjugate

Byrn - direct

1     acid will take them out.  So it will maintain the optimum pH

2     and prevent degradation, achieve desired stability.

3     Q.     Let's go to the next slide.

4                     So looking at PDX-243, can you please

5     explain what we're looking at here on PDX-243?

6     A.     On the left side is the same diagram I showed

7     earlier.  That shows the citric acid and the brackets

8     rejoined.  The pH range are the different buffers from the

9     different carboxylic acids.

10                    Citric acid has three carboxylic acids, so it in

11    principle could have three different buffers operating at

12    those pH ranges where the brackets are.

13                    And then I added to the right malic acid.  It

14    has two carboxylic acid groups, very similar structurally.

15    And those two brackets show where malic acid operates, and

16    you can see malic acid has a buffering range that

17    encompasses the optimum and, of course, citric acid does

18    also.

19    Q.     And with respect to the pKa 6.4 for the citric acid

20    that is above the pH and the pKa for the malic acid that is

21    6.24 above the pH range, do either of those have any

22    buffering effect?

23    A.     No, those wouldn't have any buffering effect in this

24    system at 3 to 3.5.

25    Q.     Now, were there parts of Bionpharma's ANDA that also

*sealed and confidential*

Byrn - direct

1   support your opinions that the way is the same?

2   A.      Yes, there are.

3   Q.      Let's go to the next slide.

4               Looking at PDX-244, first, I believe you

5   already told us what PTX-498 is, so looking specifically at

6   BION-ESOL- 622 to 623, can you tell us specifically what we

7   are looking at here?

8   A.      Yes.  This is the titration curve experiment that

9   Bionpharma did.  It's headed, figures ten, formulation

10  development study, pH curve for enalapril maleate.

11              And on the left axis it's showing on a

12  vertical, on the Y axis on the left side, it's showing pH.

13  On the right side, moles of NOA.  And if you look at the

14  first two circles coming from the left, one is a little

15  below three and one is above three.  Those are covering the

16  optimum pH range of 3 to 3.5.

17              And the level curve shows that they are

18  buffering in that range.  And if you didn't have the buffer,

19  you would have gotten -- the 0.2 point would have been up

20  just about four and so it would have been much higher.  And

21  so this shows very clearly that the buffering occurred and

22  it also shows that the sodium, the enalapril maleate

23  dissociated and reacted with the hydroxide, because if it

24  didn't do that, it would have gone up to four, close to

25  four.  By staying lower nearer 3, 0.2, the second point in

Case 1:18-cv-01962-LPS  Document 194  Filed 03/02/21  Page 83 of 143 PageID #: 6000
*sealed and confidential*
245
Byrn - direct

1    that shows very clearly that the buffering system is

2    working, it's consuming hydroxide, and that the enalapril

3    maleate is dissociated.

4    Q.      Sodium hydroxide, okay.

5              MS. MORGAN:  Okay.  Let's go to the next slide.

6    BY MS. MORGAN:

7    Q.      So what is your end conclusion regarding way?

8    A.      So like I showed on that titration curve, the maleate

9    system, the Bionpharma maleate system is removing -- in

10   that case it is removing excess hydroxide ions, and it is

11   maintaining a pH.

12             And that experiment they did directly in the

13   ANDA.

14             MS. MORGAN:  Okay.  Now let's go to PDX-246 and

15   turn to the results.

16   BY MS. MORGAN:

17   Q.      What is your end conclusion regarding why the claimed

18   buffer and Bionpharma's buffer achieve the same result?

19   A.      Well, like I was showing again on that titration

20   curve, the result, and we know that Bionpharma's product is

21   in the optimum range, 3 to 3.5.  So it maintains that pH

22   range which produces a stable product.

23             MR. MADDOX:  Okay.  Let's go to the next slide,

24   please.

25   BY MS. MORGAN:

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 84 of 143 PageID #: 6001
*sealed and confidential*
246
Byrn - direct

1    Q.      Looking at PTX-247.  Can you tell us how this

2    supports your opinion regarding results?

3    A.      Yes.  This is just a statement that is not contested.

4            Bionpharma and Silvergate agree that

5    Bionpharma's ANDA product is stable, as defined in the

6    Bionpharma asserted claims, at about 5 plus or minus 3

7    degrees C for at least 24 months.

8    Q.      And did you also look at stability data that is

9    consistent with that as well?

10   A.      Yes, I did.

11           MS. MORGAN:  Okay.  Let's go to the next slide.

12   BY MS. MORGAN:

13   Q.      Looking at PDX-248.  And this is referring to

14   PTX-484.  What is PTX-484?

15   A.      This is a part, again, a part of the ANDA, another

16   part of the ANDA, and it's part of the module 3 quality

17   section of the ANDA.

18   Q.      And referring now specifically to the pages that are

19   on the screen, PTX-484, BION-ESOL-1541 and 1544.

20           Can you tell us how this supports your opinion

21   that the result is the same between the claimed buffer and

22   Bionpharma's buffer?

23   A.      Here, they're showing that Bionpharma's buffer is

24   meeting THE unspecified impurity specifications for

25   24 months, and the total impurity specifications through 24

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 85 of 143 PageID #: 6002
*sealed and confidential*
247

Byrn - direct

1   months, which are part of the claims of claim 1.

2               MS. MORGAN:   Okay.   Let's go to the next slide.

3   BY MS. MORGAN:

4   Q.       So looking at PDX-249.   What is PTX-485, which is

5   referred to here?

6   A.       Sorry.

7   Q.       Take your time.

8   A.       That's an ANDA exhibit and registration batches --

9   sorry.   That's ANDA exhibit and registration batches, a

10  report on those.   That's part of the ANDA.   Related to the

11  ANDA really.

12  Q.       So looking at the page referred here, which is

13  from PTX-485, BION-ESOL-1758, can you please tell us how

14  these portions support your opinion that the results are

15  the same?

16  A.       Yes.   The conclusion, the first one is that they

17  indicate the drug product is stable based on that study.

18  And then a later one, they say the drug product will

19  consistently meet the specifications through the proposed

20  24-month shelf life.

21  Q.       And so does this support your conclusion that

22  Bionpharma's ANDA product will be stable for at least

23  24 months?

24  A.       Yes.

25  Q.       Did you also look at 24-month stability data?

*sealed and confidential*

248

Byrn - direct

1   A.      Yes, I did.

2   Q.      Can you take a look at PTX-122, 123, and 124 and tell

3   me what those are?

4   A.      Those are some stability summaries that are for the

5   enalapril maleate oral solution.  And those are part of the

6   ANDA that were carried out later after the ANDA was filed

7   was completed and just following up on the stability.

8               MS. MORGAN:  Okay.  Let's go to the next slide,

9   PDX-250.

10  BY MS. MORGAN:

11  Q.      And did you prepare a summary of that data?

12  A.      Yes, I did.  This table summarizes the stability

13  studies of 5 degrees centigrade.  And you can see they have

14  studied different lots, and you can see on the assay numbers

15  that they're all 98.1 and higher.  98.0 is one of them, so

16  above 98.  And the impurities are quite low.

17              And this shows that there aren't a large amount

18  of protons or hydroxide created.  If there were a lot of

19  protons or hydroxide created in these stability studies, the

20  assay would be much greater, change much more.

21              So it just shows a small amount of degradation.

22  Q.      And for the record, does this come from PTX-122 at

23  CORE-ESOL-45570, PTX-123, at CORE-ESOL-45574, and PTX-124 at

24  CORE-ESOL-45564?

25  A.      Yes.

*sealed and confidential*

249

Byrn - direct

 1   Q.       Thank you.  And I'm sorry, I didn't catch it.  Did

 2   you say what the temperature conditions were for this study?

 3   A.       I think I did but they're 6 degrees.  It's the

 4   heading up there.  They were 5 degrees centigrade for

 5   24 months.

 6   Q.       Thank you.

 7                MS. MORGAN:  Okay.  And let's go to the next

 8   slide.

 9   BY MS. MORGAN:

10   Q.       So I think we have covered all three.  So can you

11   please give us your end conclusion regarding the

12   function-way-result test for the buffer when comparing

13   Bionpharma's buffer to the claimed buffer?

14   A.       Yes.  So like I've been testifying, Bionpharma's

15   maleate/sodium hydroxide buffer has the same function in

16   that it adjusts and stabilizes the pH, and it works in

17   the same way, again, the bottles by removing hydrogen or

18   hydroxide ion, and it results in the same thing as stable

19   product for 24 months.

20   Q.       Okay.  And did you also analyze the Doctrine of

21   Equivalents under the insubstantial differences test?

22   A.       Yes.

23                MS. MORGAN:  Let's go to the next slide.

24   BY MS. MORGAN:

25   Q.       Can you please tell us your conclusion under the

*sealed and confidential*

Byrn - direct

1   insubstantial differences test, looking at PDX-252?

2   A.     Yes.   I did several different elements.   I looked at

3   several different elements under insubstantial differences

4   and concluded that there were -- the differences were

5   insubstantial.

6               MS. MORGAN:   Let's go to the next slide, which

7   is PDX-253.

8   BY MS. MORGAN:

9   Q.     Can you please tell us your reasons for finding the

10  differences were insubstantial between the two buffers?

