*sealed and confidential*

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -

   SILVERGATE PHARMACEUTICALS, INC.,     :    CIVIL ACTION
4                                         :
                 Plaintiff,               :
5    v                                    :
                                          :
6    BIONPHARMA, INC.,                    :    NO. 18-1962-LPS
                                          :    NO. 19-1067-LPS
7                Defendant.               :
   -------------------------------------
8    SILVERGATE PHARMACEUTICALS, INC.,     :    CIVIL ACTION
                                          :
9                 Plaintiff,              :
   v                                      :
10                                        :
   AMNEAL PHARMACEUTICALS, LLC,           :
11                                        :    NO. 19-678-LPS
                 Defendant.
12                                 - - -

13                          Wilmington, Delaware
                         Wednesday, February 3, 2021
14               *Bench Trial - Volume C - Sealed Portions*

15                                 - - -

16   BEFORE:       HONORABLE LEONARD P. STARK, Chief Judge

17                                 - - -
     APPEARANCES:
18

19             MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:  MEGAN E. DELLINGER, ESQ.
20
                    and
21
               WILSON SONSINI GOODRICH & ROSATI
22             BY:  WENDY L. DEVINE, ESQ., and
                    KRISTINA M. HANSON, ESQ.
23                  (San Francisco, California)

24                  and

25   Valerie J. Gunning            Brian P. Gaffigan
     Official Court Reporter       Official Court Reporter

*sealed and confidential*

1    APPEARANCES:

2

3                WILSON SONSINI GOODRICH & ROSATI
                BY:  NATALIE J. MORGAN, ESQ.
                     (San Diego, California)
4
5                    and

6                WILSON SONSINI GOODRICH & ROSATI
                BY:  GRANVILLE C. KAUFMAN, ESQ., and
                     TY W. CALLAHAN, ESQ.
7                    (Los Angeles, California)

8                         Counsel for Silvergate
                          Pharmaceuticals, Inc.
9

10               MORRIS JAMES, LLP
                BY:  KENNETH L. DORSNEY, ESQ., and
11                   CORTLAN S. HITCH, ESQ.

12                   and

13               TAFT STETTINIUS & HOLLISTER, LLP
                BY:  ROSHAN P. SHRESTHA, Ph.D., ESQ., and
14                   ANDREW M. ALUL, ESQ.
                     (Chicago, Illinois)
15
                          Counsel on behalf of Bionpharma, Inc.
16

17               YOUNG CONAWAY STARGATT & TAYLOR, LLP
                BY:  ANNE SHEA GAZA, ESQ.,
18                   KAREN L. PASCALE, ESQ., and
                     SAMANTHA G. WILSON, ESQ.
19
                     and
20
                MADDOX EDWARDS, PLLC
21              BY:  STEVEN MADDOX, ESQ.
                     JEREMY EDWARDS, ESQ.
22                   MATTHEW RUEDY, ESQ., and
                     KAVEH SABA, ESQ.
23                   (Washington, District of Columbia)

24                        Counsel on behalf of
                          Amneal Pharmaceuticals, LLC
25

*sealed and confidential*

818

Gemeinhart - direct

1                          - oOo -

2                   **P R O C E E D I N G S**

3              (Following portion ordered sealed by the Court,

4     contained herein.)

5              THE TRIALanywhere HOST:  All right.  The

6     courtroom is sealed.

7              THE COURT:  Thank you very much.

8              MR. SABA:  Thank you.

9                   DIRECT EXAMINATION

10    BY MR. SABA:

11    Q.    So, Dr. Gemeinhart, would you now please also explain

12    your opinion that the amendment was not tangential to the

13    accused equivalent in Amneal's ANDA product?

14    A.    All right.  So the amendment was not tangential to

15    the accused single acid equivalent.  The purpose of the

16    amendment was to require that sodium citrate base ingredient

17    to be included, rather than a sole weak acid.

18              The accused equivalent is a single weak acid,

19    without any base at all.

20              The accused equivalent seems to be exactly the

21    type that would be foreclosed.  Going from a weak acid to a

22    weak acid and a base, it, to me, I don't understand how that

23    could not be connected, how it could be something other than

24    included under this.

