|  |  |  |
|---|---|---|
| SILVERGATE PHARMACEUTICALS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 18-1962-LPS |
| v. | : | C.A. No. 19-1067-LPS |
| | : | **REDACTED** |
| BIONPHARMA INC., | : | **PUBLIC VERSION** |
| | : | |
| Defendant. | : | |
| | : | |

Jack B. Blumenfeld, Megan E. Dellinger, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Wendy Devine, Kristina M. Hanson, Jody Karol, WILSON SONSINI GOODRICH & ROSATI PC, San Francisco, CA

Natalie Morgan, WILSON SONSINI GOODRICH & ROSATI PC, San Diego, CA

Ty Callahan, Granville Kaufman, WILSON SONSINI GOODRICH & ROSATI PC, Los Angeles, CA

      Attorneys for Plaintiff

Kenneth L. Dorsney, Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE

Andrew M. Alul, Roshan P. Shrestha, TAFT STETTINIUS & HOLLISTER LLP, Chicago, IL

      Attorneys for Defendant

**OPINION**

April 27, 2021
Wilmington, Delaware

**STARK, U.S. District Judge:**

Silvergate Pharmaceuticals, LLC ("Silvergate" or "Plaintiff") sued Bionpharma Inc. ("Bionpharma" or "Defendant") for patent infringement under 35 U.S.C. § 271(e)(2) based on Bionpharma's filing of Abbreviated New Drug Application ("ANDA") No. 212408. (C.A. No. 18-1962 D.I. 1; C.A. No. 19-1067 D.I. 1) Silvergate initially alleged that the marketing and sale of the product described in Bionpharma's ANDA will infringe Silvergate's U.S. Patent Nos. 9,669,008 (the "'008 patent"), 9,808,442 (the "'442 patent"), 10,039,745 (the "'745 patent"), and 10,154,987 (the "'987 patent"). (C.A. No. 18-1962 D.I. 1; C.A. No. 19-1067 D.I. 1) As the parties worked through discovery, they narrowed their disputes, leaving for the Court only the issues of whether Silvergate has proven infringement of the asserted claims of its '745 and '987 patents. (*See* C.A. No. 19-1067 D.I. 157 at 1)

Silvergate concedes that Bionpharma does not literally infringe. Instead, Silvergate contends that it has proven infringement under the doctrine of equivalents ("DOE"). (C.A. No. 19-1067 D.I. 157 Ex. 2 at 9-21)[1] Bionpharma counters that legal bars – specifically, prosecution history estoppel, disclosure-dedication, and claim vitiation – prevent Silvergate from prevailing on its DOE theories. (*Id.* Ex. 3(a) at 23-41) In the alternative, Bionpharma asserts that its accused product will not infringe. (*Id.* at 41-71)

The Court held a five-day remote bench trial (using videoconferencing technology) in February 2021. (D.I. 180-89)[2] Thereafter, the parties submitted post-trial briefing (D.I. 176, 179, 205-06) and proposed findings of fact (D.I. 175, 177-78, 204, 207).

---

[1] All remaining citations to the record are to C.A. No. 19-1067.

[2] Trial was consolidated with Silvergate's co-pending case against Amneal Pharmaceuticals, LLC ("Amneal"), another ANDA filer. (*See* C.A. No. 19-678) This opinion addresses only the Bionpharma portions of that trial.

1

Pursuant to Federal Rule of Civil Procedure 52(a), and having considered the entire record in this case and the applicable law, the Court concludes that: (1) Silvergate is barred by prosecution history estoppel from asserting DOE infringement of the "buffer limitation;" (2) Silvergate failed, in any event, to prove that Bionpharma's proposed product contains an equivalent to the "buffer" of the claims; and (3) Silvergate disclosed and dedicated to the public the accused equivalent of the "preservative limitation."

The Court's findings of fact and conclusions of law are set forth in detail below.[3]

## FINDINGS OF FACT

### I.     The Parties

1.      Plaintiff Silvergate Pharmaceuticals, Inc. ("Silvergate") is a corporation organized and existing under the laws of Delaware with a principal place of business at 8 Cabot Road, Suite 2000, Woburn, Massachusetts 01801.  Silvergate is a wholly-owned subsidiary of Azurity Pharmaceuticals, Inc ("Azurity").  (Statement of Uncontested Facts (D.I. 175) ("SUF") ¶ 1)

2.      Silvergate was founded to develop high-quality pediatric-appropriate medicines. (SUF ¶ 2)

3.      Defendant Bionpharma Inc. ("Bionpharma") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 600 Alexander Rd., # 2-4B, Princeton, New Jersey 08540.  (SUF ¶ 3)

---

[3] Certain findings of fact are also provided in connection with the Court's legal analysis later in this Opinion.

## II.     The Witnesses

### A.     Silvergate Witnesses

4.      Michael Beckloff co-founded Silvergate in 2010 and has served as Silvergate's Chief Development Officer. (SUF ¶ 5) He is currently the Chief Development Officer for Azurity. (SUF ¶ 4; Beckloff Tr. 72[4])

5.      Dr. Gerold Mosher is the Vice President of Drug Development for Azurity. (SUF ¶ 6) Dr. Mosher joined Silvergate in 2013 and has served as its Vice President of Drug Development. (SUF ¶ 7)

6.      Dr. Mosher was principally responsible for the formulation and development of Silvergate's product, Epaned®. (SUF ¶ 8)

7.      Dr. Steven Byrn is a professor at Purdue University. (SUF ¶ 9; Byrn Tr. 139) Dr. Byrn is an expert in pharmaceutical formulation and chemistry. (SUF ¶ 10) Dr. Byrn is the only expert involved in this case who has direct, hands-on experience working with the active pharmaceutical ingredient ("API") enalapril maleate in liquid formulations. (Byrn Tr. 142-43)

8.      However, Dr. Byrn has never had primary responsibility formulating a drug product that has received regulatory approval or been commercialized. (Byrn Tr. 151-52) Dr. Byrn has not formulated any liquid drug products with sodium benzoate, citric acid, sodium citrate, methylparaben, or propylparaben. (Byrn Tr. 152-53, 300)

9.      While the Court accepted Dr. Byrn as an expert in pharmaceutical formulation and chemistry (Byrn Tr. 143, 226), this does not mean that the parties' experts' relative qualifications – and relative familiarity and experience with issues directly pertinent to this case – become irrelevant.

---

[4] Citations to the trial transcript (D.I. 180-89) are in the form: "([Witness last name] Tr. [page number])."

3

10. Dr. John Mahan is a board-certified pediatric nephrologist who has been practicing pediatric nephrology since 1984. (SUF ¶ 11) He is an expert on the treatment of pediatric hypertension, left ventricular disease, and heart failure. (SUF ¶ 12) Dr. Mahan is the Director of the Pediatric Nephrology Fellowship Program at Nationwide Children's Hospital at Ohio State University, the Director of the Center for Faculty Development at Nationwide Children's Hospital, a Research Investigator at the Nationwide Children's Hospital Research Institute, and a Professor of Pediatrics at the College of Medicine, Ohio State University. (SUF ¶ 11)

### B. Bionpharma Witnesses

11. Travis Webb is a formulation scientist at CoreRx, Inc. ("CoreRx"), a contract development and manufacturing organization that developed Bionpharma's proposed Product ("CoreRx"). (SUF ¶¶ 15-16)

12. At Bionpharma's direction, Travis Webb conducted a study to prepare and evaluate formulations of enalapril oral solutions using alternative preservatives and pH modifiers with no buffer. (Webb Dep. Tr. 207-08; PTX-74 at CORE-ESOL-00020449; PTX-00175 at CORE-ESOL-00011009)

13. Dr. Janice Cacace is the senior director of formulation at CoreRx and is Webb's supervisor. (SUF ¶ 18)

14. Usha Sankaran is the associate vice president of regulatory affairs at Bionpharma. (SUF ¶ 20) She is responsible for compilation, preparation, review, and submission of applications to the U.S. Food and Drug Administration ("FDA") and communications with the FDA regarding such applications. (Sankaran Dep. Tr. 17-18)[5]

---

[5] Pursuant to the parties' agreement, certain testimony was admitted via deposition designations provided to the Court by email on February 5, 2021. (*See generally* Tr. 311-13, 1098-99; D.I.

4

15.     Phanindranath Punji oversees projects related to development of pharmaceutical drugs for Bionpharma.  (SUF ¶ 22)

16.     Dr. Richard Moreton is an expert in pharmaceutical formulation.  (SUF ¶ 13; Moreton Tr. 383)  He holds a Ph.D. from University of Wales, College of Cardiff, in Pharmaceutics.  (Moreton Tr. 376)  Dr. Moreton has nearly 40 years of experience as a formulation scientist.  (Moreton Tr. 376-80, 502)  He is a member of the Royal Pharmaceutical Society of Great Britain, Royal Society of Chemistry, and American Chemical Society.  (Moreton Tr. 380-81)  He has authored between 80 and 100 articles and other publications, and is a contributing author of entries in the Handbook of Pharmaceutical Excipients.  (Moreton Tr. 381-82)  He has developed "hundreds" of pharmaceutical formulations, including oral solutions, many of which have received regulatory approval and have been marketed commercially; for example, Tyzeka®, a hepatitis B oral solution drug.  (Moreton Tr. 382-83)  He has prepared formulations directly related to the issues in this case, e.g., formulations with citric acid and sodium citrate as buffers (Moreton Tr. 542) and formulations with sodium benzoate as preservatives (Moreton Tr. 555).

C.     **Person Of Ordinary Skill In The Art**

17.     A person of ordinary skill in the art ("POSA") has a Ph.D. in pharmacy, pharmaceutical science, chemistry, or a similar subject related to formulations, with at least minimal post-degree experience in formulating pharmaceutical products; or at a minimum a bachelor's degree in pharmacy, pharmaceutical science, chemistry or a similar subject, with at least five years of post- degree practical experience in formulating pharmaceutical products.  (Byrn Tr. 225-26)

---

182)  Citations to depositions are in the format "([Deponent Last Name] Dep. Tr. [Page Number(s)])."

18.     A POSA would also have experience with pharmaceutical excipients, including their selection and use in drug formulations. With regard to the therapeutic application of the invention, a POSA would routinely collaborate with a medical doctor with experience treating hypertension and other cardiovascular conditions – particularly in pediatric patients – or a clinical pharmacologist. (*Id.*)

19.     Dr. Moreton did not offer a definition of a POSA at trial.[6]

## III.     Silvergate's Epaned® Product

20.     Silvergate's parent, Azurity, is the holder of New Drug Application ("NDA") No. 208686 for the oral liquid medication known by the trade name Epaned®. (SUF ¶ 25)

21.     Epaned® is approved by the FDA and is an angiotensin converting enzyme ("ACE") inhibitor that is a ready-to-use oral solution. (SUF ¶ 26)

22.     The composition of Epaned® is as follows:



(PTX-0042 at SLVGT-EPA_0003204; *see also* Beckloff Tr. 97-98)

---

[6] Although he did not offer a definition, the Court finds that Dr. Moreton is a person of at least ordinary skill under Silvergate's definition and that, in his testimony, he provided opinions from the perspective of a POSA.

23. The pH of Epaned® is between about 3.1 to about 3.5. (SUF ¶ 30)

24. The active ingredient of Epaned® is enalapril maleate. (*Id.*)

25. Epaned® is indicated for treatment of symptomatic heart failure. (SUF ¶ 28) Epaned® is also indicated for treatment of asymptomatic left ventricular dysfunction, to decrease the rate of development of overt heart failure and reduce hospitalization for heart failure. (SUF ¶ 29)

26. Epaned® is additionally indicated for treatment of hypertension in adults and children older than one month, to lower blood pressure. (SUF ¶ 27)

27. Enalapril was initially approved by the FDA in 1985 as tablets for oral administration and was marketed under the trade name Vasotec®. (SUF ¶ 32)

28. Oral tablets are not convenient for children or elderly patients; for these patients, a liquid formulation might be more appropriate. (Moreton Tr. 375)

29. Silvergate's first product was an enalapril powder for reconstitution dosage form known as the Epaned® Kit. (SUF ¶ 33)

30. Epaned® Kit was approved by the FDA in 2013. (SUF ¶ 34)

31. On September 20, 2016, the FDA approved Silvergate's NDA No. 208686 as an oral solution for, among other things, treatment of pediatric and adult hypertension. (SUF ¶ 31)

32. Silvergate discontinued Epaned® Kit in early 2017, after FDA refused to grant orphan drug exclusivity for the Kit and after the launch of the Epaned® oral solution. (Beckloff Tr. 87-88, 94-95, 119-20)

**IV.  Bionpharma's ANDA Product**

33. Bionpharma submitted Abbreviated New Drug Application ("ANDA") No. 212408 to the FDA under the provisions of 21 U.S.C. § 355(j), seeking approval for a generic version of Silvergate's Epaned® product (the "Bionpharma ANDA Product" or "ANDA Product"). (SUF ¶ 35)

7

34.     Bionpharma's ANDA Product is stable at about 5±3° C for at least 24 months. (SUF ¶ 37)

35.     Bionpharma's ANDA Product does not contain mannitol or silicon dioxide. (SUF ¶ 38)

36.     The pH of Bionpharma's ANDA Product is between about 3 and about 3.5. (SUF ¶ 39)

37.     Bionpharma's proposed label states that Bionpharma's ANDA Product is indicated for the treatment of heart failure and left ventricular dysfunction. (SUF ¶ 40)

38.     The formulation of Bionpharma's ANDA Product is described in its ANDA and, in particular, set forth in the composition statement submitted with the ANDA. According to that composition statement, the qualitative and quantitative formulation of Bionpharma's ANDA Product is as follows:



39.     CoreRx, a contract manufacturer, developed Bionpharma's ANDA Product.

## V.  Scientific Background And Technological Concepts

40.    The goal when developing an oral liquid formulation is a stable, bioavailable product that is easy to administer. (Moreton Tr. 515-16)  An oral liquid formulation would have a water or co-solvent based vehicle for delivery, a preservative (for a multi-dose oral liquid formulation), buffer to maintain pH, flavoring agent to mask taste, an antioxidant to reduce oxidative degradation, and a humectant to protect the formulation from drying out.  (*Id.*)

41.    A pharmaceutical formulation is a combination of bulk active drugs with inactive excipients to make the final medicines or medicinal products. (Moreton Tr. 374)  Active drugs need to be formulated because they are administered in small quantities per dose and are difficult for patients to manipulate.  (*Id.*)  The formulation is bulked to make it more manageable for the patient or the caregiver.  (*Id.*)

