**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| SILVERGATE PHARMACEUTICALS, INC., | C.A. No. 18-1962-LPS |
| *Plaintiff*, | C.A. No. 19-1067-LPS |
| | C.A. No. 20-1256-LPS |
| v. | |
| BIONPHARMA INC. | |
| *Defendant*. | |

**DEFENDANT BIONPHARMA'S BRIEF IN OPPOSITION TO PLAINTIFF**
**SILVERGATE'S PRELIMINARY INJUNCTION MOTION**

Kenneth L. Dorsney (#3726)
Morris James LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6855
kdorsney@morrisjames.com

*Of Counsel*:

Andrew M. Alul
Roshan P. Shrestha, Ph.D.
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2800
Chicago, IL 60601
312-527-4000
aalul@taftlaw.com
rshrestha@taftlaw.com

*Attorneys for Defendant*
*Bionpharma Inc.*

Dated:  April 19, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ................................................................................ iv

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

STATEMENT OF FACTS AND BACKGROUND .................................................. 3

ARGUMENT .......................................................................................................... 3

    I.      SILVERGATE CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ........ 3

          A.     The PI Claims Are Invalid ..................................................................... 3

               1.     The PI Claims Lack Adequate WD ............................................ 4

                       a.     Enalapril:  Unstable and Unpredictable ........................... 5

                       b.     What Silvergate Actually Invented Versus What It Has Claimed ...................................................................... 6

                       c.     The POSA Would Not Believe Silvergate Possessed Billions of Stable Liquids ................................ 9

               2.     The PI Claims Are Not Enabled ............................................... 12

                3.     If Adequately Supported, the                Are Obvious ................................................................................. 13

          B.     Silvergate Will Not Be Able to Prove Infringement.............................. 14

                1.     The '482 PI Claims ................................................................... 14

                2.     The '868 PI Claims ................................................................... 15

                3.     The Buffer Concentration Elements of the '868 and '621 PI Claims ...................................................................................... 15

                4.     .................................................................................. 17

    II.     SILVERGATE HAS FAILED ESTABLISH IRREPARABLE HARM............. 18

          A.     Silvergate's Delay in Filing for Its Second Wave Patents Undercuts Alleged Harm ..................................................................... 18

          B.     Silvergate's Damages Would Be Quantifiable ........................................ 18

    III.    THE BALANCE OF HARDSHIPS AND PUBLIC POLICY SUPPORT DENIAL ................................................................................................... 20

    IV.    SILVERGATE MUST POST A BOND ........................................................ 20

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
   759 F.3d 1285 (Fed. Cir. 2014) ............................................................................ 4, 6

*Allergan, Inc. v. Apotex Inc.*,
   754 F.3d 952 (Fed. Cir. 2014) .................................................................................. 14

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ........................................................................... 4, 5, 8

*Boehringer Ingelheim Corp. v. Shalala*,
   993 F. Supp. 1 (D.D.C. 1997) .................................................................................. 20

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
   480 F.3d 1335 (Fed. Cir. 2007) ................................................................................ 15

*Eli Lilly and Co. v. Am. Cyanamid Co.*,
   82 F.3d 1568 (Fed. Cir. 1996) ............................................................................ 19, 20

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
   323 F.3d 956 (Fed. Cir. 2002) ............................................................................... 4, 8

*Graceway Pharm., LLC v. Perrigo Co.*,
   722 F. Supp. 2d 566 (D.N.J. 2010) ........................................................................... 19

*High Tech Med. v. New Image*,
   49 F.3d 1551 (Fed. Cir. 1995) .................................................................................. 18

*Indenix Pharm. LLC v. Gilead Scis., Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019) ............................................................... 10, 11, 12, 13

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*,
   554 F.3d 1010 (Fed. Cir. 2009) ................................................................................ 17

*Novartis Corp. v. Teva Pharm. USA, Inc.*,
   Civ. No. 04-4473 (HAA)(ES), 2007 WL 1695689 (D.N.J. Jun. 11, 2007) ...................... 18, 19

*Nutrition 21 v. United States*,
   930 F.2d 867 (Fed. Cir. 1991) .................................................................................. 19

*Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
   923 F.3d 1368 (Fed. Cir. 2019) ........................................................................ 5, 6, 11, 12

*Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*,
   476 F.3d 1321 (Fed. Cir. 2007) ................................................................................ 17

*Par Pharm., Inc. v. Hospira, Inc.*,
   835 F. App'x 578 (Fed. Cir. 2020) ............................................................................ 17

*Pernix Ireland Pain DAC v. Alvogen Malta Operations, Ltd.*,
   323 F. Supp. 3d 566 (D. Del. 2018) ..................................................................... 11, 12

*Santarus, Inc. v. Par Pharm., Inc.*,
   694 F.3d 1344 (Fed. Cir. 2012) ................................................................................ 14

*Wang Labs., Inc. v. Am. Online, Inc.*,
  197 F.3d 1377 (Fed. Cir. 1999) ............................................................................ 18

*Wyeth and Cordis Corp. v. Abbott Labs.*,
  720 F.3d 1380 (Fed. Cir.2013) ............................................................................ 13

**Statutes**

35 U.S.C. § 112(a) ............................................................................................................. 4

**Rules**

Fed. R. Civ. P. 65(c) ....................................................................................................... 20

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| '008 patent | U.S. Patent No. 9,669,008 B1 (PTX-1) |
| '159 application | U.S. Patent Application No. 16/177,159, which issued into the '482 patent (prosecution history of which is attached as Ex. C, to the Moreton Declaration) |
| '442 patent | U.S. Patent No. 9,808,442 B2 (PTX-2) |
| '482 patent | 20-1256 D.I. 49-1, Second Am. Compl. Ex. B, U.S. Patent No. 10,786,482 B2 (*see also*, DTX-1123) |
| '482 PI Claims | '482 patent claims 18, 21, and 23 |
| '575 application | U.S. Patent Application No. 16/991,575, which issued into the '621 patent (prosecution history of which is attached as Ex. E, to the Moreton Declaration) |
| '603 application | U.S. Patent Application No. 15/081,603, which issued into the '008 patent (prosecution history of which is PTX-5) |
| '621 patent | 20-1256 D.I. 49-1, Second Am. Compl. Ex. C, U.S. Patent No. 10,918,621 B2 |
|  | '621 patent claims |
| '745 patent | U.S. Patent No. 10,039,745 B2 (PTX-3) |
| '747 patent | U.S. Patent No. 8,568,747 B1 (DTX-2054) |
| '868 patent | 20-1256 D.I. 49-1, Second Am. Compl. Ex. A, U.S. Patent No. 10,772,868 B2 |
| '868 PI Claims | '868 patent claims 9 and 12 |
| '898 application | U.S. Patent Application No. 16/242,898, which issued into the '868 patent (prosecution history of which is attached as Ex. D, to the Moreton Declaration) |
| '987 patent | U.S. Patent No. 10,154,987 B2 (PTX-4) |
| Amneal | Non-party Amneal Pharmaceuticals LLC, defendant in Civil Action Nos. 19-678-LPS and 20-1255-LPS |
| ANDA | Abbreviated New Drug Application pursuant to 21 U.S.C. |