11  A.     So these are the five factors that I looked at to

12  determine insubstantial differences.

13              First of all, both the claimed sodium and

14  citrate, citric acid and the Bionpharma's maleic acid,

15  sodium maleate, sodium hydroxide buffer, both of those are

16  common buffering agents.

17              Second, both are known to be soluble in water,

18  and, like I said, dissociate.

19              And the functional group -- third, the

20  functional group responsible for donating or accepting

21  protons is the carboxylic acid group.   They're both

22  carboxylic acid containing molecules.

23              The pKas are within their buffering range, allow

24  buffering, and a POSA would understand how to interchange

25  citric acid and maleic acid in a buffer -- a person of skill

*sealed and confidential*

Byrn - direct

1    would know how to interchange maleic acid and citric acid in

2    a buffer system based on their known properties to achieve

3    the desired pH and stability.

4    Q.    And did your analysis under the function-way-result

5    test also lead to your conclusions of the insubstantial

6    differences test?

7    A.    That's correct.  It's also supported by the

8    function-way-result analysis.

9            MS. MORGAN:  Let's look at the next slide.

10   BY MS. MORGAN:

11   Q.    So looking at PDX-254, which -- is this also -- it

12   refers to PTX-497.  We're looking at the same Handbook of

13   Pharmaceutical Excipients we looked at before?

14   A.    Right.  And this is part of the insubstantial

15   differences analysis.  They both have -- this shows maleic

16   acid, and it has carboxylic acid groups like citric acid.

17           And I already testified, it is used as a

18   buffering agent in the industry.  It has the pKas that I

19   showed on the brackets.

20           And it is quite soluble in water.

21           MS. MORGAN:  Let's go to the next slide.

22   BY MS. MORGAN:

23   Q.    Looking at PDX-255.  This does have a different PTX

24   number, 180, but is this from the same Handbook of

25   Pharmaceutical Excipients?

*sealed and confidential*

Byrn - direct

1    A.      Yes.

2    Q.      And can you please tell us how this section at

3    SLVGT-EPA-102994 to 995 supports your opinion?

4    A.      Yes.  This shows carboxylic acid groups.

5            Citric acid also, and it is widely used to form

6    buffers.

7            It has three pKas, like I showed on the

8    brackets.

9            And it also has good solubility.

10           MS. MORGAN:  All right.  Let's go to the next

11   slide.

12           And looking at the amount of the buffer.

13           Looking at PDX-256.

14   BY MS. MORGAN:

15   Q.      Can you please explain for us what this slide is

16   showing?

17   A.      So on the left side are the amounts of the buffer and

18   the elements of the claim.  And on the right side are the

19   amounts of the buffer that I calculated based on the

20   1 milligram per mL enalapril maleate.

21           And like I am saying, they both exert a

22   substantially equivalent effect, like I have been

23   testifying, by adjusting and maintaining a pH.

24           And achieve a stable product.

25   Q.      And the calculations on the right side, did we go

Byrn - direct

1    through those earlier in your opinion?

2    A.    That's right.  We went through those earlier.

3    Q.    Okay.  So considering the function of Bionpharma's

4    buffer, does the amount of the maleic acid/sodium maleate

5    buffer in Bionpharma's ANDA product perform the same

6    function as the claimed buffer?

7    A.    Yes.

8              MS. MORGAN:  Okay.  So can you take it to a

9    black screen?

10   BY MS. MORGAN:

11   Q.    So are you aware that Bionpharma's expert,

12   Dr. Morton, raises a few arguments against the

13   applicabilities of the Doctrine of Equivalents?

14   A.    Yes.

15   Q.    Are you aware of Dr. Morton's opinion that you

16   have not demonstrated that enalapril maleate completely

17   dissociates to enalapril and maleic acid?

18   A.    Yes, I am.

19   Q.    What is your response to that?

20   A.    Well, again, it is going to that titration curve.

21   That clearly shows dissociation of the enalapril maleate.

22             And further, it's a basic principle of salt

23   chemistry that enalapril maleate will dissociate in these

24   solutions that are being used.

25   Q.    So is Dr. Morton just wrong as a matter of

Byrn - direct

1    chemistry?

2    A.      That's correct.  I think so.  I think the ANDA

3    shows and that titration shows that that argument isn't

4    correct.

5    Q.      And are you aware of the opinion that a buffering

6    system typically cannot form with a combination of a weak

7    acid and a strong base?

8    A.      I am.

9    Q.      Is that correct from a scientific perspective?

10   A.      No, it's the method to forming a buffer involves

11   starting with the acid and adding a strong base.  And

12   it's -- again, it's not -- I don't believe that it's correct

13   to say that that can't -- that isn't a way to form a buffer

14   because when you do that, in the end you have that same

15   molecules present as if you formed the buffer by the other

16   method.

17   Q.      And when you say method 2, are you referring to

18   earlier in your opinions when you called it, I think, buffer

19   2 or system 2?

20   A.      That's correct.  I summarized two -- method 1 and

21   method 2.  At the end, method 1 and 2 did those same

22   molecules in solution.

23   Q.      And are you aware of Dr. Morton's opinions that it

24   is important to have a system of a weak acid and its

25   conjugate base in nearly equivalent amounts in a buffer

*sealed and confidential*

255

Byrn - direct

1  system?

2  A.    I am.

3  Q.    Do you agree that it's important to have equivalent

4  amounts?

5  A.    No, I think it depends on the system and the number

6  of hydrogen ions and hydroxide ions produced by that system.

7          And the titration curve, again, shows that the

8  maleate -- enalapril maleate/sodium hydroxide system is

9  sufficient to maintain the pH because of curved stable

10  ethyl.

11  Q.    Are you familiar with Dr. Morton's discussion of

12  buffer capacity?

13  A.    Yes.

14  Q.    Does it matter for your opinions under the Doctrine

15  of Equivalents if the buffering capacity between the

16  claimed buffer and Bionpharma's buffer is different?

17  A.    No, I don't think it matters.  And there's nothing

18  in the patents mentioned about buffer capacity.  The words

19  "buffer capacity" aren't -- don't appear in the patents.

20  Q.    Does Bionpharma's ANDA product have sufficient, a

21  sufficient buffer to reach the required pH?

22  A.    Yes.  It has sufficient buffer to give the required

23  pH and it's a sufficient buffer to stabilize the enalapril

24  because we know it lasts for 24 months in their product.

25  Q.    Okay.  So in that context, given the sufficient

*sealed and confidential*

Byrn - direct

1  buffer for both those purposes, is buffering capacity

2  irrelevant?

3  A.    To me, yes, it's not relevant.  Especially since it's

4  not mentioned in the patent in the first place.

5  Q.    All right.  And are you aware of Dr. Morton's opinion

6  that the claimed buffer serves a different function than

7  that of maleic acid because they have different chemical

8  structures?

9  A.    Yes, I am aware of that.

10 Q.    And what -- do you agree?

11 A.    No, I don't agree at all because both of them have

12 carboxylic acid groups that function in the same way as a

13 buffer, to scatter the protons and hydroxide ions.

14 Q.    Are there other similarities?

15 A.    The structure, that the solubility -- I went through

16 those on those slides, yes.  The structure, the solubility,

17 and so on.

18 Q.    Okay.  And are you aware of Dr. Morton's opinion

19 that the asserted claims require a buffer component beyond

20 whatever buffer is created by maleic acid?

21 A.    Yes, I'm aware of those.

22 Q.    Do you agree?

23 A.    No.  Again, there is nothing in the patent that you

24 need additional buffers, special buffers, et cetera, and

25 there is nothing about buffer capacity either.

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 95 of 143 PageID #: 6012
*sealed and confidential*
257
Byrn - direct

1              And when you see that the buffer, that the

2     enalapril maleate/sodium hydroxide buffer is sufficient to

3     give a two-year stability.

4     Q.     So when looking at the claim limitation, enalapril or

5     a pharmaceutically acceptable salt or solvate thereof, how

6     did you interpreted that in determining the Bionpharma

7     buffer for your opinion?

8     A.     It described enalapril is the active ingredient in

9     the maleate, which dissociates from enalapril, reacts with a

10    sodium hydroxide and makes the buffer system.

11    Q.     Okay.  And are you aware of Dr. Morton's opinion that

12    the function of the buffer in the asserted claim include in

13    vivo stability?

14    A.     Yes, I'm aware of that.

15    Q.     First, what is in vivo stability?

16    A.     Well, it was mentioned in some of the summaries, the

17    introduction, and in vivo, they're talking about stability

18    in the stomach of a patient.

19    Q.     By introductions, do you mean the opening statements

20    today?

21    A.     That's correct.  Sorry.  The opening statement.

22    Q.     All right.  I just want to make sure I understood.

23    A.     Okay.

24    Q.     So do you agree with Dr. Morton, that the function of

25    the buffer requires in vivo stability?

*sealed and confidential*

Byrn - direct

1    A.      No.  Again, I don't think that is correct.  There's

2    nothing in the patent that you have to achieve in vivo

3    stability.  The patent, as far as I can recall, doesn't use

4    the word in vivo.

5    Q.      And are you aware of Dr. Morton's opinion that you

6    have not demonstrated that with the -- that the sodium

7    hydroxide completely reacts with the maleate portion of the

8    enalapril?