25    Q.    And finally, Dr. Gemeinhart, would you please explain

1   your opinion on argument-based estoppel here?

2   A.      Okay.  So the applicants clearly and unmistakably

3   make statements on the criticality of specific components,

4   including citric acid and sodium citrate.

5           So -- and I'll be specific in a few locations

6   where they highlight this.

7           The cited references have not provided any

8   reasons to single out the specific components, and they

9   were very specific, specific components at the required

10  concentrations for a liquid recited in the instant claims.

11          And highlight that several of the art does

12  have some of the other -- have some of those ingredients.

13          Later on, any expectations of combination of

14  enalapril, citric acid, sodium citrate, sodium benzoate,

15  sucralose, water, at the recited concentrations and a pH,

16  would be successful in forming a stable enalapril liquid

17  formulation.

18          Further down:

19          Nowhere does the prior art teach or suggest a

20  combination of enalapril, citric acid, sodium citrate,

21  sodium benzoate, sucralose, and water, at the recited

22  concentrations and a pH less than 3.5, at the claimed

23  concentration would have a dramatic stabilization of

24  enalapril.

25          These are pretty clear, very specific, to me,

1   clear, unmistakable statements that these are critical

2   ingredients and critical concentrations.

3           Based on what I understand this to mean, I can't

4   see how it could be much more clearer and unmistakable.

5   Q.    So, Dr. Gemeinhart, just to recap, what are your

6   overall conclusions on infringement of the '008 patent?

7   A.    Very generally, Amneal does not infringe any claim of

8   the '008 patent.

9           Amneal's ANDA product does not include the

10  claimed buffer compromising citric acid and sodium citrate

11  in the specified amounts, literally or under Doctrine of

12  Equivalents.

13          The prosecution history shows that Silvergate

14  should be precluded from asserting the Doctrine of

15  Equivalents against Amneal.

16  Q.    And for the '442, '987, and '745 patents, what are

17  your conclusions on infringement of the asserted claims of

18  those patents?

19  A.    As parallel patents that Amneal -- and parallel

20  claims -- Amneal does not infringe any claims of the '442,

21  '987, or '745 patents.

22          No infringement of any claim of those patents

23  for the same reasons that I described for the '008 patent.

24          Silvergate relies on the exact same incorrect

25  Doctrine of Equivalents infringement theory and evidence for

*sealed and confidential*

821

Gemeinhart - cross

1    those patents.

2              For these same reasons, prosecution history

3    estoppel clearly extends to those parallel limitations of

4    the '442, '987, and '745 continuation patents.

5              MR. SABA:  Thank you, Your Honor.  No further

6    questions.  Pass the witness.

7              THE COURT:  Okay.  Thank you very much.  Good

8    morning, Devine.  Is some part of this examination going to

9    be able to stay public?

10             MS. DEVINE:  Yes.  I can begin with the public

11   portion if Your Honor prefers.

12             THE COURT:  Yes.  That would be great.

13             MS. DEVINE:  Great.

14             THE COURT:  If you could bring the public back

15   in.

16             (Sealed portion ends.)

17                   *    *    *

18             THE TRIALanywhere HOST:  The courtroom is

19   sealed.

20             THE COURT:  Thank you.

21             MS. DEVINE:  May I proceed?

22             THE COURT:  Yes.

23             MS. DEVINE:  Thank you.

24                        CROSS-EXAMINATION

25   BY MS. DEVINE:

*sealed and confidential*

1  Q.      Doctor, you agree that malic acid contains ionizable

2  hydrogens on its carboxyl acid groups; correct?

3  A.      I do agree.

4  Q.      And you agree that citric acid also contains

5  ionizable hydrogens on its carboxyl acid groups; correct?

6  A.      Yes, I do agree.

7  Q.      And you agree that when pKa is equal to pH, there is

8  a 50 percent acidic state; correct?

9  A.      That's the general description, yes.

10  Q.      And you agree that for both malic acid and citric

11  acid, the pKa of a given carboxyl acid group is indicative

12  of percent ionization at a given pH; correct?