42.    A formulator takes into account the patient population and the disease state when determining what type of dosage form to prepare for a drug.  (Moreton Tr. 375)  The most common oral dosage form is a tablet, which is not convenient for certain patients, such as older (geriatric) patients or children (pediatric) patients.  (*Id.*)  A formulator also needs to evaluate the dose and the properties of the drug and the methods of manufacture, costs, and the type of excipients that are compatible with the drug.  (*Id.*)

### A.  Acid-Base Neutralization Reactions And Buffers

43.    In chemistry, acids are generally substances that ionize in water and are capable of donating hydrogen ions. (Moreton Tr. 517)  Bases are generally substances that ionize in water and can accept hydrogen ions.  (*Id.*)  A strong acid such as hydrochloric acid and a strong base such as sodium hydroxide react – in what is called a neutralization reaction – to form a salt

9

and water. An exemplary reaction is depicted below:

$$HCl \quad + \quad NaOH \quad \rightarrow \quad H_2O \quad + \quad NaCl$$

Hydrochloric acid     Sodium hydroxide     Water     Sodium Chloride (salt)

(Moreton Tr. 517)

    44.     The pH scale represents acidity or alkalinity of a solution on a 0 to 14 scale. (Moreton Tr. 518) pH is the negative log of the hydrogen ion concentration in aqueous solution. (Byrn Tr. 215-16) Lower pH values indicate a more acidic solution while higher numbers indicate an alkaline solution. (*Id.*) A pH of 7 is neutral, indicating a solution in which there are no excess acidic or basic components. (*Id.*)

    45.     A buffer is typically a mixture of a weak acid and its salt, called the conjugate base. (Moreton Tr. 518-19) Unlike a strong acid, a buffer acid does not dissociate fully when dissolved in water. (Byrn Tr. 218-19; Moreton Tr. 518-19; DTX-1087.3-4) As depicted in the equation below, a reversible arrow in the equation means that the equilibrium can move towards the acid, HA, or towards the conjugate base, A$^-$. Buffers maintain the pH of the liquid in the formulation by resisting changes in pH when a small quantity of acid or base is added.

$$HA \quad \rightleftharpoons \quad H^+ \quad + \quad A^-$$

Weak Acid     $\rightleftharpoons$     Hydrogen ion     +     Conjugate Base

(Byrn Tr. 218, 231; Moreton Tr. 518-19; DTX-1080.4-6; DTX-1086.3-4; DTX-1087.6-8)

    46.     Chemists use the Henderson-Hasselbalch equation to compute the pH of a buffer solution, in which pKa is the dissociation constant of the weak acid, [A-] is the concentration of the conjugate base, and [HA] is the concentration of the weak acid:

10

$$pH = pK_a + \log\frac{[A^-]}{[HA]}$$

(Moreton Tr. 518-19; DTX-1080.4-6; DTX-1086.3-4; DTX-1087.4-5)

47. When weak acid [HA] and conjugate base [A⁻] are equal, the pH is equal to pKa (because log 1 = 0). (Moreton Tr. 518-19; DTX-1087.6-8) The equation also explains why the pH of a buffered solution changes only gradually: pH increases only by a small amount because the change in the ratio of [A⁻]/[HA] is dampened by the log factor in the equation. (Moreton Tr. 525-26)

48. Because pH is a logarithmic scale, a change in pH of 1 is a tenfold change between the concentrations of acid and its conjugate base. A pH change of 2 is a 100-fold change in concentrations. (Moreton Tr. 525-26)

49. Some weak acids, such as citric acid and maleic acid, have more than one acidic hydrogen, and are referred to as "polyprotic" acids; each acidic hydrogen has a separate pKa. (DTX-1087.12; *see also* Byrn Tr. 221-22; Moreton Tr. 539, 569)

50. Chemical buffers operate by consuming acid or base. (DTX-1087.8; *see also* Byrn Tr. 218, 231; Moreton Tr. 517)

51. An acid is a compound that donates protons. (Byrn Tr. 215; Moreton Tr. 517) A base is a compound that picks up, or accepts, protons. (*Id.*)

52. A strong acid is very reactive and easily donates its protons. A strong base is very reactive and easily picks up protons. (Byrn Tr. 216)

53. A hydroxide is an example of a strong base. (Byrn Tr. 216; Moreton Tr. 527)

54. If one adds additional acid or base to a solution with a buffer, the buffer will consume the excess acid or base and the pH will remain stable. (Byrn Tr. 221; Webb Dep. Tr.

66)

55.     There are at least two ways to create a buffer. (Byrn Tr. 218-19)

56.     The first way to create a buffer is to add the acid and a salt. The salt is the conjugate base. (*Id.*; Mosher Tr. 652) It is not necessary always to have an equivalent amount of weak acid and conjugate base; the amount is dependent on the needs of the buffer system and how many hydrogen or hydroxide ions are produced that need to be neutralized by the buffer system. (Byrn Tr. 255)

57.     The second way to create a buffer is by adding a substoichiometric amount of sodium hydroxide or other strong base to a weak acid. A substoichiometric amount is not enough to completely react with the acid. (Byrn Tr. 219-20, 254)

58.     The pKa of an acid indicates how strong the acid is. (Byrn Tr. 222)

59.     It is critical to maintain the pH in a pharmaceutical liquid formulation because excess hydrogens or hydroxide ions can react with the active ingredient and render it unstable and degrade it. For stability, a drug product needs to have a formulation that retains the molecule of the drug in its proper form throughout the shelf life. (Byrn Tr. 223-24)

60.     Dr. Cacace, a member of the team that developed Bionpharma's ANDA Product, acknowledged that "most drugs have a pH that they like to be at" and it is a "requirement" to have control over the pH. (Cacace Dep. Tr. 27)

### B.     Buffer Capacity And Buffer Species Concentration

61.     Buffer capacity of a buffer system is the amount of strong acid or base that the buffer system can "absorb" before the pH of the buffer solution changes significantly. (Moreton Tr. 522-23; DTX-1087.11-12) Buffer capacity is directly proportional to the buffer species concentration for simple buffer. (Byrn Tr. 160) When the concentration of buffer increases –

12

that is, the sum of the concentrations of the weak acid and its conjugate base that is present in the solution increases – the buffer capacity increases. (Moreton Tr. 522-23) Buffer capacity can be calculated with the Van Slyke equation, where $\beta$ is buffer capacity, and $C$ is the total concentration of buffer species:

$$\beta = 2.3C \ \frac{K_a[H_3O^+]}{(K_a + [H_3O^+])^2}$$

(*Id.*; *see also* Byrn Tr. 158-59 (buffer capacity is quantitative measure of resistance of solution containing buffering agent to change of pH; for simple buffers, higher concentration of buffer means higher concentration of buffer species); DTX-1081.1)

62.     The total buffer species concentration is a good indicator of buffer capacity. (Moreton Tr. 522-23; DTX-1087.12) The buffer capacity is at maximum in a solution containing nearly equal amounts of a weak acid and its conjugate base, and it falls off as the ratio of conjugate base to acid changes. (Moreton Tr. 519-20; DTX-1086.4; DTX-1087.12)

63.     The useful pH range of a buffer is approximately pKa ± 1 pH unit. (Moreton Tr. 523-24; DTX- 1087.11-12) Outside this range, there is not enough of either the weak acid or the weak base to react with added base or acid. (Moreton Tr. 523-24) If more acid or base is then added, the capacity of the buffer system to neutralize it is exceeded, resulting in the new addition sharply changing pH. (*Id.*)

64.     The Lewis reference states that "[a]lthough *it is difficult to give an exact limit,* it is generally accepted that a solution has a useful buffer capacity provided the value of [salt]/[acid] lies within the range of 10 to 0.1 . . . a particular acid can be employed for making useful buffer solutions of pH laying within the range of pKa -1 to pKa +1." (DTX-1086.4)

13

(emphasis added) It also gives the example of a pKa of 4.76, and states that it would be best "for preparing buffer solutions whose pH's *are roughly in the range of 3.75 to 5.75*." (*Id.* at 4-5) (emphasis added) The important aspect of matching pKas with pHs is to ensure that the solution remains buffered. (DTX-1087.12)

66. If the pKa of a weak acid is below one unit from the pH of the solution, there will be substantially less weak acid present as the equilibrium between weak acid and its conjugate base (or salt) will shift towards the conjugate base (salt), with the result being that the solution will have little capacity to neutralize any base added to or generated in the solution. (Moreton Tr. 540; Byrn Tr. 432-34; DTX-1080.7; DTX-1086.4-5; DTX-1087.12-13) If the pKa of the weak acid is greater than 1 unit from the pH of the solution, the equilibrium will shift towards the acid, and there will be very little conjugate base (salt) present to neutralize any acid added to or generated in the solution. (Moreton Tr. 540)

66. While buffers are included in pharmaceutical liquid dosage forms to resist changes in pH, the primary concern is not any acid or base added to the product after formulation (because the formulation is bottled and sealed); the primary concern is that components within the formulation (such as excipients) may degrade into acid compounds (and thus lower the pH) or basic compounds (and thus raise the pH). (Moreton Tr. 523)

67. A weak acid buffer, HA, works by reacting with the base to neutralize it. (Moreton Tr. 525-27) However, as more and more base is added, the weak acid of the buffer is exhausted, at which point the buffered solution reaches a point outside the buffer region. (*Id.*) When the weak acid component is exhausted, even a few drops of added base can sharply increase the pH of the solution, resulting in the pH curve shooting up dramatically. (*Id.*) Similarly, when a small amount of acid is added to the buffer system, the weak conjugate base,

14

A·, reacts with the acid to neutralize it. Therefore, the change in the concentration of hydrogen ion $H^+$ in the solution is minimal and there is very little or no change in pH of the overall solution at the beginning. (*Id.*) Eventually the weak base component of the buffer is exhausted, at which point, a few additional drops of acid can sharply change the pH of the solution. (*Id.*; *see also* DTX-1087.8-9)

68. As the amount of buffer (buffer species concentration) is increased in the solution, it takes a greater volume of strong base (or strong acid) to change the pH of the buffered solution. (Moreton Tr. 526-27) The greater the concentration of buffer species, the more the system can absorb and the better the buffer will protect against the addition of a base. (*Id.*; *see also* Byrn Tr. 217-18; DTX-1080.4-7; DTX-1087.6-7, 11-12)

69. A pH adjuster is a chemical that, unlike a buffer, is typically a strong acid or a strong base (such as hydrochloric acid or sodium hydroxide) and is used to alter the pH. (Moreton Tr. 527)

## VI.    Silvergate's Patents

### A.    Asserted Patents

70. The Asserted Patents in this case are United States Patent Nos. 10,039,745 (the "'745 patent") and 10,154,987 (the "'987 patent"). (SUF ¶ 42)

71. The '745 patent, entitled "Enalapril Formulations," issued on August 7, 2018. (SUF ¶ 43)

72. The '745 patent issued from application No. 15/802,341 (the "'341 application"), which was filed on November 2, 2017. The '341 application is a continuation of the '622 application. (SUF ¶ 44)

73. The '987 patent, entitled "Enalapril Formulations," issued on December 18, 2018.

15

(SUF ¶ 45)

74.     The '987 patent issued from application No. 16/003,994 (the "'994 application"), which was filed on June 8, 2018. The '994 application is a continuation of the '341 application. (SUF ¶ 46)

## B.     Asserted Claims

75.     Silvergate asserts that Bionpharma's ANDA Product will directly infringe claims 4, 7, and 10 of the '745 patent, and that Bionpharma will indirectly infringe (through inducement and contributory infringement) claims 20, 23, and 30 of the '987 patent (collectively, the "Asserted Claims."). (D.I. 157 Ex. 1 ¶ 45)

76.     Claims 4, 7, and 10 of the '745 patent depend from independent claim 1, which recites:

> A stable oral liquid formulation, comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; wherein the formulation is stable at about 5±3° C for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

(PTX-003)

77.     Claim 4 of the '745 patent recites: "The stable oral liquid formulation of claim 1, wherein the formulation does not contain mannitol." (*Id.*)

78.     Claim 7 of the '745 patent recites: "The stable oral liquid formulation of claim 1, wherein the pH of the stable oral liquid formulation is between about 3 and about 3.5." (*Id.*)

79.     Claim 10 of the '745 patent recites: "The stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5±3° C for at least 24 months." (*Id.*)

80.     Claims 20 and 23 of the '987 patent depend from independent claim 18, which recites:

A method of treating heart failure in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; wherein the formulation is stable at about 5±3° C. for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

(PTX-004)

81.　　　Claim 20 of the '987 patent recites: "The method of claim 18, wherein the formulation does not contain mannitol or silicon dioxide." (*Id.*)

82.　　　Claim 23 of the '987 patent recites: "The method of claim 18, wherein the formulation is stable at about 5±3° C. for at least 24 months." (*Id.*)

83.　　　Claim 30 of the '987 patent depends from independent claim 25, which recites:

A method of treating left ventricular dysfunction in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; wherein the formulation is stable at about 5±3° C. for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

(*Id.*)

84.　　　Claim 30 of the '987 patent recites: "The method of claim 25, wherein the formulation is stable at about 5±3° C. for at least 24 months."

85.　　　The "buffer limitation" of the Asserted Claims is "a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate."

86.     The "preservative limitation" of the Asserted Claims is "about 0.7 to about 1.2 mg/ml sodium benzoate."

87.     The term "about," when used in the Asserted Claims, means "approximately." (SUF ¶ 41)

## C.     Other Members Of The Epaned® Patent Family

88.     U.S. Patent No. 9,669,008 (the "'008 patent"), entitled "Enalapril Formulations," issued on June 6, 2017.  (SUF ¶ 47)

89.     The '008 patent issued from application No. 15/081,603 (the "'603 application"), which was filed on March 25, 2016.  The '603 application claims priority to provisional application No. 62/310,198, filed on March 18, 2016.  (SUF ¶ 48)

90.     U.S. Patent No. 9,808,442, entitled "Enalapril Formulations," issued on November 7, 2017.  (SUF ¶ 49)

91.     The '442 patent issued from application No. 15/613,622 (the "'622 application"), which was filed on June 5, 2017.  The '622 application is a continuation of the '603 application.  (SUF ¶ 50)

92.     Gerold Mosher and David Miles are the named inventors of the Asserted Patents and of the '008 and '442 patents.  (SUF ¶ 51)

93.     Silvergate owns the Asserted Patents as well as the '008 and '442 patents.  (SUF ¶ 52)

94.     The Asserted Patents and the '008 and '442 patents are listed in the FDA Orange Book under the entries for Epaned®.  (SUF ¶ 53)

95.     On October 31, 2018, Silvergate filed U.S. Patent Application No. 16,177,159 (the "'159 application").  (SUF ¶ 54)

96.    The '159 application claims priority to the '603 application.  (SUF ¶ 55)

**D.    Prosecution History Of The '008 Patent**

97.    The '603 application was filed with 20 claims, three of which were independent (application claims 1, 12, and 20).  (SUF ¶ 69)

98.    Original claim 1 of the '603 application recites as follows:

CLAIMS

WHAT IS CLAIMED IS:

1.  An oral liquid formulation, comprising:
    (i)     about 1 mg/ml enalapril maleate;
    (ii)    about 0.70 mg/ml of a sweetener that is sucralose;
    (iii)   a buffer comprising about 1.82 mg/ml citric acid;
    (iv)    about 1 mg/ml of a preservative that is sodium benzoate; and
    (v)     water;
    wherein the pH of the formulation is less than about 3.5; and
    wherein the formulation is stable at about 5±3 °C for at least 12 months.