| Abbreviation | Meaning |
| --- | --- |
| | § 355(j) |
| (b)(2) NDA | NDA pursuant to 21 U.S.C. § 355(b)(2) |
| Bionpharma | Defendant Bionpharma Inc. |
| BAFOF | D.I. 220[1], Bionpharma's Answering Proposed Findings of Fact, submitted concurrently herewith |
| BFOF | D.I. 190, Defendant Bionpharma's Proposed Findings of Fact |
| Bionpharma's ANDA | Bionpharma's ANDA No. 212408 |
| Bionpharma's Opening Post-Trial Brief | D.I. 189, Bionpharma's Opening Post-Trial Brief |
| Byrn | The February 1-2, 2021 Trial Testimony of Silvergate's Witness Dr. Stephen Byrn (D.I. 193-196) |
| Byrn Declaration | D.I. 235, Declaration of Stephen R. Byrn in Support of Silvergate's Motion for Preliminary Injunction |
| CSD | Colloidal silicon dioxide |
| DOE | Doctrine of equivalence |
| Dr. Byrn | Silvergate's expert, Dr. Stephen R. Byrn |
| Dr. Moreton | Bionpharma's formulation expert, Dr. R. Christian Moreton |
| E5 and E6 | The Example E5 and E6 formulations in the common specification ('482 patent 38:15-39:10) |
| Extended Stability PI Claims | |
| FDA Stability Guidance | U.S. Food and Drug Administration, *Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products* (Nov. 2003, Rev. 2) (DTX-2063) |
| First Wave Patents | '008, '442, '745, and '987 patents |
| First Wave Suits | C.A. Nos. 18-1962-LPS and 19-1067-LPS |
| FPTO | Final Pretrial Order, D.I. 170 |
| FPTO-JSUF | D.I. 170, Ex. 1 Plaintiff and Defendants' Joint Statement of |

---

[1] All docket citations are to the lead 18-1962 docket unless specified otherwise.

| Abbreviation | Meaning |
|---|---|
| | Uncontested Facts |
| HCV | Hepatitis C virus |
| HPE | Rowe, R. et al., HANDBOOK OF PHARMACEUTICAL EXCIPIENTS (6th Ed. 2009) (DTX-2150) |
| Ip and Brenner | Ip and Brenner, 16 ANALYTICAL PROFILES OF DRUG SUBSTANCES 207 (1987) (DTX2048) |
| JCCC | Joint Claim Construction Chart |
| JUF | D.I. 188, Joint Uncontested Facts |
| The Kit | Epaned® Kit, Silvergate's predecessor product to Epaned® |
| McSorley Declaration | Declaration of Robert R. McSorley, submitted concurrently herewith |
| Moreton | Feb. 2, 2021 Trial Testimony of Bionpharma's Expert Witness, Dr. R. Christian Moreton (D.I. 195, 196) |
| Moreton Declaration | Declaration of R. Christian Moreton, Ph.D., submitted concurrently herewith |
| Mr. McSorley | Robert R. McSorley, Bionpharma's damages and irreparable harm expert |
| NDA | New Drug Application pursuant to 21 U.S.C. § 355(b)(1) |
| NSAID | Non-steroidal anti-inflammatory drug |
| Paragraph IV certification | Certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) |
| | |
| PH | Prosecution history |
| PHE | Prosecution history estoppel |
| PI | Preliminary injunction |
| PI Claims[2] | |

---

[2] Silvergate also asserts claim 7 of the '745 patent in connection with its PI Motion. Because the parties' claims and defenses with respect to that claim have been fully tried and submitted to the

| Abbreviation | Meaning |
|---|---|
| | |
| PI Motion | D.I.231, Silvergate's Motion for Preliminary Injunction |
| PI Motion Brief | D.I.232, Silvergate's Opening Brief in Support of Its Motion for Preliminary Injunction |
| POSA | Person of ordinary skill in the art |
| PPI | Proton pump inhibitor |
| PSCF | D.I. 170, FPTO Ex. 2, Plaintiff's Statement of Contested Fact |
| PTO or Patent Office | United States Patent and Trademark Office |
| Second Wave Patents | '868, '482, and '621 patents |
| Silvergate | Plaintiff Silvergate Pharmaceuticals, Inc. |
| Silvergate's Epaned® Patents | '008, '442, '745, '987, '482, and '868 patents |
| Silvergate's Patents | '008, '442, '745, '987, '482, '868 patents, and '621 patents |
| The specification | The common specification of Silvergate's Patents |
| *Wands* Factors | Factors to evaluate undue experimentation in connection with non-enablement inquiry enunciated in *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988):  (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability in the art; and (8) the breadth of the claims |
| WD | Written description |

---

Court for resolution, Bionpharma does not address that claim in connection with its opposition to Silvergate's PI Motion.

Bionpharma respectfully submits the instant Brief in Opposition to Silvergate's PI Motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Bionpharma filed its ANDA back in August of 2018; in response, Silvergate instituted the First Wave Suits asserting that Bionpharma's ANDA product infringed Silvergate's First Wave Patents. The First Wave Patents cover a very narrow group of enalapril liquid formulations—buffered with citric acid and sodium citrate at specific concentrations, and preserved with sodium benzoate at specific concentrations—that Silvergate was able to establish were stable for 12 months at refrigerated conditions, a result that Silvergate described as "unexpected" and that its expert argues defies conventional wisdom regarding enalapril liquids. Bionpharma respected the validity of the First Wave Patents, but challenged infringement on numerous grounds. Trial for the First Wave Suits was held February 1-5, 2021, and the parties await the Court's decision.