9    A.      Yes.

10   Q.      To yield --

11   A.      Yes.

12   Q.      And what's your opinion on that?

13   A.      As I described in the titration curve, if it didn't

14   completely react, the pH would have gone up much higher.  So

15   the ANDA titration curve clearly showed that it does react

16   and dissociates and the maleate dissociates from the

17   enalapril.

18   Q.      Is that also just a principle of chemistry as well?

19   A.      Exactly.  That's a principle of chemistry.

20   Q.      And are you aware of Dr. Morton's criticism of your

21   use of the titration curve?

22   A.      Yes, I am.

23   Q.      And are you aware that he criticizes it because it

24   has a different concentration from the ANDA product?

25   A.      Yes, I'm aware.

*sealed and confidential*

Byrn - direct

1   Q.      Does that matter for your opinion?

2   A.      No.  Well, first, I think that Bionpharma must have

3   thought it was significantly to put it in an ANDA.  I don't

4   think they would have put a -- a titration curve in the ANDA

5   if they didn't think it was relevant to their product.

6           And, second, the difference in concentration,

7   the 2 X amount is -- that difference is not very significant

8   at only these dilute solutions.  We're only at one milligram

9   per mL later.  We're very dilute and I don't think that

10  would make it differ.

11  Q.      So if I'm understanding correctly, the other

12  excipients present for that titration curve would not have

13  had an effect on the buffering; is that correct?

14  A.      That's correct.  It's so dilute that they're just

15  well insulated, if I could use that term in solution from

16  each other.

17  Q.      Okay.  Let's go back to the slide.

18  A.      Okay.

19  Q.      Let's go to -- thank you -- the next slide.

20          So looking at PDX-257, are you aware of Dr.

21  Morton's opinion that claim vitiation applies?

22  A.      Yes, I understood that he made that argument.

23  Q.      And what is your understanding of when claim

24  vitiation applies?

25  A.      My understanding is that it only applies if the

*sealed and confidential*
Byrn - direct

1    literal claim limitation and the accused equivalent, which

2    is the maleate sodium hydroxide, are not interchangeable,

3    not insubstantially different, and do not perform the same

4    function, way, result.  And in my opinion, as I said, they

5    are interchangeable and they do perform the same function

6    with results.  So I don't think -- from what I understand, I

7    don't think claim vitiation applies.

8    Q.    And in support of this argument, did Dr. Morton raise

9    any other different arguments for this theory than you've

10   already covered with respect to the Doctrine of Equivalents?

11   A.    No, not that I recall.

12   Q.    So let's move to the next slide.

13         So just to wrap this up, under the Doctrine of

14   Equivalents analysis, what's your end conclusion with

15   respect to the buffer?

16   A.    My end conclusion is that Bionpharma's formulation

17   infringes the buffer limitation claim under both the

18   function, way, result test and the substantial differences

19   test.

20   Q.    Thank you.  Let's go to the next slide, please.

21         So let's turn to the second limitation, the

22   preservative limitation.  What did you conclude with respect

23   to the preservative limitation?

24   A.    I --

25   Q.    Actually, stop.  Just remind us all, when I say

Byrn - direct

1   preservative limitation, what are we talking about?

2   A.    Okay.  I think the next slide shows a preservative

3   limitation we're talking about.

4   Q.    Oh, other.  Can you go back one?

5   A.    Yes.

6   Q.    PDX-259.  Are you looking at PDX-259?

7   A.    Yes.

8   Q.    Okay.  Can you tell us what limitation we're talking

9   about when I say preservative limitation?

10   A.    Yes.  It's listed here, the preservative limitation

11   in the claims is -- 0.7 to 1.2 milligrams per mL sodium

12   benzoate.

13   Q.    Thank you.

14         Okay.  Let's go to the next slide.  And for the

15   preservative limitation, what is the preservative that you

16   looked at for Bionpharma's ANDA product?

17   A.    Yes.  So this shows a section again from the ANDA and

18   the highlighted section, it said it contains two

19   preservatives -- methylparaben and propylparaben and they're

20   listed in the ingredients table as antimicrobial

21   preservatives.

22   Q.    And this is found at DTX-478 at BION-ESOL-231; is

23   that right?

24   A.    Yes.

25   Q.    And can you please tell us the concentration of each

1    of methylparaben and propylparaben?

2    A.      So if you look on the right-hand column, the

3    methylparaben is 1.05 and the propylparaben is 0.21.

4    Q.      And overall, can you do the math in your head and

5    tell us what the total is for both?

6    A.      Yes.  So the total amount is 1.26 milligrams per mL.

7    Q.      Thank you.

8            And in analyzing Doctrine of Equivalents, did

9    you use the same two tests that you described before,

10   function, way, result and insubstantial differences?

11   A.      Yes.

12   Q.      Let's go to the next slide.

13           And can you briefly tell us your summary of your

14   conclusion regarding the preservative limitation for --

15   under each of the tests?

16   A.      Yes.  So my conclusion was that Bionpharma's

17   preservative has the same function because it acts as a

18   preservative.  It works in substantially the same way as

19   it kills microbes.  It serves as an antimicrobial effect.

20   And it has the same result.  It has insignificant microbrial

21   fungal growth, and also insubstantial differences.  My

22   conclusion is they're insubstantially different.

23   Q.      Let's go to the next slide.  So first looking at the

24   function, and specifically the function as a preservative,

25   let's go to the next slide.

*sealed and confidential*

263

Byrn - direct

1          Looking at PDX-263, which is referring to

2   PTX-500, is this the same Handbook of Pharmaceutical

3   Excipients that we've looked at before?

4   A.     Yes.

5   Q.     Okay.  And with reference to page SLVGT-EPA 104311,

6   can you please tell us what about this reports you opinion

7   regarding the functions being the same?

8   A.     Yes.  This is for the claimed sodium benzoate and

9   it's called an antimicrobial preservative.

10  Q.     Let's go to the next slide.

11               And looking at PDX-264, can you -- which

12  is citing PTX-498 that I believe we've discussed before, can

13  you please tell us how this reference at BION-ESOL--606

14  supports your opinion regarding the function being the

15  same?

16  A.     Well, this is part of Bionpharma's ANDA and it's

17  saying methylparaben and propylparaben are preservatives.

18  So it's saying they're the same.  That they are the same

19  function, preservative.

20  Q.     Okay.  Let's go to the next slide.

21               And looking at PDX-265, which is citing PTX-498

22  at BION-ESOL--663, can you tell us how this supports your

23  conclusion regarding the function being the same?

24  A.     Yes.  This is another statement from the Bionpharma

25  ANDA and it says the data indicates the preservative system

*sealed and confidential*

264

Byrn - direct

1    is effective for the product.

2    Q.      Okay.  And let's go to the next slide.

3             So we talked about function.  Let's talk about

4    the way.  Remind us the way in which both preservatives

5    function the same.

6    A.      Yes.  They kill the microbes.  They exert

7    antimicrobial effect.

8    Q.      Let's go to the next slide.

9             So looking at PDX-267, again, is this the same

10   Handbook of Pharmaceutical Excipients we've been looking at

11   earlier at PTX-500?

12   A.      Yes.

13   Q.      And please tell us how the entry of LVGT-EPA 104311

14   supports your opinion?

15   A.      Yes.  It's saying sodium benzoate has both bacterial,

16   static and antifungal properties.  This is a claimed -- this

17   is a claimed preservative.

18   Q.      Okay.  What about the pH?

19   A.      The pH, it says it works best in acidic solutions at

20   pH 2 to 5, and course we're at 3 to 3.5.

21   Q.      Okay.  So turning to the preservative in Bionpharma's

22   ANDA product, in what way do the methylparaben and

23   propylparaben function as a preservative?

24   A.      Yes.  They function the same way.  They're

25   bacteriostatic or they kill the bacteria or they're fungal

Byrn - direct

1    or their fungistatic.

2    Q.      Let's go to the next slide.

3            So looking at PDX-268, which is citing PTX-478,

4    I believe we looked at 478 before, so let's -- focusing at

5    the specific page by I don't know ESOL-258, can you tell us

6    how what we're looking at supports your opinion that the way

7    is the same in which both preservatives function?

8    A.      So this slide just shows, again, that the pH is in

9    the 3.2 to 3.6 range where they work as bacteriostatic or

10   antimicrobial or fungistatic.

11   Q.      And does this mean that the -- that the

12   antimicrobial, that the preservatives are going to have

13   antimicrobial effectiveness in the pH range?

14   A.      That's correct.

15   Q.      How do you know that?

16   A.      Well, it's stated here and -- pardon me, it's stated

17   in the previous slide in the Handbook of Excipients, and

18   also for the parabens, it stated that.

19   Q.      I guess if I'm understanding correctly, does it mean

20   that because this document tells us that the generic

21   formulation will be controlled in the pH to be between 3.2

22   and 3.6, that the preservative is doing its job?

23   A.      That's correct.

24            MR. ALUL:  Your Honor, these are leading

25   questions.

*sealed and confidential*
266
Byrn - direct

1          THE COURT:  That one was leading.  It's a little

2    hard with technology to object to leading, but you are

3    welcome to try.