13  A.      I believe you gave an accurate description.

14  Q.      You agree that in Amneal's liquid ANDA product, malic

15  acid is an equilibrium with malate; correct?

16  A.      With several malate species, yes.

17  Q.      Earlier you testified that malic acid cannot

18  neutralize excess acid in Amneal's ANDA formulation;

19  correct?

20  A.      Correct.

21  Q.      You agree -- you just agreed with me two questions

22  ago that the malic acid is in equilibrium with malate;

23  correct?

24  A.      With malic species, yes.

25  Q.      Okay.  And you agree that that equilibrium occurs

*sealed and confidential*

1   quite rapidly after dissolution; correct?

2   A.      Depending on the pH of the solution and how many,

3   yes.

4   Q.      Okay.  And you agree that the function of that malic

5   acid and malate system in Amneal's ANDA product absorbs

6   hydrogens; correct?

7   A.      And I'm sorry.  You, you hesitated there for a

8   minute.

9   Q.      Yeah.

10  A.      That it absorbs hydrogens?

11  Q.      Let me re-ask the question.

12          You agree that the function of the malic acid

13  malate system in Amneal's ANDA product can neutralize acid;

14  correct?

15  A.      That's -- I don't think that's what I said.  That

16  malic acid absorbs acid.

17  Q.      I'm asking about malic acid and malate.  After it

18  dissolve is and is in equilibrium, can it absorb acid?

19  A.      Malic acid contributes acid.  If there --

20  Q.      Sir, sir, sir.  Would you please listen to my

21  question?

22          Do you agree that malic acid and malate as a

23  system after it dissolves into the Amneal ANDA product can

24  absorb acid?

25  A.      Maleates that are present can absorb or consume acid

1   when they're present.

2              MS. DEVINE:  Thank you.  No further questions.

3              THE COURT:  Okay.  Mr. Saba, redirect?  And if

4   so, in open court or not?

5              MR. SABA:  It can be in open court.

6              THE COURT:  Okay.  Then give us a moment.

7              Mr. English.

8              (Sealed portion ends.)

9                   *    *    *

10             THE COURT:  And, Mr. English, do I have the

11  court staff with me as well?

12             MS. DEVINE:  I can't, I can't hear.

13             THE TRIALanywhere HOST:  Hold on.

14             THE COURT:  Can you hear me now?

15             MR. ALUL:  I can hear you just fine, Your

16  Honor.

17             THE COURT:  Okay.  Ms. Devine, can you hear me?

18             MS. DEVINE:  JD, I can't hear anyone.  I could

19  see that His Honor is speaking, but I can't hear him.

20             THE IT OPERATOR:  JD is not in the room.

21             MS. DEVINE:  Can we get ahold of him?

22             THE COURT:  Mr. English, are you there?

23             MR. MADDOX:  Wendy, can you hear anyone else?

24             Apparently not.

25             MS. DEVINE:  Oh.  Now I can hear Steve.

*sealed and confidential*
Gemeinhart - cross

1          MR. MADDOX:  You can hear me?

2          MS. DEVINE:  Yes, now I can hear.  Thank you.

3          THE COURT:  All right.  Hold on, because I'm not

4     sure -- oh, yes, my staff is coming now.

5          All right.  Are we ready to proceed?  I think

6     the folks we were hoping for are here.  And the witness is

7     not here.

8          Okay.  All right.  I've not confronted this

9     situation before.

10          Ms. Devine, why don't you tell me what you would

11     like to happen, and then we'll see what Mr. Saba's view is.

12          MS. DEVINE:  So I would like to shortcut this,

13     and I think the exam is complete, and I would like to not

14     have to do it, but I don't want there to be any question as

15     to the admissibility of this or the integrity of it or --

16     you know, I don't want to get to post-trial briefing to be

17     confronted with, well, none of those admissions are actually

18     admissions because the witness couldn't hear the examining

19     attorney.

20          So I think if defendants will agree that that is

21     not going to happen, then we can probably move on.