(SUF ¶ 70)

99.    Original independent claims 1 and 12 contain a buffer with only "about 1.82 mg/ml citric acid," while original independent claim 20 contains a buffer with "about 1.82 mg/ml citric acid and about 0.15 mg/ml sodium citrate dihydrate."  (SUF ¶ 71)

100.   On September 2, 2016, in a first office action, the U.S. Patent and Trademark Office ("PTO") Examiner rejected all 20 claims of the '603 application as obvious.  (SUF ¶ 72)

101.   In this first office action, the Examiner rejected all 20 pending claims as obvious in view of five references: (1) U.S. Patent No. 8,568,747 (the "'747 patent") (PTX-213); (2) Rippley et al., *Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children*, Biopharm. Drug Dispos., 21:339-334 (2000) ("Rippley") (PTX-332); (3) Nahata et al., *Stability of Enalapril Maleate in Three Extemporaneously Prepared Oral Liquids*, Am. J. Health-System Pharm., 55:1155-1157 (1998) ("Nahata") (PTX-231); (4) the product information of Bicitra, Sodium Citrate and Citric Acid Oral Solution USP ("Bicitra"); and (5) the product

information of Ora-Sweet® SF ("Ora-Sweet"). (SUF ¶ 73)

102. In the first office action, the Examiner also suggested "presenting evidence demonstrating criticality of the selection of the amounts and specific ingredients, such as evidence demonstrating that the prior art composition does not have the same long-term stability as the instantly claimed composition." (SUF ¶ 74)

103. On October 14, 2016, the Examiner held an interview with Silvergate. (SUF ¶ 75)

104. During the October 14, 2016 interview between Silvergate and the Examiner, Silvergate attempted to establish patentability by distinguishing the components and their specific concentrations in a formulation disclosed in the common specification (E5) with the components and concentrations of enalapril liquid formulations disclosed in the prior art that had been the subject of the Examiner's September 2, 2016 obviousness rejection. (PTX-005 at SLVGT-EPA_0000836-37; Moreton Tr. 391-93)

105. On January 17, 2017, in a second office action, the Examiner again rejected all 20 application claims of the '603 application as obvious. The Examiner rejected all claims as obvious in view of the same prior art that had been identified in the first office action. (SUF ¶ 76)

106. In the second office action, the Examiner also rejected all claims as indefinite because of the term "stable." (SUF ¶ 77)

107. In the second office action, the Examiner stated that "oral liquid compositions comprising 1 mg/mL enalapril maleate, sweeteners such as mannitol, sucrose, sorbitol, and sucralose; buffers such as citric acid and sodium citrate; preservatives such as sodium benzoate; and water were well known at the time of the invention." (SUF ¶ 78)

108. In the second office action, the Examiner also stated that "the inventive example requires sodium citrate dihydrate and is not representative of the broadest claimed composition." (SUF ¶ 79)

109. In the January 17, 2017 office action, the Examiner rejected the E5 comparison, stating:

> Further, the inventive example [E5] requires sodium citrate dihydrate, and is not representative of the broadest claimed composition. Applicant is invited to present evidence demonstrating that the amounts of the components taught by [the prior art] are different from the amounts recited in the instant claims.

(PTX-005 at SLVGT-EPA_0000837; *see also* Moreton Tr. 393)

110. One reason the Examiner rejected the E5 comparison is because the E5 formulation contained sodium citrate dihydrate, while the broader pending independent claims of the '603 application did not; thus, E5 was not commensurate in scope with pending claims 1 and 12. (Moreton Tr. 391-92)

111. On February 3, 2017, Silvergate submitted an amendment and response, in which it amended independent application claims 1, 12, and 20 of the '603 application, and cancelled application claims 3 and 14. (SUF ¶ 80)

112. In the February 3, 2017 amendment, Silvergate amended the preamble of independent application claims 1, 12, and 20 of the '603 application from "An oral liquid formulation" to "A stable oral liquid formulation." Silvergate also amended independent application claims 1, 12, and 20 of the '603 application by adding the following claim limitation: "wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period." These amendments were made in response to the Examiner's indefiniteness

21

rejection. (SUF ¶ 81)

113. In the February 3, 2017 amendment, Silvergate also amended the buffer limitation of independent application claim 1 of the '603 application by adding the following claim language: "and about 0.15 mg/mL sodium citrate dihydrate." (SUF ¶ 82)

114. In the February 3, 2017 amendment, Silvergate also amended the buffer limitation of independent application claim 12 of the '603 application by adding the following claim language: "and about 2.9% (w/w of solids) sodium citrate dihydrate." (SUF ¶ 83)

115. In the February 3, 2017 amendment, Silvergate did not amend the buffer limitation of independent application claim 20 of the '603 application, which already recited "and about 0.15 mg/mL sodium citrate dihydrate" limitation. (SUF ¶ 84) Silvergate also argued to the Examiner in the Remarks section of the February 3, 2017 Amendment that the amended claims were non-obvious because they were distinguishable from the prior art formulations based on components and specific concentrations. (PTX-005 at SLVGT-EPA_0000863, SLVGT-EPA_0000873-74; *see also* Moreton Tr. 395-98) Silvergate also argued that "the cited references have not provided any reason to single out the specific components at the requisite concentrations for a pharmaceutical liquid recited in the instant claims." (PTX-005 at SLVGT-EPA_0000863) Silvergate included the following table distinguishing the claims from the prior art based on components:

| Enalapril Extemporaneous Formulation (Ora-Sweet/Ora-Plus) | Enalapril Powder for Reconstitution Formulation | Formulation of Present Claims |
|---|---|---|
| Enalapril | enalapril | enalapril |
| lactose | mannitol | sucralose |
| magnesium stearate | colloidal silicon dioxide | citric acid |
| sodium bicarbonate | sucrose | sodium citrate dihydrate |
| starch | glycerin | sodium benzoate |
| iron oxide | sorbitol | water |
| microcrystalline cellulose | flavoring | |
| carboxymethylcellulose sodium | citric acid | |
| xanthan gum | sodium phosphate | |
| carrageenan | methylparaben | |
| calcium sulphate | potassium sorbate | |
| trisodium phosphate | water | |
| citric acid | | |
| dimethicone | | |
| potassium sorbate | | |
| methylparaben | | |
| flavoring | | |
| sorbitol | | |
| glycerin | | |
| sucrose | | |
| water | | |

(PTX-005 at SLVGT-EPA_0000873; *see also* Moreton Tr. 395-98)

116.    Silvergate went on to argue that "[i]n contrast [to the prior art formulations], the

formulation of the present claims has only *four* ingredients along with enalapril and water."

(PTX-005 at SLVGT-EPA_0000873) Silvergate also emphasized that the specific components

and concentrations of the claimed formulations, including sodium citrate dihydrate at the recited

concentration, were essential to the stability of the claimed formulations:

> As such, the prior art does not provide any expectation that any
> particular combination would be successful for stable enalapril oral
> liquid formulations, much less any expectation that the
> combination of [sic] with enalapril, citric acid, sodium citrate,
> sodium benzoate, sucralose, and water at the recited concentrations
> and at a pH of less than about 3.5 would be successful in forming a
> stable enalapril liquid formulation.

(PTX-005 at SLVGT-EPA_0000874; *see also* Moreton Tr. 397-98)

117.    In response to the Examiner's obviousness rejection, Silvergate stated that

"Nahata and the '747 patent do not disclose or suggest any liquid formulations of enalapril

having this stability at *about 5±3 °C for at least 12 months* nor any methods of achieving this

23

stability." (PTX- 5 at SLVGT-EPA_0000868; *see also* Byrn Tr. 280) Moreover, Silvergate

stated that "[n]one of the other cited references, Bicitra, Ora-sweet, and Rippley, reveal any

enalapril or other pharmaceutical liquid formulations having this stability or methods thereof."

(PTX-005 at SLVGT-EPA_0000868; *see also* Byrn Tr. 280) Accordingly, Silvergate stated that

"[b]ecause this stability element is not present in any of the cited references, the Office has not

set forth a *prima facie* case of obviousness." (PTX-005 at SLVGT-EPA_0000868; *see also* Byrn

Tr. 280)

118.    In response to the Examiner's obviousness rejection, Silvergate also stated that

"there is no guidance whatsoever to keep or eliminate the components if one were to use Nahata

or the '747 patent as a starting point to arrive at the claimed enalapril liquid formulations."

(PTX-005 at SLVGT-EPA_0000873; *see also* Byrn Tr. 280)

119.    Silvergate further argued that the pending claims were distinguishable from the

prior art based on the claimed stability, providing as support a declaration from Dr. Mosher

("Mosher Declaration"). (PTX-005 at SLVGT-EPA_0000863-868, SLVGT-EPA_0000874-887;

Moreton Tr. 394-96, 655)

120.    The Mosher Declaration included data "depict[ing] the enalapril content of

formulations E7 at 5° C and 25° C and E8 at 5° C." (PTX-005 at SLVGT-EPA_0000883-885)

Formulations E7 and E8 were as follows:

| Composition of Enalapril Maleate Formulations | | |
|---|---|---|
| Component | E7 | E8 |
| Enalapril maleate | 1.00 | 1.00 |
| Citric acid anhydrous | 1.80 | 1.82 |
| Sodium citrate anhydrous | 0.16 | 0.15 |
| Sodium benzoate | 1.00 | 1.00 |
| Sucralose | 0.70 | 0.70 |
| Mixed berry flavor | 0.50 | 0.50 |
| Water | qs | qs |
| pH (measured) | 3.3 | 3.3 |
| qs = sufficient quantity | | |

(*Id.* at SLVGT-EPA_0000883) Formulations E7 and E8 were exemplary embodiments of the

24

invention claimed in the Asserted Patents. (Mosher Tr. 839) The Mosher Declaration also described the claimed oral liquid formulations as "contain[ing] enalapril, sucralose, *a citric acid buffer*, sodium benzoate and water at a pH of less than 3.5." (PTX-005 at SLVGT-EPA_0000881) (emphasis added)

121.    In addition to the data in the Mosher Declaration, "the enalapril concentrations published by Nahata, the US 8,568,747 enalapril concentrations, and the concentrations from E7 and E8 [were] plotted graphically (Fig. 1: 5 °C and Fig. 2: 25 °C) with linear regression of the data for extrapolation." (PTX-005 at SLVGT-EPA_0000885-886) Figures 1 and 2 of the Mosher Declaration are reproduced below:



(*Id.* at SLVGT-EPA_0000885-886)

122.    According to the Mosher Declaration, "[t]he additional enalapril content data submitted for E7 and E8 shows that the formulations of the present application are significantly more stable, which in [Dr. Mosher's] opinion, reflects the superior results and advantages, obtained with the oral liquid enalapril formulation of the present claims." (*Id.* at SLVGT-EPA_0000887; *see also* Mosher Tr. 659)

25

123.    The Mosher Declaration further stated that the stability of "the oral enalapril

liquid formulations of the present claims . . . is an important aspect of the present formulations."

(PTX-005 at SLVGT-EPA_0000882; *see also* Mosher Tr. 656) The stability "contributes to the

consistency and uniformity of the formulations as well as allows for accuracy of dosing to

patients." (PTX-005 at SLVGT-EPA_0000882; *see also* Mosher Tr. 656)

124.    Silvergate's remarks accompanying the February 3, 2017 amendment referenced

Figures 1 and 2 of the Mosher Declaration, stating:

> As evidenced by [Figures 1 and 2], the E7 formulation
> demonstrates no loss of enalapril for at least 12 months at 5° C and
> about 100 days at 25° C. The E8 formulation, which has only one
> data point, is expected to trend similarly. These results drastically
> contrast with the stability or lack thereof in the extemporaneous
> and reconstituted enalapril preparations where . . . the enalapril
> degrades substantially after initial preparation. At about 90-100
> days, the extemporaneous preparations are at about 95% of the
> starting enalapril concentration when stored at either 4° C or 25 °C
> and the reconstituted formulation degrades after 8 weeks at 25° C.
> The unexpected stability results of the E7 and E8 formulations are
> not taught by Nahata or the '747 patent, and could not have been
> predicted or contemplated by the cited prior art. Nowhere does the
> prior art teach or suggest that a combination of enalapril, citric
> acid, sodium citrate, sodium benzoate, sucralose and water at the
> recited concentrations and at a pH of less than about 3.5 at the
> claimed concentrations would have resulted in such a dramatic
> stabilization of enalapril. Accordingly, Applicant has submitted
> evidence supporting the unexpected technical results achieved by
> the claimed stable enalapril liquid formulations which rebut any
> presumption of *prima facie* obviousness.