Shortly after Bionpharma filed its ANDA, Silvergate began filing patent applications seeking considerably broader and different claim coverage, and eventually secured issuance of the Second Wave Patents, which are the subject of Silvergate's Second Wave Suit. Concerned about the potential outcome of the First Wave Suits and the April 30, 2021 expiration of the 30-month stay, Silvergate now asks this Court to preliminary enjoin Bionpharma for another 12-16 months from launching its ANDA product. Silvergate's PI Motion should be denied because Silvergate cannot meet the factors justifying the extraordinary relief it seeks.

In contrast to the First Wave Patents, Silvergate's Second Wave Patents are of enormous breadth, with the formulation elements of each claim covering anywhere between tens of thousands (*e.g.*, '868 patent claims 9, 12), to hundreds of thousands (*e.g.*,                        ), to possibly billions (*e.g.*, '482 patent claims 18, 21, 23) of enalapril liquids. While sheer breadth alone would not be a problem, Silvergate has claimed—but **_has failed to describe_** in the

specification—all of these billions of enalapril formulations as being stable for 12 months (or longer) at refrigerated conditions.  What Silvergate has claimed in the Second Wave Patents is simply not what it actually invented; no POSA would believe that Silvergate had in its possession at the time it filed for the Second Wave Patents billions of enalapril liquid formulations that are stable for at least 12 months.  Indeed, during prosecution of the Second Wave Patents, the examiner picked up on this and issued no less than ***three separate lack of written description rejections***, but eventually relented under the mistaken belief that Silvergate could supplement its deficient specification by submitting inventor declarations evidencing possession of the claimed formulations ***after*** Silvergate filed its patent applications—a violation of fundamental patent law.

Moreover, as Silvergate's expert admits, the POSA would believe that numerous formulations falling within the scope of the Second Wave Patents are likely inoperable (*i.e.*, they do not meet stability requirements of the claims), and the amount of experimentation it would take for a POSA to practice the full scope of the claims to determine which formulations were operable would not only be undue, ***it would be scientifically inconceivable***.  If somehow this Court finds the PI Claims adequately supported, then Bionpharma respectfully submits that at least

are obvious, as they essentially read-on Silvergate's prior art Epaned® Kit.

Even if this Court finds a substantial likelihood that Silvergate can overcome Bionpharma's invalidity challenges, Silvergate still cannot establish a likelihood of success of proving infringement, for many of the reasons raised at trial in the First Wave Suits.  In its PI Motion Brief, Silvergate misrepresents its own expert's unsupported infringement theory to inflate the concentration of alleged "buffer" in Bionpharma's ANDA product, in an attempt to meet literally the "about 5 mM to about 20 mM" concentration element of the buffer limitations.  As explained below, regardless of what concentration of "buffer" in Bionpharma's ANDA product that the Court

2

uses to assess infringement, Bionpharma does not literally meet the concentration elements of any of the PI motion claims, and the estoppel against DOE is airtight.  For

Bionpharma respectfully submits that the term "buffer" must be construed to exclude Bionpharma's ANDA product as there is no description in the specification of an enalapril liquid formulation where the only "buffer" is an acid dissociated from an enalapril salt.

With respect to the remaining PI factors, Silvergate cannot establish irreparable harm because it unduly delayed in filing for its Second Wave Patents, and because damages from an at-risk launch would be easily quantifiable.  The balance of hardships and public policy favor denial of the PI Motion, as Bionpharma has waited patiently for 30-months to launch its non-infringing product, and the public interest favors the arrival of Bionpharma's lower-priced alternative to Silvergate's Epaned®.  Silvergate's PI Motion should be denied.

## STATEMENT OF FACTS AND BACKGROUND

The Court's attention is respectfully directed to Bionpharma's Opening Post-Trial Brief (18-1962 D.I. 189) at pages 4-9 for an explanation of the factual background of the First Wave Suits.  Shortly after Bionpharma filed its ANDA, Silvergate began filing for the Second Wave Patents.  PTX-136 at 1; Second Wave Patents at covers.  Silvergate instituted the Second Wave Suit on September 18, 2020, asserting the '868 patent, then filed amended complaints on September 29, 2020 and March 4, 2021, to add the '482 and '621 patents, respectively.  20-1256 D.I. 1, 7, and 49.  Silvergate filed its PI Motion on March 31, 2021.  D.I. 231.

## ARGUMENT

## I.   SILVERGATE CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS

### A.   The PI Claims Are Invalid

What Silvergate has claimed in its Second Wave Patents is not what it invented.  Because

of this, as explained below and in the accompanying Moreton Declaration, the PI Claims are invalid for lack of written description ("WD") and non-enablement.  If, somehow, the Court finds the PI Claims adequately supported, then at least the                   are invalid as they essentially cover an obvious version of the Epaned® Kit.

### 1.    The PI Claims Lack Adequate WD

35 U.S.C. § 112(a) requires, *inter alia*, that a patent specification contain a WD of the claimed invention that "clearly allows [a POSA] to recognize that the inventor invented what is claimed."  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (internal quotations and brackets omitted).  The WD of the claimed invention must be sufficient to "reasonably convey[] to [a POSA] that the inventor had possession of the claimed subject matter *as of the filing date*."  *Id.* (emphasis added).  This "requires an objective inquiry into the four corners of the specification from the perspective of [a POSA]," *id.*, and "an affidavit or declaration [submitted] during prosecution . . . does not cure [a] lack of [WD] in the specification, [which is] required by statute," *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 969 (Fed. Cir. 2002).