4          Try to avoid the leading questions.

5          MR. ALUL:  Thank you, Your Honor.

6          MS. MORGAN:  I will, Your Honor.

7    BY MS. MORGAN:

8    Q.    Turning to the next slide.  So we've talked about

9    function, we've talked about way.  Let's move on to results.

10          Can you remind us of the results that

11   Bionpharma's preservative and the claimed preservative

12   achieved that's the same in your opinion?

13   A.    Yes.  So Bionpharma's preservative results in

14   insignificant microbial and fungal growth.

15   Q.    Turning to the next slide, please.

16          So looking at PDX-270, which is citing PTX-498

17   at BION-ESOL--589, what are we looking at here?

18   A.    This is a study of the brand enalapril solution

19   carried out by Bionpharma, and they are simply showing that

20   the benzoic acid, sodium benzoate in the Bionpharma product

21   was .83 milligrams per mL.  They are indicating it's about

22   one milligram per mL.

23   Q.    And is this -- if you look at the top with the brand,

24   is that referring to Epaned?

25   A.    That's correct.

*sealed and confidential*

Byrn - direct

1    Q.      Okay.  And so this is Bionpharma's study of Epaned?

2    A.      That's correct.

3    Q.      Is that right?

4    A.      That's right.

5    Q.      I just want to make sure I understood.  And so

6    turning to the Bionpharma ANDA product, let's go to the next

7    slide at PDX-271, which is citing PTX-480 -- oh, I'm sorry.

8    This is -- let me start over.

9            Sticking with the Epaned product at PDX-271 at

10   PTX-480 SLVGT-EPA 3225, first, can you please look at

11   PTX-480 and tell us what that is?  And can you put the first

12   page of PTX-480 up on the screen?

13   A.      '480 is a stability study, part of the ANDA.

14           Oh, sorry.  It's the new -- it's the Silvergate

15   new drug application, Silvergate NDA, where their studying

16   expands microbial and fungal properties.

17   Q.      Thank you.

18           MS. MORGAN:  And can we go back to the slides,

19   please.

20   BY MS. MORGAN:

21   Q.      And so continuing on with PTX-480.  Can you please

22   tell us what we're looking at, at Table 2.3.P.8-4?

23   A.      Sure.  So these tables, you want the lowest number

24   you can.

25           So it's saying total aerobic microbial count is

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 106 of 143 PageID #: 6023
*sealed and confidential*
268

Byrn - direct

1    not more than 100 CFUs.

2              The yeast and the mold are not more than 10

3    CFUs.

4              E. coli is absent and antimicrobial testing

5    conformed.

6              And these were all done by the United States

7    Pharmacopeia methods.

8              So this is showing the properties of the legend

9    drug, that ANDA sodium benzoate preservative.

10   Q.    Do these tests show whether there is antimicrobial

11   effectiveness?

12   A.    Yes.  They show very clearly when it's not -- when

13   it's meeting these USP specs, it is showing that they are

14   antimicrobial and antifungal also.

15             MS. MORGAN:  Okay.  Let's go to PDX-272.

16   BY MS. MORGAN:

17   Q.    So now looking at Bionpharma's ANDA product, I think

18   we've looked at PTX-498 many times today.

19             Can you please tell us what we're looking at

20   here at BION-ESOL-668.

21   A.    Here, Bionpharma is showing that their product meets

22   the USP 51 for a Category 3 requirement.  So it meets the

23   same antimicrobial effectiveness requirement.

24   Q.    And are you referring to the line that's highlighted

25   and the row below it titled "Microbial Enumeration and

*sealed and confidential*

269

Byrn - direct

1    Tests"?

2    A.    Yes.  I'm referring to both the highlighted and the

3    row below.  All of them are showing that Bionpharma's

4    product meets the USP requirements.

5    Q.    Are those the same USP requirements we looked at with

6    respect to the Epaned product?

7    A.    Yes, they are.  51, 61, and 62.

8    Q.    So overall --

9              MS. MORGAN:  Let's go to the next slide.

10   BY MS. MORGAN:

11   Q.    -- what do the documents show us with respect to

12   result?

13   A.    That Bionpharma's preservatives have the same

14   function, to act as preservative.

15             And they function in the same way, to exert

16   antimicrobial or antifungal effects at a pH of less than

17   3.5.

18             And they have the same result, which is

19   insignificant microbial and fungal growth.

20             MS. MORGAN:  Okay.  Let's go to the next slide,

21   PDX-274.

22   BY MS. MORGAN:

23   Q.    What was your conclusion regarding whether there are

24   any insubstantial differences between the two preservatives?

25   A.    Yes.  My analysis, there are two points of my

*sealed and confidential*

270

Byrn - direct

1   analysis.

2          Methylparaben and propylparaben function in the

3   same way as sodium benzoate by inhibiting microbial growth.

4          And, two, that sodium benzoate is structurally

5   very similar to methylparaben and propylparaben.

6          MS. MORGAN:  Let's go to the next slide.

7   BY MS. MORGAN:

8   Q.     Looking at PDX-275.  Can you please explain what

9   we're looking at here?

10  A.     Yes, these show the three structures of sodium

11  benzoate, methylparaben, and propylparaben.  And you can

12  see all three of them are insubstantially different in

13  structure.  They all have that ring system with the COO on

14  it, with slightly different side chains.

15         MS. MORGAN:  Okay.  Let's go to the next slide.

16         Actually, let's -- take it to black, please.

17  BY MS. MORGAN:

18  Q.     So are you familiar with Bionpharma's expert,

19  Dr. Morton's, arguments against the applicability of the

20  Doctrine of Equivalents with respect to the preservative?

21  A.     Yes.

22  Q.     So what is your response to his opinion that

23  methylparaben and propylparaben are substantially different

24  in structure to sodium benzoate?

25  A.     Yeah, I don't agree with that.  I think they have

*sealed and confidential*
Byrn - direct

1   similar structures.  They do have different side chains,

2   but the -- most of the compound structure is similar.

3   Q.     And what is your response to Dr. Morton's opinion

4   that sodium benzoate is substantially different from paraben

5   because sodium benzoate is bacteriostatic and fungistatic

6   only under acidic conditions?

7   A.     Well, since the, the pH of the system is acidic, I

8   think that it is most relevant just to look at the

9   conditions of the formulation.  And there, they have the

10  same function-way result.

11  Q.     And what is your response to Dr. Morton's arguments

12  that the methylparaben/propylparaben combination in

13  Bionpharma's formulation does not function in the same way

14  as sodium benzoate in the claimed formulation because they

15  have different mechanisms of action?

16  A.     Yes.  I don't think that's -- I don't agree with

17  that.  I don't think that's relevant.  The patent doesn't

18  describe the mechanism of action of the various

19  preservatives.

20             And I don't think a person of skill is that

21  concerned with the mechanism of action as long as they act

22  as a preservative and are effective.

23             MS. MORGAN:  Can you please put the slides back

24  up.

25  BY MS. MORGAN:

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 110 of 143 PageID #: 6027
*sealed and confidential*
272
Byrn - direct

1    Q.      And looking at PDX-276, which cites to PTX-498,

2    BION-ESOL-669, and PTX-480, SLVGT-EPA-3225, which I believe

3    we looked at earlier.

4            Can you please tell us what these tables show in

5    response to Dr. Morton's as opinions?

6    A.      So here is a comparison.  I color coded the

7    comparison of the results of the two preservatives.

8            And in the orange is the total aerobic microbial

9    counts.  We can see that is similar.

10           The next is the yeast and molds, and that is

11   similar.

12           And the E. coli.

13           And, finally, the light blue, antimicrobial

14   effectiveness.

15           So these are insubstantially different, these

16   two, two preservative systems.

17   Q.      And is this what you are referring to when you said

18   the effect is the same?

19   A.      That's correct.

20   Q.      So are there other ways to preserve things other than

21   by killing bacteria?

22   A.      Yes.  You could, for example, do freezing.  You could

23   use freezing to preserve a product.  That would certainly

24   work.

25   Q.      And does freezing a product as a method of killing

*sealed and confidential*
273
Byrn - direct

1    bacteria, is that a substantially different way than using,

2    for example, the claimed preservative?

3    A.      That's correct.  That is a substantially different

4    way.

5    Q.      And why is that a substantially different way?

6    A.      Well, freezing just makes the whole system so cold

7    that the bacterium and the fungi can't grow.  So it's

8    working by almost a nonchemical method.  It is more just

9    temperature.

10   Q.      So Dr. Morton picks out some physical differences:

11               Antimicrobial activity.

12               Lipofillicity as a paraben that increases with

13   alkyl moiety chain lengths.

14               Differences in solubility.

15               Do those differences matter for your opinions?

16   A.      No.  As I said, those are not -- a person of skill is

17   just interested in a preservative effect, and those are way

18   too granular for determining the function-way-result of just

19   those preservatives.

20   Q.      So -- and what is your position -- what is your

21   response to Dr. Morton's position that methylparaben and

22   propylparaben have substantially different antimicrobial

23   properties to sodium benzoate?