22          THE COURT:  Mr. Saba?

23          MR. SABA:  Yes, that sounds fine to us.  That's

24     why I was suggesting to make sure that we're not going to

25     question and the witness is not going to question the other

*sealed and confidential*

826

Gemeinhart - cross

1    answers.  I frankly didn't expect that, obviously, but that

2    would be fine.

3                    THE COURT:  Okay.

4                    MR. MADDOX:  So, Your Honor?

5                    THE COURT:  Yes.

6                    MR. MADDOX:  Not sitting here waiving right now,

7    but asking the witness if he had any other questions he

8    thought of.

9                    THE COURT:  Right.  I do think we now know of

10   one question that he had volunteered that maybe he did not

11   hear.

12                    I think if we have Mr. Saba explore that

13   further, were there any others.  If there were no others,

14   then it seems to me we have an agreement that there is not

15   going to be any argument from Amneal that we can't rely on

16   what the witness's testimony has been.

17                    If there -- if he says there is more, then I

18   think Mr. Saba has the first chance to explore that, but

19   then I'm going to call on Ms. Devine to give her an

20   opportunity to do whatever further examination she wants

21   and not charge her the time for that.  And then we'll go

22   back to Mr. Saba and see where we are.

23                    Any, any other -- any objections to that or any

24   other thoughts, Mr. Saba?

25                    MR. SABA:  No, Your Honor.  That, that sounds

*sealed and confidential*

827

```
 1    fine.  Thank you.
 2                THE COURT:  Ms. Devine?
 3                MS. DEVINE:  No objection.  Thank you.
 4                THE COURT:  All right.  Well, then, let's --
 5    Mr. English, assuming you are monitoring us, if you could
 6    put us back in the courtroom when you are ready, that would
 7    be great.
 8                THE LAW CLERK:  Judge, I think Mr. English isn't
 9    able to monitor the breakout rooms.  I'll switch back over
10    to the main room and let him know he is to terminate it, and
11    it will automatically switch us all over.
12                THE COURT:  Thank you.  Thank you for that.
13                MR. MADDOX:  I'm glad there wasn't much.
14                THE COURT:  Yes.  I suppose if it wasn't for my
15    law clerk, we'd be here all day in the breakout room.
16                (Pause.)
17                THE COURT:  There he is.
18                THE TRIALanywhere HOST:  We're done?
19                THE COURT:  Yes, we're done in here.  So if you
20    could take us back, that would be great.
21                THE TRIALanywhere HOST:  No problem.  Closing
22    now.
23                (Sealed portion ends.)
24                *    *    *
25                THE TRIALanywhere HOST:  The courtroom is
```

*sealed and confidential*

828

Mosher - cross

 1    sealed.

 2                    THE COURT:  Thank you.

 3                    May I re-ask the question, Your Honor?

 4                    THE COURT:  Please.

 5                         CROSS-EXAMINATION

 6    BY MR. MADDOX:

 7    Q.     It's true that you, in doing the liquid solution,

 8    working on the liquid solution, you weren't entirely

 9    starting from scratch.  The powder formulations were part of

10    your development.  Yes?

11    A.     That's correct.

12    Q.     Can you look further down?  And when you made

13    these solutions and tested them, you saw that potassium

14    sorbate did encounter a lot of degradation and so it had

15    to be removed from the solution you were working towards.

16    Yes?

17    A.     Yes.

18    Q.     I'm sorry?

19    A.     Yes, we chose to remove it.

20    Q.     Okay.  And potassium sorbate that you saw exhibited

21    degradation, that was one of the preservatives in the Epaned

22    Kit powder.  Yes?

23    A.     That, in the diluent, yes.

24    Q.     And forgive me about diluent.  It had a jar of powder

25    and a jar of liquid.  Can we just refer to the powder as the

Case 1:18-cv-01962-LPS  Document 198  Filed 03/02/21  Page 14 of 28 PageID #: 6584
*sealed and confidential*
829
Mosher - cross

1    dry ingredients?

2    A.    Yes.

3    Q.    So within the powder formulation for mixing in the

4    Epaned Kit, potassium sorbate had been the, one of the

5    preservatives.  Yes?