(PTX-005 at SLVGT-EPA_0000875-878; *see also* Byrn Tr. 328)

125.    In response to the Examiner's statement that citric acid and sodium citrate were in

prior art enalapril liquid formulations, Silvergate argued that the claimed concentrations of citric

acid and sodium citrate were not disclosed in the prior art, rendering the amended '603

application claims patentable. (Moreton Tr. 399-401; PTX-005 at SLVGT-EPA_0000863,

SLVGT-EPA-0000873-74)

126. On March 20, 2017, the Examiner held a second interview with Silvergate. During the interview, "Examiners suggested removing the limitations directed towards the use of sucralose as the sweetener." (SUF ¶ 85; *see also* PTX-005 at SLVGT-EPA_0001150-51; Byrn Tr. 283-84)

127. On March 22, 2017, Silvergate submitted a supplemental amendment in which it amended independent application claims 1 and 12 of the '603 application, and added application claims 21 and 22 to the '603 application. Silvergate "adopt[ed] the Examiner's suggestion for the claim amendments." (SUF ¶ 86)

128. Specifically, Silvergate moved the sucralose claim limitations of independent claims 1 and 12 to dependent claims 21 and 22. (SUF ¶ 87)

129. On April 19, 2017, the Examiner allowed claims 1-20 of the '008 patent. (SUF ¶ 88)

130. The prosecution of the continuations of the '008 patent, including the two patents-in-suit here, did not include further relevant substantive communications or events pertinent to the arguments in this litigation. (SUF ¶ 89)

## VII. Additional Facts Relating To Prosecution History Estoppel

### A. Amendment-Based Estoppel

131. As Dr. Moreton opined, the amendment Silvergate made during prosecution is a narrowing amendment. (Moreton Tr. 394, 399)

132. An enalapril liquid formulation that does not have "about 0.15 mg/mL sodium citrate dihydrate" would have literally infringed original application claim 1 of the '603 application (pre-amendment), but would not literally infringe that claim post-amendment, after

27

the addition of the "about 0.15 mg/mL sodium citrate dihydrate" limitation.

133. Dr. Moreton opined that "the amendment [to add sodium citrate to the buffer limitations] is fundamental to the whole issue" of whether Bionpharma's ANDA Product contains an equivalent buffer and is not, therefore, tangential. (Moreton Tr. 511)

134. Claim 20 of the '603 application, which recited a buffer that required "about 1.82 mg/ml citric acid and about 0.15 mg/ml sodium citrate dihydrate," was rejected as obvious in the September 2, 2016 and January 17, 2017 office actions (PTX-005 at SLVGT-EPA_0000366; *see also* Byrn Tr. 291), even though it already contained the sodium citrate limitation, because the Examiner did not have the benefit of Silvergate's arguments – propounded in connection with the February 3, 2017 amendment – that the specific concentrations of citric acid and sodium citrate recited in the claim were not disclosed in the prior art (Moreton Tr. 401).

135. Silvergate could have sought claims covering formulations requiring different buffers altogether, or formulations without buffers (like Bionpharma's ANDA Product), but the only data demonstrating formulation stability for 12 months or longer in the common specification is for the E5 and E6 formulations, which used specific concentrations of citric acid/sodium citrate buffers. (PTX-003 at 37:17-39:12 (stability data in Table E-2); PTX-003 at Examples A-G; Byrn Tr. 430-31; Moreton Tr. 537-38)

136. Citric acid alone and citric acid with sodium citrate are not equivalent buffer systems. (Moreton Tr. 399)

137. There is no persuasive evidence that the sodium citrate amendment was made to "tidy up" the claims and make claims 1 and 12 co-extensive with claim 20. (Byrn Tr. 290-92; PTX-005 at SLVGT-EPA_0000858-860) Silvergate and its expert, Dr. Byrn, pointed to no legal or factual reason why the applicant would have wanted to make the claims "more consistent with

one another." (Byrn Tr. 290-91)

138.    Bionpharma's expert, Dr. Moreton, acknowledged that "the stability of the inventive formulation was an element of how Silvergate overcame the obviousness rejection." (Moreton Tr. 409)

139.    Dr. Byrn opined that ███████████ in Bionpharma's ANDA Product is tangential to, and, in fact, is entirely unrelated to, the sodium citrate claim amendment. (Byrn Tr. 290-93) Dr. Byrn provided three reasons for this conclusion: (1) claim 20, which contained the sodium citrate limitation, was also rejected as obvious; (2) the applicant stressed the superior stability of the claimed invention and not the type of buffer; and (3) the applicant's argument focused on rebutting the Examiner's *prima facie* case of obviousness. (Byrn Tr. 293) The Court was not persuaded by Dr. Byrn on these points.

140.    After the amendment, the Examiner suggested moving sucralose, which was part of the "inventive example," from the independent claims into the dependent claims, from which Dr. Byrn concludes that adding sodium citrate could not have provided the impetus for overcoming the obviousness rejection. (Byrn Tr. 283-84; PTX-005 at SLVGT-EPA_0000944) The Court was not persuaded by Dr. Byrn on this point.

141.    Even though Silvergate's arguments to the Examiner relate specifically to a lack of motivation to combine (Byrn Tr. 286-87), a lack of a reasonable expectation of success (*id.*), and the unexpected stability of the claimed invention (Byrn Tr. 288), they nevertheless constitute a clear and unmistakable disclaimer, to a POSA, of buffers that do not contain the claimed concentrations of citric acid *and* sodium citrate.

## B.    Argument-Based Estoppel

142.    A reasonable competitor of Silvergate reading the table and the arguments

presented during prosecution, including the argument that "[i]n contrast [to the prior art formulations], the formulation of the present claims had only *four* ingredients along with enalapril and water" (PTX-005 at SLVGT-EPA0000873-874), would understand that the claims as amended required the exact recited four ingredients, along with enalapril and water, at the recited concentrations, and nothing more, or otherwise would not infringe (Moreton Tr. 512-13). Silvergate argued that additional ingredients in the prior art formulations are not needed or contemplated in the claimed enalapril liquid formulations because none of them are needed to produce an oral liquid formulation of the present claims that is stable and homogenous for at least 12 months. (PTX-005 at SLVGT-EPA0000873-74) A competitor would understand that Silvergate disclaimed formulations that do not contain the exact four ingredients in exact concentrations along with enalapril and water. (Moreton Tr. 512-13)

143.    In the February 3, 2017 amendment, Silvergate stated that it "respectfully disagree[d]" with the indefiniteness rejection but made the amendments "in order to solely advance prosecution." (PTX-005 at SLVGT-EPA_0000861)

144.    In the March 22, 2017 supplemental amendment, Silvergate summarized the March 20, 2017 interview, writing: "[i]t is the Applicant's understanding that the Examiners appreciated the superior stability provided by the components and pH as recited in the claims," adding "[i]t is further Applicant's understanding that Examiner Lundgren suggested moving the sweetener, sucralose, from the independent claims to dependent claims." (PTX-005 at SLVGT-EPA_0000944; *see also* Byrn Tr. 283-84)

145.    During prosecution, the Examiner rejected all claims as obvious based on a number of prior art references stretching back almost 30 years. (PTX-005 at SLVGT-EPA_0000818) In response, the Applicant argued that the prior art did not teach the claimed

30

stability. (Byrn Tr. 285-86; Moreton Tr. 409)

146. In his declaration, Dr. Mosher pointed out the superior stability of the claimed invention in comparison to the prior art references. (Mosher Tr. 658; *see also* PTX-005 at SLVGT-EPA_0000883)

147. Silvergate argued during prosecution of the '603 application that the stability exhibited by the specific citric acid/sodium citrate buffered formulations claimed in the patents-in-suit was unexpected and, thus, not obvious. (Mosher Tr. 660-61; PTX-005 at SLVGT-EPA_0000875-78)

148. In response to the Examiner's arguments that "[i]t would be within the purview of the ordinarily skilled artisan to reconstitute enalapril tablets w/ Bicitra, Ora-Sweet, and Ora-Plus and remove components needed for powders or tablets," and that "a skilled artisan would reverse engineer the tablets dissolved in Ora-Sweet, Ora-Plus, and/or Bicitra and remove unnecessary excipients" (PTX-005 at SLVGT-EPA_0000837), Silvergate argued that the Examiner had not made a *prima facie* case of obviousness because the prior art provided no motivation to combine or expectation of success (Byrn Tr. 285-87; PTX-005 at SLVGT-EPA_0000871-874).

149. During prosecution, the Examiner invited the Applicant to submit evidence demonstrating the "criticality of the selection of the amounts and specific ingredients" for a formulation which included a limitation in the independent claims requiring sucralose. (PTX-005 at SLVGT-EPA_0000818)

150. The independent claims discussed throughout the amendment contained sucralose. (PTX-005 at SLVGT-EPA_00000858-60) At the Examiner's suggestion, Silvergate moved the sucralose limitation from the independent claims to the dependent claims, thus broadening the independent claims. (*Id.* at SLVGT-EPA_0000940-945; Byrn Tr. 283-84;

31

Moreton Tr. 408) Thus, the claims the Examiner allowed were broader than the claims referenced throughout the prosecution. (Moreton Tr. 408-09)

151.    Silvergate's expert, Dr. Byrn, opined that the prosecution history of the '008 patent shows that all six ingredients listed or identified by Applicant – enalapril, citric acid, sodium citrate, sodium benzoate, sucralose, and water – are not critical to the invention, particularly given that the Examiner suggested moving sucralose from the independent claims to dependent claims, and Applicant did so. (PTX-005 at SLVGT- EPA_0000941-944, 1150; *see also* Byrn Tr. 283-84)

152.    Bionpharma's expert, Dr. Moreton, disagreed. He opined that the arguments made by Silvergate during prosecution would have suggested to a reasonable competitor that the specific components of the claimed buffer were critical. (*See* Moreton Tr. 512-13) The Court was persuaded by Dr. Moreton on this point.

**VIII.    Facts Relating To Disclosure-Dedication Doctrine**

153.    Each asserted claim of the patents-in-suit requires "about 0.7 to about 1.2 mg/ml sodium benzoate." (Moreton Tr. 500-01)

154.    The common specification discloses that sodium benzoate is a suitable preservative for use in the disclosed formulations. (Moreton Tr. 505-06; PTX-003 at 10:49-50)

155.    The specification also discloses that a paraben or a mixture of parabens can be used as suitable preservatives in the disclosed formulations. (Moreton Tr. 506-07; PTX-003 at 12:25-38)

156.    The common specification describes a list of exemplary preservatives that are alternatives to sodium benzoate, including "parabens (such as methylparaben, ethylparaben, propylparaben, butylparaben and their salts)." (PTX-003 at 10:11-20; *see also* Moreton Tr. 501-

32

157. The full quote in the specification states:

> Preservatives include anti-microbials, anti-oxidants, and agents that enhance sterility. Exemplary preservatives include ascorbic acid, ascorbyl palmitate, BHA, BHT, citric acid, EDTA and its salts, erythorbic acid, fumaric acid, malic acid, propyl gallate, sodium ascorbate, sodium bisulfate, sodium metabisulfite, sodium sulfite, parabens (such as methylparaben, ethylparaben, propylparaben, butylparaben and their salts), benzoic acid, sodium benzoate potassium sorbate, vanillin, and the like.

> In some embodiments, the enalapril oral liquid formulation described herein comprises a preservative.

> In some embodiments, the preservative is a paraben and the sweetener is not a sugar (such as, but not limited to glucose, fructose, sucrose, lactose, maltose) or a sugar alcohol (such as, but not limited to xylitol, mannitol, lactitol, maltitol, sorbitol).

(PTX-001 at 10:5-20)

158. The common specification includes Example C, subtitled "Stability of Enalapril Maleate Formulations Containing Paraben Preservatives." (PTX-003 at 33:23-34:51) Example C discloses Silvergate prepared and tested for stability at least three enalapril maleate liquid formulations that contained methylparaben/propylparaben mixtures as preservatives. (Moreton Tr. 507-08; PTX-003 at 33:22-34:23) Within the Example C formulations, methylparaben and propylparaben would be present as free acids and not sodium salts. (Moreton Tr. 508; Byrn Tr. 301) Further, a POSA would know that the non-salts (not the salts) would be exerting antimicrobial activity. (Byrn Tr. 301)

159. While Example C discloses additional preservatives, such as potassium sorbate or sodium benzoate, there is nothing in the specification teaching that parabens must be used with another preservative. (Moreton Tr. 508-09; *see also generally* PTX-003)

160. Tables A-1 and C-1 show sodium benzoate and/or potassium sorbate in

33

formulations with methylparaben sodium and/or propylparaben sodium (or sodium benzoate alone). (PTX-001 at 31:26, 33:60)

161.    The '482 patent, which is assigned to Silvergate, also claims priority to patents-in-suit. (DTX-1123) As a continuation patent, the '482 patent contains the same specification as the patents-in-suit. Claim 14 of the '482 patent requires a mixture of parabens as preservatives and does not require any other non-paraben preservative such as potassium sorbate or sodium benzoate. (Byrn Tr. 304)

162.    Dr. Moreton explained it was known in the art that "methylparaben and propylparaben are the most used parabens and they are most often used together," because of their complementary physical and antimicrobial properties. (Moreton Tr. 502) Methylparaben and propylparaben are alkyl esters of p-hydroxybenzoic acid. (Moreton Tr. 503) As the chain lengths of the alkyl moiety increases, microbial activity increases, but solubility decreases. (*Id.*) Methylparaben and propylparaben are often used together because methylparaben is more soluble but less active and propylparaben is less soluble but more active. (Moreton Tr. 503-05, 561, 563-64; DTX-1095.3-4; DTX-1096.3-4; DTX-1100.1)

163.    Both the methylparaben (DTX-1095) and propylparaben (DTX-1096) entries in the Handbook of Pharmaceutical Excipients disclose that methylparaben and propylparaben were commonly used together to preserve parenteral formulations (i.e., aqueous liquid injectable formulations). (Moreton Tr. 505; DTX-1095.4; DTX-1096.3) The Valkova reference (DTX-1100) states that "[p]ropylparaben is considered more active against most bacteria than methylparaben. However, because the latter is more soluble in water, they are often used as a mixture in commercial preparations." (DTX-1100.1)

## IX.  Facts Relating To Infringement

164.  Silvergate has stipulated that Bionpharma's ANDA Product does not literally infringe the Asserted Claims. (D.I. 102)

165.  Bionpharma's Dr. Moreton opined that (i) ███████████████ ███████ s disclosed in the common specification of the patents-in-suit and, therefore, dedicated to the public under the disclosure dedication doctrine; (ii) Silvergate is estopped under amendment-based estoppel because it narrowed the claims during prosecution to require sodium citrate; (iii) Silvergate is further estopped because it disclaimed formulations beyond the claims in its arguments before the PTO. (Moreton Tr. 499-500) Dr. Moreton additionally opined that the ███████████████ alleged to be the buffer in Bionpharma's ANDA Product is not equivalent to the buffer limitations in the patents; and the ███████████████ ███████ is not equivalent to the sodium benzoate limitations in the patents. (*Id.*)

166.  Bionpharma's ANDA Product contains the following ingredients in the amounts shown:



167. Bionpharma's ANDA Product is a solution. As is undisputed (*see, e.g.*, Tr. 1204-06) (Bionpharma closing argument), the infringement analysis is conducted with respect to the compounds in solution after dissolution.