Importantly, when a patent claims a genus using functional language to define a desired result—as is the case Silvergate's PI Claims, with each requiring stability at refrigerated conditions for at least 12 months—"the specification must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus."  *Ariad*, 598 F.3d at 1349.  To comply with the WD requirement, functionally-defined genus claims must be supported by "a reasonable structure-function correlation . . . whether by the inventor as described in the specification or known in the art at the time of the filing date."  *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014).  "[W]hen the inventor expressly claims [a] result, [Federal Circuit] case law provides that *the result must be supported by adequate*

4

***disclosure in the specification***." *Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1384 (Fed. Cir. 2019) (emphasis added).  A claim may not "merely recite a description of the problem to be solved while claiming all solutions to it and, . . . , cover any [formulation] later actually invented and determined to fall within the claim's functional boundaries." *Ariad*, 598 F.3d at 1353.  That is exactly what Silvergate has done here.

a.   **Enalapril:  Unstable and Unpredictable**

As Silvergate and its expert, Dr. Byrn, admit, the POSA would know that enalapril is inherently unstable in liquid formulations and whether any given enalapril liquid is capable of being stable for at least 12 months or longer is entirely unpredictable.  D.I. 193, Trial Tr. Vol. A, 52:25-53:7 (Silvergate's Opening Statement:   "Another problem Amneal has is the unpredictability in the art. . . . [C]ould a [POSA] predict the ingredients needed to achieve a liquid form of enalapril . . . that would be stable for the required 24-month shelf life?  The answer is no.").  In his Declaration in support of Silvergate's PI Motion, Dr. Byrn explained ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████   Byrn Decl. ¶ 15.

During prosecution of the First Wave Patents, Silvergate narrowed its application claims to correspond to the Example E5 formulation disclosed in the specification ('482 patent 38:15-25)—which, as explained below, is one of only two enalapril liquids described in the specification as being stable for at least 12 months—and distinguished the application claims from the prior art based on, *inter alia*, the claimed formulations being stable for at least 12 months.  BFOF ¶¶ 64-70.  Silvergate stressed that "the prior art does not provide any expectation that any <u>particular</u> combination would be successful for stable enalapril oral liquid formulations." *Id*. ¶ 79.  Silvergate made the same types of unexpected results arguments during prosecution of the Second Wave

Patents.  Moreton Decl. ¶¶ 17-20, 33, 152.  Thus, Silvergate cannot excuse its failure to sufficiently describe stable enalapril liquid formulations sufficient to support the PI Claims by pointing to the prior art and arguing that the enalapril liquid formulations generally, or the specific formulations claimed in the PI Claims, were known or would be expected to be stable.  *AbbVie*, 759 F.3d at 1301; *Nuvo*, 923 F.3d at 1381, 1384.

> b.   **What Silvergate Actually Invented *Versus* What It Has Claimed**

> i.   **What Silvergate Actually Invented**

The specification generally discloses, *inter alia*, enalapril liquids that can be stable (defined as having at least 95% enalapril and about 5% w/w or less total impurities) under different conditions for different periods of time.  '482 patent 18:36-19:35; Moreton Decl. ¶ 146 n.6.  The specification explains that the enalapril liquids can be stable at refrigerated conditions "for at least 1 month, at least 2 months, at least 3 months, . . . , at least 12 months, . . . , at least 18 months, at least 24 months, . . . ."  '482 patent 18:64-19:2; Moreton Decl. ¶¶ 138, 144.  A POSA would understand this to mean that some of the enalapril liquids disclosed would be stable at refrigerated conditions for at least 1 month, others may be stable for at least 2 months, *etc*.; a POSA would not understand this as suggesting that all of the enalapril liquids disclosed in the specification would be stable for at least 12 months in refrigerated conditions.  Moreton Decl. ¶ 138.

Recognizing that the prior art was populated with enalapril liquids that were stable for only a few weeks or months—including its own Epaned® Kit, which ██████████████████████ ████████████████████████ Byrn Decl. ¶ 15—Silvergate realized during prosecution of the First Wave Patents that it would need to limit its claims to only those enalapril liquids that were stable for at least 12 months, and to argue that such stability was unexpected, in order to overcome the prior art.  BFOF ¶¶ 64-66, 68-70.  However, the only liquids that Silvergate described as being stable for at least 12 months were the Example E5 and E6 liquids, which each contained citric

6

acid/sodium citrate at specific concentrations, and 1 mg/mL of sodium benzoate. '482 patent 38:15-39:10; Moreton Decl. ¶ 144.

Indeed, the specification contains no other 12-month stability data under any conditions (refrigerated or otherwise) for any other enalapril liquid formulation. Moreton Decl. ¶ 144. And some of the accelerated data presented for other enalapril liquids,

█████████████████████████ suggests that those formulations would likely not be stable at 12 months under refrigerated conditions. *Id*. ¶¶ 145-46. During trial, Silvergate's expert, Dr. Byrn,

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████ an opinion that Bionpharma's expert, Dr. Moreton, agrees with. *Id*. ¶ 146. Thus, Silvergate limited the claims of its First Wave Patents to cover a very small group of enalapril liquids that require specific concentrations of citric acid, sodium citrate, and sodium benzoate, corresponding to the E5 and E6 formulations, which were the only enalapril liquids that Silvergate actually described in the specification as being stable for 12 months.

### ii.   What Silvergate Has Claimed in the Second Wave Patents

However, after Bionpharma filed its ANDA, Silvergate began filing for the Second Wave Patents seeking considerably broader and different claim coverage. During prosecution of the '159 application (which issued into the '482 patent), Silvergate sought to claim enalapril liquids with ***any amount*** of citric acid/sodium citrate buffer, and with ***any*** preservative at ***any*** concentration. Moreton Decl. ¶¶ 15. The Examiner, however, recognized that Silvergate was attempting to claim enalapril liquids that were nowhere described in the specification, and issued no less than three separate WD rejections, which required Silvergate to narrow its '159 application claims to cover enalapril liquids with a specific range of concentrations of citric acid/sodium citrate buffer, and a

at a specific concentration (1 mg/mL).

*Id*. ¶¶ 16-29, 93-94, 97-102.