24   A.      Again, that's -- from this table, it looks like

25   they're quite similar.  And, typically, you are just looking

*sealed and confidential*

274

Byrn - direct

```
 1    for a material that will meet the USP requirements, and so I

 2    can't agree with that analysis.

 3    Q.     Did Dr. Morton identify that enalapril is any more

 4    susceptible to fungus such that that kind of a distinction

 5    is important here?

 6    A.     No, he didn't.

 7    Q.     So did Dr. Morton's arguments impact your opinions

 8    one way or the other regarding infringement under the

 9    Doctrine of Equivalents?

10    A.     No.  I still believe that there is infringement under

11    the Doctrine of Equivalents.

12              MS. MORGAN:  Let's go to the next slide.

13    BY THE WITNESS:

14    A.     The function-way-result and the insubstantial

15    differences.

16              MS. MORGAN:  Okay.  So looking at PDX-277, which

17    is referring to PTX-478 at BION-ESOL-231 that we've looked

18    at many times.

19    BY MS. MORGAN:

20    Q.     I want to talk now about the amount of the

21    preservative.

22              Can you remind us again what is the total amount

23    of the preservative?

24    A.     Yes.  The total amount is 1.26 milligrams per mL

25    preservative for the parabens.
```

*sealed and confidential*

275

Byrn - direct

1    Q.      Okay.  And when you consider the amount of the

2    preservative that is claimed, and you can also consider, in

3    comparison, to the amount of Bionpharma's preservative, what

4    is your opinion regarding whether the amount of -- let me

5    rephrase -- whether the amount of the claimed preservative

6    and the amount of Bionpharma's preservative is equivalent

7    under the Doctrine of Equivalents?

8    A.      I think they're equivalent under the Doctrine of

9    Equivalents.  There is insubstantial differences.

10   Q.      And considering the function of sodium benzoate

11   in the claims, does the amount of methylparaben and

12   propylparaben in Bionpharma's ANDA still perform that same

13   function?

14   A.      Exactly.  Yes.  In my opinion, yes.

15   Q.      Okay.  So are you familiar with Dr. Morton's

16   assertion that the preservatives are not equivalent because

17   methylparaben and propylparaben are used in combination at

18   certain concentrations whereas sodium benzoate is used alone

19   at a certain concentration?

20   A.      Yes.

21   Q.      Do you agree with that?

22   A.      No.

23   Q.      Why not?

24   A.      Well, because, again, the person of skill is

25   searching for a preservative that will prevent bacteria

*sealed and confidential*

276

Byrn - direct

 1     and fungi from contaminating the products, and the exact

 2     preservatives can meet that under the Doctrine of

 3     Equivalents means two preservatives meet that goal.

 4     Q.     And what is the end --

 5             MS. MORGAN:  Go to the next slide, please.

 6     BY MS. MORGAN:

 7     Q.     So just in total, what is your end conclusion

 8     regarding infringement under the Doctrine of Equivalents

 9     about the preservative?

10     A.     So that Bionpharma's preservative meets -- is

11     equivalent to the claimed preservative under the

12     function-way-result and the insubstantial differences test.

13     Q.     Okay.  Let's turn now to the doctrine of -- strike

14     that.

15             Let's turn now to Dr. Morton's assertions

16     regarding prosecution history estoppel.

17             Are you aware that Dr. Morton has argued that

18     Silvergate is precluded from arguing infringement under the

19     Doctrine of Equivalents?

20     A.     Yes.

21     Q.     Did you form your own opinions regarding prosecution

22     history estoppel and disclosure dedication?

23     A.     Yes, I did.

24     Q.     What is your opinion?

25     A.     That Silvergate is not precluded from asserting

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 115 of 143 PageID #: 6032
sealed and confidential
277
Byrn - direct

1    Doctrine of Equivalents by those principles, by those legal

2    argument.

3                    MS. MORGAN:   Okay.  Let's go to the next slide.

4    BY MS. MORGAN:

5    Q.    What are we looking at here at PTX-279?

6    A.    This is a timeline of the prosecution history of the

7    '008 patent.

8                    And I mentioned earlier, the '008 patent

9    prosecution history basically serves as a prosecution

10   history for all four patents.

11   Q.    And it's referring to PTX-5?

12   A.    That's correct.

13   Q.    Okay.  So walking through the timeline, after the

14   applicants filed the application on March 25th, 2016, what

15   happened next?

16   A.    There was a pre-interview communication and an

17   Examiner interview.

18   Q.    And then what happened after the interview -- in the

19   interview?

20   A.    There were -- the Examiner communicated to the -- to

21   Silvergate the opinions on the patent.

22   Q.    Are you referring to -- are we on January 17th, 2017?

23   A.    No, I am on September 2nd and October 14th.  I think

24   the next slide.

25   Q.    Okay.  Sorry.  Let me rephrase my question.

*sealed and confidential*

Byrn - direct

```
 1                    MS. MORGAN:  Let me go back.  Sorry.  My

 2      mistake.

 3      BY MS. MORGAN:

 4      Q.      After the application was filed, I think you

 5      mentioned there is the pre-interview communication.  What

 6      was after the pre-interview communication?

 7      A.      Then the Examiner issued some statements that are on

 8      the next slide.

 9                    MS. MORGAN:  Okay.  So let's go to the next

10      slide.

11      BY MS. MORGAN:

12      Q.      PDX-280 cites PTX-5 at SLVGT-EPA-818.

13                    Can you please explain what we're looking at

14      here?

15      A.      So here, the Examiner rejected all claims as obvious,

16      and the Examiner suggested presenting evidence demonstrating

17      criticality of the amounts of ingredients, such as evidence

18      demonstrating that the prior art composition does not have

19      the same long-term stability as the instantly claimed

20      composition.

21                    MS. MORGAN:  Let's go to the next slide.

22      BY MS. MORGAN:

23      Q.      And turning back to the timeline, looking at PDX-281.

24                    After the pre-interview communication, what

25      happened next?
```

*sealed and confidential*

279

Byrn - direct

1    A.      So then there was an interview with the Examiner, and

2    Office Action was filed.

3                MS. MORGAN:   Okay.  And let's look at what

4    happened in the Office Action.  Let's go to PDX-282.

5                So it is citing SLVGT-EPA-837.

6    BY MS. MORGAN:

7    Q.      What happened in the Office Action?

8    A.      The Examiner rejected all claims as obvious under the

9    same prior art.

10               And they also rejected all claims as indefinite

11   because of the term "stable."

12               And the Examiner further stated the inventive

13   example requires sodium citrate dihydrate and is not

14   representative of the broadest claim composition.

15               MS. MORGAN:   Let's go to the next slide.

16   BY MS. MORGAN:

17   Q.      So looking at PDX-283, what was the next thing that

18   happened after the Office Action?

19   A.      So then the applicant responded to the Office Action

20   with an amendment in an inventor declaration.

21   Q.      Okay.  Let's look at the next slide.

22               So looking at PDX-284, what are we looking at

23   here?  And it's citing SLVGT-EPA 858.

24   A.      So this is the amendment related to stability, and

25   the applicant argued that this stability amendment overcame

*sealed and confidential*

Byrn - direct

1    the indefiniteness rejection.  And the underlying portions

2    are the amendment to claim 1.  They added a stable and then

3    they added that whole phrase below, wherein the stable or a

4    liquid formulation was about 95 percent or greater of the

5    initial amount enalapril in five percent or less total

6    impurity at the end of the storage period.  I showed that

7    the table, for example, showing some data like that.

8    Q.     Let's go to the next slide.

9    A.     And --

10   Q.     Sorry?

11   A.     Go ahead.  Sorry.  I apologize.

12   Q.     Looking at PDX-285, which is citing PTX-5 at SLVGT

13   EPA 863 to 873, can you please tell us what we're looking at

14   here?

15   A.     Here, the applicant is responding to the obviousness

16   objection, and the applicant argued that the prior art did

17   not disclose the stability of the claim, and there was no

18   motivation or guidance to arrive at the claim.

19                    And then they explained that further.

20   They said the Nahata '747, and it's highlighted, do not

21   disclose or suggest liquid formulations of enalapril having

22   this stability.  They said specifically, the Office has not

23   set forth a prima facie case for obviousness.  And then they

24   said, further, no guidance whatsoever is given to keep or

25   eliminate components.

*sealed and confidential*
281
Byrn - direct

1   Q.      Let's go to the next slide.  Looking at PDX-286,

2   which is citing PTX-SLGVT-EPA 863 to 873, what are we

3   looking at here?

4   A.      So this is part of the declaration and it shows some

5   stability studies.  On the Y axis is initial content at

6   100 percent.  You can see it's about in the middle, and then

7   on the X axis are days going out to 600 days, and you can

8   see the dark diamonds for formulating E7.  That's a very

9   stable formulation related to the final formulation.  And

10  you can see it's very stable, going down only from like 102

11  to 91, 99 in 600 days.  So it's very stable.

12          And then it's showing all of those grayed

13  formulations.  Those are various prior art formulations and

14  you can see they dropped from 99 to 94 in less than

15  200 days, and some of those have citrate buffer such as

16  the diamond, the triangle.  Nahata's citrate buffer, it's

17  very unstable, and others down below a line where it says

18  Nahata's citrate buffer of pH 5, it's very unstable.  So

19  those prior art formulations are unstable.