6    A.    Potassium sorbate is not in the powder form.

7    Q.    It's formed when you -- I beg your pardon.  When you

8    mix it, you got potassium sorbate?

9    A.    Yes.  In the final, yes.  It's in the final

10   compounded formula, yes.

11   Q.    So potassium sorbate within the solution created by

12   the kit?  Yes?

13   A.    That's correct.

14   Q.    Okay.  Now we'll go a little further down.

15         Then you also recall perhaps that there were a

16   couple of different parabens that were preservatives in the

17   kit product.  Yes?

18   A.    Yes.

19   Q.    Okay.  And you noted here that parabens are not very

20   active below pH four; correct?

21   A.    Yes.

22   Q.    And since they weren't very active below pH four,

23   it didn't make sense to keep them, because you were

24   targeting a pH of something around three, between three and

25   five; is that correct?

*sealed and confidential*

830

Mosher - cross

1   A.      That's correct.

2   Q.      Okay.  And your knowledge about where parabens were

3   and were not affected, that is part of your general

4   education and training you discussed with --

5   A.      I actually saw this statement about pH four in the

6   Handbook of Pharmaceutical Excipients.

7   Q.      Okay.

8   A.      I try to keep as a primary reference and in the

9   monograph four, methyl and propylparaben, it calls out they

10  are used between pH four and pH eight.

11  Q.      Okay.  All right.  And could we go down to the next

12  formulation?  The next section.  I beg your pardon, the next

13  section.

14          MR. MADDOX:  Forgive me, Your Honor.  Can we go

15  back to the first page.  Okay.  And now onto the second

16  page.  I'm sorry.

17  BY MR. MADDOX:

18  Q.      And so in this document, you presented some

19  formulations that you had put together that didn't have

20  either of the two buffers from the kit; is that correct?

21  I'm sorry.  Either of the two preservatives from the kit; is

22  that correct?

23  A.      That's correct.

24          MR. MADDOX:  Okay.  And may we go to the text

25  here.

*sealed and confidential*
Mosher - cross

1    BY MR. MADDOX:

2    Q.      And these lots here, N through T, they included 1

3    milligram per milliliter of sodium benzoate as a

4    preservative, correct?

5    A.      That's correct.

6    Q.      It was your idea to use sodium benzoate.

7    A.      Yes.

8    Q.      And sodium benzoate at the time was known to you as

9    one of the most common preservatives in solution,

10   pharmaceutical solutions; yes?

11   A.      That's correct.

12   Q.      And the amount of 1 milligram per milliliter was

13   known to you as one of the most common amounts of sodium

14   benzoate to use?

15   A.      That's correct.

16   Q.      And you did not actually test and screen other

17   preservatives before going with sodium benzoate; correct?

18   A.      That's correct.

19            MR. MADDOX:  Now, can we look to page 3 of

20   DTX-2151.

21            And at the top of the page it says "Intellectual

22   Property Summary."

23   BY MR. MADDOX:

24   Q.      What was your purpose in writing this section?

25   A.      I was trying to present some basic information to my

*sealed and confidential*

Mosher - cross

1  patent attorney to --

2        MS. MORGAN:  And, Your Honor, I'm just going to

3  object on grounds of privilege here.

4        So, Mr. Mosher, in providing your answer, don't

5  reveal any communications between you and your attorney.

6        THE WITNESS:  Okay.

7        THE COURT:  Okay.

8        MR. MADDOX:  She is not objecting to answering

9  the question.

10        MS. MORGAN:  Yes.

11        THE COURT:  You are --

12        MS. MORGAN:  So Mr. --

13        THE COURT:  -- objecting to answering the

14  question?

15        MS. MORGAN:  I am objecting to Mr. Mosher

16  providing any information in his answer that includes

17  communications with counsel.

18        But he can answer the question to the extent he

19  can answer it with information that does not concern -- that

20  is not the subject of communications with counsel.

21        MR. MADDOX:  I would argue, Your Honor, that

22  this was an exhibit in a deposition, in several depositions.

23  If they had, if they had concerns about it, they should have

24  raised it.  And I certainly would think that given that, I

25  should be able to ask what his purpose was in this.