168. The limitation "[a] stable oral liquid formulation" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 49)

169. The limitation "about 0.6 to about 1.2 mg/mL enalapril or a pharmaceutically acceptable salt or solvate thereof" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 47)

170. The limitation "water" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 48)

171. The limitations "wherein the formulation is stable at about 5±3° C. for at least 12 months" and "wherein the formulation is stable at about 5±3° C. for at least 24 months" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 49; PTX-003 at SLVGT-EPA_0083167)

172. The limitation "wherein the formulation does not contain mannitol" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 50)

173. The limitation "wherein the formulation does not contain silicon dioxide" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 50)

174. The limitation "pH is between about 3 and about 3.5" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 51)

175. The limitation "treatment of heart failure" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 52)

176. The limitation "treatment of left ventricular dysfunction" is met literally and not in dispute. (D.I. 157 Ex. 1 ¶ 52)

177. The limitation "therapeutically effective amount" is met literally and not in

dispute.  (*See* D.I. 157 Ex. 2 at 20-21)

## A. Amount

178.    The claims require 0.8-3.5 mg/mL citric acid and 0.1-0.8 mg/mL sodium citrate dihydrate.

179.    Bionpharma's ANDA Product contains ███████████████████████████

████████████████████████████████████████████████████████

180.    Bionpharma's ANDA Product contains "QS" or "quantum satis" of sodium hydroxide, meaning enough to get it to the correct pH, or sufficient quantity.  (Byrn Tr. 231; Moreton Tr. 527; PTX-00478 at BION-ESOL-00000231)

181.    Bionpharma created exhibit batches for submission to the FDA; the batch records of the Bionpharma formulations show that the amount of sodium hydroxide added to the Bionpharma ANDA Product is between 0.030-0.032 mg/mL.  (Byrn Tr. 232; PTX-00492 at BION-ESOL-00001783; PTX-00494 at BION-ESOL- 00001852; PTX-00495 at BION-ESOL-0000001917)

182.    The preservative limitation in the claims requires 0.7 to 1.2 mg/mL sodium benzoate.

183.    Bionpharma's ANDA Product contains ███████████████████████████

████████████████████████████████████████████████ the claimed

range. ██████████████████████████████████████

## B. Buffer Limitation

184.    The parties agree that the buffer limitations are responsible for maintaining formulation pH.  (Byrn Tr. 235; Moreton Tr. 535)

185.    The specification confirms that the purpose of the buffer is to maintain the pH of

the liquid enalapril formulation. (Byrn Tr. 234; PTX-001 at 13:6-7)

186.     The parties agree that buffering agents as defined in the common specification maintain the pH of the enalapril liquid formulations of the patents-in-suit. (Byrn Tr. 235; Moreton Tr. 518; PTX-003 at 21:9-10)  The buffer protects enalapril during storage and also in the stomach after ingestion. (Moreton Tr. 535)

187.     A buffer's function in the claims is to maintain pH, beyond any pH maintenance provided by ███████████████████████████ (Moreton Tr. 535, 537)  The claims require a separate, independent buffer component, to maintain pH beyond any pH maintenance provided by any acid ████████████████ (Moreton Tr. 535-37)  Every example listed in the common specification uses only the enalapril maleate form of enalapril and no other forms of enalapril. (Moreton Tr. 538)  Drs. Moreton and Byrn agree there is no description in the common specification of enalapril formulations in which ████████████████████ ████████████████ erves as the buffer. (Byrn Tr. 430-31; Moreton Tr. 538)

188.     At the 18th step in the manufacturing process of Bionpharma's ANDA Product, sodium hydroxide is added. (Moreton Tr. 528-29; DTX-1092.50)  At that step, all the other components are in the formulation. (*Id.*)  When sodium hydroxide is added, it can react with ████████████████████████████ in Bionpharma's formulation, ███████████████████████████████████████████████ ███████████████████████████████████████████████ (Moreton Tr. 529-31)  If ████████████████████████████ then the amount of alleged buffer species ████████████████████ (*Id.*)

189.     There is no evidence that in the formulation of Bionpharma's ANDA Product, ███████████████████████████████████████████████ ███████████████████████████████████████████████

(Moreton Tr. 527-28)

190. Dr. Byrn admitted that he could have experimentally verified the existence of the alleged ██████████████████████ in Bionpharma's ANDA Product but chose not to. (Byrn Tr. 439)

191. Study 3 in the Pharmaceutical Development Report of Bionpharma's ANDA (DTX 1092.44-45) ("PDR") was performed in two samples of █████████████████ with no other excipients, and the concentration of ████████████████████ ██████████████ formulation at issue (Moreton Tr. 531-33; DTX 1092.44-45). In the study, the ████████████████████████████████ the pH changes were measured from pH 2.9 to 6.0. (DTX 1092.77)

192. The PDR graph does not show an appreciable ██████████████ buffer system in Bionpharma's ANDA Product as the experiment does not unequivocally demonstrate that ████████████████████ (Moreton Tr. 532-33) The experiment contained ████████████████████████ (*Id.*) The study concludes with the assertion that ███████████████████████████ (DTX- 1092.45) (emphasis added) Therefore, at most the graph shows the buffering of ██████████ ████████████████ Moreton Tr. 533) In addition, the experimental solution ████████████████████████████████ (Moreton Tr. 533)

193. Drs. Byrn and Moreton agreed that for a buffer to function properly, the strength of the weak acid component (i.e., its pKa) must be within a certain range of the formulation pH,

although they disagreed as to the breadth of that range. (Byrn Tr. 434-35; Moreton Tr. 519-22)

194.    Dr. Byrn conceded that ▮▮▮▮▮▮▮ has no acidic hydrogen with a pKa within plus or minus one of the pH of Bionpharma's ANDA Product. (Byrn Tr. 438)

195.    Dr. Byrn testified that a weak acid can function as a buffer within ±2 of the pKa of the weak acid. (Byrn Tr. 434-35) Dr. Byrn did not provide any support from literature for this opinion. (*Id.*) To the contrary, literature such as the Harris reference states that "outside of pKa ± 1 pH unit, there is not enough of either the weak acid or the weak base to react with added base or acid." (DTX-1087.12; *see also* DTX-1086.4; Byrn Tr. 434-35, 438)

196.    The Henderson-Hasselbalch Equation provides that in a liquid formulation, when the pH equals the pKa of the first acidic hydrogen on ▮▮▮▮▮▮▮ the two species – ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ – are at a ratio of approximately 1:1. (Byrn Tr. 432) Drs. Byrn and Moreton agreed that the pKa of the first acidic hydrogen ▮▮▮▮▮▮▮ (Byrn Tr. 432; Moreton Tr. 539) The pH of Bionpharma's ANDA Product is about 3.3 and is controlled between 3.2 and 3.6. (Byrn Tr. 432; Moreton Tr. 530)

197.    As the pH of an aqueous solution ▮▮▮▮▮▮▮ increases from 1.97 to 2.9 (approximate pH = 1 + pKa), there are ▮▮▮▮▮▮▮ in the solution. (Byrn Tr. 432-33; Moreton Tr. 538-40) As pH further increases to 3.3, there is very ▮▮▮▮▮▮▮ in Bionpharma's ANDA Product to neutralize any base added or generated over time. (Byrn Tr. 432-33; Moreton Tr. 540) Therefore, at a pH of 3.3, the ability of the alleged ▮▮▮▮▮▮▮ buffer to neutralize an added (or generated base) would be severely diminished. (Byrn Tr. 432-33; Moreton Tr. 540) Hence, the ▮▮▮▮▮▮▮ would not be an effective buffer in Bionpharma's ANDA Product. (Moreton Tr. 539-40; *see also* Byrn Tr. 433-34)

198.     The pKa of citric acid is 3.1, which is within ± 1 of pH of 3 to 3.5 for the formulation of the Asserted Claims and within the same distance from the pH of the Epaned® formulation. (Moreton Tr. 539; *see also* Byrn Tr. 160)

199.     The inventor, Dr. Mosher, explained that buffers in the claimed enalapril formulations help adjust and maintain the pH because the pKa of citric acid is approximately that of the solution. (Mosher Tr. 652-53)

200.     The concentration elements of the buffer limitation ("about 0.8 to about 3.5 mg/ml citric acid" and "about 0.1 to about 0.8 mg/ml sodium citrate") represent a range of buffer concentrations species – i.e., the concentration of actual weak acid and conjugate base species present and available to neutralize any acid or base added or generated over time. (Moreton Tr. 546-47) Dr. Moreton calculated the buffer species concentration for the claimed buffer limitations and for the accused ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in Bionpharma's ANDA Product. (Moreton Tr. 547-48) For this exercise, he assumed that Dr. Byrn is correct that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *(Id.)*

Even under this assumption, the claimed buffer limitations have, depending on the exact concentration of citric acid and sodium citrate used, anywhere between 2.24 and 10.5 times greater buffer species concentration than the accused ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ n Bionpharma's ANDA product. (Moreton Tr. 548-49) Dr. Byrn did not dispute the accuracy of Dr. Moreton's buffer species calculations. (Byrn Tr. 441-42)

201.     Again, there is no evidence that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the alleged buffer. (Moreton Tr. 527-28) Therefore, the concentration of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in solution is even smaller than hypothesized

by Dr. Byrn, so the difference between the total buffer species concentration of the claimed buffer and the alleged █████████████████████████ in Bionpharma's ANDA Product, and their respective buffer capacities, is even greater. (*Id.*)

202.    Consequently, the alleged █████████████████████ in Bionpharma's ANDA Product has substantially less buffer capacity than the buffer limitations of the claims require. (Moreton Tr. 548-50)

203.    The specification states that "[s]table as used herein refers to enalapril oral liquid formulations having about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of a given storage period." (PTX-003 at 18:41-45)

204.    Bionpharma does not contest that its product is stable. (Byrn Tr. 246; D.I. 157 Ex. 1 ¶ 49)

205.    Bionpharma and Silvergate agree that Bionpharma's ANDA Product is stable as defined in the Asserted Claims "at about 5 ± 3° C for at least 24 months." (Byrn Tr. 246; *see also* PTX-00485 at BION-ESOL- 00001758)

206.    The Asserted Claims and the patent specification do not include any mention of *in vivo* stability, which means stability in the body of a patient. (Byrn Tr. 257-58)

207.    Dr. Moreton admitted that neither the '987 nor '745 patent require that the formulation of the invention function to prevent enalapril degradation *in vivo*. (Moreton Tr. 415-16)

208.    Nevertheless, on April 3, 2017, Silvergate filed the Citizens' Petition, requesting that the FDA deny biowaiver requests for generic versions of Epaned®. (DTX-1068 at SLVGT-EPA_0002581) In the Petition, Silvergate stated that citric acid and sodium citrate "act together

to keep Epaned® (enalapril maleate) Oral Solution 1 mg/mL in a stable pH band (*e.g.*, impacting shelf life – stability) and are thought to protect enalapril, *after ingestion, from premature hydrolysis in the stomach's acidic environment*." (*Id.* at SLVGT-EPA_0002588) (emphasis added) That is, in the Petition Silvergate expressly represented to FDA that a separate buffer of citric acid/sodium citrate was important to protecting enalapril during storage *and* from premature hydrolysis after ingestion in the acidic environment and elevated temperatures in the stomach. (Beckloff Tr. 131-32; Moreton Tr. 542-45; DTX-1068.1, DTX-1068.8, DTX-1068.18; DTX-2159) Silvergate explained to the FDA that any reduction in the amount of buffer (citric acid/sodium citrate) could materially affect the dosing of enalapril. (DTX-1068.1, DTX-1068.8)

209.    The Handbook of Pharmaceutical Excipients explains that███████████ "is used in the pharmaceutical industry as a pH modifier and a buffering agent." (PTX-00497 at SLVGT-EPA_014306)

210.    Dr. Moreton admitted that the ██████████████████ in Bionpharma's ANDA Product may provide buffering capacity. (Moreton Tr. 571)

211.    Bionpharma's Travis Webb admitted that sodium hydroxide was chosen for Bionpharma's formulation because "it's a commonly used pH adjustor." (Webb Dep. Tr. 87) The Quality Overall Summary of Bionpharma's ANDA also states that sodium hydroxide is a functional component for the formulation pH because it is added to adjust the pH to a predetermined target. (PTX-00478 at BION-ESOL-00000246-47) Bionpharma's PDR similarly states that the pH adjustment is performed using 1.0N sodium hydroxide to adjust the final pH as needed. (PTX-00498 at BION-ESOL-00000606-07)

212.    The formulator of Bionpharma's ANDA Product, Travis Webb testified that in developing the ANDA Product formulation, the product was targeted to a pH range of 3.1 to 3.7.

(Webb Dep. Tr. 125-27; PTX-00478 at BION-ESOL-00000238)

213.    Bionpharma's PDR acknowledges that ██████████████████████

██████████████████████████████ (PTX-00498 at BION-ESOL-

00000622)

**C.    Preservative Limitation**

214.    The preservative limitation in the Asserted Claims requires about 0.7 to about 1.2 mg/mL of sodium benzoate.

215.    Bionpharma's ANDA Product does not contain sodium benzoate; it contains ████████████████████ (Moreton Tr. 553)

216.    Dr. Moreton agreed that an oral liquid formulation "will necessarily contain a preservative" in order to "mop up any stray microbes that would get in there." (Moreton Tr. 515-16)

217.    Travis Webb, the formulator of Bionpharma's ANDA Product, testified that ████████████████████ used as a preservative, and have the same function as the sodium benzoate in Silvergate's Epaned® product. (Webb Dep. Tr. 111-12) He further testified that ██████ selected for Bionpharma's ANDA Product solely because they are antimicrobial preservatives. (Webb Dep. Tr. 68, 77, 83-85)

218.    Usha Sankaran, Bionpharma's Associate Vice President of Regulatory Affairs, agreed that the function of ████████████████ in Bionpharma's ANDA Product is to be "antimicrobial preservatives." (Sankaran Dep. Tr. 207, 220-21)

219.    ████████████████ are structurally similar to sodium benzoate.