But the Examiner also allowed Silvergate to claim enalapril liquids with concentrations of citric acid/sodium citrate buffer beyond those of the E5 and E6 formulations under the mistaken belief that Silvergate could supplement its WD with inventor declarations submitted ***after*** the '159 application was filed that described additional enalapril liquids as being stable, in violation of fundamental patent law. *Id*. ¶¶ 166-67; *Enzo*, 323 F.3d at 969. Silvergate intentionally took advantage of this misunderstanding—even though E5 and E6 had citric acid/sodium citrate buffer concentrations of 10 mM and 5 mM, respectively, Silvergate submitted a declaration describing formulations stable for 12 months with citrate buffer concentrations going up to 20 mM as "evidence to overcome the § 112(a) rejection asserted by the [Examiner]," and to allow Silvergate to claim enalapril liquids with a citric acid/sodium citrate buffer concentration of between "about 5 mM to about 20 mM." Moreton Decl. ¶¶ 166-67. This was contrary to law. *Enzo*, 323 F.3d at 969; *Ariad*, 598 F.3d at 1351. Things got ***worse*** during prosecution of the '898 and '575 applications (which issued into the '868 and '621 patents, respectively), where Silvergate submitted an additional declaration describing enalapril liquid formulations stable at 12 months that use buffers beyond citric acid and sodium citrate, which was used to convince the Examiner to allow claims that do not require any particular kind of buffer. Moreton Decl. ¶¶ 35, 40, 210-11.

Partly because Silvergate was able to take advantage of the Examiner's failure to understand that a deficient specification cannot be cured by post-application filing declarations, and partly because the Examiner simply failed to appreciate the enormous breadth of the claims that Silvergate filed, Silvergate was able to secure incredibly broad claims in connection with its Second Wave Patents, that go well beyond what is described and enabled in the specification. For

instance, because the '482 patent claims use the "comprising" transitional phraseology, the formulations covered by those claims include the recited components, but can also contain more of the same components, or additional unrelated components altogether, as Silvergate's own expert admitted at trial.  D.I. 195, Trial Tr. Vol. B, Byrn 315:6-25; Moreton Decl. ¶ 141.  Furthermore, many of the '482 patent claims (including '482 PI Claims 18 and 23), require no restriction on pH, an incredibly important factor for stability of enalapril in liquid formulations, which the Examiner likely overlooked.  Byrn Decl. ¶ 18; Moreton Decl. ¶¶ 155-57.  As a result, as Bionpharma's expert, Dr. Moreton, explains, the formulation elements of the '482 PI Claims cover hundreds of thousands (and possibly billions) of enalapril liquids.  Moreton Decl. ¶¶ 141, 143.

The formulation elements of the issued claims of the '868 and '621 patents are slightly narrower because they use the transitional phrase "consisting essentially of," instead of the broader "comprising" transitional phrase, but, as Dr. Moreton explains, they are still of enormous breadth, particularly because the broader independent claims of those patents require a buffer of ***any kind*** at a broad concentration range, and can include sweeteners and flavoring agents at any concentrations.  *Id*.  ¶¶ 205-06, 232-33, 253.

Dr. Moreton estimates that each of the '868 and '621 PI Claims cover tens of thousands of enalapril liquids.  *Id*.

    **c.**    **The POSA Would *Not* Believe Silvergate Possessed Billions of Stable Liquids**

The formulations elements the PI Claims go well beyond the E5 and E6 liquids, and a POSA would simply not believe that Silvergate possessed billions of enalapril liquids that meet the claimed stability requirements because numerous aspects of the PI Claims have no support:

> **<u>Only Buffer is Acid Dissociated from Enalapril</u>**:  By virtue of its claims against Bionpharma, Silvergate maintains that the PI Claims cover enalapril liquids where however, there is no description of (or any "blaze marks" for) such formulations in the specification, let alone

ones that would meet the stability requirements of the claims.  *Id.* ¶¶ 153-54. ████████
██████████

████████████   D.I. 196, Sealed Trial Tr. Vol. B, Byrn 430:23-431:2.

██████████████████████████  then all the PI Claims are invalid for lack of WD.  *Indenix Pharm. LLC v. Gilead Scis., Inc.*, 941 F.3d 1149, 1163-65 (Fed. Cir. 2019).  *Indenix*, a case that originated in this Court, is dispositive on this issue.

**Preserved Formulations**:  The ███████████████████████████████

█████████████████  and there is no description in the specification of a ███████████  enalapril liquid that is stable for at least 12 months, *id.* ¶ 160.  Quite the opposite:  as Dr. Moreton explains, and as Dr. Byrn conceded at trial, the accelerated data provided █████████  enalapril formulations ██████████  would convince a POSA that those formulations would likely ***not be stable*** for 12 months at refrigerated conditions.  *Id.* ¶¶ 145-46.

**No pH Restriction**:  '482 patent claims 18 and 23 contain no restriction on pH, while '868 patent claim 12 and ███████████████████████████████████████████

██████  *Id.* ¶¶ 10-13, 155, 215, 242.  The only formulations stable for 12 months described in the specification (E5 and E6) had a pH of 3.3, *id.* ¶¶ 178, and, as Dr. Byrn admits███
████████████████████████████████████████████████████  Byrn Decl. ¶ 18. The specification teaches that enalapril degradation into enalaprilat and enalapril diketopiperazine increases at pHs above 3.5 and below 4, respectively, and a POSA would know that the optimal pH for enalapril stability is around 3.  Moreton Decl. ¶¶ 155-57. There is no description of an enalapril liquid stable for 12 months at a pH beyond 3.3, nor would a POSA believe Silvergate possessed such formulations.  *Id.*

**Buffers Beyond Citric Acid/Sodium Citrate**:  The '868 and '621 PI Claims do not specify a specific kind of buffer, and the specification lists at least 38 different kinds of buffering agents that may be used.  *Id.* ¶¶ 12-13, 206, 210-11.  However, the only liquids in the specification described as stable for at least 12 months (E5 and E6) use a citric acid/sodium citrate buffer.  *Id.* ¶¶ 210-11.  There is no description of an enalapril formulation stable for at least 12 months that uses any other kind of buffer.  *Id.*

**Buffers That Do Not Have pKa within ±1 of the Formulation pH**:  Relatedly, the '868 and '621 PI Claims cover formulations with buffers that do not have weak acid components with an acidic hydrogen having a pKa within ±1 of the formulation pH (like (allegedly) Bionpharma's formulation, as explained at trial).  *Id.* ¶¶ 212-14, 241.  Such buffers are non-functional, and the specification does not describe any such formulation, let alone one that is stable for at least 12 months.  *Id.*

**Buffer Concentration beyond 5-10 mM**:  The molar concentration of citric acid/sodium citrate buffer in the E5 and E6 formulations is 10 mM and 5 mM, respectively, but, as explained above, the PI Claims cover enalapril liquids with buffer concentrations beyond 5-10 mM (because of Examiner error).  There is no description of an enalapril liquid with a buffer concentration beyond 5-10 mM that is stable for 12 months.  *Id.* ¶¶ 166-67.