20  Q.      Okay.  Let's look at the next slide.  Actually, let's

21  go one more slide.

22          So looking at PDX-288 at PTX-5 at SLVGT-EPA 858

23  to 60, can you tell us what we're looking at here?

24  A.      So this is more on the obviousness rejection.  This

25  is showing another one of the amendments and what happened

*sealed and confidential*

282

Byrn - direct

1    here is there was a claim 20 on the right-hand panel.  It

2    already had the and about .15 milligrams per mL sodium

3    citrate dihydrate.  It already had that phrase in it.  They

4    just copied that and put that in claim 1, and claim 20 had

5    been rejected for obviousness.

6    Q.    Okay.  And let's go back one slide.  And looking at

7    PDX-287, which is at PTX-5 SLVGT EPA 837, is this part of

8    the obviousness rejection you were referring to?

9    A.    Yes, and it's related to that slide that I already

10   showed.  The Examiner said, buffers such as citric acid and

11   sodium citrate were well-known at the time of the invention.

12   So the Examiner also said that sodium citrate was well-known

13   and couldn't -- of course, a conclusion is it couldn't be

14   used to overcome obviousness.

15   Q.    So I guess the next question, the answer to the next

16   question is probably obvious then.  Did the applicants

17   make an argument then that the addition of sodium citrate

18   dihydrate to the claim overcame the obviousness rejection?

19            MR. ALUL:  Objection, Your Honor.  Objection,

20   Your Honor.  We're getting into the realm of leading

21   questions again.

22            THE COURT:  Ms. Morgan, let's try not to be

23   leading, please.

24            MS. MORGAN:  Sorry, Your Honor.  He basically

25   answered my question before I got to ask it.

Byrn - direct

1          THE COURT:  Ask it again.

2          MS. MORGAN:  I'm happy to ask it again.

3  BY MS. MORGAN:

4  Q.      Did the applicant make any argument that the

5  addition of the sodium citrate dihydrate overcame the

6  obviousness objection?

7  A.      No.

8          MR. ALUL:  Objection.

9          THE COURT:  I'm going to overrule it.  Go ahead

10  and answer, Doctor, if you can.

11          THE WITNESS:  Sorry about that, Your Honor.  No,

12  they never made any such claim or statement.

13          MS. MORGAN:  And can we have the next two

14  slides?

15  BY MS. MORGAN:

16  Q.      And looking at PDX-289, can you tell us what happened

17  then after the applicant's response to the office action?

18  A.      So there was another Examiner interviewed and then

19  the applicant filed a supplemental amendment following the

20  Examiner's suggestion.

21  Q.      And did anything come of the interview?

22  A.      Yes.  Well, ultimately, the claims were loud.

23  Q.      Well, let's look at the next slide.  Looking at

24  PDX-290, which is citing PTX-SLVGT-EPA 944, can you tell us

25  what is happening here?

*sealed and confidential*
284

Byrn - direct

1   A.      So here, the applicant is summarizing what they

2   thought happened at the interview and they say it is the

3   applicant's understanding that the Examiners appreciated the

4   superior stability provided by the components and pH as

5   recited in the claims.  Further, the applicant's

6   understanding that Examiner Lundgren suggested moving the

7   sweetener, sucralose, from the independent claims to the

8   dependent claims.

9   Q.      And did the applicant follow the Examiner's

10  suggestion?

11  A.      Yes, they did.

12  Q.      Let's go to the next slide.  So what happened next?

13  A.      And then the claims were loud.

14  Q.      And the patent issued?

15  A.      That's correct.

16  Q.      Let's continue on.

17          Was there anything in these prosecution

18  histories -- actually, let me take a step back.

19          Did you look at the prosecution histories of the

20  three other patents that we referred to very early in your

21  testimony, prosecution histories for the '442 -- well, the

22  other three patents, PTX-6, PTX-7 and PTX-8?

23  A.      Yes, I did.

24  Q.      And was there anything in those prosecution histories

25  that was important for your opinion or for responding to Dr.

*sealed and confidential*

285

Byrn - direct

1    Morton?

2    A.      No.   That's what I was saying earlier, that the basic

3    or the key prosecution history is the '008.   Any other ones

4    didn't really change my opinion or have an effect on my

5    opinion.

6    Q.      Okay.   Let's go to the next slide.

7            So looking at PDX-292 now, so now we'll discuss

8    the prosecution histories.   Let's take a closer look at Dr.

9    Morton's assertion.

10           What's your understanding of what argument based

11   estoppel requires?

12   A.      So my understanding is that for the argument-based

13   estoppel applied to the equivalents, the Doctrine of

14   Equivalents, there has to be a clear and unambiguous

15   disavowal of claim scope.

16   Q.      And do you believe that has occurred here?

17   A.      No.

18   Q.      Let's go to the next slide.

19           So can you summarize -- summarize for us --

20   we're on PDX-293 for the record.   Can you summarize for us

21   what was the applicant's arguments regarding the prior art

22   as a whole if you read the arguments in context?

23   A.      So as a whole, the applicant argued that the Examiner

24   had a flawed obviousness analysis and the applicant argued

25   that none of the prior art teaches the claimed stability.   I

Byrn - direct

1    showed some slides on that.  And that the prior art does not

2    provide any reason or guidance as to how to arrive at the

3    claimed invention.  And also the prior art provides no

4    reasonable expectation of success.

5    Q.    Let's turn to the next slide.  We're on PDX-294.

6          So let's take a look at some of the applicant's

7    arguments.  Are you aware that Dr. Morton asserts that this

8    recitation of ingredients here, looking at the second box,

9    PTX-5 at SLVGT-EPA 874, which refers to enalapril citric

10    acid, sodium citrate, sodium benzoate, sucralose and water

11    creates a disavowal of claim scope?

12    A.    Yes, I'm aware of that, but I don't agree with it.

13    Q.    And why not?

14    A.    Well, I think the applicant just argued that there

15    was no guidance to keep or eliminate components and no

16    expectation of success.

17          The applicant argued in one session, the

18    top box, that the cited references did not provide any

19    reason to single out the specific components.

20          And then in the lower box, the applicant

21    argued, the prior art does not provide any expectation that

22    any particular combination would be successful or as stable

23    or a liquid formulation much less the expectation that the

24    combination of the components you just mentioned at a pH of

25    less than 3.5 would be successful in forming a stable

*sealed and confidential*

Byrn - direct

1    enalapril liquid formulation.  So the applicant is just

2    arguing that there was no guidance to keep or eliminate

3    components.

4    Q.    Let's go to the next slide.

5          Looking at PDX-295 is another example.  Are you

6    aware that Dr. Morton asserts that statements like this

7    created disavowal of claim scope because the applicant

8    contrasted the components of the prior art to the claimed

9    formulation?

10   A.    Yes.

11   Q.    Do you agree that this disavows claim scope?

12   A.    No.  This section, this statement, is in an overall

13   section, I put it above in bold, that says that there is no

14   reasonable expectation of success for the claimed subject

15   matter.

16         So the applicant's simply arguing that there is

17   no reasonable expectation of success.  And they say, as

18   apparent that extemporaneously prepared formulation from

19   Nahata has 19 components and another one at '747 has 10

20   components.

21         And then they just go on to say there is no

22   reasonable expectation of success for these components,

23   knowing which components to put in the formulation.

24         MS. MORGAN:  Let's go to the next slide.

25         So looking at PDX-296, which is citing PTX-5 at

Byrn - direct

1    SLVGT-EPA-887 and SLVGT-EPA-882.

2    BY MS. MORGAN:

3    Q.      Are you aware of Dr. Morton's arguments that there is

4    a disavowal of claim scope because the inventor, Dr. Mosher,

5    submitted a declaration saying that the claimed formulation

6    had superior stability to prior art?

7    A.      Yes.  So they're just -- in my opinion, the inventor

8    is simply focusing on the superior ability of the

9    formulation.  He just states in the top box, "This stability

10   is an important aspect of the formulation."  And then in the

11   bottom box, "that it's significantly more stable."  And he

12   is talking about the E7 formulation that I was talking about

13   in the graph.

14   Q.      Do you believe that the statements such as this

15   creates a disavowal of claim scope?

16   A.      No, it's not -- no, it's not disavowing any specific

17   claim scope.

18              MS. MORGAN:  Let's go to the next slide.

19              So looking at -- we're on PDX-297.

20   BY MS. MORGAN:

21   Q.      So in your opinion, is Dr. Morton taking portions of

22   the applicant's statement out of context?

23   A.      Yes, that's my opinion.

24   Q.      What is the proper context for the quotes that

25   Dr. Morton is pulling out of the prosecution history?

*sealed and confidential*

289

Byrn - direct

1    A.      So the applicant -- the context is that the applicant

2    is arguing that the Examiner had a flawed obviousness

3    analysis.

4            That none of the prior art teaches the claimed

5    stability.

6            That's one of their additional arguments.

7            That the prior art doesn't provide any reason or

8    guidance to arrive at the claimed invention.

9            And there is no reasonable expectation of

10   success.

11           MS. MORGAN:   Okay.  Let's move on to

12   amendment-based estoppel.

13           Let's go to the next slide.

14   BY MS. MORGAN:

15   Q.      So what is your understanding of the standard for

16   amendment-based estoppel.