*sealed and confidential*

Mosher - cross

1              MS. MORGAN:  Your Honor, we're not objecting to

2     use of the exhibit.  He can talk about the facts.  We're

3     objecting to inquiry into the purpose behind the document

4     to the extent it invades privilege, and we're objecting to

5     any invasion into discussions about why the document was

6     prepared to the extent it invades on attorney-client

7     privilege communication.

8              He is free to ask about the facts of the

9     document, what it represents, what is relayed in the

10    document, et cetera.  That's fine.

11             THE COURT:  The current question, as I

12    understand it, is, why did you have this section?  And he

13    said to convey the information to his attorney.

14             MS. MORGAN:  Right.

15             THE COURT:  I'm not sustaining an objection to

16    that question or to that answer.  I guess we'll see what

17    happens next, but I don't think anything objectionable has

18    happened yet based on how we got here.

19             Mr. Maddox.

20    BY MR. MADDOX:

21    Q.    And when you say "intellectual property" up top here,

22    were you contemplating patents among others?

23    A.    We looked to try to secure patents on all of our

24    formulations.

25             MR. MADDOX:  Okay.  Now, if we could go to page

Mosher - cross

1    4 of the document, within those intellectual property

2    section, there are two headings of buffering systems

3    selection.

4    BY MR. MADDOX:

5    Q.      And would you take a moment and just read those to

6    yourself?

7            And let me know when you are done.

8    A.      Okay.

9    Q.      And nowhere in those sections did you decide to, to

10   tell your -- tell the attorneys about how you came up with

11   the amounts of citric acid and sodium citrate to include in

12   your claims; correct?

13           MS. MORGAN:  I'm going to object because that

14   sounds like he is asking about what he told his attorneys.

15           MR. MADDOX:  Well, I'm not --

16           MS. MORGAN:  Do you want to rephrase?

17           THE COURT:  Hold on.

18           MR. MADDOX:  Sure.

19           THE COURT:  What I heard was, are these words

20   in the document.  I think that is a fair question, so

21   overruled.

22           Dr. Mosher, do you need the question again?

23           THE WITNESS:  Yes, please.

24   BY MR. MADDOX:

25   Q.      In neither of these sections that you chose to write

Mosher - cross

1    for your attorney about buffering systems did you go into

2    the, the -- your work in determining what the amount of

3    citric acid and sodium citrate should be?

4    A.    That language is not included here, no.

5              MR. MADDOX:  Okay.  Now, can we go a little

6    further down the road to -- it was a section you wrote on

7    preservatives.

8    BY MR. MADDOX:

9    Q.    And in the preservative section, you did not mention

10   anything about the reasons for or novelty of your choice in

11   going with sodium benzoate?

12   A.    That language is not here, no.

13   Q.    Okay.  In view of your assessments of sodium benzoate

14   without any testing, wouldn't you agree that sodium benzoate

15   was a fairly obvious choice for you as a scientist?

16   A.    I don't understand what you mean by "not testing."

17   Q.    Well, you didn't test any other preservative; you

18   went straight to sodium benzoate; yes?

19   A.    That is correct.

20   Q.    Okay.  Scientists don't often go straight to

21   something in a solution for pharmaceutical use without doing

22   some testing of alternatives; correct?

23   A.    It depends upon the history of the individual, and

24   how much knowledge and background they have.

25   Q.    You, as a pharmaceutical scientist at that time, your

*sealed and confidential*

836

Mosher - cross

1  knowledge about preservatives, at least it was obvious to

2  you that sodium benzoate would be a good preservative here;

3  yes?

4  A.    That's correct.

5  Q.    I'd like to go to your declaration.

6         MR. MADDOX:  Could we go to -- I beg your

7  pardon.

8         Excuse me, Your Honor.  May I have just a sip of

9  water?

10         THE COURT:  Yes, of course.

11         (Pause.)

12         MR. MADDOX:  Can we go to PTX-005 at 564.

13         And hopefully this is another copy of your

14  declaration.

15  BY MR. MADDOX:

16  Q.    Do you see it up on the screen?

17  A.    Yes, I do.

18  Q.    And this is -- I'll reference this is the same

19  declaration you discussed on your direct exam; correct?