Each has the same core with different side chains:

Sodium Benzoate



(Byrn Tr. 270; PTX-00500 at SLVGT-EPA_0104311; DTX-1095.3; DTX-1096.3)

220. ████████████████████████████████████████
████████████████████ (Moreton Tr. 554-55)

221. ████████████ a different mechanism of action. They work in different ways than sodium benzoate and have different physical properties as well. (Moreton Tr. 555)

222. Sodium benzoate is inactive and has to be converted to benzoic acid, at a pH below 5, in order for it to exert its antimicrobial effects. (Moreton Tr. 555, 557; *see also* Byrn Tr. 160) The optimal pH for the antimicrobial activity of ████████████████████████ (Moreton Tr. 557)

223. A skilled formulator preparing an enalapril liquid formulation would have to consider the relative solubilities of the preservatives because she would have to tailor the manufacturing processes to the properties of the ingredients. (Moreton Tr. 557)

224. ██████████████████████████████████████ water. (Moreton Tr. 555-56; DTX-1095.5; DTX-1096.4) Solubility for ████████████ ████████████████████████████████ parts of water. (Moreton Tr. 556) Sodium benzoate on the other hand has higher solubility of 1 part per 1.8

parts of water. (*Id.*; DTX-1102.5) 

(Moreton Tr. 555-56; DTX-1095.5; DTX-1096.4) A formulator can get ▮▮▮▮ aqueous solution by using t▮ odium salts, as Silvergate did in its studies. (Moreton Tr. 556) A formulator can also dissolve ▮▮▮ in a ▮▮▮▮ as Bionpharma did. (*Id.*) Sodium benzoate does not need a ▮▮▮▮ (Moreton Tr. 556-57; DTX-1102.5)

225. ▮▮▮ ffective against ▮▮▮▮▮▮▮ ▮▮▮▮▮ considered by a POSA as ▮▮▮▮▮▮ (Moreton Tr. 559; DTX- 1084.1; DTX-1085.1-4; DTX-1090.1-2; DTX-1100.1)

226. Sodium benzoate, on the other hand, is only effective under acidic conditions, and the way in which it acts as a preservative is by entering the bacterial cell and inhibiting the fermentation of glucose. (Moreton Tr. 559; DTX1093.3; DTX-1099.1) Sodium benzoate is considered bacteriostatic and fungistatic, not bactericidal and fungicidal. (Moreton Tr. 559) It inhibits the growth of microorganisms but does not kill the microorganisms. (*Id.*)

227. Dr. Moreton testified that sodium benzoate has antimicrobial effects and exerts effects against yeast at a pH less than five. (Moreton Tr. 570-71)

228. Dr. Moreton also testified that, in the oral solution of the ANDA Product, the ▮▮▮▮▮▮▮▮▮▮ antimicrobial effects and exerts effects against yeast. (Moreton Tr. 571)

229. Bionpharma's ANDA Product maintains a pH between 3.2 and 3.6. The ▮▮▮▮▮▮ ffective at preventing microbial growth for the product ▮▮▮ ▮▮▮ (Byrn Tr. 261, 264-65; PTX-00478 at BION-ESOL-00000231, 258; PTX-00498 at BION-ESOL-00000606, 663)

230.    The Epaned® product shows that the sodium benzoate preservative demonstrates antimicrobial effectiveness. It meets the specifications of the United States Pharmacopeia ("USP") methods <51>, <61>, and <62>, and has both antimicrobial and antifungal effects. The Epaned® solution shows an absence of Escherichia coli, or E. coli. (Byrn Tr. 267-68; PTX- 480 at SLVGT-EPA_0003225)

231.    Bionpharma's ANDA Product shows substantially similar efficacy with █████████. █████████████████████████████ The antimicrobial effectiveness meets the same requirements of the USP <51>, <61>, and <62>. Bionpharma's ANDA Product also has an absence of E. coli. (Byrn Tr. 268-69, 272; PTX-00498 at BION-ESOL-000000668)

232.    Freezing would be another way of killing bacteria or preventing its growth and would be substantially different from the chemical action of sodium benzoate and █████████████████████ (Byrn Tr. 272-73)

## X.    Facts Relating To Indirect Infringement

233.    Bionpharma's proposed label instructs healthcare workers to use Bionpharma's ANDA Product to treat heart failure and left ventricular dysfunction in a therapeutically effective amount. (Mahan Tr. 932-34; D.I. 157 Ex. 1 ¶ 52)

234.    Dr. Mahan testified that the label will instruct "the prescriber . . . about the indications and use, the dosage administration, the side effects, and all aspects that would be important in using this medication with patients." (Mahan Tr. 932-33)

235.    Left ventricular dysfunction is equivalent to asymptomatic left ventricular dysfunction. (Mahan Tr. 934)

236.    The only indications for which Bionpharma's ANDA Product may be prescribed are hypertension, heart failure, and left ventricular dysfunction. (Mahan Tr. 934-35)

## LEGAL STANDARDS

### I.     Burden of Proof

The patent owner has the burden of proving infringement by a preponderance of the

evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir.

1988). This same burden of proof applies to both direct and indirect infringement. *See id.*; *see*

*also Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) (induced

infringement).

### II.     Infringement

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells

any patented invention, within the United States . . . during the term of the patent." 35 U.S.C.

§ 271(a). Courts employ a two-step analysis in deciding infringement. *See Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, a court must construe the

asserted claims. *See id.* Next, the trier of fact must compare the properly-construed claims to the

accused infringing product. *See id.*

A patent owner may prove infringement under two theories: literal infringement or the

doctrine of equivalents. Literal infringement occurs when "every limitation in a patent claim is

found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570,

1575 (Fed. Cir. 1995). Infringement under the doctrine of equivalents occurs when the accused

product embodies every element of a claim either literally or by an equivalent. *See id.* This

doctrine "allows the patentee to claim insubstantial alterations that were not captured in drafting

the original patent claim but which could be created through trivial changes." *Festo Corp. v.*

*Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002).

48

## A. Doctrine of Equivalents

The Supreme Court has explained that the "scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Id.* Two frameworks are available for application of DOE: (1) the "function-way-result test," which asks whether the accused product performs "'substantially the same function in substantially the same way to obtain the same result'" as the patented invention; and (2) the "insubstantial differences test," which asks "whether the accused product or process is substantially different from what is patented." *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866-67 (Fed. Cir. 2017) (quoting *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950)).[7]

"[T]he 'all elements' rule informs a DOE analysis by requiring that equivalence be assessed on a limitation-by-limitation basis, rather than from the perspective of the invention as a whole, and that no limitation be read completely out of the claim." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1017 (Fed. Cir. 2006). A determination of infringement under the doctrine of equivalents presents a question of fact. *See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).

---

[7] The Supreme Court has also stated:

> The particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention? ... An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 (1997).

## B.    Limitations On DOE

The doctrine of equivalents is circumscribed by important limitations, several of which are involved in the instant action: prosecution history estoppel, disclosure-dedication, and claim vitiation.

### 1.    Prosecution history estoppel

As the Federal Circuit recently explained,

> Prosecution history estoppel arises when a patent applicant narrows the scope of his claims during prosecution for a reason "substantial[ly] . . . relating to patentability." A narrowing amendment is presumed to be a surrender of all equivalents within "the territory between the original claim and the amended claim." This presumption can be overcome if the patentee can show that one of the following "exceptions" to prosecution history estoppel applies: (1) the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; (2) the equivalent was unforeseeable at the time of the application; or (3) there was some other reason suggesting that the patentee could not reasonably be expected to have described the equivalent. "[W]hether prosecution history estoppel applies, and hence whether the doctrine of equivalents may be available for a particular claim limitation, presents a question of law." In making this determination, we must "look to the specifics of the amendment and the rejection that provoked the amendment to determine whether estoppel precludes the particular doctrine of equivalents argument being made."

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1364 (Fed. Cir. 2020) (internal citations omitted).

In addition to estoppel based on narrowing claim amendments, prosecution history estoppel may also arise from "arguments made during prosecution of the application to secure the allowance of claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1350 (Fed. Cir. 2002). "Any argument-based estoppel affecting a limitation in one claim will also extend to all claims in which that limitation appears." *Id.*

### 2. Disclosure dedication

Judge Connolly recently summarized the disclosure-dedication doctrine:

> Under the disclosure-dedication doctrine, a patentee can disclaim
> an equivalent by disclosing the equivalent in the written
> description but not claiming it. *SanDisk Corp. v. Kingston Tech.
> Co.*, 695 F.3d 1348, 1363 (Fed. Cir. 2012). The disclosure-
> dedication doctrine provides:
>
>> [W]hen a patent drafter discloses but declines to
>> claim subject matter . . . this action dedicates that
>> unclaimed subject matter to the public. Application
>> of the doctrine of equivalents to recapture subject
>> matter deliberately left unclaimed would conflict
>> with the primacy of the claims in defining the scope
>> of the patentee's exclusive right.
>
> The doctrine "does not mean that any generic reference in a written
> specification necessarily dedicates all members of that particular
> genus to the public." Rather, for the disclosure-dedication doctrine
> to apply, "the disclosure must be of such specificity that one of
> ordinary skill in the art could identify the subject matter that had
> been disclosed and not claimed." Furthermore, "before unclaimed
> subject matter is deemed to have been dedicated to the public, that
> unclaimed subject matter must have been identified by the patentee
> as an alternative to a claim limitation." Thus, "[t]he proper inquiry
> is whether one of ordinary skill in the art could identify which
> subject matter has been disclosed and which subject matter has
> been claimed."

*Eagle Pharm., Inc. v. Slayback Pharma LLC*, 382 F. Supp. 3d 341, 344-45 (D. Del. 2019), *aff'd*,

958 F.3d 1171 (Fed. Cir. 2020) (internal citations omitted).

### 3. Claim vitiation

As the Federal Circuit further explained in *Bio-Rad*,

> Claim vitiation presents another bar to a finding of infringement
> under the doctrine of equivalents. "[S]aying that a claim element
> would be vitiated is akin to saying that there is no equivalent to the
> claim element in the accused device based on the well-established
> 'function-way-result' or 'insubstantial differences' tests." More
> recently, we have explained that vitiation "is not an exception or
> threshold determination that forecloses resort to the doctrine of

51

equivalents, but is instead a legal conclusion of a lack of equivalence based on the evidence presented and the theory of equivalence asserted."

967 F.3d at 1366-67 (internal citations omitted).

## C. Indirect infringement

In addition to direct infringement, a patentee may show that an accused infringer is liable for indirect infringement. One form of indirect infringement is induced infringement, which requires a showing of direct infringement as well as that "the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009). Another form of indirect infringement is contributory infringement. To show contributory infringement, a patentee must prove, in addition to direct infringement, "the accused infringer had knowledge of the patent," "the component has no substantial non-infringing uses," and "the component is a material part of the invention." *Fujitsu Ltd. v. Netgear, Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

## DISCUSSION

## I. Direct Infringement

The parties agree that Bionpharma's ANDA Product does not literally infringe any of the Asserted Claims. Silvergate asserts that Bionpharma infringes under the doctrine of equivalents. Only two claim limitations are in dispute: the buffer limitation and the preservative limitation. As explained below, Silvergate cannot and/or has not proven that Bionpharma's ANDA Product meets either of these limitations.

## A. The Buffer Limitation

The "buffer limitation" appears in all of the Asserted Claims. The "buffer limitation" requires the presence of "a buffer comprising about 0.8 to about 3.5 mg/ml of citric acid and about 0.1 to about 0.8 mg/ml sodium citrate." Bionpharma's product contains no citric acid and no sodium citrate. (D.I. 176 at 7) (citing ANDA No. 212408 at tbl. 2.3.P.1-1) Silvergate contends that █████ in the ANDA Product ███████ , which is equivalent to the buffer of the claims. (*Id.* at 3) Bionpharma counters that Silvergate is barred from proceeding on a theory of DOE and, in any event, its product contains no buffer at all.

### 1. Prosecution history estoppel

No asserted patent has any significant prosecution history. Only the formerly-asserted and related '008 patent does. Both parties' experts identified the same five prosecution events from which the Court must determine if prosecution history estoppel applies:

1. In March 2016, Silvergate filed the '603 application (which became the '008 patent), claiming oral liquid formulations of enalapril in 20 claims, including three independent claims.

2. In September 2016, the Examiner issued a first office action rejecting all claims as obvious.

3. In October 2016, Silvergate held an interview with the Examiner, distinguishing its claims from the prior art.

4. In January 2017, the Examiner issued a second office action, again rejecting the claims for obviousness.

5. In February 2017, Silvergate amended its claims to distinguish its invention from the prior art.

Because each of the Asserted Patents derives priority from one common application, they necessarily share the same prosecution history. To Bionpharma, therefore, the prosecution

history of the application that became the '008 patent is representative of each asserted patent; and because, in Bionpharma's view, prosecution history estoppel attaches to the '008 patent, it attaches to each of the Asserted Patents. (*See* C.A. No. 19-1067 D.I. 176 at 6) Silvergate has no substantive response on this point, noting only (in a footnote) that it "disagrees." (D.I. 205 at 13 n.7)

Bionpharma is correct. "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999).[8] Neither of the later-filed Asserted Patents has any substantive prosecution history. Therefore, any estoppel attaching to the '008 patent must likewise attach to the remaining Asserted Patents.

### a. Amendment-based estoppel

In determining whether amendment-based estoppel applies, the Court follows the four-step test first articulated by the Federal Circuit in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1366-67 (Fed. Cir. 2003) (en banc). When there is (1) a narrowing amendment (2) made for the purposes of patentability, the Court assesses whether the alleged equivalent is (3) within the scope of the surrendered subject matter and (4) whether an exception applies. *See id.* It is Bionpharma's burden, as the accused infringer, to prove that a narrowing amendment occurred; the remaining inquiries must be proven by Silvergate, as the patentee. *See id.*

Bionpharma has proven that Silvergate made a narrowing amendment. As originally

---

[8] In the context of divisional applications, the Federal Circuit has also stated: "In prosecuting a related application the applicant is not barred from raising new arguments or correcting past errors." *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1141 (Fed. Cir. 2003). The asserted patents are continuations, not divisionals. (D.I. 176 at 6)

54

submitted in March 2016, the buffer limitations of the independent claims of the '603 application read as follows:

- Claims 1 and 12: a buffer of "about 1.82 mg/mL of citric acid"
- Claim 20: a buffer of "about 1.82 mg/mL of citric acid and about 0.15 mg/mL of sodium citrate dihydrate"

After the Examiner's September 2016 obviousness rejection, October 2016 interview, and January 2017 obviousness rejection, Silvergate amended the claims in February 2017 so that all three independent claims required "a buffer comprising about 1.82 mg/mL of citric acid and about 0.15 mg/mL of sodium citrate dihydrate." This narrowed the scope of claims 1 and 12. Prior to amendment these claims required *solely* 1.82 mg/mL of citric acid, while after amendment these same claims required *both* 1.82 mg/mL of citric acid *and* 0.15 mg/mL of sodium citrate dihydrate. Embodiments containing citric acid but not sodium citrate dihydrate would infringe the original claims but would not infringe the amended claims. Claim scope, therefore, was narrowed.