**Sugars/Sugar Alcohols**:

There is no WD of a                enalapril liquid that includes a sugar/sugar alcohol and is stable for 12 months.  *Id.*

**Preservative Concentration Beyond "about 1 mg/ml"**:  There is no description in the common specification of an enalapril liquid with a preservative concentration greater than "about 1 mg/ml" that is stable for at least 12 months, yet all of the                permit greater amounts of preservative.  *Id.* ¶¶ 161-65.

**Stability Longer than 12 months**:  the Extended Stability PI Claims require stability out to at least either 18 or 24 months, but there is no WD of any enalapril liquid stable for longer than 12 months (or any indication that is even possible).  *Id.* ¶¶ 158-59.

The above described enalapril liquids, which fall within the scope of the PI Claims, are nowhere described in the specification, and a POSA would not believe that Silvergate possessed such formulations at the time it filed for the Second Wave Patents.  In *Indenix*, the claims were directed to a method of treating HCV by administering a "β-D-2'-methyl-ribofuranosyl nucleoside" with a methyl group in the 2' up position, and any substituent in the 2' down position. *Indenix*, 941 F.3d at 1154-55.  The accused infringer's product used a nucleoside with a fluorine group in the 2' down position, but such a compound was nowhere described in the specification, let alone as effective in treating HCV, which led the Federal Circuit to find the claims invalid for lack of WD.  *Id.* at 1163-65.  The claims in *Nuvo* were directed to a pharmaceutical composition with a coated NSAID core surrounded by a layer of an acid inhibitor, such as a PPI, effective to raise gastric pH to 3.5, where at least some of the PPI is uncoated.  *Nuvo*, 923 F.3d at 1372-73. The brand insisted as part of its response to the generics' obviousness case that a POSA "would not have expected uncoated PPIs to be effective," but there was nothing in the specification supporting the efficacy of uncoated PPI to raise gastric pH.  *Id.* at 1377.  The Federal Circuit found the *Nuvo* patent claims invalid for lack of WD for failing to demonstrate that uncoated PPI would be effective in raising gastric pH to 3.5.  *Id.* at 1381-84.  In *Pernix Ireland Pain DAC v. Alvogen Malta Operations, Ltd.*, 323 F. Supp. 3d 566 (D. Del. 2018), Federal Circuit Judge Bryson, sitting

on this Court by designation, found that claims directed to methods of treating pain in a patient having mild/moderate hepatic impairment that covered the use of nearly any hydrocodone extended release formulation to achieve certain functional requirements were not adequately described when the specification only described one formulation that would meet the claims' functional limitations.  *Id*. at 617-630.  *Indenix Nuvo*, and *Pernix* support a lack of WD finding.

### 2.    The PI Claims Are Not Enabled

The PI Claims are of enormous breadth and, as Dr. Byrn agrees, ███████████████

████████████████████████████████████████████████  Moreton Decl. ¶¶ 170-74.

"A claim is not enabled when, at the effective filing date of the patent, [a POSA] could not practice their full scope without undue experimentation."  *Indenix*, 941 F.3d at 1154 (internal quotations omitted).  Applying the *Wands* Factors shows that determining which formulations fall within the scope of the PI Claims are operable would not only require undue experimentation, it would be scientifically inconceivable.  Moreton Decl. ¶¶ 175-186, 220-231, 248-261.

The quantity of experimentation required would be enormous:  a POSA would have to prepare anywhere between tens of thousands to potentially billions of enalapril liquids (depending on the PI Claim), and to subject all of those liquids to stability testing at refrigerated conditions for at least 12 months, and up to 24 months, and then analyze the results.  *Id*. ¶¶ 176, 223-25, 253.  As Dr. Moreton explains, this experimentation is not routine; it is essentially impossible.  *Id*. ¶¶ 177, 222, 254.  The specification contains only two working examples (E5 and E6), which are very similar in composition.  "Where, as here, working examples are present but are very narrow, despite the wide breadth of the claims at issue, this factor weighs against enablement."  *Indenix*, 941 F.3d at 1161 (internal quotations omitted).  And while the specification warns that enalapril degradation increases at certain pHs, and that ████████████████████████████████████████████████████ the POSA would not find those teachings helpful as a number of PI

Claims are not restricted by pH (or permit pH up to 4.5), and the

As explained above,

enalapril liquid stability is unpredictable, the presumption is that such formulations are not stable

long-term, and Silvergate admits that the prior art provides no guidance.  All the *Wands* Factors

support non-enablement, and *Indenix* is directly on point.  *See also Wyeth and Cordis Corp. v.*

*Abbott Labs.*, 720 F.3d 1380, 1386 (Fed. Cir.2013) (affirming non-enablement under similar facts).

    **3.**    **If Adequately Supported,**    **Are Obvious**

Upon reconstitution, Silvergate's predecessor product, Epaned® Kit, was an enalapril oral

liquid that contained a citric acid/sodium citrate buffer

As Bionpharma's expert, Dr. Moreton, explains, a POSA

looking to reformulate the Kit to a RTU formulation would:  (1) target a pH of around 3, because

that was known to be the pH of maximum stability for enalapril in solution, (2) remove the solid

excipients, such as mannitol and CSD; (3) remove potassium sorbate, which was known to

destabilize liquid formulations in plastic containers; and (4) through routine optimization, adjust

the concentrations of citrate buffer and                               arrive at the claimed

concentrations of all

and, as such, essentially reads on the

reconstituted Kit formulation.  *Id*. ¶ 263.  The excipients remaining after removal of

mannitol/CSD/potassium sorbate are either permitted by the claims or would be removed if found

through routine experimentation to adversely impact stability.  *Id*. ¶ 264.