17   A.      So there's the three bullets.

18           It requires an applicant to narrow the scope of

19   the claim by amending during prosecution.

20           It must be related to patentability.

21           And it doesn't apply if the equivalent, which is

22   the maleate proper, is tangentially related to the reasons

23   for amending.

24           MS. MORGAN:   Let's go to the next slide.

25   BY MS. MORGAN:

Byrn - direct

1    Q.      So do you believe that amendment-based estoppel

2    should apply here?

3    A.      No, I don't believe it should apply first because the

4    amendment between the two equivalent buffer systems does not

5    really narrow the claim.

6                They're equivalent buffers.

7                The amendment was not made for patentability

8    reasons.

9                And the equivalent, the maleate buffer, is

10   tangential to the reasons for amending.

11               MS. MORGAN:  Let's go to the next slide.

12   BY MS. MORGAN:

13   Q.      So first --

14               MS. MORGAN:  Let's go to the next slide,

15   actually.

16   BY MS. MORGAN:

17   Q.      Can you please explain for us --

18               MS. MORGAN:  And for the record, we're on

19   PDX-301.

20   BY MS. MORGAN:

21   Q.      Can you please explain for us why you believe that

22   the addition of sodium citrate dehydrate was not a narrowing

23   amendment?

24   A.      You have to consider the context of the addition.

25   And the citric, as I'm saying in the second bullet, you

*sealed and confidential*
291
Byrn - direct

1    have citric acid already and then you add sodium citrate.

2    Well, once it is in solution, it's going to equilibrate to

3    a citric acid and conjugate-based molecules, just like

4    citric acid itself.  And so when you adjust the pH, you're

5    going to get the same molecules, the same buffer with

6    either system.

7            So it's not really a narrowing amendment, it's

8    more they're very minor differences between the two buffer

9    system.

10           MS. MORGAN:  So now let's turn to the next

11   slide, please.

12           For the record, we're at PDX-302.

13   BY MS. MORGAN:

14   Q.   So can you please explain why in your opinion the

15   amendment was not made for purposes of patentability?

16   A.   So as shown here, the amendment came -- the amendment

17   in claim 1, which adds sodium citrate dihydrate, came from

18   claim 20.

19           And claim 20 was already rejected for

20   obviousness.  So it doesn't -- I don't see how, if you

21   rejected a claim for obviousness that has this phrase, that

22   when you put this phrase in claim 1, it is going to somehow

23   make it not obvious.

24           It's, it's -- it doesn't look like that

25   amendment was added to overcome obviousness.

*sealed and confidential*

292

Byrn - direct

 1  Q.      And is there another reason for the addition of
 2  sodium citrate dihydrate?
 3  A.      Yes.  It looks to me more like the applicant was
 4  trying to tidy up the claims or get the claims to be more --
 5  the various claims to be more consistent with each other.
 6              MS. MORGAN:  Let's advance two slides.
 7              So looking at PDX-304.
 8  BY MS. MORGAN:
 9  Q.      Are you aware of Dr. Morton's assertion that the
10  amendment was related to patentability because the
11  applicants intended to overcome the Examiner's obviousness
12  rejection by comparing E5 in the patent to Nahata?
13  A.      Yes, I'm aware of that.
14  Q.      Do you agree?
15  A.      No, I don't agree as I'm saying here.  The amendment
16  was never mentioned in an argument, and it ignores the
17  applicant's stability arguments that were successful.
18              MS. MORGAN:  Okay.  Let's go on to the next
19  slide.
20  BY MS. MORGAN:
21  Q.      Let's turn now to the tangential relationship.  Can
22  you please explain --
23              MS. MORGAN:  Actually, let's go to the next
24  slide.
25  BY MS. MORGAN:

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 131 of 143 PageID #: 6048
sealed and confidential
293

Byrn - direct

Q.      Can you please explain the basis for your conclusion

that the amendment bears no more than a tangential

relationship to the accused equivalent?

A.      Yes.  So first, again, claim 20 with the sodium

citrate argument was rejected as obvious.

        So that's my first consideration.

        Second, the context of the amendment, the

arguments stress superior stability of the claimed

invention.

        And finally, the applicant rebutted the

obviousness analysis by presenting that obvious- -- argument

that obviousness did not apply.

        MS. MORGAN:  All right.  Let's go to the next

slide.

BY MS. MORGAN:

Q.      Are you aware of Dr. Morton's opinion that the

applicant admitted supposedly that enalapril formulations

without sodium citrate are obvious by arguing that there

were limited excipients in the claims?

A.      I am, yes.

Q.      And do you agree with that?

A.      No, and --

Q.      Why not?

A.      -- as I state here, the applicant never asserted

sodium citrate was critical.

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 132 of 143 PageID #: 6049
*sealed and confidential*
294
Byrn - direct

1              The applicant's obviousness arguments were that

2      the Examiner's theory was flawed and there was no prima

3      facie evidence.

4              And the applicant's obviousness arguments never

5      referred to the sodium citrate amendment.

6      Q.      And are you aware of Dr. Morton's opinion that

7      Bionpharma's admission of citric acid and sodium citrate

8      from its formulations makes the amendment not tangential?

9      A.      Yes.

10     Q.      Do you agree?

11     A.      No, I don't agree with that either.

12     Q.      Why?

13     A.      For these same reasons.

14     Q.      Okay.  And in your opinion, are any of Dr. Morton's

15     arguments regarding tangential relationship applicable?

16     A.      No, they're not.  Not at all.

17              MS. MORGAN:  Okay.  Let's go to the next slide.

18     BY MS. MORGAN:

19     Q.      So last, disclosure dedication.  What is your

20     understanding of when this applies?

21     A.      So this applies if the patentee disclosed an element

22     as an alternative to the relevant limitation but did not

23     claim that, that alternative.

24     Q.      And in your opinion, does that apply here?

25     A.      No.

Byrn - direct

1           MS. MORGAN:  Let's go to the next slide.

2    BY MS. MORGAN:

3    Q.      Are we talking about the preservative limitation with

4    respect to disclosure dedication?

5    A.      Yes.

6    Q.      Okay.  And are you aware of Dr. Morton's arguments --

7    actually, strike that.

8               Are you aware of Dr. Morton's argument that the

9    applicant clearly and ambiguously describes the mixture of

10   methylparaben and propylparaben such that there is a

11   specific disclosure as an alternative to sodium benzoate?

12   A.      Yes.

13   Q.      Do you agree?

14   A.      No, I don't.  There is no specific disclosure.

15           MS. MORGAN:  Let's go to the next slide.

16   BY MS. MORGAN:

17   Q.      Looking at PDX-310, which is referring to PTX at --

18   PTX-1 at Column 10, lines 11 to 29.

19               What are we looking at?

20   A.      This is the part of the specification from the

21   common -- of all four patents.  And this is the -- this

22   is a laundry list of preservatives that include all

23   kinds of molecules in them.  It includes a large number

24   of molecules.

25   Q.      And is there anything in this list that discloses

Byrn - direct

1    the combination of methylparaben and propylparaben as an

2    alternative to sodium benzoate?

3    A.      No, there is nothing disclosing the combination of

4    methylparaben and propylparaben.

5    Q.      And is there anything disclosing that combination

6    as an alternative specifically to sodium benzoate?

7    A.      Nothing at all.  It's just a list of preservatives.

8            MS. MORGAN:  Let's go to the next slide.

9    BY MS. MORGAN:

10   Q.      Are you aware that Dr. Morton refers to some tables

11   in the patent for his assertion regarding disclosure

12   dedication?

13   A.      Yes.

14   Q.      And in your opinion, do the tables support that there

15   has been any disclosure dedication?

16   A.      No, I don't think they provide support to that.

17   Q.      Okay.  So please explain for me why, for example,

18   specifically with Table A-1 first --

19           MS. MORGAN:  And sorry.  For the record, we're

20   at PDX-311 citing PTX-1 at Column 31, lines 29 to 48.

21   BY MS. MORGAN:

22   Q.      So can you please explain for me with respects to

23   Table A-1 in your opinion what is in Table A-1 does not

24   provide a specific disclosure of methylparaben and

25   propylparaben as an alternative to sodium benzoate?

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 135 of 143 PageID #: 6052
*sealed and confidential*
297
Byrn - direct

1   A.       So the paraben or salts are here.  So the first

2   point is that the salts are different molecules from the

3   paraben itself.  And the FDA recognizes that salts are

4   different APIs, different molecules from the paraben.

5               So it's not the paraben but rather the salt.

6               Secondly, if you look in A-5, there is one of

7   them, methylparaben salt plus sodium benzoate, so that is

8   not disclosing.

9               And then in A-6, the two salts, not the free

10  acid, plus a third preservative.  So they're not operating

11  independently or disclosed.

12              Further, the pH of those are 4.5 and 4.4 and

13  those are unstable pHs.

14              So those are not really operative formulations

15  any way.

16  Q.    Would a person of ordinary skill in the art believe

17  methylparaben -- actually, strike that.

18              MS. MORGAN:  Let me go to the next slide.

19              Looking at PDX-312 and looking at Table C.

20  BY MS. MORGAN:

21  Q.    Does this table disclose a mixture of methylparaben

22  and propylparaben as an alternative to sodium benzoate?