20  A.    I don't know if it's the same one or not.

21  Q.    I'll tell you what:  I'll represent to you it's the

22  same.  Yes, I'll represent to you that it is.

23         Now, you submitted this declaration in

24  connection with Silvergate's response to the Patent Office

25  along the way in prosecuting the '008 patent; correct?

*sealed and confidential*

Mosher - cross

1    A.      The attorney submitted this, yes.

2    Q.      Oh, but, I mean, you executed this and you -- you

3    knew it was going into the Patent Office; yes?

4    A.      That's correct.

5    Q.      Okay.  And on page 4 --

6              MR. MADDOX:  If we can go there, which I guess

7    we are there.

8    BY MR. MADDOX:

9    Q.      -- you submitted --

10             MR. MADDOX:  It's at 568 in paragraph 14,

11   please.

12             Oh, I beg your pardon.  My mistake.

13   BY MR. MADDOX:

14   Q.      You compared in this declaration some stability data

15   from two formulations, E7 -- called E7 and E8; correct?

16   A.      That's correct.

17   Q.      Okay.  And both E7 and E8 -- actually, you didn't

18   make the formulations E7 and E8.

19   A.      That's correct.

20   Q.      And, in fact, Silvergate didn't make those

21   formulations.

22   A.      That's correct.

23   Q.      Somebody else did; right?  Someone outside the

24   company?

25   A.      Yes.  A contractor.

*sealed and confidential*

838

Mosher - cross

1  Q.      Okay.  And do you know if, if -- do you know -- let's

2  start with "do you know" -- if the contractor was instructed

3  to do so by Silvergate's lawyers?

4  A.      I do not know.

5  Q.      Did you instruct them to make E7 and E8?

6  A.      Yes, I did.

7  Q.      Okay.  And was that at about the time of the

8  declaration?

9  A.      I do not know when those were made.

10  Q.      And E7 and E8, as in your patent, has a pH of

11  somewhere around 3 to 3.5; yes?

12  A.      Yes.

13  Q.      And the solutions you were comparing it to from

14  Nahata had a pH of about -- actually reported 5.0; correct?

15  A.      I would have to see the Nahata reference.

16  Q.      Sure.  Well, I'll tell you what.  Maybe I can help

17  you out there.

18              MR. MADDOX:  Could I go to page 569 of his

19  declaration?

20              There's a table.  Could we get the top half of

21  one of the tables?

22  BY MR. MADDOX:

23  Q.      This is from your declaration, Dr. Mosher.  And do

24  you see this is a table you made; yes?  Or you included in

25  your declaration; yes?

*sealed and confidential*

839

Mosher - cross

1    A.      That's correct.

2    Q.      Okay.  And Nahata is the prior art solution that you

3    were comparing the inventive E7 and E8 to; yes?

4    A.      Yes.

5    Q.      Okay.  And do you see where it says citrate buffer,

6    pH 5, under Nahata?

7    A.      Yes.

8    Q.      So would it be correct that you were comparing

9    stability of E7 and E8, your inventions with a pH of 3 to

10   3.5, to the stability of the Nahata solution which had a pH

11   of 5?  Is that correct?

12   A.      That is one of the comparisons, yes.

13   Q.      Okay.  Now, it is your understanding that the optimal

14   stability of -- optimal pH for stability of enalapril is

15   about 3 or so; yes?

16   A.      In my formulation, yes.

17   Q.      Okay.  And you don't know whether that's in the

18   literature as well?

19   A.      I do not.

20   Q.      Okay.  But at least in your formulation, you set your

21   formulations' pH at the optimal pH for the longest and best

22   stability; yes?

23   A.      In my formulation, yes, I do.

24   Q.      And you knew, and the reason you did this, was

25   because you knew that stability of enalapril in solution was

*sealed and confidential*

840

Mosher - cross

1  pH-dependent; yes?

2  A.      That's correct.

3  Q.      Okay.  And in this declaration, you compared your,

4  your solution at a pH of 3 to 3.5, very close to the optimal

5  pH for stability, to Nahata with a pH of 5.0; is that

6  correct?