Silvergate is correct that amendments which merely "make express what had been implicit in the claim as originally worded" are not narrowing. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1377 (Fed. Cir. 2001). That is not, however, a fair characterization of the amendment here. Silvergate's argument is that "citric acid and sodium citrate dihydrate dissociate to the same species." (D.I. 179 at 11) The chemistry presented at trial establishes that, on this point, Silvergate is correct about what occurs in the composition. That is, pre- and post-amendment, at a certain time while practicing the claims, one has both citric acid and sodium citrate dihydrate, whether one starts with both components or starts only with citric acid. (*See, e.g.*, Byrn Tr. 156-57) Even so, the amendment is narrowing because a formulation starting with just citric acid could have infringed prior to amendment but could not

55

infringe after amendment.

Moreover, as Bionpharma correctly states: "Silvergate and its expert have come forward with *no evidence* that formulations falling with the scope of the original claim 1 of the '603 application *inherently contain* what was added via amendment, 'about 0.15 mg/mL sodium citrate dihydrate' without altering the specific concentration (about 1.82 mg/mL) of citric acid required by the claims." (D.I. 189 at 21 n.6)

Additionally, the relative concentrations of the components are different, and narrower in scope, in the amended claims as compared to in the original claims. Pre-amendment, "if you have 1.82 milligrams of citric acid, that is going to equilibrate to a certain proportion when the pH is 3.5." (Byrn Tr. 157) But post-amendment, "[i]f you add in another .15 milligrams sodium citrate, maybe that brings it up to 1.9 something." (*Id.*) Thus, although "you are going to have the *same molecules* in the *same ratio*," you will nonetheless have "slightly different *amounts*" of those molecules present. (*Id.*) (emphasis added) That narrows the claim. (*See* D.I. 219 at 5) ("Thus, the amendment to the buffer limitation narrowed the scope of the application claims by requiring the addition of 'about 0.15 mg/ml sodium citrate dihydrate,' which means that, post-amendment, the claims require a higher concentration of citric acid and sodium citrate than what was required pre-amendment, which, in turn, means that, post-amendment, the claims require a higher buffer species concentration and thus higher buffer capacity.") (internal emphasis omitted)

Indeed, pre-amendment, a formulator could have used any quantity of sodium citrate in conjunction with the claimed 1.82 mg/ml citric acid to result in any amount of sodium citrate following dissociation. But post-amendment, only the quantities captured in the claim – 1.82 mg/ml *and* 0.15 sodium citrate – suffice. Hence, again, the post-amendment claims are

56

narrower.

Silvergate also argues that the amendment was made for "clarity," suggesting this (if true) somehow means it could not have been narrowing. (*See, e.g.*, D.I. 179 at 12-13, 15) Other than Dr. Byrn's conclusory speculation (*see* Bryn Tr. 292), there is no evidence to support the view that the amendment was made for clarification. Even if there were such evidence, a "clarifying" amendment that also, as here, plainly narrows the scope of a claim would, nonetheless, be a narrowing amendment for estoppel purposes.

Moving to the next step in the estoppel analysis, the Court concludes that the amendment was made for the purposes of patentability. Where there is an expressed reason for the narrowing amendment, such as "a substantive change to [the] claim that clearly responds to an examiner's rejection of that claim as unpatentable over prior art," then "prosecution history estoppel applies to that claim; only the question of the scope of the estoppel remains. No presumption needs to be applied in such a case because the reason for the amendment is clear." *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1355 (Fed. Cir. 1988). Where, instead, "the prosecution history reveals no reason for the narrowing amendment," *Festo*, 344 F.3d at 1366, the Court "presumes that the patentee had a substantial reason relating to patentability."

Here, Silvergate's narrowing amendment was made in response to the Examiner's obviousness rejections. Twice during prosecution, the Examiner rejected Silvergate's claims as obvious. One of the rejected claims, '603 application claim 20, already included the "0.15 mg/mL sodium citrate dihydrate" limitation. In Silvergate's view, then, "adding the same sodium citrate language that was already found in rejected claim 20 to claims 1 and 12 could not have overcome the obviousness rejection, and thus could not have been related to patentability." (D.I. 179 at 14) The Court disagrees.

Silvergate made clear that it was the specific concentration of citric acid *and* sodium citrate that distinguished its invention from the prior art. For example, the Examiner, in her pre-interview communication, suggested Silvergate should "present[] evidence demonstrating criticality of the selection of the amounts and specific ingredients" to overcome the prior art. (PTX-005 at SLVGT-EPA_0000818) Post-interview, the Examiner suggested that Silvergate demonstrate how "the amounts of the components taught by [the prior art] *are different from the amounts recited in the instant claims*." (*Id.* at SLVGT-EPA_0000837) (emphasis added) In response, Silvergate did exactly that, arguing that "the cited references have not provided any reason to single out the specific components at the requisite concentrations for a pharmaceutical liquid recited in the instant claims." (*Id.* at SLVGT-EPA_0000863) Silvergate added: "Nowhere does the prior art teach or suggest that a combination of enalapril, citric acid, sodium citrate, sodium benzoate, sucralose and water *at the recited concentrations* . . . would have resulted in such a dramatic stabilization of enalapril." (*Id.* at SLVGT-EPA_0000878) (emphasis added) Further confirming the importance of the "0.15 mg/mL of sodium citrate dihydrate" to patentability is a post-amendment interview summary, in which Silvergate expressed its "understanding that the Examiners appreciated the superior stability *provided by the components and pH as recited in the claims*." (*Id.* at SLVGT-EPA_0000944) (emphasis added)

In repeatedly relating its unexpected stability results to the *specific* concentrations of *specific* ingredients in the amended claims, Silvergate necessarily made the identity and concentration of its ingredients central to overcoming the obviousness rejection. Silvergate has not met its burden to show otherwise. *See Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1357-58 (Fed. Cir. 2013) (stating this burden is on patentee). [9]

_____

[9] In the alternative, the Court would apply the presumption that Silvergate made the amendment for a "substantial reason relating to patentability." *Festo*, 344 F.3d at 1366. Because Silvergate

The Court, thus, turns to the third step of the estoppel analysis, determining the scope of the surrendered material. A narrowing amendment is presumed to be a surrender of all equivalents within "the territory between the original claim and the amended claim." *Festo*, 535 U.S. at 740.

Silvergate contends that the scope of surrender (if any) is extremely narrow. To Silvergate, the applicant, at most, disclaimed only buffers that fall within the space between "1.82 mg/mL of citric acid" and "1.82 mg/mL of citric acid and 0.15 mg/mL of sodium citrate dihydrate." The Court disagrees. Instead, as Bionpharma persuasively argues, "[t]hrough its amendment, Silvergate sought to exclude formulations that do not contain sodium citrate at the requisite concentration, which includes Bionpharma's ANDA product." (D.I. 176 at 24) In other words, Silvergate overcame the obviousness rejections by adding to independent claims 1 and 12 – and better explaining to the Examiner the importance of the narrower buffer limitation already contained in independent claim 20 – a specific amount of sodium citrate dihydrate, which alters the relative concentration of citric acid and sodium citrate in the final formulation. In doing so, Silvergate was touting the crucial importance to its invention of the presence of sodium citrate at a specific concentration. In this way, Silvergate disclaimed all formulations not containing *both* 1.82 mg/mL of citric acid *and* 0.15 mg/mL of sodium citrate dihydrate. Alternatively, at minimum, Silvergate has failed to meet its burden to prove, instead, that Silvergate by its amendment only disclaimed the more circumscribed amount of claim scope for which it now argues.

---

has not proven that the amendment was made for a reason *not* relating to patentability – and the Court finds no support in the prosecution history itself for Silvergate's position on this point – Silvergate fails to meet its burden at this step of the estoppel test, regardless of whether the Court concludes (i) the amendment was made for a reason relating to patentability or (ii) the record is silent.

Finally, Silvergate has also failed to persuade the Court that its amendment bears no more than a tangential relation to Bionpharma's accused equivalent.[10] *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F3d. 1304, 1315 (Fed. Cir. 2008) ("To rebut the estoppel presumption with tangentiality, a patentee must demonstrate that the rationale underlying the amendment bore no more than a tangential relation to the equivalent in question, or, in other words, that the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent."). The crux of the tangentiality inquiry is "the patentee's objectively apparent reason for the narrowing amendment . . . [as] discernible from the prosecution history record." *Festo*, 344 F.3d at 1369. Here, the objectively apparent reason for the narrowing amendment that emerges from the prosecution history is that both the identity and concentration of *both* components of the claimed buffer – "about 1.82 mg/mL of citric acid" *and* "about 0.15 mg/mL of sodium citrate dihydrate" – are important to maintaining the long-term stability of the overall composition. It follows that the amendment bears *more than a tangential relationship* to the accused equivalent, ▮▮▮▮▮▮▮▮ just as it bears more than a tangential relationship to all potential equivalent buffers that omit citric acid and sodium citrate dihydrate. Silvergate has failed to meet its burden to prove its contrary view the amendment was "unrelated to buffers generally, let alone to ▮▮▮▮▮▮▮▮▮" (D.I. 179 at 17)

Accordingly, the Court concludes that amendment-based prosecution history estoppel precludes Silvergate from proving that Bionpharma's ANDA Product meets the buffer limitation of the Asserted Claims due to the presence in Bionpharma's product of ▮▮▮▮▮▮

### b. Argument-based estoppel

To give rise to argument-based estoppel, a patentee's statements must clearly and

---

[10] Tangentiality is the only exception Silvergate contends applies.

unmistakably surrender subject matter. *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008); *see also Intendis GmbH v. Glenmark Pharms. Inc.*, 822 F.3d 1355, 1365 (Fed. Cir. 2016) (internal quotation marks omitted) ("Argument-based estoppel only applies when the prosecution history evince[s] a clear and unmistakable surrender of subject matter."). "[W]hether or not actually required to secure allowance of the claim," an argument that is nonetheless clear and "made during prosecution in support of patentability" may create an estoppel against assertion of the doctrine of equivalents. *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1368 (Fed. Cir. 2007) (internal citations omitted). In determining whether that clear and unmistakable surrender has occurred, "[t]he relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Id.*

Here, as Dr. Moreton persuasively explained, a reasonable competitor would interpret Silvergate's statement that "the formulation of the present claims has only *four* ingredients along with enalapril and water" as a disclaimer of formulations that *do not* contain only those four specific ingredients at the claimed concentrations, along with enalapril and water. (Moreton Tr. 512-13) (discussing PTX-005 at SLVGT-EPA_0000873) Bionpharma's ANDA Product contains at least six ingredients, not just four, and does not contain three of the four ingredients (citric acid, sodium citrate, sodium benzoate) which Silvergate told the Examiner were among the only necessary ingredients. (Moreton Tr. 512-13) (discussing PTX-005 at SLVGT-EPA_0000873 and arguing that "additional excipients in the other formulations are not needed or contemplated in the claimed enalapril liquid formulations as *none of them are needed or necessary* to produce an enalapril liquid formulation of the present claims that is stable and homogenous") (emphasis added)

Silvergate contends that it was only distinguishing prior art and not narrowly defining its

own terms. When an applicant's argument is meant to distinguishes one's invention from the prior art, the scope of that distinction must be considered. *See, e.g.*, *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382-83 (Fed. Cir. 2005). In *AquaTex*, for example, the patentee distinguished its invention from the prior art by suggesting that the prior art did not "teach[] or suggest[] the overall composition of materials" in the patented claims. *Id.* at 1383. Similarly, in *Eagle Comtronics, Inc. v. Arrow Comm'cn Labs., Inc.*, 305 F.3d 1303, 1316 (Fed. Cir. 2002), the patentee "repeatedly distinguished the prior art" by arguing that the prior art did not "teach[] or suggest[]" its specific invention, in an "attempt[] to distinguish the claimed seal location from the location found in the prior art." In both *AquaTex* and *Eagle Comtronics*, however, no estoppel arose because the patentee did not surrender *all* subject matter; instead, the patentee only pointed out differences between her invention and the prior art. *See AquaTex*, 419 F.3d at 1383; *Eagle Comtronics*, 305 F.3d at 1316.

Bionpharma has persuaded the Court that this is not what occurred here. Instead, in full context, a POSA would understand that Silvergate clearly and unmistakably disclaimed embodiments not containing citric acid and sodium citrate buffers. Silvergate overcame the Examiner's obviousness rejections by pointing to the specific concentrations and identity of its specific ingredients, including its two-component buffer of citric acid and sodium citrate. (*See, e.g.*, FF ¶¶ 111-29)

In the prosecution history, Silvergate repeatedly references the "requisite concentrations" of the components of its invention, and the specificity and combination of ingredients. (*See, e.g.*, FF ¶ 115) As Silvergate now emphasizes, these references are all made in the context of Silvergate's overall response to the Examiner's obviousness rejection and, specifically, were aimed at persuading the Examiner that she had not made even a *prima facie*

case of obviousness. Silvergate insists that it "never argued that those 'only four ingredients' were critical to overcoming the prior art; rather Silvergate contrasted the number of ingredients in the prior art to the number of ingredients in the claimed formulation to bolster Silvergate's arguments regarding the lack of a *prima facie* case for obviousness." (D.I. 205 at 16)

It is true, as Silvergate emphasizes, that the patentee's "[a]rguments must be viewed in context," *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 824-25 (Fed. Cir. 1992); *see also Galderma Labs., L.P. v. Amneal Pharm. LLC*, 806 F. App'x 1007, 1010 (Fed. Cir. 2020) ("Statements by the patent owner are not considered in a vacuum; rather, the skilled artisan would look at the record as a whole in assessing claim scope."), but Silvergate is not correct that a reasonable competitor, viewing Silvergate's statements in the full context of the entire prosecution history, would fail to understand that Silvergate was disclaiming embodiments that lacked citric acid and sodium citrate, for the reasons stated above.

In the Court's view, a POSA (just like a reasonable competitor) would have understood Silvergate's arguments – although couched in terms of explaining how there was not even a *prima facie* showing of obviousness, for reasons including the lack of a motivation to combine prior art references to arrive at the claimed invention – as clearly and unmistakably disclaiming buffers not containing citric acid and sodium citrate dihydrate at the claimed concentrations.