With respect to the stability limitations, the '747 patent, which covered the Kit, teaches the

degradation of enalapril and provides the "at least 95% enalapril/less than about 5% impurities"

benchmark recited in the claims, and discloses that enalapril stability is maximized in refrigerated

conditions and can be up to 36 months.  *Id.* ¶ 201.  From the FDA Stability Guidance, the POSA would have targeted at least 12 months, but more preferably 24 months, of stability for a product stored in refrigerated conditions, and would have reasonably expected to achieve this through routine experimentation.  *Id.*  Moreover, Silvergate appears to argue (PI Mot. Br. at 18 n. 18), that enalapril liquid formulations covered by the        claims are ***inherently*** stable—if true, then Bionpharma does not need to establish that the stability limitations were obvious.  *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) (obvious formulation does not become non-obvious by claiming inherent property).

Unexpected results/secondary considerations must be commensurate in scope with, and have a nexus to, the claims.  *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 965 (Fed. Cir. 2014).  Silvergate has no unexpected results or other secondary considerations supporting                                        given the breadth of the claims, Silvergate cannot provide evidence commensurate in scope.  If                 are adequately supported, then Bionpharma submits they are obvious in view of the Kit.

**B.    Silvergate Will Not Be Able to Prove Infringement**

**1.    The '482 PI Claims**

Silvergate concedes no literal infringement of the '482 PI Claims, as Bionpharma's ANDA product does not contain citric acid/sodium citrate.  PI Mot. Br. at 8-9.  Its DOE arguments also fail because Silvergate applies an incorrect PHE analysis:  Silvergate ignores that the claims of the '159 application (which issued into the '482 patent) were originally filed with ***no restriction*** on citric acid/sodium citrate concentration, but were rejected thrice for lack of WD because the Examiner correctly pointed out that the specification contains no support for stable enalapril liquids with any concentration of citric acid/sodium citrate buffer.  Moreton Decl. ¶¶ 93-96.

14

Silvergate had to narrow the buffer limitations of its '482 patent claims to ultimately require "about 5 mM to about 20 mM" of citric acid/sodium citrate.  *Id.*  This narrowing amendment triggered a presumption of PHE.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1341 (Fed. Cir. 2007) ("An amendment made to comply with § 112 may give rise to estoppel."). Bionpharma's ANDA product has **_no_** citric acid/sodium citrate, and that falls within the scope of what Silvergate gave up when it narrowed its claims; thus, no tangential relations exception applies.  *Id.* at 1333-34; Moreton Decl. ¶ 95.  If Silvergate is allowed to proceed with its DOE claims, then for the same reasons set forth in Bionpharma's Opening Post-Trial Brief at 26-36, Bionpharma's ANDA product has no equivalent buffer.  *See also*, Moreton Decl. ¶¶ 103-116.

2.    **The '868 PI Claims**

Silvergate concedes no literal infringement of the '868 PI Claims because Bionpharma's ANDA product does not contain "about 1 mg/ml . . . sodium benzoate."  PI Mot. Br. at 9-10.  The preservative limitation of the '868 PI Claims traces back to the '159 application, where the original claims recited "a preservative."  Moreton Decl. ¶ 122.  In response to three lack of WD rejections, Silvergate ultimately narrowed the limitation to "about 1 mg/ml . . . sodium benzoate," which made its way into the '868 patent claims.  *Id.*  This narrowing amendment was made to overcome the § 112 rejections and gives rise to PHE.  Bionpharma's ANDA product,

falls within the territory of what Silvergate surrendered, so no tangential relation exception.  Further, disclosure-dedication bars Silvergate's DOE claims; if Silvergate is allowed to proceed with DOE,

substantially different.  Bionpharma's Opening Post-Trial Br. at 15-18, 37-40.

3.    **The Buffer Concentration Elements of the '868 and '621 PI Claims**

Bionpharma also does not infringe the '868 PI Claims, as well as '621 PI Claims

15

because its ANDA product does not contain "about 5 mM to about 20 mM" of a buffer. Bionpharma disputes that any                                                            exists in Bionpharma's ANDA product.  *Id*. at 26-28.  But even if such a system exists, its concentration is not "about 5 mM to about 20 mM" under Dr. Byrn's own infringement theory.  Moreton Decl. ¶¶ 77-86.  In the First Wave Suits, Dr. Byrn

                                                            but Silvergate—apparently without Dr. Byrn's support—inflates that concentration by

         Bionpharma's ANDA product, to reach a total concentration of

              ***This is in error*—**

    Under Dr. Byrn's original theory,

                                                            it was never actually considered part of the buffer.  *Id*.

         Regardless of whether the Court ultimately finds that a

                                                  none of those literally are "about 5 mM to about 20 mM."  The specification, under the heading "Certain Definitions," explains that "'about' is used to indicate that a value includes the standard level of error for the device or method being employed to determine the value."  '868 patent 29:29-31.  HPLC is used in all of the examples to measure concentration, and, as Dr. Moreton explains, its standard level of error is below 1%, or one hundredth of a concentration unit.  Moreton Decl. ¶ 83.  For the lower range of the claimed concentration, 1% of 5 mM is 4.95-5.05 mM; thus, "about" or "approximately" 5 mM should be no less than 4.95.  *Id*.  Indeed, the buffer concentrations provided in the specification examples are to a hundredth or thousandths of a concentration unit, except for the A2, A4, and A5 formulations, where the buffer concentrations are to the tenth of a unit.  *Id*. ¶ 84; *Ortho-McNeil Pharm., Inc. v.*

*Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1327 (Fed. Cir. 2007) ("[T]he data points from the experiments described in the specification support a conclusion" of a narrow meaning for "about"). The specification also explains that suitable buffer concentrations for use in the claimed formulations are "about 5 mM, about 6 mM, about 7 mM, . . . , or about 20 mM," indicating that Silvergate intended for "about" to mean that a measured concentration is rounded to its next whole number concentration unit. '868 patent 14:51-57; Moreton Decl. ¶ 82; *Ortho-McNeil*, 476 F.3d at 1327. At best for Silvergate, "about 5 mM" would mean 4.5-5.4 mM. None of 2.03, 2.78, or 2.83 mM literally meet "about 5 mM to about 20 mM" and, because those elements were included during prosecution to overcome three separate WD rejections, PHE precludes Silvergate's DOE claims. Moreton Decl. ¶¶ 77-86, 123-26, 136.[3]