23  A.       Again, this table is kind of a mix -- mix of all

24  these things.  It is showing that two salts.  So it's not

25  showing the free parabens.

*sealed and confidential*
298

Byrn - direct

1           And in C-1 and C-2, it also shows a third

2       preservative.

3           And in C-3, it shows potassium sodium benzoate.

4           In C-4 and 5, it shows just one of the parabens.

5           So a person of skill wouldn't be able to look at

6       this and see to make mixtures.  It's just not a disclosure.

7           And the stability, the pHs are also wrong, so

8       it's unstable.  The formulation is unstable.  It's not an

9       operative formulation.

10      Q.    So would this disclose to a person of ordinary

11      skill in the art that methylparaben -- that a mixture of

12      methylparaben and propylparaben is an alternative to sodium

13      benzoate?

14      A.    No, this doesn't disclose it.  It's too mixed up to

15      disclose it.

16          MS. MORGAN:  So let's go to the next slide.

17          So looking at PDX-313.

18      BY MS. MORGAN:

19      Q.    So can you please just wrap up disclosure dedication

20      for us.  What is your own conclusion?

21      A.    So, as I -- my bullets.

22          So, first of all, the combination is not

23      explicitly listed as an alternative of sodium benzoate.

24          And it is not clearly disclosed as an

25      alternative.

*sealed and confidential*

Byrn - direct

1              And so this doctrine does not apply to

2      methylparaben and propylparaben.

3      Q.      So in your opinion, do any of Bionpharma's defenses

4      to the application of the Doctrine of Equivalents apply?

5      A.      No, I don't believe so.

6      Q.      And does Bionpharma's ANDA product infringe all of

7      the asserted claims, all the limitations infringe either

8      literally or under the Doctrine of Equivalents?

9      A.      Yes.  Bionpharma's product infringes all the

10     limitations and all the claims either literally or under the

11     Doctrine of Equivalents.

12              MS. MORGAN:  Thank you, Doctor.

13              I will turn the witness for cross-examination.

14              THE COURT:  All right.  Mr. Alul, is your cross

15     likely to exceed 45 minutes?

16              MR. ALUL:  I'll probably be about 30 or

17     35 minutes.

18              THE COURT:  Oh, is that right?

19              MR. ALUL:  Yes.

20              THE COURT:  You really think it's only going to

21     be 35 or less?

22              MR. ALUL:  I am hopeful.  Yes.  With that -- I'm

23     going to -- yes.  I'm going to do my best.

24              THE COURT:  We might be able to get that in, but

25     let's get started.  I might have to cut you off.

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 138 of 143 PageID #: 6055
*sealed and confidential*
300

                              Byrn - cross

 1                  MR. ALUL:  Okay.  Understood.  Understood.

 2                  THE COURT:  Are you able to start in open court,

 3      or did you want to start under seal?

 4                  MR. ALUL:  We can start in open court, Your

 5      Honor.

 6                  THE COURT:  Okay.  Mr. English, if you could

 7      start in open court.

 8                  (Silvergate sealed portion ends.)

 9                          *    *    *

10                  THE TRIALanywhere HOST:  The courtroom is

11      sealed.

12                  THE COURT:  Thank you.

13                          CROSS EXAMINATION

14      BY MR. ALUL:

15      Q.      You have never formulated any products using paraben

16      preservatives; is that correct?

17      A.      Yes, that's correct.

18      Q.      All right.  Please turn to PTX-3 in your Exhibit

19      binder.

20      A.      Okay.

21      Q.      You recognize this as the '745 patent; is that

22      correct?

23      A.      Correct.

24      Q.      Please turn to Example 3 at column 33.

25      A.      Okay.

Case 1:18-cv-01962-LPS   Document 194   Filed 03/02/21   Page 139 of 143 PageID #: 6056
*sealed and confidential*
301
Byrn - cross

1    Q.      Okay.  Let's just focus on the liquid formulations in

2    the table that is on 34.  I believe you discussed these with

3    Ms. Morgan just a few moments ago?

4    A.      Yes.

5    Q.      Okay.  Now, you understand that -- strike that.

6            You don't dispute that in these formulations

7    methylparaben and propylparaben would be present as the

8    three acids, i.e., the non-salts; is that correct?

9    A.      I think that's likely.  You have to look at the pH,

10   but I think it's likely that they would.

11   Q.      All right.  The pHs are right down there at the

12   bottom?

13   A.      Yes.

14   Q.      You see that; right?

15   A.      I think that's correct.  I think that's correct.

16   Q.      Okay.  And a person of skill would know that; is that

17   correct?

18   A.      Yes.

19   Q.      Okay.  And in these liquid formulations, it's the

20   non-salt compounds, methylparaben and propylparaben, the

21   three acids that are exerting antimicrobial activity; is

22   that correct?

23   A.      That is correct.

24   Q.      Okay.  Okay.  I believe you testified that one of the

25   reasons you disagree that the Example C formulations support

*sealed and confidential*

302

Byrn - cross

1    Dr. Morton's opinion that methylparaben and propylparaben

2    are disclosed as suitable alternatives to the claimed sodium

3    benzoate is that all of the enalapril liquid formulations

4    disclosed in this example all include another preservative

5    beyond methylparaben and propylparaben salts; is that

6    correct?

7    A.      Well, I didn't testify exactly that way, but that is

8    the gist -- that's part of -- that's the gist of what I

9    said, yes.

10   Q.      Okay.

11   A.      There's no clear disclosure of the two compounds

12   together by themselves.

13   Q.      And if you look at these, the additional

14   preservatives in these formulations, they're non-parabens;

15   is that correct?

16   A.      That's correct.

17   Q.      Okay.  Are you aware that late last year Silvergate

18   secured additional Epaned patents beyond the four that were

19   originally asserted against Bionpharma in this case?

20   A.      No, I'm not.

21   Q.      All right.  Please turn to DTX-1123 in your exhibit

22   binder.

23           MR. ALUL:  And, for the record, this is a patent

24   entitled U.S. Patent No. 10,786,482 B.

25   BY MR. ALUL:

*sealed and confidential*

Byrn - cross

1   Q.      Dr. Byrn, have you ever seen this document before?

2   A.      No.

3   Q.      If you look at the -- hang on a second.  You're a

4   named inventor on approximately four or five United States

5   patents; is that correct?

6   A.      Right.

7   Q.      And you're not a lawyer; is that right?

8   A.      Right.

9   Q.      But you're generally familiar with the structure of a

10  United States patent; is that correct?

11  A.      Correct.

12  Q.      Okay.  The '482 patent is entitled Enalapril

13  Formulations; is that correct?

14  A.      Correct.

15  Q.      And that's the same title as the patents-in-suit; is

16  that correct?

17  A.      Yes.

18  Q.      And if you look at the applicant and assignee

19  information on the cover of the '482 patent, Silvergate is

20  identified for both; is that correct?

21  A.      Yes.

22  Q.      And the inventors Gerald Mosher and David Miles

23  are the same inventors on the patents-in-suit; is that

24  correct?

25  A.      Yes.

*sealed and confidential*

Byrn - cross

1    Q.      And if you look at the related U.S. application data

2    section on the '482 patent, do you see how it claims

3    priority of the patents-in-suit?

4    A.      I see that and some other patent in that list.

5    Q.      All right.  But you see the 987 patent; is that

6    correct?

7    A.      Correct.

8    Q.      And you see the '745 patent there; is that correct?

9    A.      Correct.

10   Q.      Okay.  Please turn to claim 14.  Can you generally

11   describe for the Court what Silvergate has claimed here?

12   A.      Well, they're -- claim I, element I is enalapril or a

13   pharmaceutically acceptable salt or solvate, and (ii) is a

14   citric acid, sodium citrate buffer of different millimolar

15   concentration.  And claim (iii) is about one milligram per

16   mL of a preservative, wherein the preservative is parabens

17   or a mixture of parabens and (iv) is water.

18   Q.      Okay.  And claim 14 does not require any other

19   preservatives beyond a paraben or mixture of parabens; is

20   that correct?

21   A.      That's correct.

22   Q.      It does not require a non-paraben preservative such

23   as potassium sorbate or sodium benzoate; is that correct?

24   A.      Correct.

25   Q.      Now, you're somewhat familiar with 35 U.S.C. Section

*sealed and confidential*

305

Byrn - cross

1    112; is that correct?

2    A.     Correct.

3    Q.     Okay.  And you understand that for a patent claim to

4    properly claim priority to an earlier filed patent

5    application or patent, the subject matter of the claim must

6    be adequately described and enabled in the priority

7    document; correct?

8    A.     I have a general understanding.  You're starting to

9    reach the edge of my legal patent expertise.  I'm a

10   professor.

11   Q.     Okay.  Okay.

12          MR. ALUL:  Your Honor, at this point we can

13   unseal the courtroom.

14          THE COURT:  Okay.  Mr.  English, you may unseal

15   it, please.

16          (Bionpharma sealed portion ends.)

17

18       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

19

20                    /s/ Brian P. Gaffigan
                    Official Court Reporter
21                    U.S. District Court

22

23

24

25