7  A.      Citrate buffer, yes.

8  Q.      Yes.  Now, when you compared them, were you really

9  surprised that E7 and E8 at the optimal pH had better

10  stability than Nahata at the pH of 5.0, almost two pH units

11  away from the optimal stability?

12  A.      That particular one was not terribly surprising, no.

13  Q.      Now, your choice to use a citrate buffer, at least

14  most of the time, with citric acid and sodium citrate, was

15  that in any way related to a needs to try different

16  concentrations?

17  A.      Can you repeat the question?  I don't quite

18  understand what you are asking.

19  Q.      When concentrations of various ingredients changed,

20  or if they changed, by using citric acid and sodium citrate,

21  you wouldn't have to also change concentrations of your

22  buffer; correct?

23  A.      I'm sorry.  I still don't understand.

24  Q.      Okay.  You have a solution, an enalapril solution;

25  yes?

*sealed and confidential*

841

Mosher - cross

1   A.     Yes.

2   Q.     And let's say you decide to add more of some of the

3   excipients.

4   A.     Okay.

5   Q.     When a concentration -- and perhaps even the active.

6   When the concentrations of those constituents change, you --

7   if you were using citric acid and sodium citrate together,

8   you wouldn't necessarily have to change the amount of buffer

9   you put in; yes?

10  A.     You may not have to, right.

11            MR. MADDOX:  No further questions.

12            THE COURT:  Okay.  Was Bionpharma seeking to

13  examine the witness?

14            MR. ALUL:  No questions from Bionpharma, Your

15  Honor.

16            THE COURT:  All right.  We'll go back to the

17  plaintiffs.

18            MS. MORGAN:  Just one point of clarification if

19  that concludes Mr. Maddox's both direct and cross.

20            THE COURT:  Mr. Maddox, are you reserving an

21  opportunity for further examination?

22            MR. MADDOX:  If he has some redirect, I may

23  respond to that, but I finished the examination, yes.

24            MS. MORGAN:  Okay.  Thank you.  Then I just have

25  very short redirect.

*sealed and confidential*

842

Mosher - redirect

1              **REDIRECT EXAMINATION**

2    BY MS. MORGAN:

3    Q.       Dr. Mosher, how long did it take you to come to the

4    final formulation for a stable oral liquid form of

5    enalapril?

6    A.       I believe we worked about two years on this.

7    Q.       Thank you, Dr. Mosher.  No further questions.

8                    THE COURT:  All right.  Mr. Maddox?

9                    MR. MADDOX:  No, Your Honor.

10                   THE COURT:  Okay.  Mr. Alul, for the record?

11                   MR. ALUL:  No, Your Honor.

12                   THE COURT:  Okay.  All right.  Do you have any

13   exhibits to move in?

14                   MS. MORGAN:  We do not have any exhibits.

15                   THE COURT:  Mr. Maddox?

16                   MR. MADDOX:  Mr. Ruedy, do we have any exhibits?

17                   MR. RUEDY:  Yes, Judge.  Amneal offers 2151,

18   2192, 2193 and 2303.

19                   THE COURT:  Any objection?

20                   MS. MORGAN:  Just one minute.  No objections,

21   Your Honor.

22                   THE COURT:  Those are all admitted.

23                   (The above-referenced exhibits were admitted

24   into evidence.)

25                   THE COURT:  Dr. Mosher, thank you very much for

*sealed and confidential*

843

Mosher - redirect

1    being with us.  We appreciate it.  Your examination is

2    concluded.  I hope you have a good rest of your day.

3                    THE WITNESS:  Thank you.

4                    MS. MORGAN:  Thank you, Dr. Mosher.

5                    (Witness excused.)

6                    THE COURT:  All right.  Counsel, we're going to

7    take a recess about 15 minutes before we get started.

8                    MS. MORGAN:  Thank you.

9                    (Brief recess taken.  Sealed portion ends.)

10

11          I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

12

13                           /s/ Brian P. Gaffigan
                            Official Court Reporter
14                           U.S. District Court

15

16

17

18

19

20

21

22

23

24

25