For all of these reasons, the Court concludes that Silvergate is barred by argument-based estoppel from alleging that Bionpharma's ANDA Product, which does not contain citric acid or sodium citrate, meets the buffer limitation.[11]

---

[11] To the extent the parties make arguments in the context of amendment-based estoppel that also apply to argument-based estoppel, the Court's analysis of such arguments should also be understood to apply in whatever context the parties have made them.

63

## 2. Silvergate failed to prove DOE infringement of the buffer limitation

Even if Silvergate were not estopped from proceeding with its theory that Bionpharma's ANDA Product infringes the buffer limitations under the doctrine of equivalents – which it is – the Court would find no infringement for the additional reason that Silvergate has failed to prove, by a preponderance of the evidence, that Bionpharma's product contains a buffer equivalent to the buffer of the Asserted Claims. Silvergate has failed to prove that the accused ANDA Product even contains a buffer. Silvergate has also failed to prove that, even assuming the product has a buffer, any buffer in the ANDA Product is equivalent to the claimed citric acid-sodium citrate buffer under the function-way-result or insubstantial differences tests.

First, Silvergate has failed to prove that Bionpharma's ANDA Product has a buffer. As used in the invention, a buffer "maintains the pH of the liquid enalapril formulation." (PTX-003 at 13:16-19) There are two ways to make a buffer. The first is to mix a weak acid and its conjugate base together in solution. (Byrn Tr. 218-19) When mixed, the weak acid and conjugate base will equilibrate in solution and then function as a buffer within a certain pH range. (*Id.*) The second method of creating a buffer is to mix a weak acid with a substoichiometric amount of sodium hydroxide. (Byrn Tr. 219) Bionpharma's ANDA Product does not make use of a weak acid-conjugate base buffer system. (Byrn Tr. 228-29) Nor does it explicitly contain a weak acid-sodium hydroxide buffer. (*Id.*) It follows, then, that Bionpharma's ANDA Product does not contain a buffer. (*See* Moreton Tr. 537 (opining that ███████████████ 540 (███████████ not an effective buffer for enalapril formulation."), 550 (opining that █████████████████████████ ███

Silvergate argues that, notwithstanding the fact that Bionpharma's ANDA Product does not involve either of the two methods for creating a buffer, the accused product nonetheless contains a buffer that is derived from chemical dissociation of the active ingredient in Bionpharma's ANDA Product. (Byrn Tr. 228) According to Silvergate, the buffer system in Bionpharma's ANDA Product is ███████ ██████████████████████████████

████████ ████████████████████████████████████ ████████████████████

████████████████ (Byrn. Tr. 229-30)

Silvergate has failed to prove by a preponderance of the evidence that this is what occurs in Bionpharma's product. Dr. Byrn conducted no tests to confirm the presence or quantity of the purported ███████ Instead, as Bionpharma's Dr. Moreton persuasively explained, Dr. Byrn simply assumed ███████████████████████████. (Moreton Tr. 528) Silvergate's absence of evidence is all the more glaring given that Bionpharma presented evidence (on an issue on which it lacks any burden) that sodium hydroxide – which, during the preparation of Bionpharma's ANDA Product, is added last – may be reacting with other, ███████████████ ███████ constituents in yielding the final product. (Moreton Tr. 528-31)

In support of its buffer creation theory, Silvergate also points to a titration curve in Bionpharma's ANDA, which details ███████████████████████ in water. (*See* DTX-1092) But the study in which the curve is reported is not representative of Bionpharma's ANDA Product. (Moreton Tr. 531-32) Instead, the compositions involved in the study omitted the components present in Bionpharma's ANDA Product and used a ████████████████████ ███████████████ than is present in Bionpharma's actual ANDA Product. (Moreton Tr. at 531-34) In short, Silvergate's evidence falls far short of proving that the inclusion of ████████ ███████ necessarily "maintains the pH of the liquid enalapril formulation" as contemplated by

the patent.

Furthermore, Bionpharma's alleged ▓▓▓▓▓ buffer cannot be a functioning buffer. At the claimed pH formulation range of 3.0-3.5, the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ have pKas outside the pH range of ±1 of the formulation, which would render it ineffective as a buffer. That is, the Court is persuaded by Dr. Moreton that the effective pKa range is ±1, not ±2 as Dr. Byrn asserted (but for which he did not provide corroborating evidence). (*See* Byrn Tr. 222, 435, 437-39; Moreton Tr. 519-24; *see also* DTX-1086.4-5; DTX-1087.11-13)[12] ▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Moreton Tr. 539) Neither of these are within ±1 pH of the claimed formulation pH of 3.0-3.5. Therefore, again, Silvergate has failed to prove that Bionpharma's ANDA Product contains a buffer.

Even assuming, contrary to the Court's conclusions, that the accused product's

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ constitutes a buffer, Silvergate has additionally failed to prove that this buffer is equivalent to the claimed citric acid-sodium citrate buffer. This conclusion follows whether one applies the function-way-result or insubstantial differences tests.

The function of a buffer in the invention of the Asserted Patents is, as both parties agree, to "maintain the pH of the liquid enalapril formulation." (PTX-003 at 13:16-19) There is no evidence that the pH of the liquid enalapril formulation in Bionpharma's ANDA Product is not maintained. In assessing function for purposes of DOE, however, more is required than simply maintaining pH.

Silvergate submitted to the FDA a Citizen Petition asserting that part of the function of

---

[12] Although both experts are POSAs, Dr. Moreton's experience with drug formulation – and Dr. Byrn's lack of experience – made Dr. Moreton more persuasive on several key disputed points. The Court also agrees with Bionpharma that Dr. Byrn's refusal to concede that "the addition of sodium citrate to the buffer limitations during prosecution was a narrowing amendment" undermined his credibility. (D.I. 176 at 14)

the buffer is to preserve stability of the formulation *in vivo*. (DTX-1068 at 8) ("These buffering agents act together to keep Epaned® . . . in a stable pH band . . . *and are thought to protect enalapril, after ingestion, from premature hydrolysis in the stomach's acidic environment*.") (emphasis added) While there is no *in vivo* stability limitation in the Asserted Claims (Byrn Tr. 257-258; Moreton Tr. 415-416), the Federal Circuit has "never held that a patent must spell out a claim element's function, way, and result in order for the doctrine of equivalents to apply as to that element," *Intendis*, 822 F.3d at 1362. Instead, "[t]he relevant inquiry is what the claim element's function in the claimed composition is to one of skill in the art, and a fact finder may rely on extrinsic evidence in making this factual determination." *Id.*

The Court agrees with Bionpharma that the function as understood by a POSA for purposes of the function, way, result test must include preserving stability of the formulation *in vivo*, consistent with Silvergate's own Citizen Petition. In that petition, Silvergate could hardly have been clearer, writing: "Any change in the amount of citric acid or sodium citrate, removal of one or more [of] these non active-ingredients, *or replacement with different buffering components*, could materially affect the amount of enalapril that gets hydrolyzed in the stomach to the minimally bioavailable enalaprilat." (DTX-1068 at 8) (emphasis added) There is no evidence whatsoever that Bionpharma's accused buffer performs the function of increasing bioavailability of enalapril; absent that evidence, the Court does not find equivalence. Accordingly, Silvergate has failed to prove that the purported buffer in Bionpharma's ANDA Product satisfies the function portion of the function, way, result test.

Silvergate has also failed to show that the accused buffer performs in substantially the same way as the claimed buffer. The applicable "way" must be more than just Silvergate's broadly articulated "by absorbing excess ions" (D.I. 179 at 25), which would apply to all buffers

67

(Moreton Tr. 517; D.I. 206 at 13) – but Silvergate has not claimed *all* buffers. Looking more closely at how the claimed composition and the accused ANDA Product perform, the record establishes that the buffer species concentration of the claims range from $4.55*10^{-6}$ mols to $2.13*10^{-5}$ mols of buffer species while, by contrast, Bionpharma's ANDA Product contains only approximately ▓▓▓▓ mols of buffer species. (Moreton Tr. 547-48) Thus, Bionpharma's ANDA Product, if has a buffer, contains somewhere between ▓▓▓▓▓▓▓▓▓▓▓ buffer species than the claimed buffer, indicating that it functions in a substantially different way than the claimed buffer. (Moreton Tr. 548-49) Silvergate asserts, but has not proven, that this difference does not matter. (*See, e.g.*, D.I. 205 at 9) Instead, the Court concludes that Silvergate has failed to meet the way prong of the test.

Given the Court's conclusions with respect to the function and way components, there is no need to address the result prong.

Finally, the Court's conclusion that Silvergate has failed to meet its burden is the same when applying the insubstantial differences test. For at least the reasons stated above, Bionpharma's accused buffer operates substantially differently than does the claimed buffer. Bionpharma's alleged buffer, therefore, is not insubstantially different.

Accordingly, Silvergate has failed to prove infringement of the buffer limitation.[13]

### B.  Preservative Limitation

Determining whether Silvergate proved that the "preservative limitation" of the Asserted Claims is met, under the doctrine of equivalents, by Bionpharma's ANDA Product requires assessing whether the accused product contains a substantial equivalent to the claimed "about 0.7 to about 1.2 mg/mL sodium benzoate." It is undisputed that the Bionpharma ANDA Product

---

[13] The Court need not reach Bionpharma's claim vitiation defense.

does not contain sodium benzoate. (D.I. 157 Ex. 2 ¶ 42) Instead, the preservative in the accused

product is ███████████████████████████ (DTX-1079.3 tbl. 2)

Bionpharma argues that its ██████████████████████████ cannot

be found to infringe under the doctrine of equivalents because this embodiment was dedicated to

the public. Bionpharma additionally contends that Silvergate has failed to prove, in any event,

that its preservative is equivalent to the claimed preservative. The Court agrees that Silvergate

disclosed and dedicated a █████████████████████████ preventing

Silvergate from asserting infringement by equivalents based on that embodiment. The Court will

not address whether Silvergate's infringement case also fails for lack of evidence.

The disclosure-dedication doctrine acts as a limitation on the doctrine of equivalents,

foreclosing infringement theories with respect to equivalents that are described in the patent

specification but not claimed. A putative equivalent is disclosed and dedicated when it is both

identified as an alternative to the claim limitation, and specific enough that a POSA could

identify that subject matter. *See Pfizer, Inc. v. Teva Pharm. USA, Inc.,* 429 F.3d 1364, 1379

(Fed. Cir. 2005).

The shared patent specification here discloses ████████████████████

███████ For example:

> Preservatives include anti-microbials, anti-oxidants, and agents
> that enhance sterility. Exemplary preservatives include ascorbic
> acid, ascorbyl palmitate, BHA, BHT, citric acid, EDTA and its
> salts, erythorbic acid, fumaric acid, malic acid, propyl gallate,
> sodium ascorbate, sodium bisulfate, sodium metabisulfite, sodium
> sulfite, *parabens (such as methylparaben, ethylparaben,*
> *propylparaben, butylparaben and their salts),* benzoic acid,
> sodium benzoate potassium sorbate, vanillin, and the like.

> In some embodiments, the enalapril oral liquid formulation
> described herein comprises a preservative.

> In some embodiments, the preservative is a ***paraben*** and the
> sweetener is not a sugar (such as, but not limited to glucose,
> fructose, sucrose, lactose, maltose) or a sugar alcohol (such as, but
> not limited to xylitol, mannitol, lactitol, maltitol, sorbitol).

(PTX-003 at 10:12-27) (emphasis added)

Silvergate contends, nonetheless, that the patent does not disclose █████████████

███████ as an alternative preservative, meaning that disclosure-dedication does not apply. (D.I.

179 at 19-20) The Court disagrees.

As Bionpharma points out, the relevant inquiry is whether a POSA could identify, from

the patent disclosure, the alleged equivalent's existence and suitability as an alternative. (D.I.

206 at 2-3) Bionpharma has proven that a POSA would have had such an understanding. Dr.

Moreton testified that a POSA would know that ████████████████████████████

commonly used ██████ and would be a suitable alternative preservative. (Moreton Tr. 502)

Dr. Moreton further testified that the patent's disclosures demonstrate the ██████ suitability

specifically as an alternative to sodium benzoate. (Moreton Tr. 505-08; *see also* PTX-003 at

10:11-20, 10:28-29, 12:25-27) The Court is persuaded that a POSA would understand, based

upon the disclosures in the specification, that (1) ████████████████████ may be used

as a preservative in the claimed formulations; and (2 ██████████████████████████

████████████████████ By disclosing and then not claiming this

embodiment, Silvergate is estopped from proving DOE infringement based on it.

Although unnecessary to the Court's conclusion, this result is further supported by a

follow-on patent obtained by Silvergate on the basis of the same specification. Silvergate's '482

patent is a continuation of the '987 patent-in-suit. The '482 patent expressly claims an

embodiment with a mixture of propylparaben and methylparaben as a preservative. (*See* DTX-

1123 claim 14) By seeking and obtaining a patent with a propylparaben/methylparaben

embodiment based on the same specification, Silvergate was representing that the specification provided adequate written support for such an embodiment, as claimed in the '482 patent.

It is true, as Silvergate notes, that the level of disclosure for dedication purposes is not the same as necessary for § 112 compliance purposes. (D.I. 179 at 18 & n.2; *see also Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1334 (Fed. Cir. 2004) ("[T]he level of disclosure needed to implicate the disclosure-dedication rule is different from the level of disclosure required under § 112 to support claims directed to the claimed invention, not to disclosures in the written description that may implicate the disclosure-dedication rule.")) But that does not alter the Court's conclusion. As the disclosure is sufficient to satisfy § 112 requirements for a combined paraben preservative embodiment, it is also sufficient for disclosure-dedication doctrine purposes. *See generally PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) ("It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112."); *CSP Techs., Inc. v. Sud-Chemie AG*, 643 F. App'x 953, 958-59 (Fed. Cir. 2016) (filing of related patent application indicates patentee's view of "these two embodiments" as "alternatives").

Therefore, Silvergate is precluded from arguing that Bionpharma's ▮▮▮▮▮▮▮ is an infringing equivalent. Accordingly, again, Silvergate has failed to prove infringement under the doctrine of equivalents.

71

## II.    Indirect Infringement

Absent a finding of direct infringement, there cannot be indirect infringement, whether induced or contributory. *See Vita-Mix Corp.*, 581 F.3d at 1328. Therefore, the Court finds that the marketing of Bionpharma's ANDA Product will not cause indirect infringement of the Asserted Patents.

## CONCLUSION

An appropriate Order follows.