### 4.    '621 Patent Claim 30

As explained above, the specification includes no WD of a buffer that consists only of acid dissociated from an enalapril salt, like                                        Thus, "buffer" must be construed to mean "a buffering agent or mixture of agents that maintain(s) the pH . . . beyond any pH maintenance provided by . . . any compound disassociated from an enalapril salt," as Bionpharma has proposed. 20-1256 D.I. 74-1, JCCC Ex. B at 10; Moreton Decl. ¶¶ 61-65; *Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) (claim term cannot be construed in a way that "would . . . expand the scope of the claims far beyond anything described in the specification"); *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377,

---

[3] *Par Pharmaceutical, Inc. v. Hospira, Inc.*, 835 F. App'x 578 (Fed. Cir. 2020) is distinguishable because Silvergate's Patents, unlike the *Par* patent, include the aforementioned intrinsic evidence explaining what "about" means, *id.* at 583-85, and that evidence supports a finding of no literal infringement. Moreover, **Silvergate narrowed the buffer limitation** to require "about 5 to about 20 mM," which supports a narrow application of "about." *Ortho-McNeil*, 476 F.3d at 1327 (applying "about" narrowly because of the intrinsic evidence).

1382-83 (Fed. Cir. 1999) (same).  All of the specification example formulations, and all of the at least 39 separate formulations described in inventor declarations submitted during prosecution, use supporting Bionpharma's construction.  Moreton Decl. ¶ 65.  Under this proper construction, Bionpharma's ANDA product does not infringe any of the PI Claims.

## II.    SILVERGATE HAS FAILED ESTABLISH IRREPARABLE HARM

### A.    Silvergate's Delay in Filing for Its Second Wave Patents Undercuts Alleged Harm

"[D]elay in seeking a remedy is an important factor bearing on the need for a [PI]."  *High Tech Med. v. New Image*, 49 F.3d 1551, 1557 (Fed. Cir. 1995).  "Absent a good explanation," a delay in seeking relief "militates against the issuance of a [PI]."  *Id*.  Silvergate began filing for its First Wave Patents back in 2016 ('008 patent at cover), but waited to start filing for its Second Wave Patents—which all claim priority to Silvergate's First Wave Patents—until late October 2018 ('482 patent at cover), only *after* Bionpharma filed its ANDA.  Silvergate could have, and should have, filed for its Second Wave Patents earlier.  Silvergate failed to do so, however, because, as explained above, Silvergate's Second Wave Patents ███████████████ ██████████████████████████████████████████ ████████ instead, they represent a strategic, improper, last-ditch attempt by Silvergate to stave off generic competition.

### B.    Silvergate's Damages Would Be Quantifiable

Silvergate's assertion that it will suffer irreparable harm from ████████████████ ██████████ upon launch of Bionpharma's ANDA product (PI Mot. Br. at 15-16) is simply false.  ████████████████████████████████████████ is not enough to establish irreparable harm.  *Novartis Corp. v. Teva Pharm. USA, Inc.*, Civ. No. 04-4473 (HAA)(ES), 2007 WL 1695689, at *26-*27 (D.N.J. Jun. 11, 2007); *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed.

18

Cir. 1991).  Here, as Bionpharma's expert, Mr. McSorley, explains ███████████

█ █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████  McSorley Decl. ¶¶ 16-17, 20.  Further, Silvergate has produced documents

in this case ██████████████████████████ █ ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████  *Id.* ¶¶ 21-22.  From this information ████████

███████████████████████████████████████████████████████████

█████ █ ████████████████████████████████ particularly given that █████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ █ ███████████  *Id.* ¶¶ 19, 23; *Graceway Pharm., LLC v.*

*Perrigo Co.*, 722 F. Supp. 2d 566, 577 (D.N.J. 2010) (In a market characterized by "unit-by-unit

competition," "damages can be calculated relatively easily and such a calculation undermines the

position that harm is irreparable."); *Eli Lilly and Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578

(Fed. Cir. 1996) (same).  Similarly, █████████████████████████████████

███████████████  can be quantified.  McSorley Decl. ¶¶ 31-32; *Novartis*, 2007 WL 1695689, at

*27 (rejecting claim that price erosion was unquantifiable).

        Silvergate's █████████████████████████████████████████

██████████████████  (PI Mot. Br. 15-16) ████████████████  and undermined by

precedent:  sales and revenues of Plavix®, another oral drug used to treat heart disease, rebounded

entirely after the generic (Apotex) was removed from the market a few weeks after an at-risk

launch in August 2006—even though Apotex had shipped quantities that remained in distributors'

19

inventories until 2007—and the brand sustained no long-term adverse impact.  McSorley Decl. ¶¶ 26-30. 

(PI Mot. Br. 17-18)

*Id.* ¶¶ 33-38.

rejected by the Federal Circuit as grounds for irreparable harm.  *Eli Lilly*, 82 F.3d at 1578.

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC POLICY SUPPORT DENIAL

Silvergate does not seek to preserve the status quo; rather, it seeks to alter it by delaying the launch of Bionpharma's ANDA product after Silvergate has enjoyed a full 30-month stay of approval of Bionpharma's ANDA, with patents that Silvergate could have filed for much earlier. Bionpharma has made a significant investment in its design-around product, and has waited 30-months so that the parties could secure certainty over Silvergate's First Wave Patents. Any further delay in the launch of Bionpharma's ANDA is simply prejudicial to Bionpharma.  McSorley Decl. ¶¶ 47-53.  The "public interest [favors] receiving generic competition to brand-name drugs as soon as is possible."  *Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 203 (D.D.C. 1997).

## IV.   SILVERGATE MUST POST A BOND

If the Court is inclined to grant the PI Motion, Bionpharma respectfully requests that Silvergate be required to post a bond to secure Bionpharma's rights in an amount identified in paragraph 59 of the McSorley Declaration.  FED. R. CIV. P. 65(c).

## CONCLUSION

Bionpharma respectfully requests that Silvergate's PI Motion be denied.

Dated:  April 19, 2021

/s/ Kenneth L. Dorsney
Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6855
kdorsney@morrisjames.com

*Of Counsel*:
Andrew M. Alul
Roshan P. Shrestha, Ph.D.
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, IL 60601
312-527-4000
aalul@taftlaw.com
rshrestha@taftlaw.com

*Attorneys for Defendant
Bionpharma Inc.*

21