# EXHIBIT 1

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 2

# REDACTED IN ITS ENTIRETY

# EXHIBIT 3

*sealed and confidential*

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

    SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
4                                         :
              Plaintiff,                  :
5    v                                    :
                                          :
6    BIONPHARMA, INC.,                    :    NO. 18-1962-LPS
                                          :    NO. 19-1067-LPS
7              Defendant.                 :
    -------------------------------------
8    SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
                                          :
9              Plaintiff,                 :
    v                                     :
10                                        :
    AMNEAL PHARMACEUTICALS, LLC,          :
11                                        :    NO. 19-678-LPS
              Defendant.                  :
12                              - - -

13                        Wilmington, Delaware
                        Thursday, February 4, 2021
14             *Bench Trial - Volume D - Sealed Portion*

15                              - - -

16   BEFORE:       HONORABLE LEONARD P. STARK, Chief Judge

17                              - - -
    APPEARANCES:
18

19             MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:  MEGAN E. DELLINGER, ESQ.
20
                   and
21
               WILSON SONSINI GOODRICH & ROSATI
22             BY:  WENDY L. DEVINE, ESQ., and
                   KRISTINA M. HANSON, ESQ.
23                 (San Francisco, California)

24                 and

25   Valerie J. Gunning              Brian P. Gaffigan
    Official Court Reporter          Official Court Reporter

*sealed and confidential*

1    APPEARANCES:

2

3              WILSON SONSINI GOODRICH & ROSATI
               BY:  NATALIE J. MORGAN, ESQ.
                   (San Diego, California)

4

5              and

6              WILSON SONSINI GOODRICH & ROSATI
               BY:  GRANVILLE C. KAUFMAN, ESQ., and
                   TY W. CALLAHAN, ESQ.

7                  (Los Angeles, California)

8                      Counsel for Silvergate
                       Pharmaceuticals, Inc.

9

10             MORRIS JAMES, LLP
               BY:  KENNETH L. DORSNEY, ESQ., and

11                  CORTLAN S. HITCH, ESQ.

12             and

13             TAFT STETTINIUS & HOLLISTER, LLP
               BY:  ROSHAN P. SHRESTHA, Ph.D., ESQ., and

14                  ANDREW M. ALUL, ESQ.
                   (Chicago, Illinois)

15

                       Counsel on behalf of Bionpharma, Inc.
16

17             YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  ANNE SHEA GAZA, ESQ.,

18                  KAREN L. PASCALE, ESQ., and
                   SAMANTHA G. WILSON, ESQ.

19

20             and

               MADDOX EDWARDS, PLLC
21             BY:  STEVEN MADDOX, ESQ.
                   JEREMY EDWARDS, ESQ.

22                  MATTHEW RUEDY, ESQ., and
                   KAVEH SABA, ESQ.

23                  (Washington, District of Columbia)

24                     Counsel on behalf of
                       Amneal Pharmaceuticals, LLC

25

*sealed and confidential*

1045

David - direct

1       - oOo -

2                       P R O C E E D I N G S

3               (Following portion ordered sealed by the Court,

4       contained herein.)

5               THE COURT:  Go ahead.

6               MR. CALLAHAN:  Mr. MacQueen, if we can turn to

7       PDX-074.

8                       DIRECT EXAMINATION

9       BY MR. CALLAHAN:

10      Q.      Mr. David, what does this slide show?

11      A.      Well, I first evaluated the sales of Epaned oral and

12      the predecessor Epaned Kit, and what you see here, it's the

13      monthly sales by Silvergate of monthly units of those two

14      products.

15              Everything to the left of vertical line is

16      Epaned oral solution, and essentially everything to the

17      right is -- excuse me -- is Epaned Kit to the left and

18      everything to the right is essentially Epaned oral solution.

19              There was a very small amount of kit that was

20      sold during the transition period, but essentially all oral

21      solution after January 2017.

22              And what you can see in the blue line, that's

23      monthly sales.  And then I added the orange line which is

24      a moving average of that to smooth out some of the

25      fluctuation.

*sealed and confidential*

David - direct

1    And you can see that when the kit was launched,

2    sales increased pretty rapidly over a two- to three-year

3    period and essentially have begun to level out around early

4    to mid-2016.  That's just to the left of the vertical line.

5    You can see sales of the Kit roughly leveling

6    out just under ████ units per month.

7    And then the oral solution product is launched

8    in January 2017.  The kit is withdrawn from the market,

9    sales remain flat for another few months and then start to

10   move upward again, reaching about ████ units per month

11   around early 2020, which is the last date that I had data

12   for when I performed this analysis.

13   Q.    And as sources for this figure, did you list PTX-254

14   and PTX-255?

15   A.    Yes.  Those are the -- the exhibit versions of the

16   original materials that I reviewed.

17   MR. CALLAHAN:  If we could turn to the next

18   slide, which is PDX-705.

19   BY MR. CALLAHAN:

20   Q.    Dr. David, what does this slide show?

21   A.    So now I'm comparing the sales of the two Epaned

22   products against sales of enalapril overall in two age

23   groups:  the age 0 to 2 population and the 3 to 9

24   population.  So these two lines represent the share of

25   prescriptions of all enalapril in those two age groups.

David - direct

1     And, again, everything to the left of the line

2   is kit; to the right is oral solution.

3     And what you can see is that the kit product was

4   gradually gaining market share in these age groups, reaching

5   about ▇ percent in the 0 to 2 and about ▇ percent in the 3

6   to 9 age groups.

7     That latter number is a little lower because

8   Silvergate was generally targeting patients toward the lower

9   end of that range, toddlers really.

10     So, by the way, you can see that even as of

11   2016, the kit is still representing a minority of the market

12   for enalapril overall among these groups.

13     But then after the solution is launched,

14   those market shares move upward, or continue to move

15   upwards, reaching over ▇ percent in the 0 to 2 group by

16   early 2020 and over ▇ percent in the 3 to 9 group by

17   early 2020.

18   Q.   And to date, what percentage of Epaned has been sold

19   to patients in these age groups?

20   A.   It's about ▇ percent to date within these two age

21   groups.  And, again, mostly in the 0 to 2 and perhaps 3 to 6

22   group.

23     And I should add, by the way, that the data here

24   is now in Plaintiffs' Exhibits 34 and 251.

25   Q.   Thank you, Dr. David.

*sealed and confidential*
1048
David - direct

1    MR. CALLAHAN:  Mr. MacQueen, if we can pull up

2    page SLVGT-EPA-100529 of PTX-29, and also page Bates ending

3    599 of PTX-329.

4    Perfect.

5    BY MR. CALLAHAN:

6    Q.    Dr. David, can you explain how these pages relate to

7    your opinions?

8    A.    Sure.

9    These are some internal Silvergate

10   presentations.  I believe they're prepared around 2017, just

11   around the launch of the oral solution product.  And they

12   describe some of the strategy of the company.

13   We heard from Mr. Beckloff that the company was

14   essentially founded to treat pediatric -- to develop

15   treatments for pediatric --

16   THE COURT REPORTER:  I'm sorry.  I'm sorry, but

17   the witness is frozen.

18   Excuse me --

19   BY THE WITNESS:

20   A.    -- there the Epaned oral solution products --

21   THE COURT REPORTER:  Excuse me.  Excuse me.

22   BY THE WITNESS:

23   A.    -- which had just been launched.

24   THE COURT:  Hold on.  Hold on, Doctor.

25   THE COURT REPORTER:  I had lost his entire

David - direct

 1     answer.  The screen froze, and I did not get any of the

 2     answer.

 3                    If I could just have the answer repeated.

 4                    THE COURT:  Okay.

 5                    Dr. David, the court reporter missed your

 6     answer.

 7                    So, Mr. Callahan, why don't you ask the question

 8     again; and, unfortunately, Dr. David, we'll need you to

 9     repeat your answer.

10                    THE WITNESS:  That's quite all right.

11     BY MR. CALLAHAN:

12     Q.     So look at Bates ending 100529 of PTX-29, and page

13     with Bates ending 599 of PTX-329, Dr. David, can you explain

14     how these pages relate to your opinions?

15     A.     Sure.  So these are internal Silvergate presentations

16     that were produced in 2017 right around the launch time of

17     the oral solution product.  And they describe the strategy

18     of the company, provide similar information to what we heard

19     from Mr. Beckloff earlier this week.

20                    That Silvergate was a company that initiated and

21     that proceeded primarily or exclusively to develop products

22     for pediatric patients.  And you can see on the left there

23     at the top that that was, in fact, the strategy even as of

24     2017; providing accurate dosing products for pediatric

25     patients.  And you've got a picture there of the oral

*sealed and confidential*

David - direct

 1    solution product on that left-hand slide.

 2            And then I was going to move to the right-hand

 3    slide and it gets into a little bit more detail about that

 4    strategy.

 5            You can see that the primary sales targets on

 6    the left-hand side of that slide are children's hospitals;

 7            And that the prescriber base are doctors at

 8    those hospitals who practice in a variety of fields, but

 9    they're all pediatric physicians.

10            So that was the purpose of Silvergate from the

11    very beginning, and that was the strategy that they pursued

12    including with Epaned, both the kit and the oral solution,

13    products.

14    Q.    Thank you, Dr. David.

15            MR. CALLAHAN:  If we can go back to the slide.

16    Specifically, if we can show specifically, PDX-706.

17    BY MR. CALLAHAN:

18    Q.    What does this slide show?

19    A.    So this now evaluates the price of the different

20    Epaned products.  And I got this information from PTX-254

21    and 255.

22            As you can see on the left, the kit was

23    introduced to the list price of ██.  And if you take out

24    discounts in rebates, the average net price was about ██

25    or ██ during the period in which it was sold.  And then

*sealed and confidential*

1051

David - direct

1    there never was a price increase for that product.  So that

2    was Silvergate's strategy.

3                You can see then that the oral solution product

4    is introduced in January 2017 at a much higher price.  And

5    this is going to be a critical issue on the question of

6    commercial success.

7                The list price for the oral solution product

8    was approximately ███, and around ███ net after rebate.

9    So you've got almost a doubling of price, which, again, is

10   quite significant.  In particular, because as we saw before,

11   there was no decline in sales, in the unit sales.

12               So we've got a very large increase in price with

13   no adverse impact on the amount of the product that was

14   sold.

15   Q.    And --

16   A.    I just would like to -- I'm sorry, Ty.  I'd just like

17   to add one more thing.

18               Keep in mind, you could compare these prices to

19   the price of the tablet, which is, at this time, around $30

20   per unit.  So these are very, very large premiums relative

21   to the tablet version of enalapril.

22   Q.    Thank you.

23               MR. CALLAHAN:  And if we can go to the next

24   slide, which is PDX-707.

25   BY MR. CALLAHAN:

*sealed and confidential*

1052

David - direct

1  Q.      What does this slide show?

2  A.      Well, we've looked at quantities and prices.  If you

3  put that together with some cost information, you can get

4  profits as well as revenues, and that is what I have done

5  here.

6          Again, on the left we've got four years of

7  history of Epaned Kit, and then on the right, we've got

8  another four years of oral solution.

9          The very top of the red bars represents the

10  gross revenues.  And you can see that that number increased

11  by almost ████████████ from 2016 to 2017 in line with those

12  price increases that we just saw.

13          But there were no corresponding cost increases

14  so that translates -- in fact, costs went down a little bit.

15  And so that translates into a very significant increase in

16  profits.

17          And the measure of profits that I've got here

18  are the blue bars which are the net margins.

19          That represents all the revenues that came into

20  Silvergate from the Epaned products minus all of the costs

21  that the company tracks for its specific products, which

22  means manufacturing costs and freight costs and anything

23  else that it can designate to a particular product.  And

24  you can see that that number, the net margin increased by

25  over ██████████, more than doubling from 2016 to 2017, and

David - direct

1    currently nearing ▬▬▬▬ a year compared to less than

2    ▬▬▬▬ a year prior to the launch of Epaned oral

3    solution.

4            So at the end of the day, more than a doubling

5    of net margin for the company due to the launch of oral

6    solution relative to what it was doing before with Epaned

7    Kit.

8            And I should just add that the data here came

9    from documents which are now PTX-250, 255, and 259.

10           MR. CALLAHAN:  If we could turn to the next

11   slide, PDX-708.

12   BY MR. CALLAHAN:

13   Q.    Based on the financial performance metrics we

14   discussed, what did you conclude?

15   A.    I looked at each of these and considered whether they

16   provide evidence consistent with or indicative of commercial

17   success, and I concluded that they do.  I highlighted five

18   of those here.

19           The high profits relative to the development

20   costs is one.

21           And now, we haven't discussed that yet, but it

22   costs about ▬▬▬▬ for Silvergate to develop the oral

23   solution product over a two- or three-year period in 2014 to

24   2016.  That money is only about ▬ percent of one year of

25   net margin of the new product.

*sealed and confidential*

David - direct

1    So Silvergate was already paying back its

2 development costs after just a few months of sales.

3    So that is obviously indicative of a successful

4 product.

5    We talked about the higher price and the lack of

6 any decline in sales.  That demonstrates much higher demand

7 for Epaned oral solution relative to Epaned Kit.

8    I mentioned the lower costs, so there were

9 additional cost savings that helped improve margins when

10 Epaned oral solution was launched.

11    Also evidence of a successful product.

12    And, of course, just generally speaking, very

13 high margins, in excess of █ percent at the net margin

14 level for Epaned oral solution from 2017 forward.

15    And then finally, the very high market shares

16 within that targeted group of patients that were likely to

17 use an Epaned product, it had been █ to █ percent prior

18 to the launch of kit, and most recently now exceeding

19 █ percent in the 0 to 2 group and █ percent when

20 considering both groups together.

21    So high market shares; again, indicative of

22 commercial success.

23 Q.    You mentioned the higher price of Epaned relative to

24 Epaned Kit.  How do you know that higher price relates to

25 the patented features of Epaned?

*sealed and confidential*
1055
David - direct

1    A.    Well, that was in discussion with Mr. Beckloff about

2    the company's strategy.  That is what he told me.  And I

3    believe he testified about that earlier.

4           But I also reviewed a number of documents that

5    support that conclusion, and I think we've got some here.

6           MR. CALLAHAN:  Yes.  Mr. MacQueen, if you can

7    call page Bates ending 3- -- 100388 and 100389 from PTX-31.

8           Thank you.

9    BY MR. CALLAHAN:

10   Q.    Dr. David, what do these pages show?

11   A.    So these are some pages from a document that was

12   prepared for Silvergate to value the company around 2015.

13   So this is during the period when the oral solution product

14   was being developed but prior to its launch.

15          THE WITNESS:  And if we could look at the

16   left-hand side and call out that box on the upper right.

17   BY THE WITNESS:

18   A.    So this is a discussion of a forecast of the revenue

19   for the company as of 2015.  And the main point here is that

20   the entry of Epaned RTU, that's the oral solution, as well

21   as some other products, drives significant growth.  And

22   they're talking about growth and revenue.

23          So, now, why is that important?

24          Well, if we're talking about growth, the

25   company already had Kit.  So if there's going to be

*sealed and confidential*

1056

David - direct

1    additional growth from RTU, it has to be because the company

2    expects that it is going to be able to charge more or sell

3    more of the oral solution product than it did or that it

4    expected to of the Epaned Kit.

5              As we saw, the unit sales were roughly

6    consistent between the two products.  So really this extra

7    growth in revenue is coming from the company's ability to

8    charge a higher price for the better product.

9              And that was something that it anticipated well

10   before the launch of Epaned oral solution.

11             And I think there's another point, perhaps just

12   below that one, if we could go back to the left-hand slide.

13   Down at the bottom there under "Key Assumptions."

14             You can see that top point, "Premium pricing

15   possible for oral solution."

16             And, again, what premium compared to do what?

17             Well, it must be compared to the kit which is

18   already on the market at that time.

19             Notice while we're here mention of the market

20   share in excess of ██ percent expected, and, in fact, we're

21   nearing that level as of today, just three years into the

22   launch of the oral solution product.

23             Then I think there's some more information on

24   the right-hand slide.

25             Yes, if we can call out the top there.

*sealed and confidential*

1057

David - direct

1  Q.      And this is PTX ending 389 -- or, I'm sorry, Bates

2  number ending 100389; is that correct?

3  A.      Right.  And you can see here that as of 2015, there

4  was an expectation there would be a higher price for the RTU

5  product at ███.

6          In fact, at the end of the day, Silvergate even

7  revised that number upward.  It was closer to ███ where the

8  oral solution product was launched.

9          And, again, half price increase compared to what

10  it expected it could do with the kit.  And that's going to

11  be one of the main bases for my conclusions about commercial

12  success.

13          MR. CALLAHAN:  Let's turn back to your slides

14  and go to PDX-709.

15  BY MR. CALLAHAN:

16  Q.      Did you also analyze profitability and return on

17  investment?

18  A.      Yes.  And that's what you can see here, which was

19  developed in my expert report from various documents,

20  including PTX-250, 253, 255, 256, 258, and 259.

21          And this is really from my point of view, as an

22  economist, the bottom line on the question of commercial

23  success.  And the way I evaluate that is, did the new

24  product -- was the new product successful from the point

25  of view of Silvergate in terms of justifying the initial

*sealed and confidential*

1058

David - direct

1   investment and any costs that the company incurred did

2   compared to what it could have done, its next-best

3   alternative, which was to sit back and continue to sell

4   Epaned Kit.

5           So I'm comparing the two products and evaluating

6   how much more successful Epaned oral solution was relative

7   to Epaned Kit.

8           And I could just walk everybody through the few

9   lines here.

10          Row (a) are the extra profits that Silvergate

11  earned by selling Epaned oral solution instead of selling

12  the same amount of Epaned Kit.  And it's got higher price,

13  and we talked about the lower cost.  And when you net those

14  things out, you get about ███████████ a year, in excess of

15  ███████████ a year additional profit from selling Epaned

16  oral solution relative to Epaned Kit.

17          So that's the benefit to the company from

18  selling the product.

19          Of course, on the cost side, you've got row (b),

20  it took some investment to bring this product to market.  I

21  mentioned roughly ███████████ over a three-year period and a

22  little bit of capital costs ongoing.

23          So we want to subtract that out to get the net

24  return to the company, and that is row (c).  And you see

25  that number is about ███████████ a year today, and it is

*sealed and confidential*
1059

David - direct

1  continuing on where I would expect that's at least ███

2  ████████ a year going forward.

3          In order to evaluate all those different

4  numbers in each year in one place, with one single measure,

5  I discount those dollars back to 2014, which was when the

6  initial decision to invest in the oral solution product was

7  made.  And when you discounted back, you get a number, a net

8  present value number in row (e) of about ████████.

9          So this project, after just three years of

10  launch, has already earned Silvergate ████████, and that

11  number is increasing at about ████████ a year as you can

12  see from the number in the bottom right under 2019.

13          That was the additional net present value of the

14  product oral solution relative to Epaned Kit.

15          So ████████ net return already, increasing by

16  ████████ a year.

17          Another way to look at that is the number in

18  row (f), which is, what kind of return on investment has

19  Silvergate earned from this project?

20          And I calculate that number to be ██ percent

21  per year.  So that is like if you put $100 in the bank, at

22  the end of the year you've got ████.  That is clearly a

23  fantastic investment return, far higher than a normal stock

24  market return or a bond return or anything like that.

25          For me, ultimately, that is proof that this was

*sealed and confidential*
David - direct

1    a commercially successful product from the point of view of

2    Silvergate.

3    Q.        Thank you, Dr. David.

4              MR. CALLAHAN:  Your Honor, at this point I

5    think we can unseal the courtroom for the remainder of his

6    testimony.

7              THE COURT:  Okay.  Thank you.

8              Mr. English, let's do that, please.

9              (Sealed portion ends.)

10

11        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

12

13                              /s/ Brian P. Gaffigan
                              Official Court Reporter
14                              U.S. District Court

15

16

17

18

19

20

21

22

23

24

25

**$**

$100 [1] - 1059:21

$30 [1] - 1051:19

**/**

/s [1] - 1060:13

**0**

0 [5] - 1046:23, 1047:5, 1047:15, 1047:21, 1054:19

**1**

100388 [1] - 1055:7
100389 [2] - 1055:7, 1057:2
100529 [1] - 1049:12

18-1962-LPS [1] - 1043:6
19-1067-LPS [1] - 1043:6
19-678-LPS [1] - 1043:11

**2**

2 [5] - 1046:23, 1047:5, 1047:15, 1047:21, 1054:19

2014 [2] - 1053:23, 1059:5
2015 [3] - 1055:12, 1055:19, 1057:3
2016 [4] - 1047:11,

1052:11, 1052:25, 1053:24
2017 [9] - 1045:21, 1046:8, 1048:10, 1049:16, 1049:24, 1051:4, 1052:11, 1052:25, 1054:14
2019 [1] - 1059:12
2020 [3] - 1046:11, 1047:16, 1047:17
2021 [1] - 1043:13
251 [1] - 1047:24
253 [1] - 1057:20
255 [3] - 1050:21, 1053:9, 1057:20
256 [1] - 1057:20
258 [1] - 1057:20
259 [2] - 1053:9, 1057:20

**3**

1046:23, 1047:5, 1047:16, 1047:21
1055:7,

34 [1] - 1047:24
389 [1] - 1057:1

**4**

4 [1] - 1043:13

**5**

599 [2] - 1048:3, 1049:13

**6**

6 [1] - 1047:21

**7**

**9**

9 [3] - 1046:23, 1047:6, 1047:16

**A**

ability [1] - 1056:7
able [1] - 1056:2
accurate [2] - 1049:24, 1060:11
ACTION [2] - 1043:3, 1043:8
add [3] - 1047:23, 1051:17, 1053:8
added [1] - 1045:23
additional [4] - 1054:9, 1056:1, 1058:15, 1059:13
adverse [1] - 1051:13
age [7] - 1046:22, 1046:23, 1046:25, 1047:4, 1047:6, 1047:19, 1047:20
ahead [1] - 1045:5
almost [2] - 1051:9, 1052:11
alternative [1] - 1058:3
ALUL [1] - 1044:14
AMNEAL [1] - 1043:10
Amneal [1] - 1044:24
amount [3] - 1049:19, 1051:13, 1058:12
analysis [1] - 1046:12
analyze [1] - 1057:16
AND [1] - 1043:2
ANDREW [1] - 1044:14
Angeles [1] - 1044:7
ANNE [1] - 1044:17
answer [5] - 1049:1, 1049:2, 1049:3, 1049:6, 1049:9
anticipated [1] - 1056:9
APPEARANCES [2] - 1043:17, 1044:1
ARSHT [1] - 1043:19
Assumptions [1] - 1056:13
average [2] - 1045:24, 1050:24

**B**

bank [1] - 1059:21
bars [2] - 1052:9,

1052:18
base [1] - 1050:7
based [1] - 1053:13
bases [1] - 1057:11
Bates [5] - 1048:2, 1049:12, 1049:13, 1055:7, 1057:1
Beckloff [3] - 1048:13, 1049:19, 1055:1
BEFORE [1] - 1043:16
beginning [1] - 1050:11
begun [1] - 1046:3
behalf [2] - 1044:15, 1044:24
below [1] - 1056:12
Bench [1] - 1043:14
benefit [1] - 1058:17
best [1] - 1058:2
better [1] - 1056:8
between [1] - 1056:6
BIONPHARMA [1] - 1043:6
Bionpharma [1] - 1044:15
bit [3] - 1050:3, 1052:14, 1058:22
blue [2] - 1045:22, 1052:18
bond [1] - 1059:24
bottom [3] - 1056:13, 1057:22, 1059:12
box [1] - 1055:16
Brian [2] - 1043:25, 1060:13
bring [1] - 1058:20
BY [20] - 1043:19, 1043:22, 1044:3, 1044:6, 1044:10, 1044:13, 1044:17, 1044:21, 1045:9, 1046:19, 1048:5, 1048:19, 1048:22, 1049:11, 1050:17, 1051:25, 1053:12, 1055:9, 1055:17, 1057:15

**C**

c) [1] - 1058:24
calculate [1] - 1059:20
California [3] - 1043:23, 1044:3, 1044:7
CALLAHAN [19] - 1044:6, 1045:6, 1045:9, 1046:17, 1046:19, 1048:1, 1048:5, 1049:11, 1050:15, 1050:17,

1051:23, 1051:25, 1053:10, 1053:12, 1055:6, 1055:9, 1057:13, 1057:15, 1060:4
Callahan [1] - 1049:7
capital [1] - 1058:22
certify [1] - 1060:11
charge [2] - 1056:2, 1056:8
Chicago [1] - 1044:14
Chief [1] - 1043:16
children's [1] - 1050:6
CIVIL [2] - 1043:3, 1043:8
clearly [1] - 1059:22
closer [1] - 1057:7
Columbia [1] - 1044:23
coming [1] - 1056:7
commercial [5] - 1051:6, 1053:16, 1054:22, 1057:11, 1057:22
commercially [1] - 1060:1
company [13] - 1048:12, 1048:13, 1049:18, 1049:20, 1052:21, 1053:5, 1055:12, 1055:19, 1055:25, 1056:1, 1058:1, 1058:17, 1058:24
company's [2] - 1055:2, 1056:7
compare [1] - 1051:18
compared [5] - 1053:1, 1056:16, 1056:17, 1057:9, 1058:2
comparing [2] - 1046:21, 1058:5
CONAWAY [1] - 1044:17
conclude [1] - 1053:14
concluded [1] - 1053:17
conclusion [1] - 1055:5
conclusions [1] - 1057:11
considered [1] - 1053:15
considering [1] - 1054:20
consistent [2] - 1053:16, 1056:6
contained [1] - 1045:4
continue [2] -

1047:14, 1058:3
**continuing** [1] -
1059:1
**correct** [1] - 1057:2
**corresponding** [1] -
1052:13
**CORTLAN** [1] -
1044:11
**cost** [5] - 1052:3,
1052:13, 1054:9,
1058:13, 1058:19
**costs** [10] - 1052:14,
1052:20, 1052:22,
1053:20, 1053:22,
1054:2, 1054:8,
1058:1, 1058:22
**Counsel** [3] - 1044:8,
1044:15, 1044:24
**course** [2] - 1054:12,
1058:19
**COURT** [8] - 1043:1,
1045:5, 1048:16,
1048:21, 1048:24,
1048:25, 1049:4,
1060:7
**Court** [5] - 1043:25,
1045:3, 1060:13,
1060:14
**court** [1] - 1049:5
**courtroom** [1] -
1060:5
**critical** [1] - 1051:5

## D

**data** [3] - 1046:11,
1047:23, 1053:8
**date** [3] - 1046:11,
1047:18, 1047:20
**David** [10] - 1045:10,
1046:20, 1047:25,
1048:6, 1049:5,
1049:8, 1049:13,
1050:14, 1055:10,
1060:3
**decision** [1] - 1059:6
**decline** [2] - 1051:11,
1054:6
**Defendant** [2] -
1043:7, 1043:11
**DELAWARE** [1] -
1043:2
**Delaware** [1] -
1043:13
**DELLINGER** [1] -
1043:19
**demand** [1] - 1054:6
**demonstrates** [1] -
1054:6
**describe** [2] -
1048:12, 1049:17

**designate** [1] -
1052:23
**detail** [1] - 1050:3
**develop** [3] - 1048:14,
1049:21, 1053:22
**developed** [2] -
1055:14, 1057:19
**development** [2] -
1053:19, 1054:2
**DEVINE** [1] - 1043:22
**Diego** [1] - 1044:3
**different** [2] - 1050:19,
1059:3
**DIRECT** [1] - 1045:8
**discount** [1] - 1059:5
**discounted** [1] -
1059:7
**discounts** [1] -
1050:24
**discussed** [2] -
1053:14, 1053:21
**discussion** [2] -
1055:1, 1055:18
**DISTRICT** [2] - 1043:1,
1043:2
**District** [2] - 1044:23,
1060:14
**Doctor** [1] - 1048:24
**doctors** [1] - 1050:7
**document** [1] -
1055:11
**documents** [3] -
1053:9, 1055:4,
1057:19
**dollars** [1] - 1059:5
**done** [2] - 1052:4,
1058:2
**DORSNEY** [1] -
1044:10
**dosing** [1] - 1049:24
**doubling** [3] - 1051:9,
1052:25, 1053:4
**down** [2] - 1052:14,
1056:13
**Dr** [9] - 1046:20,
1047:25, 1048:6,
1049:5, 1049:8,
1049:13, 1050:14,
1055:10, 1060:3
**drives** [1] - 1055:21
**due** [1] - 1053:5
**during** [3] - 1045:20,
1050:25, 1055:13

## E

**early** [4] - 1046:3,
1046:11, 1047:16,
1047:17
**earned** [3] - 1058:11,

1059:10, 1059:19
**economist** [1] -
1057:22
**EDWARDS** [2] -
1044:20, 1044:21
**enalapril** [4] -
1046:22, 1046:25,
1047:12, 1051:21
**end** [4] - 1047:9,
1053:4, 1057:6,
1059:22
**ending** [6] - 1048:2,
1049:12, 1049:13,
1055:7, 1057:1,
1057:2
**ends** [2] - 1060:9
**English** [1] - 1060:8
**entire** [1] - 1048:25
**entry** [1] - 1055:20
**Epaned** [33] - 1045:11,
1045:12, 1045:16,
1045:17, 1045:18,
1046:21, 1047:18,
1048:20, 1050:12,
1050:20, 1052:7,
1052:20, 1053:2,
1053:6, 1054:7,
1054:10, 1054:14,
1054:17, 1054:23,
1054:24, 1054:25,
1055:20, 1056:4,
1056:10, 1058:4,
1058:6, 1058:7,
1058:11, 1058:12,
1058:15, 1058:16,
1059:14
**ESQ** [17] - 1043:19,
1043:22, 1043:22,
1044:3, 1044:6,
1044:6, 1044:10,
1044:11, 1044:13,
1044:14, 1044:17,
1044:18, 1044:18,
1044:21, 1044:21,
1044:22, 1044:22
**essentially** [5] -
1045:16, 1045:18,
1045:20, 1046:3,
1048:14
**evaluate** [2] - 1057:23,
1059:3
**evaluated** [1] -
1045:11
**evaluates** [1] -
1050:19
**evaluating** [1] -
1058:5
**evidence** [2] -
1053:16, 1054:11
**EXAMINATION** [1] -
1045:8
**exceeding** [1] -

1054:18
**excess** [3] - 1054:13,
1056:20, 1058:14
**exclusively** [1] -
1049:21
**Excuse** [1] - 1048:21
**excuse** [3] - 1045:17,
1048:18, 1048:21
**exhibit** [1] - 1046:15
**Exhibits** [1] - 1047:24
**expect** [1] - 1059:1
**expectation** [1] -
1057:4
**expected** [3] - 1056:4,
1056:20, 1057:10
**expects** [1] - 1056:2
**expert** [1] - 1057:19
**explain** [2] - 1048:6,
1049:13
**extra** [2] - 1056:6,
1058:10

## F

**fact** [4] - 1049:23,
1052:14, 1056:20,
1057:6
**fantastic** [1] - 1059:23
**far** [1] - 1059:23
**features** [1] - 1054:25
**February** [1] - 1043:13
**few** [3] - 1046:9,
1054:2, 1058:8
**fields** [1] - 1050:8
**figure** [1] - 1046:13
**finally** [1] - 1054:15
**financial** [1] - 1053:13
**first** [1] - 1046:13
**five** [1] - 1053:17
**flat** [1] - 1046:9
**fluctuation** [1] -
1045:25
**Following** [1] - 1045:3
**FOR** [1] - 1043:2
**forecast** [1] - 1055:18
**foregoing** [1] -
1060:11
**forward** [2] - 1054:14,
1059:2
**founded** [1] - 1048:14
**four** [2] - 1052:6,
1052:8
**Francisco** [1] -
1043:23
**freight** [1] - 1052:22
**froze** [1] - 1049:1
**frozen** [1] - 1048:17

## G

**Gaffigan** [2] -
1043:25, 1060:13
**gaining** [1] - 1047:4
**GAZA** [1] - 1044:17
**generally** [2] - 1047:8,
1054:12
**GOODRICH** [3] -
1043:21, 1044:2,
1044:5
**gradually** [1] - 1047:4
**GRANVILLE** [1] -
1044:6
**gross** [1] - 1052:10
**group** [5] - 1047:15,
1047:16, 1047:22,
1054:16, 1054:19
**groups** [8] - 1046:23,
1046:25, 1047:4,
1047:6, 1047:12,
1047:19, 1047:21,
1054:20
**growth** [5] - 1055:21,
1055:22, 1055:24,
1056:1, 1056:7
**Gunning** [1] - 1043:25

## H

**half** [1] - 1057:9
**hand** [6] - 1050:1,
1050:2, 1050:6,
1055:16, 1056:12,
1056:24
**HANSON** [1] - 1043:22
**heard** [2] - 1048:13,
1049:18
**helped** [1] - 1054:9
**hereby** [1] - 1060:11
**herein** [1] - 1045:4
**high** [4] - 1053:19,
1054:13, 1054:15,
1054:21
**higher** [9] - 1051:4,
1054:5, 1054:6,
1054:23, 1054:24,
1056:8, 1057:4,
1058:12, 1059:23
**highlighted** [1] -
1053:17
**history** [1] - 1052:7
**HITCH** [1] - 1044:11
**hold** [1] - 1048:24
**Hold** [1] - 1048:24
**HOLLISTER** [1] -
1044:13
**Honor** [1] - 1060:4
**HONORABLE** [1] -
1043:16

hospitals [2] - 1050:6, 1050:8

## I

Illinois [1] - 1044:14
impact [1] - 1051:21
important [1] - 1055:23
improve [1] - 1054:9
IN [2] - 1043:1, 1043:2
Inc [2] - 1044:8, 1044:15
INC [3] - 1043:3, 1043:6, 1043:8
including [2] - 1050:12, 1057:20
increase [4] - 1051:1, 1051:12, 1052:15, 1057:9
increased [3] - 1046:2, 1052:10, 1052:24
increases [2] - 1052:12, 1052:13
increasing [2] - 1059:11, 1059:15
incurred [1] - 1058:1
indicative [3] - 1053:16, 1054:3, 1054:21
information [4] - 1049:18, 1050:20, 1052:3, 1056:23
initial [2] - 1057:25, 1059:6
initiated [1] - 1049:20
instead [1] - 1058:11
internal [2] - 1048:9, 1049:15
introduced [2] - 1050:23, 1051:4
invest [1] - 1059:6
investment [5] - 1057:17, 1058:1, 1058:20, 1059:18, 1059:23
issue [1] - 1051:5

## J

JAMES [1] - 1044:10
January [3] - 1045:21, 1046:8, 1051:4
JEREMY [1] - 1044:21
Judge [1] - 1043:16
justifying [1] - 1057:25

## K

KAREN [1] - 1044:18
KAUFMAN [1] - 1044:6
KAVEH [1] - 1044:22
keep [1] - 1051:18
KENNETH [1] - 1044:10
Key [1] - 1056:13
kind [1] - 1059:18
Kit [14] - 1045:12, 1045:17, 1046:5, 1052:7, 1053:7, 1054:7, 1054:24, 1055:25, 1056:4, 1058:4, 1058:7, 1058:12, 1058:16, 1059:14
kit [11] - 1045:19, 1046:1, 1046:8, 1047:2, 1047:3, 1047:11, 1050:12, 1050:22, 1054:18, 1056:17, 1057:10
KRISTINA [1] - 1043:22

## L

lack [1] - 1054:5
large [2] - 1051:12, 1051:20
last [1] - 1046:11
latter [1] - 1047:7
launch [9] - 1048:11, 1049:16, 1053:2, 1053:5, 1054:18, 1055:14, 1056:10, 1056:22, 1059:10
launched [6] - 1046:1, 1046:7, 1047:13, 1048:23, 1054:10, 1057:8
least [1] - 1059:1
left [11] - 1045:15, 1045:17, 1046:4, 1047:1, 1049:22, 1050:1, 1050:6, 1050:22, 1052:6, 1055:16, 1056:12
left-hand [4] - 1050:1, 1050:6, 1055:16, 1056:12
LEONARD [1] - 1043:16
less [1] - 1053:1
level [3] - 1046:3, 1054:14, 1056:21
leveling [1] - 1046:5

## M

MacQueen [3] - 1045:6, 1048:1, 1055:6
MADDOX [2] - 1044:20, 1044:21
main [1] - 1055:19, 1057:11
manufacturing [1] - 1052:22
margin [4] - 1052:24, 1053:5, 1053:25, 1054:13
margins [3] - 1052:18, 1054:9, 1054:13
market [10] - 1046:8, 1047:4, 1047:11, 1047:14, 1054:15, 1054:21, 1056:18, 1056:19, 1058:20, 1059:24
materials [1] - 1046:16
MATTHEW [1] - 1044:22
means [1] - 1052:22
measure [2] - 1052:17, 1059:4
MEGAN [1] - 1043:19
mention [1] - 1056:19
mentioned [3] - 1054:8, 1054:23, 1058:21
metrics [1] - 1053:13
mid-2016 [1] - 1046:4

mind [1] - 1051:18
minority [1] - 1047:11
minus [1] - 1047:20
missed [1] - 1049:5
money [1] - 1053:24
month [2] - 1046:6, 1046:10
monthly [3] - 1045:13, 1045:23
months [2] - 1046:9, 1054:2
MORGAN [1] - 1044:3
MORRIS [2] - 1043:19, 1044:10
most [1] - 1054:18
mostly [1] - 1047:21
move [4] - 1046:10, 1047:14, 1050:2
moving [1] - 1045:24
MR [18] - 1045:6, 1045:9, 1046:17, 1046:19, 1048:1, 1048:5, 1049:11, 1050:15, 1050:17, 1051:23, 1051:25, 1053:10, 1053:12, 1055:6, 1055:9, 1057:13, 1057:15, 1060:4
must [1] - 1056:17

## N

NATALIE [1] - 1044:3
nearing [2] - 1053:1, 1056:21
need [1] - 1049:8
net [12] - 1050:24, 1051:8, 1052:18, 1052:24, 1053:5, 1053:25, 1054:13, 1058:13, 1058:23, 1059:7, 1059:13, 1059:15
never [1] - 1051:1
new [3] - 1053:25, 1057:23, 1057:24
next [4] - 1046:17, 1051:23, 1053:10, 1058:2
next-best [1] - 1058:2
NICHOLS [1] - 1043:19
NO [3] - 1043:6,

1043:6, 1043:11
normal [1] - 1059:23
notes [1] - 1060:11
notice [1] - 1056:19
number [13] - 1047:7, 1052:10, 1052:24, 1055:4, 1057:2, 1057:7, 1058:25, 1059:7, 1059:8, 1059:11, 1059:12, 1059:17, 1059:20
numbers [1] - 1059:4

## O

obviously [1] - 1054:3
OF [1] - 1043:2
Official [3] - 1043:25, 1060:13
one [7] - 1051:17, 1053:20, 1053:24, 1056:12, 1057:11, 1059:4
ongoing [1] - 1058:22
oOo [1] - 1045:1
opinions [2] - 1048:7, 1049:14
oral [32] - 1045:11, 1045:16, 1045:18, 1045:20, 1046:7, 1047:2, 1048:11, 1048:20, 1049:17, 1049:25, 1050:12, 1051:3, 1051:7, 1052:8, 1053:2, 1053:5, 1053:22, 1054:7, 1054:10, 1054:14, 1055:13, 1055:20, 1056:3, 1056:15, 1056:22, 1057:8, 1058:6, 1058:11, 1058:16, 1059:6, 1059:14
orange [1] - 1045:23
order [1] - 1059:3
ordered [1] - 1045:3
original [1] - 1046:16
overall [2] - 1046:22, 1047:12

## P

page [4] - 1048:2, 1049:12, 1055:7
pages [4] - 1048:6, 1049:14, 1055:10, 1055:11
particular [2] - 1051:10, 1052:23

**PASCALE** [1] - 1044:18
**patented** [1] - 1054:25
**patients** [5] - 1047:8, 1047:19, 1049:22, 1049:25, 1054:16
**paying** [1] - 1054:1
**PDX-074** [1] - 1045:7
**PDX-705** [1] - 1046:18
**PDX-706** [1] - 1050:16
**PDX-707** [1] - 1051:24
**PDX-708** [1] - 1053:11
**PDX-709** [1] - 1057:14
**pediatric** [5] - 1048:14, 1048:15, 1049:22, 1049:24, 1050:9
**per** [4] - 1046:6, 1046:10, 1051:20, 1059:21
**percent** [12] - 1047:5, 1047:15, 1047:16, 1047:20, 1053:24, 1054:13, 1054:17, 1054:19, 1056:20, 1059:20
**percentage** [1] - 1047:18
**perfect** [1] - 1048:4
**performance** [1] - 1053:13
**performed** [1] - 1046:12
**perhaps** [2] - 1047:21, 1056:11
**period** [6] - 1045:20, 1046:3, 1050:25, 1053:23, 1055:13, 1058:21
**Ph.D** [1] - 1044:13
**PHARMACEUTICAL S** [3] - 1043:3, 1043:8, 1043:10
**Pharmaceuticals** [2] - 1044:8, 1044:24
**physicians** [1] - 1050:9
**picture** [1] - 1049:25
**place** [1] - 1059:4
**Plaintiff** [2] - 1043:4, 1043:9
**Plaintiffs'** [1] - 1047:24
**PLLC** [1] - 1044:20
**point** [7] - 1055:19, 1056:11, 1056:14, 1057:21, 1057:24, 1060:1, 1060:4
**population** [2] - 1046:23, 1046:24
**portion** [2] - 1045:3,

1060:9
**Portion** [1] - 1043:14
**possible** [1] - 1056:15
**practice** [1] - 1050:8
**predecessor** [1] - 1045:12
**Premium** [1] - 1056:14
**premium** [1] - 1056:16
**premiums** [1] - 1051:20
**prepared** [2] - 1048:10, 1055:12
**prescriber** [1] - 1050:7
**prescriptions** [1] - 1046:25
**present** [2] - 1059:8, 1059:13
**presentations** [1] - 1048:10, 1049:15
**pretty** [1] - 1046:2
**price** [17] - 1050:19, 1050:23, 1050:24, 1051:1, 1051:4, 1051:7, 1051:9, 1051:12, 1051:19, 1052:12, 1054:5, 1054:23, 1054:24, 1056:8, 1057:4, 1057:9, 1058:12
**prices** [2] - 1051:18, 1052:2
**pricing** [1] - 1056:14
**primarily** [1] - 1049:21
**primary** [1] - 1050:5
**proceeded** [1] - 1049:21
**proceeding** [1] - 1060:11
**produced** [1] - 1049:16
**product** [28] - 1046:7, 1047:3, 1048:11, 1049:17, 1050:1, 1051:1, 1051:3, 1051:7, 1051:13, 1052:23, 1053:23, 1053:25, 1054:4, 1054:11, 1054:17, 1055:13, 1056:3, 1056:8, 1056:22, 1057:5, 1057:8, 1057:24, 1058:18, 1058:20, 1059:6, 1059:14, 1060:1
**products** [12] - 1045:14, 1046:22, 1048:20, 1049:21, 1049:24, 1050:13, 1050:20, 1052:20, 1052:21, 1055:21, 1056:6, 1058:5

**profit** [1] - 1058:15
**profitability** [1] - 1057:16
**profits** [5] - 1052:4, 1052:16, 1052:17, 1053:19, 1058:10
**project** [2] - 1059:9, 1059:19
**proof** [1] - 1059:25
**provide** [2] - 1049:18, 1053:16
**providing** [1] - 1049:24
**PTX** [1] - 1057:1
**PTX-250** [2] - 1053:9, 1057:20
**PTX-254** [2] - 1046:13, 1050:20
**PTX-255** [1] - 1046:14
**PTX-29** [2] - 1048:2, 1049:12
**PTX-31** [1] - 1055:7
**PTX-329** [2] - 1048:3, 1049:13
**pull** [1] - 1048:1
**purpose** [1] - 1050:10
**pursued** [1] - 1050:11
**put** [2] - 1052:3, 1059:21

## Q

**quantities** [1] - 1052:2
**quite** [2] - 1049:10, 1051:10

## R

**range** [1] - 1047:9
**rapidly** [1] - 1046:2
**reaching** [3] - 1046:10, 1047:4, 1047:15
**really** [3] - 1047:9, 1056:6, 1057:21
**rebate** [1] - 1051:8
**rebates** [1] - 1050:24
**recently** [1] - 1054:18
**red** [1] - 1052:9
**relate** [2] - 1048:6, 1049:14
**relates** [1] - 1054:24
**relative** [8] - 1051:20, 1053:6, 1053:19, 1054:7, 1054:23, 1058:6, 1058:16, 1059:14
**remain** [1] - 1046:9
**remainder** [1] - 1060:5
**repeat** [1] - 1049:9

**repeated** [1] - 1049:3
**report** [1] - 1057:19
**REPORTER** [3] - 1048:16, 1048:21, 1048:25
**Reporter** [3] - 1043:25, 1060:13
**reporter** [1] - 1049:5
**represent** [1] - 1046:24
**representing** [1] - 1047:11
**represents** [2] - 1052:9, 1052:19
**return** [7] - 1057:16, 1058:24, 1059:15, 1059:18, 1059:23, 1059:24
**revenue** [3] - 1055:18, 1055:22, 1056:7
**revenues** [3] - 1052:4, 1052:10, 1052:19
**reviewed** [2] - 1046:16, 1055:4
**revised** [1] - 1057:7
**right-hand** [2] - 1050:2, 1056:24
**ROSATI** [3] - 1043:21, 1044:2, 1044:5
**ROSHAN** [1] - 1044:13
**roughly** [3] - 1046:5, 1056:5, 1058:21
**row** [5] - 1058:10, 1058:19, 1058:24, 1059:8, 1059:18
**RTU** [3] - 1055:20, 1056:1, 1057:4
**RUEDY** [1] - 1044:22

## S

**SABA** [1] - 1044:22
**sales** [14] - 1045:11, 1045:13, 1045:23, 1046:2, 1046:5, 1046:9, 1046:21, 1046:22, 1050:5, 1051:11, 1054:2, 1054:6, 1056:5
**SAMANTHA** [1] - 1044:18
**San** [2] - 1043:23, 1043:3
**savings** [1] - 1054:9
**saw** [3] - 1051:10, 1052:12, 1056:5
**screen** [1] - 1049:1
**Sealed** [2] - 1043:14, 1060:9
**sealed** [1] - 1045:3
**see** [17] - 1045:12,

1045:22, 1046:1, 1046:5, 1047:3, 1047:10, 1049:22, 1050:5, 1050:22, 1051:3, 1052:10, 1052:24, 1056:14, 1057:3, 1057:18, 1058:24, 1059:12
**sell** [2] - 1056:2, 1058:3
**selling** [4] - 1058:11, 1058:15, 1058:18
**share** [3] - 1046:24, 1047:4, 1056:20
**shares** [3] - 1047:14, 1054:15, 1054:21
**SHEA** [1] - 1044:17
**show** [6] - 1045:10, 1046:20, 1050:16, 1050:18, 1052:1, 1055:10
**SHRESTHA** [1] - 1044:13
**side** [3] - 1050:6, 1055:16, 1058:19
**significant** [3] - 1051:10, 1052:15, 1055:21
**Silvergate** [17] - 1044:8, 1045:13, 1047:8, 1048:9, 1049:15, 1049:20, 1050:10, 1050:20, 1053:22, 1054:1, 1055:12, 1057:6, 1057:25, 1058:10, 1059:10, 1059:19, 1060:2
**SILVERGATE** [2] - 1043:3, 1043:8
**Silvergate's** [1] - 1051:2
**similar** [1] - 1049:18
**single** [1] - 1059:4
**sit** [1] - 1058:3
**slide** [13] - 1045:10, 1046:18, 1046:20, 1050:1, 1050:3, 1050:6, 1050:15, 1050:18, 1051:24, 1052:1, 1053:11, 1056:12, 1056:24
**slides** [1] - 1057:13
**SLVGT-EPA-100529** [1] - 1048:2
**small** [1] - 1045:19
**smooth** [1] - 1045:24
**sold** [4] - 1045:20, 1047:18, 1050:25, 1051:14
**solution** [32] -

1045:16, 1045:18, 1045:21, 1046:7, 1047:2, 1047:13, 1048:11, 1048:20, 1049:17, 1050:1, 1050:12, 1051:3, 1051:7, 1052:8, 1053:3, 1053:6, 1053:23, 1054:7, 1054:10, 1054:14, 1055:13, 1055:20, 1056:3, 1056:10, 1056:15, 1056:22, 1057:8, 1058:6, 1058:11, 1058:16, 1059:6, 1059:14
**SONSINI** [3] - 1043:21, 1044:2, 1044:5
**sorry** [4] - 1048:16, 1051:16, 1057:1
**sources** [1] - 1046:13
**speaking** [1] - 1054:12
**specific** [1] - 1052:21
**specifically** [2] - 1050:16
**STARGATT** [1] - 1044:17
**STARK** [1] - 1043:16
**start** [1] - 1046:9
**STATES** [1] - 1043:1
**stenographic** [1] - 1060:11
**STETTINIUS** [1] - 1044:13
**STEVEN** [1] - 1044:21
**still** [1] - 1047:11
**stock** [1] - 1059:23
**strategy** [7] - 1048:12, 1049:17, 1049:23, 1050:4, 1050:11, 1051:2, 1055:2
**subtract** [1] - 1058:23
**success** [5] - 1051:6, 1053:17, 1054:22, 1057:12, 1057:23
**successful** [5] - 1054:3, 1054:11, 1057:24, 1058:6, 1060:1
**support** [1] - 1055:5

**T**

**tablet** [2] - 1051:19, 1051:21
**TAFT** [1] - 1044:13
**targeted** [1] - 1054:16
**targeting** [1] - 1047:8
**targets** [1] - 1050:5

**TAYLOR** [1] - 1044:17
**terms** [1] - 1057:25
**testified** [1] - 1055:3
**testimony** [1] - 1060:6
**THE** [14] - 1043:1, 1043:2, 1045:5, 1048:16, 1048:19, 1048:21, 1048:22, 1048:24, 1048:25, 1049:4, 1049:10, 1055:15, 1055:17, 1060:7
**three** [5] - 1046:2, 1053:23, 1056:21, 1058:21, 1059:9
**three-year** [3] - 1046:2, 1053:23, 1058:21
**Thursday** [1] - 1043:13
**today** [2] - 1056:21, 1058:25
**toddlers** [1] - 1047:9
**together** [2] - 1052:3, 1054:20
**took** [1] - 1058:20
**top** [4] - 1049:23, 1052:9, 1056:14, 1056:25
**toward** [1] - 1047:8
**tracks** [1] - 1052:21
**transcript** [1] - 1060:11
**transition** [1] - 1045:20
**translates** [2] - 1052:14, 1052:15
**treat** [1] - 1048:14
**treatments** [1] - 1048:15
**Trial** [1] - 1043:14
**true** [1] - 1060:11
**TUNNELL** [1] - 1043:19
**turn** [4] - 1045:6, 1046:17, 1053:10, 1057:13
**two** [10] - 1045:13, 1046:2, 1046:21, 1046:22, 1046:24, 1046:25, 1047:20, 1053:23, 1056:6, 1058:5
**Ty** [1] - 1051:16
**TY** [1] - 1044:6

**U**

**U.S** [1] - 1060:14
**ultimately** [1] - 1059:25

**under** [3] - 1046:6, 1056:13, 1059:12
**unfortunately** [1] - 1049:8
**unit** [3] - 1051:11, 1051:20, 1056:5
**UNITED** [1] - 1043:1
**units** [3] - 1045:13, 1046:6, 1046:10
**unseal** [1] - 1060:5
**up** [1] - 1048:1
**upper** [1] - 1055:16
**upward** [3] - 1046:10, 1047:14, 1057:7
**upwards** [1] - 1047:15

**V**

**Valerie** [1] - 1043:25
**value** [3] - 1055:12, 1059:8, 1059:13
**variety** [1] - 1050:8
**various** [1] - 1057:19
**version** [1] - 1051:21
**versions** [1] - 1046:15
**vertical** [2] - 1045:15, 1046:4
**view** [3] - 1057:21, 1057:25, 1060:1
**Volume** [1] - 1043:14

**W**

**walk** [1] - 1058:8
**Washington** [1] - 1044:23
**week** [1] - 1049:19
**WENDY** [1] - 1043:22
**Wilmington** [1] - 1043:13
**WILSON** [4] - 1043:21, 1044:2, 1044:5, 1044:18
**withdrawn** [1] - 1046:8
**witness** [1] - 1048:17
**WITNESS** [5] - 1048:19, 1048:22, 1049:10, 1055:15, 1055:17

**Y**

**year** [15] - 1046:2, 1053:1, 1053:2, 1053:23, 1053:24, 1058:14, 1058:15, 1058:21, 1058:25, 1059:2, 1059:4,

1059:11, 1059:16, 1059:21, 1059:22
**years** [4] - 1052:6, 1052:8, 1056:21, 1059:9
**YOUNG** [1] - 1044:17

# EXHIBIT 4

*sealed and confidential*

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -
      SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
 4                                         :
                 Plaintiff,                :
 5      v                                  :
                                           :
 6    BIONPHARMA, INC.,                     :    NO. 18-1962-LPS
                                           :    NO. 19-1067-LPS
 7               Defendant.                 :
      ------------------------------------
 8    SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
                                           :
 9               Plaintiff,                :
        v                                  :
10                                         :
      AMNEAL PHARMACEUTICALS, LLC,         :
11                                         :    NO. 19-678-LPS
                 Defendant.
12                         - - -

13                    Wilmington, Delaware
                   Friday, February 5, 2021
14             Bench Trial - Volume E - Sealed Portions

15                         - - -

16    BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge

17                         - - -
      APPEARANCES:
18

19              MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  MEGAN E. DELLINGER, ESQ.
20
                     and
21
                WILSON SONSINI GOODRICH & ROSATI
22              BY:  WENDY L. DEVINE, ESQ., and
                     KRISTINA M. HANSON, ESQ.
23                   (San Francisco, California)

24                   and

25    Valerie J. Gunning            Brian P. Gaffigan
      Official Court Reporter       Official Court Reporter
```

*sealed and confidential*

1   APPEARANCES:

2

3                   WILSON SONSINI GOODRICH & ROSATI
                    BY:  NATALIE J. MORGAN, ESQ.
                         (San Diego, California)
4
                         and
5
                    WILSON SONSINI GOODRICH & ROSATI
6                   BY:  GRANVILLE C. KAUFMAN, ESQ., and
                         TY W. CALLAHAN, ESQ.
7                        (Los Angeles, California)

8                            Counsel for Silvergate
                             Pharmaceuticals, Inc.
9

10                  MORRIS JAMES, LLP
                    BY:  KENNETH L. DORSNEY, ESQ., and
11                       CORTLAN S. HITCH, ESQ.

12                       and

13                  TAFT STETTINIUS & HOLLISTER, LLP
                    BY:  ROSHAN P. SHRESTHA, Ph.D., ESQ., and
14                       ANDREW M. ALUL, ESQ.
                         (Chicago, Illinois)
15
                             Counsel on behalf of Bionpharma, Inc.
16

17                  YOUNG CONAWAY STARGATT & TAYLOR, LLP
                    BY:  ANNE SHEA GAZA, ESQ.,
18                       KAREN L. PASCALE, ESQ., and
                         SAMANTHA G. WILSON, ESQ.
19
                         and
20
                    MADDOX EDWARDS, PLLC
21                  BY:  STEVEN MADDOX, ESQ.
                         JEREMY EDWARDS, ESQ.
22                       MATTHEW RUEDY, ESQ., and
                         KAVEH SABA, ESQ.
23                       (Washington, District of Columbia)

24                           Counsel on behalf of
                             Amneal Pharmaceuticals, LLC
25

*sealed and confidential*

1169

Hofmann - direct

1           - oOo -

2        P R O C E E D I N G S

3        (Following portion ordered sealed by the Court,

4   contained herein.)

5        THE COURT:  You may proceed.

6              DIRECT EXAMINATION

7   BY MR. RUEDY:

8   Q.     Mr. Hofmann, how did Silvergate transition Epaned Kit

9   sales to oral -- the Epaned oral solution?

10  A.     Well, I mean, the main, the main thing they did, or

11  things they did, was essentially they -- they stopped

12  supplying the Kit to the providers and, instead, began to

13  provide the ready-to-use solution.

14        And then through detailing and information

15  dissemination, essentially explained to prescribers that you

16  don't have to do anything differently, just keep writing

17  Epaned; and instead of the Kit, it will be supplied through

18  the ready-to-use solutions.

19        So it was a fairly seamless transition.

20  Q.     Now, did physicians have to actually change their

21  prescribing behavior in order to prescribe Epaned oral

22  solution rather than the Epaned Kit?

23  A.     They did not.  And that was really a central message

24  to prescribers by Silvergate; that they didn't have to do

25  anything differently, just write Epaned and people get the

Case 1:18-cv-01962-LPS  Document 304-2  Filed 07/30/21  Page 33 of 106 PageID #: 21150
*sealed and confidential*
1170
Hofmann - direct

1  ready-to-use solution.

2         MR. RUEDY:  And if we could go to DDX-705, please.

3  BY MR. RUEDY:

4  Q.    And, Mr. Hofmann, if you could explain to the Court

5  what you have on this slide, please.

6  A.    Yes.  So this is a marketing internal document in

7  terms of what Silvergate was identifying as the key points

8  for the promotion of the ready-to-use solution.

9         And you can see I've highlighted in yellow they

10  identify the key point being that you don't have to do

11  anything differently, just keep prescribing Epaned.

12         And that's, I think, based on PTX-257.

13  Q.    And that's at page SLVGT-EPA_0094016?

14  A.    Yes, sir.

15  Q.    Did you review any documentation regarding the

16  lifecycle management that was made by Silvergate?

17  A.    Yes.  So there was financial data that reflects the

18  cannibalization, if you will, of the unit sales and the

19  movement from the Kit to the ready-to-use solution.

20         Now, of course, as is common in a lifecycle

21  management strategy, there was also a price increase that

22  Silvergate imposed.  But given the small patient population,

23  you know, they were able to essentially enhance revenues but

24  essentially cannibalize the existing sales of Epaned Kit.

25         MR. RUEDY:  Next slide, please.

*sealed and confidential*
1171

Hofmann - direct

1    BY MR. RUEDY:

2    Q.     And, Mr. Hofmann, if you could explain for the Court

3    the graph on this page, please.

4    A.     Yes.  So this is, as you can see in the background,

5    a board of directors meeting slide from 2016, which is the

6    Epaned launch.  And essentially this shows, with the

7    existing Epaned Kit units being on the far left, that the

8    higher end, still only ███████ units a month, is the kind of

9    drug, you know, declining rapidly.  And then the upward

10   lines in the line graph, expecting full conversion, you

11   know, within months, having changed the supply chain from

12   kit to the ready-to-use solution.  And the seamless ability

13   to allow prescribers to essentially just keep supplying

14   Epaned for the very few patients that even take this and

15   fully convert it, like I said, in a matter of months while

16   taking a bit of a price increase.

17   Q.     And what document do you rely on for this point?

18   A.     I believe it's PTX-328 at SLVGT-EPA_0092913.

19          MR. RUEDY:  Next slide, please.

20   BY MR. RUEDY:

21   Q.     Mr. Hofmann, did you analyze any data which

22   illustrates the conversion of Epaned Kit to Epaned oral

23   solution sales?

24   A.     Yes.  And I think this, this graph really shows just

25   how quickly and rapidly the conversions happened.  Again,

*sealed and confidential*

1172

Hofmann - direct

1    rather seamlessly.

2              There was, in blue, the Kit which, after launch,

3    you know, grew at the pace that you can see there.  And then

4    from 2016 to 2017, now we know the ready-to-use launched in

5    early 2017.  It's █████████████, but there is a

6    ████████ amount at the bottom of the 2017 bar that you

7    can see that very rapidly they essentially supplanted the

8    Kit sales in units with the Epaned ready-to-use.  And it

9    was really flat in 2017 and a much slower, you know, growth

10   trajectory compared to the periods in blue for the Kit.

11   Q.    I'd like to direct your attention to 2016 in particular.

12             Approximately, how many Epaned Kit units were

13   shipped in 2016?

14   A.    Yes.  So if you look at the lines, it's just shy of

15   ██████ units on an annual basis.

16   Q.    And going on to 2017, approximately how many shipped

17   units of Epaned oral solution were done?

18   A.    Again, just shy of ██████ units, essentially flat.

19   Q.    How does this graph depict Silvergate's lifecycle

20   management efforts?

21   A.    It's a reflection of, you know, essentially a

22   well-executed lifecycle management strategy.  It doesn't, it

23   doesn't reflect necessarily any particular pent-up demand or

24   interest in the ready-to-use solution.  It simply shows that

25   they deployed pretty standard commercial tactics to convert

*sealed and confidential*

1173

Hofmann - direct

1  the market from the Kit to the ready-to-use solution as

2  reflected here in.

3  Q.    And, Mr. Hofmann, you are relying on PTX-254 and

4  PTX-255 for this slide?

5  A.    Yes, I am.

6            THE WITNESS:  (Witness drinks water.)

7  Hopefully, my voice doesn't give away.

8            THE COURT:  Okay.

9            MR. RUEDY:  Okay.  May I proceed?

10            THE WITNESS:  Sure.  Sure.

11  BY MR. RUEDY:

12  Q.    How does Silvergate's lifecycle management efforts

13  impact your analysis with respect to commercial success?

14  A.    Well, I think it essentially undermines what we heard

15  from Dr. David yesterday in terms of the claims of nexus

16  through the marketplace performance of Epaned ready-to-use

17  and the patents-in-suit.

18            Essentially, all that we see here is a strategy

19  that was executed to convert an existing kit demand that

20  existed, you know, on a limited basis, because we aren't

21  talking about huge volumes here, but essentially they were

22  able to switch over to the ready-to-use solution by

23  deploying those commercial strategies.

24            It's really not a reflection of the claims of

25  the patents-in-suit.  It's just executing that lifecycle

*sealed and confidential*
1174

Hofmann - direct

1  management strategy so there is no nexus.

2  Q.    Now, turning to one of the other opinions on your

3  summary slide.  You stated that Dr. David failed to

4  appropriately address what was known in the prior art as a

5  driver of the marketplace performance of Epaned oral solution.

6  A.    That's correct.

7  Q.    How does the fact that the Epaned Kit was known in

8  the prior art, how does that impact your analysis?

9  A.    Well, I think we heard from Dr. Mahan yesterday, and

10  we have heard from other witnesses, that essentially the Kit

11  gave an oral solution to parents and patients, you know,

12  when they arrived at the, at the pharmacy.

13          And so the idea and the ability to get a

14  commercially available oral solution and various other

15  aspects of that oral solution, which I understand Dr. Sinko

16  is going to address more fully, were all things that were

17  known in the prior art.

18          And so here, again, we have a further reason

19  that there is a lack of nexus.  Essentially what is driving

20  the sales here is the commercial strategy of the lifecycle

21  management plan, combined with, you know, why did that work?

22  Because it was essentially just a different version of the

23  oral solution, and they cannibalized demand for the Kit

24  previously.

25  Q.    Now, did you hear Dr. David's testimony regarding the

*sealed and confidential*

Hofmann - direct

1    alleged benefit of the Epaned oral solution product relative

2    to the alleged benefits of the Epaned Kit?

3    A.    I did.

4    Q.    And do you agree with him?

5    A.    No.    I think between the testimony of Dr. David and

6    Dr. Mahan, you know, from what I heard and what I understand

7    from Dr. Sinko, a lot of what they're attributing to the

8    alleged nexus here are things that were known in the prior

9    art and I understand that Dr. Sinko will talk a little bit

10   more about that later today.  But based on my discussion and

11   my understanding and hearing that testimony, the things that

12   they are attributing to are things that were previously

13   known.

14   Q.    How does the alleged benefit of Epaned oral solution

15   being known in the prior art impact your analysis with

16   respect to market success?

17   A.    Well, going back to the framework, you have to have

18   nexus to even potentially find commercial success, and if

19   what is driving the performance are things that were known

20   in the prior art, you can't have nexus.  And then when you

21   layer on top of that the life cycle management strategy

22   that you discussed, it really breaks apart any reasonable

23   claim of nexus through the marketplace performance of

24   Epaned.

25   Q.    Did you also hear Dr. David's testimony regarding

*sealed and confidential*

1176

Hofmann - direct

1    that if potential inventors had evaluated the marketplace

2    for Ready-to-Use enalapril, they could have reached the

3    conclusion that there would be a market for such a product?

4    A.    I did hear that testimony, yes.

5    Q.    Do you agree with his testimony?

6    A.    No.  I strongly disagree.  I think that market

7    dynamics and the position of a third party is very different

8    than the position that Silvergate was in in terms of market

9    demand from the Kit to the Ready-to-Use solution.

10   Q.    Why would a third party be in a different market

11   position compared to Silvergate?

12   A.    Well, you know, in the first instance, you're talking

13   about a tiny market.  There's not a lot of demand here for

14   this product in general and so there's not a lot of volume

15   for a pharmaceutical product.  You're talking about pretty

16   small dollars, which I think I'm talking about a little bit

17   more.  But then also you have Silvergate who has a Kit on

18   the market and they have the ability to kill the Kit, which

19   is what they did.  They essentially eliminated the supply of

20   the Kit and, you know, ramped up the supply of the

21   Ready-to-Use solution.

22          If a third party were to come to market, as

23   Dr. David describes, Silvergate wouldn't necessarily have

24   killed the Kit.  They would have, you know, competed with a

25   third, theoretical third party on both price and in

*sealed and confidential*

1177

Hofmann - direct

1  marketing.  A third party also wouldn't have the benefit

2  that Silvergate had with respect to the R&D that they had

3  done in bringing the Kit to market and leveraging that to

4  bring the Ready-to-Use solution to market.

5           So I just, I find it incredible or uncredible

6  the idea that there was this economic motivation or ability

7  or, you know, prospect of profit.  As Dr. David described,

8  as a third party, you know, Silvergate really was the one

9  that had the ability to control the marionette strings, if

10  you will, to bring this product to market and leverage its

11  path.

12  Q.    So you just mentioned sales and profitability.  The

13  third parties had actually -- let me withdraw that.

14           If Silvergate continued to sell the Epaned Kit

15  to compete with a hypothetical third party, how would this

16  competition impact the potential sales and profitability of

17  the third party's Ready-to-Use product?

18  A.    That's just it.  It would have widespread

19  implications.

20           First off, by killing the Kit, they essentially

21  replaced the demand with the Ready-to-Use solution, which

22  they controlled both of those, whereas a third party would

23  have to try and take away sales of the Kit while Silvergate

24  would, you know, presumably continue to promote, continue to

25  compete on price and continue to work against a potential

Case 1:18-cv-01962-LPS  Document 304-2  Filed 07/30/21  Page 41 of 106 PageID #: 21158
*sealed and confidential*
1178
Hofmann - direct

1  hypothetical third party.  And if you're talking about such

2  a tiny level of demand, it's just implausible that a third

3  party would be able to make a go of it or be economically

4  interested in making a go of it.

5  Q.     Are there any other reasons why a third party would

6  not be incentivized to develop the asserted claims of the

7  patent-in-suit?

8  A.     Yes.  Essentially, the overarching point that we're

9  only talking about, you know, ████ or so units a month.

10  For pharmaceuticals, prescription pharmaceuticals, this

11  wouldn't even hit the radar at most pharmaceutical

12  companies, it's just such a tiny market.

13  Q.     Now, did you hear Dr. David's testimony regarding

14  incremental profit and profit of Epaned oral solution over

15  the Epaned Kit?

16  A.     I did.

17  Q.     Do you agree with his testimony?

18  A.     No.  I think it's very flawed and misleading.

19  Q.     And why is that?

20  A.     Well, I mean, it's inherent in what I just explained

21  in terms of his analysis assumes that a third party would

22  essentially step into the financial position that Silvergate

23  was in where Silvergate was able to kill the Kit, was able

24  to migrate demand very seamlessly to the Ready-to-Use

25  solution and move its marketing resources to that, leverage

*sealed and confidential*

1179

Hofmann - direct

1    its prior R&D.  A third party would not be in that situation

2    at all.  They would have to, you know, essentially start

3    from the ground floor and do their own R&D.  They would have

4    to get approval for product that wouldn't be called Epaned.

5    It wouldn't automatically kind of move over in the way that

6    the RTU did from the Kit and would also have to compete in

7    terms of marketing and price with the Epaned Kit.

8              So the analysis and the numbers and figures that

9    we saw from Dr. David and the incremental profitability are

10   essentially, you know, unique to the niche position that

11   Silvergate is in.  It's not as if a third party could have

12   done this and realized those kinds of profits or return on

13   investment.

14   Q.    Did you hear Dr. David's testimony regarding the

15   prescription share of Epaned oral solution and the alleged

16   profits for that product?

17   A.    I did.

18   Q.    And do you agree with his testimony?

19   A.    I do not.

20   Q.    Let's start with prescription share.  Why do you

21   disagree with him on prescription share?

22   A.    Well, he, I think, falsely defined the very narrow

23   market.  I think the metric that he put up focused on, like,

24   zero to two age population and the three to nine age

25   population, that I understand that this product and I've

Case 1:18-cv-01962-LPS  Document 304-2  Filed 07/30/21  Page 43 of 106 PageID #: 21160
*sealed and confidential*
1180
Hofmann - direct

1   heard referred to by other witnesses this week is also used

2   in the geriatric population and I think it also is labeled

3   for anyone over the age of a couple months.

4             MR. RUEDY:  Next slide, please.

5   BY MR. RUEDY:

6   Q.    Now, Mr. Hofmann, did you analyze the prescription

7   share of Epaned oral solution for the entire patient

8   population?

9   A.    Yes.  And what we see here on this graph, so, again,

10   this is only enalapril, so I'm not, I'm not -- I'm not

11   plotting all antihypertensives.  I'm just plotting the share

12   of Epaned relative to other products where enalapril is the

13   active ingredient.  And what you can see is that blue

14   reflects that ██ percent or more of the prescriptions

15   written for an antihypertensive containing enalapril are

16   things other than Epaned.

17           The ████████████████████ at the top

18   is Epaned, which is ██ percent or less in the period and

19   then there's also a little bit of a Kit carrying over in

20   2017 and then the Vasotec tablet.  But essentially,

21   ██ percent or more are things other than Epaned.  So the

22   metrics we saw at ██ or ██ percent as presented by Dr. David

23   I think are pretty misleading in terms of how successful or

24   how much penetration has happened in the marketplace.

25   Q.    And on this slide you're referring to PTX-034 and

*sealed and confidential*

Hofmann - direct

1    **PTX-251?**

2    A.    That's correct.

3    Q.    Now, Mr. Hofmann, what conclusions, if any, did

4    you draw from your analysis with respect to prescription

5    share?

6    A.    Well, I think what prescription share shows us is

7    that, look, there's the very limited and very weak demand

8    that is not indicative of commercial success.  What we see

9    when you look at the weak market share and the weak

10   performance accompanied by the commercial strategy I

11   discussed in terms of the life cycle management plan and the

12   work that was done to migrate demand from the Kit to the

13   RTU, it's unsurprising that they were able to do what they

14   did and it's certainly not indicative of commercial success.

15   Q.    Now, with respect to Dr. Davidson's opinion regarding

16   alleged profits of Epaned oral solution, do you disagree

17   with him?

18   A.    Yes.  I don't believe he fully accounted for key

19   categories that exist with respect to branded pharmaceutical

20   products.  I don't think he fully accounted for marketing

21   and promotion, research and development and other costs.

22   Q.    And how would the exclusion of the costs have

23   affected the net margin?

24   A.    Well, it further overstates some of the metrics that

25   we see in the presentation by Dr. David.  You know, again,

*sealed and confidential*
Hofmann - cross

1    you have to fully account and fully load the costs

2    associated with the product.

3                Silvergate is a -- is a company with very few

4    products and Epaned is essentially its main product, and you

5    have to allocate, you know, not only marketing and R&D to

6    Epaned, but you have to allocate some level of the

7    administrative costs, too, if you are really going to get

8    what their true profitability is.

9                I think a lot of the metrics of profitability

10   we have don't allocate costs from Silvergate as a whole,

11   and really, Silvergate as a whole is Epaned, at least so

12   far.

13                MR. RUEDY:  Your Honor, I believe we can unseal

14   the courtroom at this time.

15                THE COURT:  Okay.  Let's do so then, please.

16                (Sealed portion ends.)

17                      *     *     *

18                THE COURT:  Okay.  Go ahead.

19                Ms. Morgan, you can go ahead.

20                MS. MORGAN:  Thank you.

21                Can we go to DDX-708, please.

22                      CROSS-EXAMINATION

23   BY MS. MORGAN:

24   Q.    Do you know what numbers annual prescriptions are

25   represented in DDX-708?

Case 1:18-cv-01962-LPS  Document 304-2  Filed 07/30/21  Page 46 of 106 PageID #: 21163
*sealed and confidential*
1183
Hofmann - cross

1   A.      What, what number are the annual prescriptions in

2   units?

3   Q.      Correct.  Correct.

4   A.      Not off the top of my head, no.

5   Q.      Would you be surprised if I told you that your source

6   documents you cite your, for example, for 2017 said

7   ███████████?

8   A.      That would not surprise me, but I don't remember.

9   Q.      Does ████████ prescriptions represent a tiny market?

10  A.      No.  Enalapril is widely used.

11  Q.      Okay.  And the blue block represents the pill or

12  tablet form of enalapril; correct?

13  A.      Correct.  It is --

14  Q.      Okay.  Thank you.

15          And your slide DDX-708 includes the entire adult

16  and pediatric population of the U.S., ages 0 to 85 and over;

17  correct?

18  A.      It does.

19  Q.      And you don't know what portion of the population

20  ages 10 and up cannot swallow a pill; correct?

21  A.      I, I don't know that.

22  Q.      And you didn't talk to any clinician to determine

23  what age group cannot swallow a pill; correct?

24  A.      No, ma'am.

25  Q.      And you didn't talk to any clinician to identify what

Case 1:18-cv-01962-LPS  Document 304-2  Filed 07/30/21  Page 47 of 106 PageID #: 21164
*sealed and confidential*
1184
Hofmann - cross

1   segment of the population is prescribed enalapril in a

2   liquid form; correct?

3   A.      I mean, that's reflected in data.

4   Q.      And you didn't ask any clinician when or why

5   enalapril in a liquid form is prescribed versus a pill form;

6   correct?

7   A.      I did not speak with a clinician, no.

8   Q.      You used IMS data to construct DDX-708; correct?

9   A.      IQVIA, but yes.

10  Q.      And you agree that there is IMS data showing

11  enalapril prescriptions by product for ages 0 to 9; correct?

12  A.      Which is within this dataset.

13  Q.      But you didn't compare alone enalapril prescription

14  shares for only ages 0 to 9; correct?

15  A.      That was the -- what David did, and this was my, my

16  response to that.

17  Q.      Sir, can you please answer my question?

18          You didn't compare enalapril prescription share

19  for only ages 0 to 9; correct?

20  A.      No, I included --

21  Q.      Okay.  Thank you.

22  A.      -- the label consistent --

23  Q.      Thank you.  You answered, you answered my question,

24  sir.  Thank you.

25          MS. MORGAN:  We can unseal the courtroom, Your

*sealed and confidential*

1185

52(c) motion

1  Honor.

2          THE COURT:  Okay.  Mr. English, if you would

3  please do so.

4          MS. MORGAN:  You are not --

5          THE TRIALanywhere HOST:  The courtroom is open.

6          THE COURT:  Hold on.

7          MS. MORGAN:  Pardon.  Pardon me.

8          THE COURT:  Done, right?

9          (Sealed portion ends.)

10                *    *    *

11          THE TRIALanywhere HOST:  I removed the public

12  and Mr. George.  The courtroom is sealed.

13          THE COURT:  Okay.  Mr. Alul.

14          MR. ALUL:  Your Honor, I think the -- we

15  respectfully submit that the evidence showed that a skilled

16  artisan reviewing the common specification would know that

17  methylparaben and propylparaben were disclosed as suitable

18  alternatives to the claimed sodium benzoate.

19          On prosecution history estoppel, Your Honor,

20  argument-based -- or I'm sorry, amendment-based, we believe

21  there is an indisput- -- there was an indisputable narrowing

22  amendment of the buffer limitation during prosecution by

23  Silvergate, and it was done at the request of the, the

24  Examiner.

25          The Examiner asked -- or Silvergate tried to

*sealed and confidential*

1186

52(c) motion

1  distinguish the application claims from the prior art

2  based on one of the exemplified formulations in the common

3  specification the E5 formulation.   The Examiner rejected the

4  comparison and noted that, that the broader independent

5  claims, 1 and 12, do not require sodium citrate dihydrate.

6           And what did Silvergate do in response?   It

7  narrowed the buffer limitation to include sodium citrate and

8  then continued to distinguish the claims from the prior art

9  based on the specific components and concentrations,

10  separate and apart from any arguments they made

11  distinguishing the prior art based on stability.

12           For argument-based estoppel, Your Honor, we

13  think the disclaimer is there.

14           In that paragraph underneath the table that said

15  that, you know, there are only four components to our claim

16  formulation plus enalapril and water and we believe as a

17  matter of law, that's a disclaimer.

18           We didn't find out until I believe

19  cross-examination what Silvergate may be arguing to try to

20  get around that disclaimer, and that's because at the

21  Examiner's suggestion, the applicants removed sucralose from

22  the independent claims, that somehow that negated the

23  disclaimer, but as Your Honor will see in my closing

24  statement, I've got some slides on this, that was

25  insufficient to recant the disclaimer.   Under Federal

1   Circuit law, it doesn't even matter if the Examiner relied

2   on the disclaimer.  Once it's made, competitors like

3   Bionpharma should be able to rely on it.

4             And then the factual defenses, Your Honor, we

5   just feel that they failed to carry their burden of proving

6   that we actually have a functioning buffer in our product

7   and that our preservatives, or the preservatives that we

8   used, the methylparaben and propylparaben, are substantially

9   similar to the claimed formulation.  We feel that they

10  failed to prove that.  So we respectfully request for

11  judgment under Rule 52(c), Your Honor.

12            THE COURT:  All right.  Does plaintiff wish to

13  respond?

14            MS. DEVINE:  Yes, please, Your Honor.  I won't

15  go into deep detail.  All of this is covered in my closing.

16  However, we respectfully disagree with each of the points

17  that Mr. Alul just made.  Disclosure dedication, while we

18  agree that the specification does discuss parabens generally

19  and we note that Mr. Alul is correct in the evidence that he

20  brought out that we now have a patent that specifically

21  covers a preservative that is a paraben and that patent is

22  well supported by the specification, the law requires for

23  disclosure dedication that the accused equivalent be

24  disclosed specifically as an alternative to the claimed

25  sodium benzoate and we believe we've shown that it was

1    not.

2              Regarding amendment-based estoppel, as we've

3    brought out in the evidence, there was no narrowing

4    amendment.  Even if one were to look at the language on its

5    face, if you look at it as a person of skill in the art and

6    in the context of the specification, there are ultimate

7    buffer systems disclosed there and it's simply swapping one

8    alternate for another, it's not narrowing.

9              Even if we were to assume it was narrowing, it

10   was not for purposes of patentability.  The Examiner had

11   already noted that sodium citrate was in the prior art,

12   so it could not have distinguished the claims.  Moreover,

13   the Examiner had rejected as obvious a claim that already

14   had the limitation that was added, so that could not have

15   overcome as a matter of logic the obviousness rejection.

16             Even if we want to assume that it was for

17   purposes of patentability, it was tangential to the accused

18   equivalent.  The accused equivalent appears nowhere in the

19   prior art or in the prosecution history.

20             As far as argument-based estoppel, I believe Mr.

21   Alul just stated that a competitor is entitled to rely on

22   the statements in the prosecution made regarding the five

23   ingredients of the formulation.  I would submit that a

24   competitor must also look at the scope of the claims, which

25   is not consistent with that five ingredient analysis, and

*sealed and confidential*

52(c) motion

1    must be responsible for understanding that that is not a

2    clear and unmistakable disavowal.

3                Regarding buffers, Dr. Byrn did provide

4    sufficient evidence to meet the preponderance standard that

5    there is a functioning buffer in the Bionpharma product as

6    we allege and that the preservative in the Bionpharma

7    product is equivalent to the preservative in the claim.

8                So we submit that judgment is certainly not

9    appropriate and that judgment of infringement is

10   appropriate.

11               THE COURT:  All right.  Mr. Alul, I am going to

12   take the motion under advisement.  Anything further you want

13   to say on it?

14               MR. ALUL:  Just that, Your Honor, and I guess I

15   will touch on this more in my closing statement.  I'm still

16   astonished that plaintiffs continue to maintain this

17   position that somehow adding sodium citrate to the buffer

18   limitations during prosecution was not a narrowing

19   amendment.  It just defies logic, common sense, fundamental

20   patent law.

21               Their own other infringement experts -- and I

22   will get into this during my closing, but we believe Dr.

23   Byrn, you know, impeached himself and destroyed his own

24   credibility by failing to admit this fact, and I will note

25   that Silvergate's other infringement expert, Dr. Buckton, on

1   cross-examination relented and finally admitted, yes, adding

2   sodium citrate probably did narrow the literal scope of the

3   claim.

4           So we're just -- I'm astonished that plaintiff

5   keeps trying to push this specious argument that somehow it

6   wasn't a narrowing limitation and I will be bringing that up

7   during our closing argument and certainly in post-trial

8   briefing.

9           MS. DEVINE:  Your Honor, may I respond briefly?

10          THE COURT:  Sure.  Go ahead.

11          MS. DEVINE:  We have an agreement that

12  Bionpharma will not rely on the record of experts in the

13  Amneal case and vice-versa, so to the extent Mr. Alul is

14  intending to rely on the testimony of Dr. Buckton, that is

15  improper.

16          MR. ALUL:  Your Honor, if I can respond?

17          THE COURT:  Sure.

18          MR. ALUL:  Your Honor, certainly, we have no

19  intention of relying on anything substantive that Dr.

20  Buckton said during his testimony at all during trial.

21  That's not our intention.  But we certainly believe we

22  should be able to -- that we should be able to rely on the

23  fact that he essentially impeached their other infringement

24  expert, Dr. Byrn, by admitting that, yes, adding sodium

25  citrate to the buffer limitations during prosecution did

1    narrow the literal scope of the claims.

2                  By contrast, Dr. Byrn, as it appears that Ms.

3    Devine is doing right now, dug his heels in and refused to

4    admit the undeniable, which is that it was a narrowing

5    amendment.

6                  And so we think it's -- we should be able to

7    rely on Dr. Buckton's representation.  We're not relying on

8    any of the substantive opinions.  We have no intention of

9    doing that.

10                  THE COURT:  All right.  Well, you are going to

11   have to I suppose next week put your heads together on this

12   point.

13                  I think what you are trying to do, Mr. Alul, is

14   inconsistent with the stipulation that I signed, the order

15   that I entered at defendants' request, which as I understood

16   it was to the extent humanly possible, I am to cabin the

17   information I learned in connection with the Amneal trial

18   and not use it in connection with the Bionpharma's

19   determination.  So if I have to do that and plaintiffs have

20   to do that, it seems to me that defendants should have to do

21   that as well.  But if that is not somebody's interpretation

22   of the order, again, you're going to have to meet and confer

23   on that and then let me know if you want to propose an

24   amendment to the order or if there's a dispute that I need

25   to resolve.  Okay?

Case 1:18-cv-01962-LPS  Document 304-2  Filed 07/30/21  Page 55 of 106 PageID #: 21172
*sealed and confidential*
1192
52(c) motion

1          MR. ALUL:  Understood.  Understood, Your Honor.

2          THE COURT:  All right.  Does Amneal want to be

3   heard at this time?

4          MR. MADDOX:  Yes.  Mr. Saba?

5          MR. SABA:  Yes, Your Honor.  Kaveh Saba.  I will

6   try to be brief.

7          Amneal would like to move for judgment in its

8   favor under Rule 52(c) under both noninfringement and

9   invalidity.

10         Noninfringement, Amneal requests judgment based

11  on prosecution history estoppel, including both

12  amendment-based and argument-based estoppel.  I won't rehash

13  the reasons for that, but we do agree that there was clearly

14  a narrowing amendment made for reasons related to

15  patentability that was not tangential to the accused

16  equivalent.

17         Also that plaintiff failed to prove infringement

18  under the doctrine of equivalents with respect to the

19  required buffer of citric acid and sodium citrate for all

20  four asserted patents.

21         On invalidity, Amneal requests judgment under

22  Rule 52(c) based on obviousness of all of the asserted

23  claims and on lack of enablement and written description

24  of the open-ended stability element of all the asserted

25  claims.

Case 1:18-cv-01962-LPS  Document 304-2  Filed 07/30/21  Page 56 of 106 PageID #: 21173
*sealed and confidential*
1193
52(c) motion

1  　　　　We're happy to provide further explanation of

2  any of these bases or further briefing if the Court would

3  like.  It does seem like much of it is discussion that will

4  go on in closing argument.

5  　　　　THE COURT:  All right.  Thank you.  I don't need

6  anything further at this time.

7  　　　　Ms. Devine, did you want to respond?

8  　　　　MS. DEVINE:  Your Honor, after consultation with

9  my colleagues, in view of Amneal's motion, we would like to

10  move for judgment under Rule 52 on obviousness and the 112

11  issues.  We believe that Amneal has is far from presenting

12  clear and convincing evidence on those issues and it will be

13  discussed in our closing statements.  However, I would be

14  happy to elaborate if you would like.

15  　　　　THE COURT:  That's really up to you.  Is there

16  anything further you want to say in response to Amneal?

17  　　　　MS. DEVINE:  We disagree.  Given that Amneal did

18  not go into detail, I will not belabor the point.

19  　　　　THE COURT:  Okay.  I plan to take Amneal's

20  motion under advisement as I will plan to do with respect to

21  your motion now.  So it's up to you if you want to use time

22  now or do it in the context of closing arguments.

23  　　　　MS. DEVINE:  We will reserve our time

24  foreclosing, please.  Thank you.

25  　　　　THE COURT:  Mr. Saba, anything you want to say

1    in response for your motion or against the plaintiffs'

2    motion?

3           MR. SABA:  No.  But we'll reserve that time

4    foreclosing argument.

5           THE COURT:  Okay.  Thank you.

6           MR. SABA:  Thank you, Your Honor.

7           THE COURT:  We're going to take a recess.  We'll

8    calculate how much time is left and share it with you before

9    we get started and then we'll come back and I will hear

10    closing arguments.

11           Mr. Alul?

12           MR. ALUL:  Your Honor, we've put together some

13    slides sort of at the last minute.  Would Your Honor like it

14    if we submitted to the Court the slides?

15           THE COURT:  Sure, but, of course, copy the other

16    parties on it when you submit it to me.

17           MR. ALUL:  Absolutely.

18           THE COURT:  If anyone else is able to do that,

19    that's fine.  If you can't, that's fine as well.  I will

20    work from what you display.  And I suppose I think we don't

21    have the public with us right now, so if that's the case,

22    Mr. English, if you could bring them back before we take a

23    break.

24           (Sealed portion ends.)

25               *    *    *

*sealed and confidential*

closing argument by Ms. Devine

1    THE TRIALanywhere HOST:  The public has been put

2    in the waiting room, and the courtroom is sealed.

3    THE COURT:  All right.  And is the -- any

4    individual that needs to be out -- Ms. Devine, only you know

5    what you are going to say, but should the individual be out

6    as well?

7    MS. DEVINE:  My client should not be present,

8    yes.

9    THE COURT:  All right.  Mr. English, has that

10   been done?

11   THE TRIALanywhere HOST:  Okay.  Mr. George has

12   been removed as well.

13   THE COURT:  Okay.  Thank you.  Go ahead.

14   MS. DEVINE:  Thank you.

15   (Mr. George removed.)

16   MS. DEVINE:  As Drs. Byrn and Buckton explain,

17   defendants' own documents reflect that there is infringement

18   under the Doctrine of Equivalents.

19   Now, Amneal attempts to avoid this by arguing

20   that any equivalent must have two components, as Your Honor

21   as I just discussed.

22   This is simply not true as Federal Circuit

23   law indicates that one part of the accused device can be

24   equivalent to two elements in the claim; and, moreover,

25   Amneal ignores that the asserted claims are not methods of

*sealed and confidential*

1196

closing argument by Ms. Devine

1  making a solution.  They contain claims to a solution.

2          So the correct perspective for analyzing the

3  equivalent in Amneal's product is after dissolution in the

4  solution is achieved and equilibrium is reached.

5          Now, as to Bionpharma, its criticisms of

6  Dr. Byrn fail.  There is no requirement that Dr. Byrn test

7  the accused product.

8          As Dr. Byrn explained, it is a matter of

9  acid-based chemistry that Bionpharma's ANDA product contains

10  the accused buffer.

11          Similarly, Bionpharma's contention that there

12  are six differences between the claims and its accused

13  product improperly chops up the claim.

14          The buffer limitation is a single limitation for

15  which there is an equivalent in the Bionpharma ANDA product.

16          Now, Bionpharma's argument also ignores the

17  about-modifiers of the buffer amount range.

18          Bionpharma's expert, Dr. Moreton, testified that

19  when the claimed range of amounts of buffer are converted to

20  buffer species, the range is 4.55 to 21.3 times 10 to the

21  minus 6.

22          Now, while Bionpharma's ANDA product contains

23  2.03 times 10 to the minus 6, given the breadth of the range

24  in the claim, the amount in Bionpharma's ANDA product is not

25  significantly different.

*sealed and confidential*

1197

closing argument by Ms. Devine

1  Can we move to the next slide, please.

2  Now, as the Federal Circuit recently stated in

3  November of last year, defining the outer reaches of "about"

4  in a claimed range can be a matter of claim construction,

5  when the claims -- but when the claims are applied to an

6  accused device, it is a question of technological fact

7  whether the accused device meets a reasonable meaning of

8  "about" in the particular circumstances.

9  Now, Bionpharma's remaining argument is rooted

10  in a belated incorrect claim construction that requires a

11  buffer that is not derived from an enalapril salt.  There

12  is nothing in the specification or the prosecution history

13  supporting such a construction.

14  Indeed, as Bionpharma's own expert testified,

15  the claims asserted against Bionpharma cover a freebase

16  enalapril plus a separate buffer.

17  Likewise, Dr. Byrn explained that from the

18  perspective of a person of skill, the accused equivalent

19  preservative in Bionpharma's product was not disclosed as

20  an alternative to the claimed sodium benzoate.

21  The accused ANDA products are not novel.  Both

22  defendants modeled their products off of Dr. Mosher's

23  Epaned and Silvergate's patents, making only insubstantial

24  modification for no other reason than to generate an

25  argument for litigation.

*sealed and confidential*

1198

closing argument by Mr. Alul

```
 1              Those arguments fail, and Silvergate
 2   respectfully requests that the Court enter a judgment of
 3   infringement as to both.
 4              And that is the end of my closing, Your Honor.
 5   If you have further questions.
 6              THE COURT:  Not at this time.  We'll save the
 7   rest of your time for any rebuttal.
 8              MS. DEVINE:  Great.  Thank you very much.
 9              THE COURT:  Thank you.
10              Mr. Alul, are you going first?
11              MR. ALUL:  I presume so, Your Honor, if it's
12   okay with my friends representing Amneal, I'd appreciate it.
13              MR. MADDOX:  Absolutely.  That is what we
14   assumed.
15              THE COURT:  Okay.  And did you want to start
16   closed or opened?
17              MR. ALUL:  Closed just for a few minutes, Your
18   Honor, if that is okay.
19              THE COURT:  That's fine.  Go ahead.
20              MR. ALUL:  Katie, are we closed?  I'm sorry.
21              Oh, I believe we are.  Okay.  I'm sorry.
22              THE COURT:  Yes.
23              MR. ALUL:  Your Honor, I'd like to start off
24   talking about the experts because I think it's -- I think
25   it's sort of an important backdrop to before we get to
```

*sealed and confidential*
1199
closing argument by Mr. Alul

1     arguing about the what the evidence shows.

2          We respectfully -- so there were two experts

3     that testified in connection with Silvergate's claims

4     against Bionpharma:  Dr. Byrn for Silvergate, Dr. Moreton

5     for Bionpharma.

6          We respectfully submit, Your Honor, that

7     Dr. Byrn, we don't dispute he is a very experienced chemist,

8     but we respectfully submit that he is less qualified in the

9     area of formulation than Dr. Moreton is.

10          And in support of that, we have testimony from

11     Dr. Byrn himself where he admits that he had never primary

12     responsibility formulating a product that has received

13     regulatory approval and been marketed.

14          By contrast, Dr. Moreton has formulated hundreds

15     of drugs and had primary responsibility formulating numbers

16     of those drugs, including ones that have received regulatory

17     approval and been commercially marketed in the United

18     States, including Tyzeka, which was an oral solution.

19          But more pertinent to this case, Your Honor,

20     Dr. Byrn admitted he's never formulated liquid products

21     using the very excipients we're dealing with in this case:

22     citric acid, sodium citrate, sodium benzoate, and the

23     parabens.

24          By contrast, Dr. Moreton confirmed that he's

25     formulated liquid products using all of those excipients.

*sealed and confidential*
1200
closing argument by Mr. Alul

1       And, finally, Your Honor, and I wasn't going to

2  touch on the Dr. Buckton point of this, but I feel like I

3  have to now that Ms. Devine brought it up in her opening.

4       But we respectfully submit, as I stated in

5  connection with our Rule 52(c) arguments, that Dr. Byrn

6  impeached himself by refusing to admit what we respectfully

7  submit is undeniable.  And that is, adding sodium citrate

8  to the buffer limitations during prosecution narrowed the

9  literal scope of the claims.

10      He kept arguing, as Ms. Devine did in her

11 closing, that somehow that wasn't -- but as Your Honor

12 correctly pointed out, and as Ms. Devine conceded, you could

13 have a product that wouldn't literally infringe -- or you

14 could have a product that didn't include sodium citrate that

15 would not infringe before and would infringe afterwards.

16      So it's a conceded, undisputed fact, and I still

17 don't understand, for the life of me, why they're trying to

18 push this.  I don't know why Dr. Byrn kept arguing this.

19      The only thing that I can think of is either he

20 doesn't understand literal infringement; and that can't be

21 the case; he's served as an expert in a number of these

22 cases on the infringement side; or he just took his level of

23 advocacy to an area where he shouldn't have gone.

24      But we respectfully submit that based on that,

25 he -- his credibility was severely undercut.

*sealed and confidential*

closing argument by Mr. Alul

1    By contrast, Your Honor, Dr. Moreton testified

2    credibly.  He wasn't impeached.  And he backed up his

3    opinions with citations to the literature.

4    Onto what we believe the evidence shows.  The

5    defense is, first of all, Your Honor, disclosure dedication.

6    We pushed this defense, Your Honor may recall,

7    early last year in connection with our motion for leave to

8    file a Rule 12(c) motion.

9    And at the time, at the May 5th hearing, Your

10   Honor said:  I hear what you guys are saying, I hear what

11   you are saying, Bionpharma, but I would like to hear some

12   expert testimony on this.

13   We respectfully submit that we came forward with

14   the expert testimony that we believe Your Honor may have

15   been looking for.

16   And that is when a POSA looks at this passage

17   in Column 10 of the specification, which describes what

18   preservatives are useful in the claimed invention, and it

19   identifies a number of preservatives, including

20   methylparaben, propylparaben, and their salts and sodium

21   benzoate.  As Dr. Byrn explained, a POSA would bring to

22   this table some background knowledge on the parabens.  And

23   from that knowledge, a POSA would know methylparaben and

24   propylparaben were the most common paraben preservatives

25   and they were most often used together.

closing argument by Mr. Alul

1   Based on that, and given that the spec needs to

2   be read from the standpoint of a POSA, we believe just as

3   disclosed here in Column 10 is enough to trigger the

4   disclosure dedication doctrine.

5   But even if that wasn't enough, Dr. Byrn walked

6   the Court -- I'm sorry, Dr. Moreton walked the Court through

7   the specification, pointed out other passages where the

8   specification unequivocally says, in some embodiments, the

9   preservative is a combination of parabens, without anything

10  else.

11  That slide just summarizes Dr. Moretan's

12  testimony on what the POSA would know.

13  Next, Your Honor, Dr. Moreton took us to

14  Example C.  And we really think this is, essentially, the

15  nail in the coffin here because what it reveals is that

16  Silvergate in its R&D actually experimented with paraben

17  preservatives.

18  And it disclosed those paraben preserved

19  formulations in Example C.

20  Silvergate's two counterarguments fell apart

21  during trial.

22  The first one was, well, we should disregard

23  these Example C formulations because they used -- they don't

24  use methylparaben and propylparaben, the non-salts but free

25  acids like Bionpharma does in its formulation.  Instead,

closing argument by Mr. Alul

1  they used the sodium salts.

2         But as both experts agree, Dr. Byrn on cross-

3  examination, Dr. Moreton on direct, in these formulations,

4  within these actual liquid formulations, the salts would

5  be dissociated, and it would be just methylparaben and

6  propylparaben floating around, the non-salts.

7         And it would be the non-salts that would be

8  exerted their antimicrobial activity.

9         Dr. Byrn admitted it on cross, Dr. Moreton

10 stated it unequivocally in his direct.

11        And the only other criticism they have, Your

12 Honor, is that somehow these formulations should be

13 disregarded and -- because they contain another preservative,

14 either potassium sorbate or sodium benzoate.

15        As Dr. Moreton explained in his direct, Your

16 Honor, and as Your Honor well knows from being a veteran in

17 this type of -- in these types of cases, you don't read a

18 portion of the spec in isolation.

19        And we saw through -- in Dr. Moretan's direct

20 the other passages which unequivocally state in some

21 embodiments, the preservative is a mixture of parabens.

22        And we also saw DTX-1123, the '482 patent that

23 is asserted against us in the 20-1256 case, which includes

24 claims where the only preservative required is a paraben

25 or a mixture of parabens, and it claims priority to the

*sealed and confidential*

1204

closing argument by Mr. Alul

1   patents-in-suit, which means formulations that only use a

2   combination of parabens must be described in the common

3   specification according to Silvergate.

4           And so we respectfully submit collectively this

5   disclosure, Example C, what we saw in Column 10, is enough

6   for the specification disclosure necessary that

7   methylparaben and propylparaben are suitable alternatives to

8   the claimed sodium benzoate.

9           THE COURT:  Let me ask you a little bit about

10  your response to that first criticism, the 20-1256.

11          MR. ALUL:  Sure.

12          THE COURT:  As I understand it, your view is I

13  should look at colloquially what is floating around in this

14  solution.

15          And that that is the important reality for your

16  disclosure dedication doctrine.

17          Do I also do that for all infringement issues

18  with respect to Bionpharma, look at the reality of what is

19  floating around in the solution, or is that not the analysis

20  you are going to ask me to take?

21          MR. ALUL:  No, Your Honor.  We are not shying

22  away from Your Honor relying on expert testimony regarding

23  what is actually in Bionpharma's ANDA product.

24          And we may be touching on this in connection

25  with our factual defense to the buffer limitations.

*sealed and confidential*

1205

closing argument by Mr. Alul

1    But we respectfully submit that the evidence

2  there shows that what is in our ANDA product is not a

3  functioning buffer.  It's not.  Because, because the

4  strength of maleic acid is too far away from the pH of

5  our formulation.  And, therefore, we have no -- hardly any

6  maleic acid and hardly any capacity to neutralize any base

7  that is added or generated over time as all the equilibrium

8  has shifted over to sodium maleate.

9    And by the definitions for what constitutes a

10  proper buffer in the literature evidence that Dr. Moreton

11  relied on that I crossed Dr. Byrn on, it was unequivocal.

12    The strength of the weak acid must be within

13  plus or minus 1 of the pH, of the formulation.  And Dr.

14  Byrn conceded under that standard, yes, maleic acid is not

15  strong enough.  Its pKa is not within plus or minus 1 of

16  the pH of Bionpharma's ANDA product, and, therefore, just

17  the documentary evidence says, we don't have a properly

18  functioning buffer in our formulation.

19    This is all if Dr. Byrn's theory about the

20  existence of this buffer in our product is true.

21    THE COURT:  Okay.  I just -- I mean, that is

22  where I was going.  I just want to know that I can rely on

23  Bionpharma to consistently take the view that I should be

24  looking at what is really going on in the solution for my

25  analysis as to whether you infringe.

*sealed and confidential*
1206
closing argument by Mr. Alul

1    MR. ALUL:  Yes, Your Honor.  We are not in any

2  way employing a double standard and I hope I didn't suggest

3  that in any way.

4    THE COURT:  All right.  You can go on.

5    MR. ALUL:  Okay.  One more thing, Your Honor,

6  about this slide in connection with the question you asked,

7  Your Honor, as to whether I should look at what's going on

8  in this formulation.

9    Your Honor doesn't even have to do that because

10 as we said earlier, in column 10, it unequivocally states

11 that preservatives include methylparaben, propylparaben and

12 their salts, and, again, Example C should not be read in

13 isolation.  It should be read in conjunction with column

14 ten, the disclosure of column 10, which says, you know, you

15 can use the salts or the non-salts.

16    And, you know, Dr. Moreton explained during his

17 direct the reason why Silvergate used the salts here is

18 because methylparaben and propylparaben are very lipophilic.

19 They don't want to dissolve in water and so you really have

20 only two options -- use the salts, which column 10 says we

21 can do, or do what Bionpharma did, which is dissolve the

22 free acids with a co-solvent, which Silvergate didn't do in

23 its R&D, but it doesn't detract from the fact that a POSA

24 would look at this and see that methylparaben and

25 propylparaben were used in a formulation, in formulations

*sealed and confidential*

1207

closing argument by Mr. Alul

1     together in the Example C formulation.

2                Okay.  And my last few slides, Your Honor, we

3     put these together quickly, so I don't have them in my

4     memory, but we just quoted the testimony here that I

5     paraphrased for Your Honor earlier.

6                We can unseal at this point, Your Honor, for a

7     few moments.

8                THE COURT:  Before you do that, let me ask you

9     some of my sealed questions, which I also put together, and

10    it may not be in any particular order.

11               MR. ALUL:  Sure.

12               THE COURT:  But let's try and deal with them

13    now.

14               I think you distinguished your preservative

15    based in part on the method of growth inhibition.  Is that

16    right?

17               MR. ALUL:  Yes, Your Honor.  I'm trying to get

18    to that real quick, to those slides.

19               Yes, Your Honor.  So among the, you know, a

20    number of different properties, methylparaben and

21    propylparaben on the one hand and sodium benzoate on the

22    other hand have, one of them, and this is something our

23    expert explained, is that they exert their antimicrobial

24    effects in different ways, in substantially different ways.

25               THE COURT:  All right.

*sealed and confidential*

1208

closing argument by Mr. Alul

1      MR. ALUL:  With that --

2      THE COURT:  Right.  So the question is:  How is

3  that relevant?  Is that in the claims or is that just

4  another function but not one that is claimed and therefore

5  maybe doesn't factor into the analysis?

6      MR. ALUL:  Well, it's relevant, Your Honor, if

7  we're using the function -- well, it's relevant under either

8  test we respectfully submit.

9      Under function, way, result, the result is

10  different because methylparaben and propylparaben, the way

11  they exert their antimicrobial activity, they kill bacteria,

12  yeast and mold.  They kill microorganisms whereas the

13  mechanism of action for sodium benzoate merely inhibits the

14  microorganism pathways that generate glucose and so it

15  doesn't necessarily kill the microorganisms, it just

16  inhibits their growth.

17      So if we're in the function, way, result world,

18  the result is different.  You know, one -- I'm sorry.

19      THE COURT:  Yes.  Is there not a line on which

20  function becomes relevant?  I mean, I think the plaintiffs'

21  view is going to be that -- let's just assume that's a

22  different function, but so what?  I mean, they might have

23  different tastes, different colors.  Right?  I mean, at some

24  point they're just not relevant in the analysis.

25      MR. ALUL:  So, Your Honor, we respectfully

Case 1:18-cv-01962-LPS   Document 304-2   Filed 07/30/21   Page 72 of 106 PageID #: 21189
*sealed and confidential*
1209

closing argument by Mr. Alul

1    submit, their standard is way too broad.  What their

2    standard is, look, is to preserve the formulation.  If so,

3    we meet the function, way, result test, but we respectfully

4    submit that the case law actually gets more specific than

5    that.  It does focus on mechanism of action and we're going

6    to be citing -- I don't have it with me handy right now, but

7    we're going to be citing in our post-trial brief.

8            It's in our proposed conclusions of law, our

9    statements of law in connection with the final pretrial

10   order, but in connection with the substantial differences

11   test and the function, way, result test in the you --

12   they're not chemical compounds, you know, have the same

13   mechanism, but an accused equivalent in a product has the

14   same mechanism of action as the missing limitation in the

15   claims.

16           So we think it's fair game for function, way,

17   result.  We also think it's fair game for just the

18   substantial differences along with all the other

19   differences, including the differences in lipophilicity,

20   which our expert said would be very important to a

21   formulator to consider.

22           THE COURT:  All right.  I think you -- with

23   respect to buffer, I think you suggested in the opening that

24   your formulators figured out that if you do it just right,

25   you don't need a buffer.

*sealed and confidential*

1210

closing argument by Mr. Alul

1          MR. ALUL:  Correct.

2          THE COURT:  Did I hear evidence to support that?

3          MR. ALUL:  Your Honor did.  Your Honor heard Dr.

4  Moreton explain that.  We actually specifically asked him on

5  direct, how is it Bionpharma -- well, let me just take a

6  step back.

7          To the extent that Your Honor is asking whether

8  or not we have a buffer in our ANDA product, we think that

9  a good portion of Dr. Moreton's direct was dedicated to

10  that.

11          Silvergate, of course, bears the burden of

12  proving that there is a buffer in our product and they

13  failed to do so with respect to, you know, the existence of

14  this, you know, malic acid, sodium maleate buffer in our

15  ANDA product.  Dr. Byrn never supported his opinion that all

16  of the malic acid in our product is dissociated from the

17  enalapril and free to interact with sodium hydroxide to form

18  this alleged buffer.

19          Relatedly, Dr. Moreton explained that the sodium

20  hydroxide that Dr. Byrn said is necessary to form this

21  buffer is added at the -- during the final stages of our

22  formulation process and therefore could react with other

23  acidic components in our formulation instead of maleic acid

24  such that we wouldn't have any appreciable malic acid,

25  sodium maleate buffer system in our product, and Dr. Byrn

*sealed and confidential*

1211

closing argument by Mr. Alul

1    could have confirmed it experimentally.  He could have

2    calculated the ratio of maleic acid to sodium maleate in our

3    buffer system assuming what he said was true.  He never did

4    that.  We presume he didn't do that because if he did, he

5    would have exposed his theory as being flawed.

6            But the point is, is they came forward with no

7    evidence other than Dr. Byrn's unsupported opinion on this,

8    and, you know, again, we point out, we believe his

9    credibility was severely damaged, and you also have Dr.

10   Morton's belief that, look, if there's, you know, there's

11   just an equally plausible explanation malic acid or at least

12   a lot of it stays associated with the enalapril and that

13   sodium hydroxide reacts with other said components such that

14   you don't really have this malic acid/sodium maleate buffer

15   system in Bionpharma's ANDA product.

16           THE COURT:  Did we hear any evidence of how

17   Bionpharma put together its formulation?  Is that what you

18   are suggesting in opening, that you all followed a

19   particular sort of creative path to design around, something

20   like that?

21           MR. ALUL:  The only evidence we heard on that,

22   Your Honor, we didn't get into too much detail about our R&D

23   leading into our product, was Dr. Moreton's testimony that

24   when I asked him, I said, how did Bionpharma do this?  How

25   did they develop a product that didn't use a buffer?  And he

*sealed and confidential*
1212
closing argument by Mr. Alul

1    said, through very judicious use of excipients.  And he

2    explained essentially that, you know, if you formulate your

3    product just right, you don't need a buffer.

4              THE COURT:  So what is it that is stabilizing

5    the pH in your product if it's not a buffer?

6              MR. ALUL:  What is stabilizing the pH?  Well,

7    maybe nothing.  It could just be that the excipients that we

8    used and the combination of excipients don't generate

9    degradants in any appreciable manner in the two-year shelf

10   life such that, you know, we don't have any degradants that

11   are acidic or basic over the two-year shelf life that want

12   to raise or lower the pH.  It's just that the way we made

13   this formulation and the specific excipients we use don't,

14   you know, at least in the two-year shelf life appear to

15   degrade into acidic or basic components that want to raise

16   the pH.

17             THE COURT:  On the sodium hydroxide step, which

18   I think you referred to a moment ago.  Right?

19             MR. ALUL:  Yes, Your Honor.

20             THE COURT:  Towards the end.  Right?

21             MR. ALUL:  Yes, Your Honor.

22             THE COURT:  Do you agree though that the point

23   in time that I'm analyzing is some time after you have added

24   the sodium hydroxide?  I should be looking at everything

25   that's in the solution at that point?

*sealed and confidential*                                    1213

closing argument by Mr. Alul

 1              MR. ALUL:  Agree, Your Honor.

 2              THE COURT:  So --

 3              MR. ALUL:  Agree.

 4              THE COURT:  There's no legal relevance to the

 5    time at which that is added?  There's a factual point about

 6    what it might be associated with.  Right?

 7              MR. ALUL:  Yes.  We only bring that up to point

 8    out, Your Honor, that if it had been added earlier during

 9    the formulation step, then maybe Silvergate would have an

10    argument that it all reacts with malic acid instead of

11    anything else to form this buffer in situ.  That is assuming

12    that the malic acid is completely dissociated from

13    enalapril.  But the only reason we raised that it's added in

14    the final few steps of the formulation process is that once

15    it goes on, it has got a lot of other stuff to react

16    potentially to react with than maleic acid to form this

17    alleged buffer in our product.

18              THE COURT:  All right.  My only other question

19    for which I think you would want to be closed is about the

20    urgency of a decision.

21              Can you talk about that, remind me of the

22    30-month stay situation?

23              MR. ALUL:  Thank you, Your Honor.  Thank you so

24    much for that.

25              So our 30-month stay expires April 30th, and

*sealed and confidential*

1214

closing argument by Mr. Alul

 1  pursuant to Your Honor's directive, Ms. Devine and I met and

 2  conferred on this on Wednesday evening and it was actually a

 3  very cordial meet and confer.  And I conveyed to her, and it

 4  wasn't much of a surprise for her because she actually does

 5  a lot of generic work.  We're actually usually on the same

 6  side of these cases, working together.

 7          And I conveyed to her that, you know, for a lot

 8  of reasons she's well versed in, my client does not want to

 9  provide Silvergate with advanced notice of any at-risk

10  launch, and there are a number of reasons.  I'm happy to get

11  into get into that with the Court if you would like.

12          THE COURT:  I don't need the details at this

13  point, and I'm mindful, I don't want you to disclose

14  anything that for any reason you don't want anyone else in

15  here to hear.

16          For my purposes right now, it's just based on

17  what you've said, is that your expectation that you want a

18  briefing schedule in a situation that would lead to a

19  possible decision by April 30th where I should assume I

20  might have some expedited motion practice if I'm unable to

21  meet the April 30th deadline.  Is that where we are from

22  your perspective?

23          MR. ALUL:  Yes, Your Honor.

24          THE COURT:  Okay.  All right.  Ms. Devine, if

25  you want to speak to this, we'll turn your clock on.  I can

closing argument by Ms. Devine

1  certainly defer that to later, but it's up to you.  It may

2  be helpful to talk about it now.

3          MS. DEVINE:  The only thing I will say is that

4  regardless of this decision, there are other

5  patents-in-suits in a separate matter, one of which has a

6  generic buffer limitation, one of which has a preservative

7  limitation that's applicable in the current circumstance.

8  There's also another patent issuing next week that has both

9  the generic buffer limitation and the applicable

10 preservative limitation in the same claim.  So really

11 regardless of how this case turns out, we may need to

12 request an injunction.

13         THE COURT:  And it sounds like you're at least

14 reserving the right to possibly move for an injunction in

15 one of those other cases.  It might not even be in this

16 case, I suppose.

17         MS. DEVINE:  Correct, correct.  Regardless of

18 when this decision comes out, even if it comes out not in

19 our favor, we may need an injunction to preserve our rights

20 on the other patent.

21         THE COURT:  Okay.  All right.  We'll come back

22 to you later then.  Thank you for that.

23         MS. DEVINE:  Thank you.

24         THE COURT:  Mr. Alul, if you plan to talk about

25 other things that would be sealed, it might be helpful to do

closing argument by Mr. Alul

 1    it now.

 2              MR. ALUL:  I suspected Your Honor was going to

 3    suggest that, so I will just continue with my closing on the

 4    buffer situation if that's okay.

 5              THE COURT:  Yes.

 6              MR. ALUL:  Okay.  Your Honor, so I think we've

 7    sort of presented my argument, my closing argument on

 8    whether or not this alleged buffer system exists in our ANDA

 9    product, so I will move on from there and into the world of,

10    well, let's just say that what Dr. Byrn -- that Your Honor

11    accepts what Dr. Byrn said about the existence of this

12    alleged buffer is true and that it exists in our product.

13              Well, Your Honor, we respectfully submit that

14    the evidence showed that it would not be a properly

15    functioning buffer, and that is because, as I mentioned, the

16    strength of maleic acid doesn't line up with the pH of our

17    formulation and the bottom line is, as Dr. Moreton

18    explained, it's too strong of a weak acid, and because of

19    that, the equilibrium, because of the pH of our product is

20    at 3.3 and how strong maleic acid is relative to that, the

21    equilibrium shifts all the way to sodium citrate such that

22    there is very little, if any, maleic acid in our ANDA

23    product if what Dr. Byrn says is true.

24              And by any, you know, traditional definition

25    then, it's not a -- it's not a functioning buffer, because

closing argument by Mr. Alul

1    it doesn't have the capacity -- because there's no malic

2    acid, there is no capacity or hardly any capacity to

3    neutralize any base, any components that degrade and become

4    basic over time.

5          And, Your Honor, Your Honor may recall that

6    there was this PDX, I can't remember what it was, PDX-243 on

7    Dr. Byrn's direct, and there was some cross-examination on

8    this.

9          Dr. Byrn tried to get around the standard for

10    what a proper buffer is by essentially misrepresenting what

11    it was.  In this, in this slide, he seemed to suggest that

12    if the strength of a weak acid was in plus or minus 2 of the

13    PX, that it could serve as a viable functioning buffer in an

14    accused product.

15          And I have to admit when I first saw this slide,

16    it caught me off guard.  I didn't really understand the

17    vertical bracket that well and what he was saying until

18    he -- it came out of his mouth during testimony.

19          He said, yeah, you know, I think a weak acid

20    would serve as a suitable buffer if its pKa is within plus

21    or minus 2 of the pH.

22          It turns out, Your Honor, he was wrong.  And I

23    flushed that out during cross-examination.  I put some

24    literature evidence that Dr. Moreton relied on in his direct

25    that clearly showed that, that for a weak acid to serve as

*sealed and confidential*

closing argument by Mr. Alul

1   a, as a properly functioning buffer, the strength of that

2   weak acid, i.e., its pKa, must be within plus or minus 1 of

3   the pH.

4           And then after that, Dr. Byrn conceded yes,

5   maleic acid, its pKa is not within plus or minus 1 of the pH

6   of Bionpharma's ANDA product.

7           Which means, again, you know, even if Dr. Byrn's

8   theory about the existence of this buffer is true, it's all

9   shifted to the right, to the sodium citrate, and there's

10   hardly any maleic acid, and so it's not a traditional --

11   it's not a -- it doesn't satisfy the scientific community's

12   definition of what a functioning buffer is.

13           And that this, from this cartoon, you know,

14   Dr. Moreton expanded on this.  This essentially, is the

15   depiction here.  This is contrasted, Your Honor, to the

16   claimed buffer limitations, which citric acid -- and this is

17   the reason why Dr. Mosher chose citric acid for the claimed

18   formulations, because it lines up nicely with the optimal pH

19   for the drug and the formulations.

20           Because of that, because the citric -- the pKa

21   of the first acidic hydrogen on citric acid is within plus

22   or minus 1 of a pH, I think then it's within .3 or .4 of the

23   pH, you have a nice, roughly even split between citric acid

24   and citrate ions in the claimed formulations and in the

25   Epaned product that are there and able to neutralize any

*sealed and confidential*

1219

closing argument by Mr. Alul

1    acid or base that are generated over time.  That is the

2    definition of what a buffer is.

3            By contrast, in our product, you don't have

4    that.  You don't have anything that looks like that.

5            And then even under the function-way-result

6    test, Your Honor, we touched on this.  We've got a dispute

7    about what the proper function of the buffer is.

8            You know, our -- we believe that what Silvergate

9    intended to claim was a strong independent buffer.

10           Under Dr. Byrn's own theory, the claimed

11   formulations, all of the claimed formulations of the '442

12   and '008 patents, and many of the claimed formulation --

13   many of the formulations falling within the scope of the

14   formulations of the '745 and '987 patents would contain this

15   maleic acid/sodium maleic buffer system.

16           And, indeed, all the examples which all used

17   enalapril maleate as the active ingredient would all contain

18   this maleic acid/sodium maleate buffer system, but they

19   chose to claim a separate, independent buffer component.

20           And, again, there is not much dispute about

21   the substantially different way, except for the first time I

22   heard Mr. Devine argue that actually the difference in

23   buffer species concentration is not enough, or is not

24   substantial.

25           That the buffer species concentration of the

closing argument by Mr. Alul

1   alleged buffer in Bionpharma's ANDA product is really not

2   that far away.  It's like a difference of two to times 10 to

3   the minus 6 or something from the lower concentration range,

4   buffer species concentration for the buffer limitations.

5           Your Honor, that is all unsupported attorney

6   argument.  Dr. Byrn never said that in his direct

7   examination or on cross.  He never said that the difference,

8   the numerical difference was unsubstantial or something like

9   that.  There just was no testimony on that.  That is just

10  Ms. Devine's attorney argument.

11          And, in fact, as Dr. Moreton explained, it is a

12  substantial difference.

13          The buffer species concentration of the claimed

14  buffers is substantially more than the buffer species

15  concentration of the alleged buffer in our product, and that

16  means the buffer capacity for the claimed formulation is

17  substantially higher.

18          There was no dispute on that from Dr. Byrn on

19  either the species concentration or the capacity

20  differences.  None whatsoever.

21          He just says it is irrelevant.  And the reason

22  why he says it is irrelevant, Your Honor, is because -- and

23  this was Silvergate's position all along before Ms. Devine

24  decided to argue that maybe the difference in buffer species

25  concentration isn't substantial, but their position all

closing argument by Mr. Alul

1   along throughout this case the last two plus years is that

2   it doesn't matter that the buffer species concentration and

3   buffer capacity of the claimed formulations is a lot

4   greater than what is alleged in Bionpharma's ANDA product.

5   Bionpharma's ANDA product is still a stable product.

6            But, Your Honor, that is improper.  As both

7   experts agreed, stability is a property of the overall

8   formulation, not specifically tied to the buffer element.

9            And under a function-way-result test or a

10  substantial differences test, Your Honor, that is improper.

11  They shouldn't be comparing the, the stability of our

12  formulation with the stability of the claimed formulations.

13           They need to compare the relevant property of

14  the buffer limitation, which is to maintain pH.  And the

15  only way to do that is to ascertain any differences in

16  buffer species concentration and buffer capacity.

17           And we get that, Your Honor, from the

18  *Warner-Jenkinson* Supreme Court case.  The Doctrine of

19  Equivalents must be applied to individual elements of the

20  claim, not to the invention as a whole.  And there are

21  subsequent Federal Circuit decisions we'll be bringing up

22  in our, in our briefing.

23           I just would like to finally touch on, Your

24  Honor, some of the stuff that we can, we can unseal the

25  courtroom for the estoppel stuff.

*sealed and confidential*

1222

closing argument by Mr. Maddox

1  MR. MADDOX:  Your Honor, this is Steve Maddox.

2  I don't know what the official time is, but we

3  had 90 minutes when defendants -- and I'm a little concerned

4  Mr. Alul may have used an hour of that.

5  THE COURT:  No, I think maybe a half hour.

6  MR. MADDOX:  Oh.  My miscalculation.  I'm

7  terribly sorry.

8  THE COURT:  I don't have the official time, but

9  we haven't been here long enough for him to have been going

10  for an hour.

11  MR. MADDOX:  I beg your pardon.  Sorry.

12  THE COURT:  Okay.  All right.  Thank you.

13  Mr. Alul -- well, Mr. English, let's bring the

14  public and any others back in, and then Mr. Alul can finish

15  up with public thoughts.

16  THE TRIALanywhere HOST:  The courtroom is open.

17  THE COURT:  Thank you.  Go ahead.

18  (Sealed portion ends.)

19  *  *  *

20  THE COURT:  I'd like to start with infringement.

21  You know, maybe I can -- well, I'm going to

22  start with infringement.  It's going to have -- it's going

23  to get to sensitive issues very quickly.

24  THE COURT:  Okay.

25  MR. MADDOX:  Narrowing amendment.  I don't want

*sealed and confidential*

1223

closing argument by Mr. Maddox

1    to dwell on it.  But I do want to say you should reject

2    Dr. Buckton's argument but you should not disregard it.

3          This notion that looking at the pre and

4    post-amendment versions of that claim, to come to this court

5    and to tell you in his expert opinion that this was not a

6    narrowing amendment we suggest bears on his credibility.

7          Now, as for the amendment being made to reasons

8    relating to patentability.

9          The Examiner asked for the proof of criticality

10    of the ingredients.  And Silvergate's response to the

11    objection, to the, excuse me, to the obviousness rejection,

12    was amendments and argument and a declaration from

13    Dr. Mosher.

14          And their response was, look at our invention.

15    It's not obvious because we have these great unexpected

16    results.  But by the time they were saying look at our

17    invention, they had amended the claims so that the invention

18    was with the 1.82 citric acid and the .15 sodium citric

19    neutralize and Dr. Mosher's declaration was sold with

20    respect to the combination of those ingredients.

21          And you heard testimony that Dr. Buckton wasn't

22    surprised.  These results were not unexpected to Dr. Buckton

23    given that they were sparing their pH formulation invention

24    against the prior art pH of 5.  You heard testimony that

25    Dr. Mosher wasn't surprised by this.  You heard testimony

*sealed and confidential*

1224

closing argument by Mr. Maddox

1  that Dr. Sinko wouldn't be surprised.

2          The fact is no one would have thought this

3  unexpected, and the fact is Dr. Mosher was wise enough not

4  to swear under penalty of perjury that it was with respect

5  to there was nowhere for it to be found in his declaration.

6  The only people who found this unexpected was Silvergate's

7  prosecution counsel, and when you see the submission they

8  made, you'll see they kind of suggested that Dr. Mosher said

9  so, too, but he did not, and good for him.

10          Dr. Buckton's reasons here are it had nothing to

11  do with patentability.  It had to do with a spontaneous

12  desire to tidy up my claims.  He admitted he didn't see

13  any reason or benefit to doing that, and when questioned

14  about, well, is it just coincidence that the tidying

15  happened to align the claims with the unexpected results

16  argument, he said, yes, you know, I was just tidying how

17  it's done.  He even actually said it's the only reason it

18  could have been done.  This is another argument from Dr.

19  Buckton we would like you to reject, but not to disregard

20  the nature of it.

21          Now, if there's no estoppel and the doctrine of

22  equivalents is not precluded from application, we turn to,

23  well, what would be an equivalent?  And Silvergate's view is

24  anything that performs the function of a buffer, that chose,

25  that meets the definition of a buffer, it stabilizes pH, and

1    the way they chose is how every buffer in the world

2    stabilizes pH.  It neutralizes additional protons and

3    neutralizes additional hydroxides.

4             And you may recall Dr. Buckton's cross.  We had

5    this slide, DDX-401, please, where we discussed with him,

6    well, given your function, way, result, right, if you took

7    away the sodium citrate entirely, you would still have an

8    infringing product provided all the other limitations are

9    met, the pH is about 3.5 and so forth, less than 3.5, and

10   you saw his equivalents goes back to and encompasses the

11   claim that Silvergate originally proposed and never made any

12   attempt to defend the nonobviousness of it.  They never

13   argued that it was not obvious.  They immediately amended it

14   and built an argument about nonobviousness of the amended

15   version.

16             May I have the next one?

17             And then we took away even that and we said,

18   well, wouldn't your doctrine of equivalents, your function,

19   way, result cover this?  And there was some argument and

20   Your Honor pointed out that one of my questions was a little

21   ambiguous, but once we did get that straightened out, he

22   said, yes.  We suggest that a function, way, result test,

23   it's kind of on the one hand way too abstract because it

24   encompasses it, and then it's also at the same time, oddly

25   enough, it's way too molecular because it just means if for

*sealed and confidential*

1226

closing argument by Mr. Maddox

1   this element you've got a buffer or anything that acts like

2   a buffer and you achieve this pH, which leads to the

3   stability, you infringe.  We suggest that's too broad.

4              Now, are you saying -- you can take that down

5   now.  Are we saying that if you find no estoppel, that there

6   can be no scope of doctrine of equivalents?  No.  Frankly,

7   we do think there's a case that when a claim is made this

8   way, it's inherently narrow, that there shouldn't be, but

9   even if that is not the case, and here I'm thinking of Sage

10  and some other cases, but even if it's not the case, take a

11  look at this from foreseeability.

12             The inventors -- it was not only foreseeable to

13  the inventors, but it was actually foreseen by the inventors

14  that you could have a single acid buffer within the

15  specification, but they chose to claim the two-component

16  buffer, and at first they chose it in different claims, but

17  then they just went with the two-component buffer.

18             There's no way to say -- and I realize that

19  foreseeability isn't conclusive, but there is a factor.

20  There's no way to say, well, we should extend the doctrine

21  of equivalents to them because the poor inventors, they

22  couldn't have foreseen this kind of thing.  They absolutely

23  foresaw a single acid buffer.  They disclosed it.  They

24  discussed it and in the end they ran away from it and chose

25  not to claim it.

*sealed and confidential*
1227
closing argument by Mr. Maddox

1      Other possibilities?  Maybe other two-component

2  citrate buffer systems, maybe in the doctrine of

3  equivalents.  Perhaps more wiggle room around the amounts,

4  specific amounts.  But if estoppel doesn't apply, it should

5  not follow that anything that is a buffer that produces the

6  pH, which produces the stability, is an equivalent.  That

7  makes it a very much patent claim to any enalapril solution

8  that has a pH of 3 to 3.5 and that's not what the claim is

9  to.

10      Now, you also asked Dr. Gemeinhart about the

11  benefits of the two-component buffer over the

12  single-component buffer, and he told you, listen, using two,

13  that's how you can control and find and get to a particular

14  pH by adjusting the relative amounts of each other, and he

15  also explained to you that, listen, this allows you to boost

16  your buffer capacity because if you need to deal with the

17  influx of more protons or more hydroxide, you can simply up

18  the amounts of these ingredients, keeping them in the same

19  ratio, and you are covered.  If you were using just single

20  acid alone and you wanted to achieve that capacity, if you

21  upped the amount of the acid, the problem is you make the

22  solution more acidic by doing it.

23      There are advantages here and I'm not offering

24  this as obviousness, but I would point out that Dr. Mosher

25  never tried a single acid buffer.  He always had two things

*sealed and confidential*

1228

closing argument by Mr. Maddox

1    going.

2              Now, finally, if we get to it, we have Dr.

3    Gemeinhart's heart testimony explaining how a single acid

4    deals with protons and hydroxides in a different way than

5    the two-buffer system.  It donates hydrogen atoms, and to

6    the extent that it can pick up a hydroxide, it can't do it

7    until it donated that hydrogen.  It is basically a war waged

8    on one front.

9              Now, I can turn now to obviousness and we can

10   open the court.  If you have some closed court questions for

11   me, I'm hear to answer.

12             THE COURT:  All right.  Let me do that before we

13   open up.

14             So if your product does not contain buffer, what

15   is stabilizing the pH?

16             MR. MADDOX:  The product contains a buffer.

17   It's the malic acid as in our ANDA.

18             THE COURT:  And it's undisputed, right, that

19   that is a buffer in your product?

20             MR. MADDOX:  Yes.

21             THE COURT:  Okay.  And what is your view on the

22   urgency of the decision for your client?

23             MR. MADDOX:  Our 30-month stay expires in

24   August.  We do think frankly that the results in this case,

25   infringement and perhaps especially obviousness, may have

*sealed and confidential*

1229

closing argument by Mr. Maddox

1   some impact on the trajectory of future litigation from the

2   refreshing stream of patents coming.

3           We have been asked to give 30 days notice.  That

4   was two nights ago.  I have not been able to get a formal

5   response from my client yet, but it's obviously less

6   imminent for us or likely less imminent for us, but I would

7   like to see this decided by April as well.  However, I'm in

8   a slightly different position than Mr. Alul.

9           THE COURT:  All right.  That's fine.  I don't

10  have any other questions that I think we need to be sealed

11  or, so let's go ahead and open up the courtroom.

12           (Sealed portion ends.)

13

14       I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

15

16                           /s/ Brian P. Gaffigan
                          Official Court Reporter
17                          U.S. District Court

18

19

20

21

22

23

24

25

**'**

**'008** [1] - 1219:12
**'442** [1] - 1219:11
**'482** [1] - 1203:22
**'745** [1] - 1219:14
**'987** [1] - 1219:14

**/**

**/s** [1] - 1229:16

**0**

**0** [4] - 1183:16, 1184:11, 1184:14, 1184:19

**1**

**1** [6] - 1186:5, 1205:13, 1205:15, 1218:2, 1218:5, 1218:22
**1.82** [1] - 1223:18
**10** [10] - 1183:20, 1196:20, 1196:23, 1201:17, 1202:3, 1204:5, 1206:10, 1206:14, 1206:20, 1220:2
**112** [1] - 1193:10
**12** [1] - 1186:5
**12(c** [1] - 1201:8
**15** [1] - 1223:18
**18-1962-LPS** [1] - 1167:6
**19-1067-LPS** [1] - 1167:6
**19-678-LPS** [1] - 1167:11

**2**

**2** [2] - 1217:12, 1217:21
**2.03** [1] - 1196:23
**20-1256** [2] - 1203:23, 1204:10
**2016** [4] - 1171:5, 1172:4, 1172:11, 1172:13
**2017** [7] - 1172:4, 1172:5, 1172:6, 1172:9, 1172:16, 1180:20, 1183:6
**2021** [1] - 1167:13
**21.3** [1] - 1196:20

**3**

**3** [2] - 1218:22, 1227:8
**3.3** [1] - 1216:20
**3.5** [3] - 1225:9, 1227:8
**30** [1] - 1229:3
**30-month** [3] - 1213:22, 1213:25, 1228:23
**30th** [3] - 1213:25, 1214:19, 1214:21

**4**

**4** [1] - 1218:22
**4.55** [1] - 1196:20

**5**

**5** [2] - 1167:13, 1223:24
**52** [1] - 1193:10
**52(c** [4] - 1187:11, 1192:8, 1192:22, 1200:5
**5th** [1] - 1201:9

**6**

**6** [3] - 1196:21, 1196:23, 1220:3

**7**

**8**

**85** [1] - 1183:16

**9**

**9** [3] - 1184:11, 1184:14, 1184:19
**90** [1] - 1222:3

**A**

**ability** [5] - 1171:12, 1174:13, 1176:18, 1177:6, 1177:9
**able** [13] - 1170:23, 1173:22, 1178:3, 1178:23, 1181:13, 1187:3, 1190:22, 1191:6, 1194:18, 1218:25, 1229:4
**about-modifiers** [1] - 1196:17
**absolutely** [3] - 1194:17, 1198:13, 1226:22
**abstract** [1] - 1225:23
**accepts** [1] - 1216:11
**accompanied** [1] - 1181:10
**according** [1] - 1204:3
**account** [1] - 1182:1
**accounted** [2] - 1181:18, 1181:20
**accurate** [1] - 1229:14
**accused** [14] - 1187:23, 1188:17, 1188:18, 1192:15, 1195:23, 1196:7, 1196:10, 1196:12, 1197:6, 1197:7, 1197:18, 1197:21, 1209:13, 1217:14
**achieve** [2] - 1226:2, 1227:20
**achieved** [1] - 1196:4
**acid** [40] - 1192:19, 1196:9, 1199:22, 1205:4, 1205:6, 1205:12, 1205:14, 1210:14, 1210:16, 1210:23, 1210:24, 1211:2, 1211:11, 1213:10, 1213:12, 1213:16, 1216:16, 1216:18, 1216:20, 1216:22, 1217:2, 1217:12, 1217:19, 1217:25, 1218:2, 1218:5, 1218:10, 1218:16, 1218:17, 1218:21, 1218:23, 1219:1, 1223:18, 1226:14, 1226:23, 1227:20, 1227:21, 1227:25, 1228:3, 1228:17
**acid-based** [1] - 1196:9
**acid/sodium** [3] - 1211:14, 1219:15,
1219:18
**acidic** [5] - 1210:23, 1212:11, 1212:15, 1218:21, 1227:22
**acids** [2] - 1202:25, 1206:22
**action** [3] - 1208:13, 1209:5, 1209:14
**ACTION** [2] - 1167:3, 1167:8
**active** [2] - 1180:13, 1219:17
**activity** [2] - 1203:8, 1208:11
**acts** [1] - 1226:1
**actual** [1] - 1203:4
**added** [7] - 1188:14, 1205:7, 1210:21, 1212:23, 1213:5, 1213:8, 1213:13
**adding** [4] - 1189:17, 1190:1, 1190:24, 1200:7
**additional** [2] - 1225:2, 1225:3
**address** [2] - 1174:4, 1174:16
**adjusting** [1] - 1227:14
**administrative** [1] - 1182:7
**admit** [4] - 1189:24, 1191:4, 1200:6, 1217:15
**admits** [1] - 1199:11
**admitted** [4] - 1190:1, 1199:20, 1203:9, 1224:12
**admitting** [1] - 1190:24
**adult** [1] - 1183:15
**advanced** [1] - 1214:9
**advantages** [1] - 1227:23
**advisement** [2] - 1189:12, 1193:20
**advocacy** [1] - 1200:23
**affected** [1] - 1181:23
**afterwards** [1] - 1200:15
**age** [4] - 1179:24, 1180:3, 1183:23
**ages** [5] - 1183:16, 1183:20, 1184:11, 1184:14, 1184:19
**ago** [2] - 1212:18, 1229:4
**agree** [11] - 1175:4, 1176:5, 1178:17, 1179:18, 1184:10,
1219:18
**agreed** [1] - 1221:7
**agreement** [1] - 1190:11
**ahead** [7] - 1182:18, 1182:19, 1190:10, 1195:13, 1198:19, 1222:17, 1229:11
**align** [1] - 1224:15
**allege** [1] - 1189:6
**alleged** [13] - 1175:1, 1175:2, 1175:8, 1175:14, 1179:15, 1181:16, 1210:18, 1213:17, 1216:8, 1216:12, 1220:1, 1220:15, 1221:4
**allocate** [3] - 1182:5, 1182:6, 1182:10
**allow** [1] - 1171:13
**allows** [1] - 1227:15

**alone** [2] - 1184:13, 1227:20
**alternate** [1] - 1188:8
**alternative** [2] - 1187:24, 1197:20
**alternatives** [2] - 1185:18, 1204:7
**ALUL** [34] - 1168:14, 1185:14, 1189:14, 1190:16, 1190:18, 1192:1, 1194:12, 1194:17, 1198:11, 1198:17, 1198:20, 1198:23, 1204:11, 1204:21, 1206:1, 1206:5, 1207:11, 1207:17, 1208:1, 1208:6, 1208:25, 1210:1, 1210:3, 1211:21, 1212:6, 1212:19, 1212:21, 1213:1, 1213:3, 1213:7, 1213:23, 1214:23, 1216:2, 1216:6
**Alul** [14] - 1185:13, 1187:17, 1187:19, 1188:21, 1189:11, 1190:13, 1191:13, 1194:11, 1198:10, 1215:24, 1222:4, 1222:13, 1222:14, 1229:8
**ambiguous** [1] - 1225:21
**amended** [3] - 1223:17, 1225:13,

1225:14
**amendment** [13] - 1185:20, 1185:22, 1188:2, 1188:4, 1189:19, 1191:5, 1191:24, 1192:12, 1192:14, 1222:25, 1223:4, 1223:6, 1223:7
**amendment-based** [3] - 1185:20, 1188:2, 1192:12
**amendments** [1] - 1223:12
**AMNEAL** [1] - 1167:10
**Amneal** [13] - 1168:24, 1190:13, 1191:17, 1192:2, 1192:7, 1192:10, 1192:21, 1193:11, 1193:16, 1193:17, 1195:19, 1195:25, 1198:12
**Amneal's** [3] - 1193:9, 1193:19, 1196:3
**amount** [4] - 1172:6, 1196:17, 1196:24, 1227:21
**amounts** [5] - 1196:19, 1227:3, 1227:4, 1227:14, 1227:18
**analysis** [11] - 1173:13, 1174:8, 1175:15, 1178:21, 1179:8, 1181:4, 1188:25, 1204:19, 1205:25, 1208:5, 1208:24
**analyze** [2] - 1171:21, 1180:6
**analyzing** [2] - 1196:2, 1212:23
**AND** [1] - 1167:2
**ANDA** [18] - 1196:9, 1196:15, 1196:22, 1196:24, 1197:21, 1204:23, 1205:2, 1205:16, 1210:8, 1210:15, 1211:15, 1216:8, 1216:22, 1218:6, 1220:1, 1221:4, 1221:5, 1228:17
**ANDREW** [1] - 1168:14
**Angeles** [1] - 1168:7
**ANNE** [1] - 1168:17
**annual** [3] - 1172:15, 1182:24, 1183:1
**answer** [2] - 1184:17, 1228:11
**answered** [2] -

1184:23
**antihypertensive** [1] - 1180:15
**antihypertensives** [1] - 1180:11
**antimicrobial** [3] - 1203:8, 1207:23, 1208:11
**apart** [3] - 1175:22, 1186:10, 1202:20
**appear** [1] - 1212:14
**APPEARANCES** [2] - 1167:17, 1168:1
**applicable** [2] - 1215:7, 1215:9
**applicants** [1] - 1186:21
**application** [2] - 1186:1, 1224:22
**applied** [2] - 1197:5, 1221:19
**apply** [1] - 1227:4
**appreciable** [2] - 1210:24, 1212:9
**appreciate** [1] - 1198:12
**appropriate** [2] - 1189:9, 1189:10
**appropriately** [1] - 1174:4
**approval** [3] - 1179:4, 1199:13, 1199:17
**April** [4] - 1213:25, 1214:19, 1214:21, 1229:7
**area** [2] - 1199:9, 1200:23
**argue** [2] - 1219:22, 1220:24
**argued** [1] - 1225:13
**arguing** [5] - 1186:19, 1195:19, 1199:1, 1200:10, 1200:18
**argument** [22] - 1185:20, 1186:12, 1188:20, 1190:5, 1190:7, 1192:12, 1193:4, 1194:4, 1196:16, 1197:9, 1197:25, 1213:10, 1216:7, 1220:6, 1220:10, 1223:2, 1223:12, 1224:16, 1224:18, 1225:14, 1225:19
**argument-based** [4] - 1185:20, 1186:12, 1188:20, 1192:12
**arguments** [5] - 1186:10, 1193:22, 1194:10, 1198:1,

1200:5
**arrived** [1] - 1174:12
**ARSHT** [1] - 1167:19
**art** [13] - 1174:4, 1174:8, 1174:17, 1175:9, 1175:15, 1175:20, 1186:1, 1186:8, 1186:11, 1188:5, 1188:11, 1188:19, 1223:24
**artisan** [1] - 1185:16
**ascertain** [1] - 1221:15
**aspects** [1] - 1174:15
**asserted** [7] - 1178:6, 1192:20, 1192:22, 1192:24, 1195:25, 1197:15, 1203:23
**associated** [3] - 1182:2, 1211:12, 1213:6
**assume** [4] - 1188:9, 1188:16, 1208:21, 1214:19
**assumed** [1] - 1198:14
**assumes** [1] - 1178:21
**assuming** [2] - 1211:3, 1213:11
**astonished** [2] - 1189:16, 1190:4
**at-risk** [1] - 1214:9
**atoms** [1] - 1228:5
**attempt** [1] - 1225:12
**attempts** [1] - 1195:19
**attention** [1] - 1172:11
**attorney** [2] - 1220:5, 1220:10
**attributing** [2] - 1175:7, 1175:12
**August** [1] - 1228:24
**automatically** [1] - 1179:5
**available** [1] - 1174:14
**avoid** [1] - 1195:19

---

**B**

---

**backdrop** [1] - 1198:25
**backed** [1] - 1201:2
**background** [2] - 1171:4, 1201:22
**bacteria** [1] - 1208:11
**bar** [1] - 1172:6
**base** [3] - 1205:6, 1217:3, 1219:11
**based** [19] - 1170:12, 1175:10, 1185:20, 1186:2, 1186:9, 1186:11, 1186:12, 1188:2, 1188:20,

1192:10, 1192:12, 1192:22, 1196:9, 1200:24, 1202:1, 1207:15, 1214:16
**bases** [1] - 1193:2
**basic** [3] - 1212:11, 1212:15, 1217:4
**basis** [2] - 1172:15, 1173:20
**bears** [2] - 1210:11, 1223:6
**become** [1] - 1217:3
**becomes** [1] - 1208:20
**BEFORE** [1] - 1167:16
**beg** [1] - 1222:11
**began** [1] - 1169:12
**behalf** [2] - 1168:15, 1168:24
**behavior** [1] - 1169:21
**belabor** [1] - 1193:18
**belated** [1] - 1197:10
**belief** [1] - 1221:10
**Bench** [1] - 1167:14
**benefit** [4] - 1175:1, 1175:14, 1177:1, 1224:13
**benefits** [2] - 1175:2, 1227:11
**benzoate** [9] - 1185:18, 1187:25, 1197:20, 1199:22, 1201:21, 1203:14, 1204:8, 1207:21, 1208:13
**between** [3] - 1175:5, 1196:12, 1218:23
**BIONPHARMA** [1] - 1167:6
**Bionpharma** [18] - 1168:15, 1187:3, 1189:5, 1189:6, 1190:12, 1196:5, 1196:15, 1197:15, 1199:4, 1199:5, 1201:11, 1202:25, 1204:18, 1205:23, 1206:21, 1210:5, 1211:17, 1211:24
**Bionpharma's** [17] - 1191:18, 1196:9, 1196:11, 1196:16, 1196:18, 1196:22, 1196:24, 1197:9, 1197:14, 1197:19, 1204:23, 1205:16, 1211:15, 1218:6, 1220:1, 1221:4, 1221:5
**bit** [5] - 1171:16, 1175:9, 1176:16, 1180:19, 1204:9

**block** [1] - 1183:11
███████ 1172:2, ███████ 1172:10, 1180:13, 1183:11
**board** [1] - 1171:5
**boost** [1] - 1227:15
**bottom** [2] - 1172:6, 1216:17
**bracket** [1] - 1217:17
**branded** [1] - 1181:19
**breadth** [1] - 1196:23
**break** [1] - 1194:23
**breaks** [1] - 1175:22
**Brian** [2] - 1167:25, 1229:16
**brief** [2] - 1192:6, 1209:7
**briefing** [4] - 1190:8, 1193:2, 1214:18, 1221:22
**briefly** [1] - 1190:9
**bring** [6] - 1177:4, 1177:10, 1194:22, 1201:21, 1213:7, 1222:13
**bringing** [3] - 1177:3, 1190:6, 1221:21
**broad** [2] - 1209:1, 1226:3
**broader** [1] - 1186:4
**brought** [3] - 1187:20, 1188:3, 1200:3
**Buckton** [8] - 1189:25, 1190:14, 1190:20, 1195:16, 1200:2, 1223:21, 1223:22, 1224:19
**Buckton's** [4] - 1191:7, 1223:2, 1224:10, 1225:4
**buffer** [91] - 1185:22, 1186:7, 1187:6, 1188:7, 1189:5, 1189:17, 1190:25, 1192:19, 1196:10, 1196:14, 1196:17, 1196:19, 1196:20, 1197:11, 1197:16, 1200:8, 1204:25, 1205:3, 1205:10, 1205:18, 1205:20, 1209:23, 1209:25, 1210:8, 1210:12, 1210:14, 1210:18, 1210:21, 1210:25, 1211:3, 1211:14, 1211:25, 1212:3, 1212:5, 1213:11, 1213:17, 1215:6, 1215:9, 1216:4, 1216:8, 1216:12,

1216:15, 1216:25, 1217:10, 1217:13, 1217:20, 1218:1, 1218:8, 1218:12, 1218:16, 1219:2, 1219:7, 1219:9, 1219:15, 1219:18, 1219:19, 1219:23, 1219:25, 1220:1, 1220:4, 1220:13, 1220:14, 1220:15, 1220:16, 1220:24, 1221:2, 1221:3, 1221:8, 1221:14, 1221:16, 1224:24, 1224:25, 1225:1, 1226:1, 1226:2, 1226:14, 1226:16, 1226:17, 1226:23, 1227:2, 1227:5, 1227:11, 1227:12, 1227:16, 1227:25, 1228:5, 1228:14, 1228:16, 1228:19

**buffers** [2] - 1189:3, 1220:14
**built** [1] - 1225:14
**burden** [2] - 1187:5, 1210:11
**BY** [15] - 1167:19, 1167:22, 1168:3, 1168:6, 1168:10, 1168:13, 1168:17, 1168:21, 1169:7, 1170:3, 1171:1, 1171:20, 1173:11, 1180:5, 1182:23
**Byrn** [31] - 1189:3, 1189:23, 1190:24, 1191:2, 1195:16, 1196:6, 1196:8, 1197:17, 1199:4, 1199:7, 1199:11, 1199:20, 1200:5, 1200:18, 1201:21, 1202:5, 1203:2, 1203:9, 1205:11, 1205:14, 1210:15, 1210:20, 1210:25, 1216:10, 1216:11, 1216:23, 1217:9, 1218:4, 1220:6, 1220:18
**Byrn's** [5] - 1205:19, 1211:7, 1217:7, 1218:7, 1219:10

## C

**cabin** [1] - 1191:16
**calculate** [1] - 1194:8

**calculated** [1] - 1211:2
**California** [3] - 1167:23, 1168:3, 1168:7
**CALLAHAN** [1] - 1168:6
**cannibalization** [1] - 1170:18
**cannibalize** [1] - 1170:24
**cannibalized** [1] - 1174:23
**cannot** [2] - 1183:20, 1183:23
**capacity** [10] - 1205:6, 1217:1, 1217:2, 1220:16, 1220:19, 1221:3, 1221:16, 1227:16, 1227:20
**carry** [1] - 1187:5
**carrying** [1] - 1180:19
**cartoon** [1] - 1218:13
**case** [15] - 1190:13, 1194:21, 1199:19, 1199:21, 1200:21, 1203:23, 1209:4, 1215:11, 1215:16, 1221:1, 1221:18, 1226:7, 1226:9, 1226:10, 1228:24
**cases** [5] - 1200:22, 1203:17, 1214:6, 1215:15, 1226:10
**categories** [1] - 1181:19
**caught** [1] - 1217:16
**central** [1] - 1169:23
**certainly** [6] - 1181:14, 1189:8, 1190:7, 1190:18, 1190:21, 1215:1
**certify** [1] - 1229:14
**chain** [1] - 1171:11
**change** [1] - 1169:20
**changed** [1] - 1171:11
**chemical** [1] - 1209:12
**chemist** [1] - 1199:7
**chemistry** [1] - 1196:9
**Chicago** [1] - 1168:14
**Chief** [1] - 1167:16
**chops** [1] - 1196:13
**chose** [7] - 1218:17, 1219:19, 1224:24, 1225:1, 1226:15, 1226:16, 1226:24
**Circuit** [4] - 1187:1, 1195:22, 1197:2, 1221:21
**circumstance** [1] - 1215:7

**circumstances** [1] - 1197:8
**citations** [1] - 1201:3
**cite** [1] - 1183:6
**citing** [2] - 1209:6, 1209:7
**citrate** [15] - 1186:5, 1186:7, 1188:11, 1189:17, 1190:2, 1190:25, 1192:19, 1199:22, 1200:7, 1200:14, 1216:21, 1218:9, 1218:24, 1225:7, 1227:2
**citric** [9] - 1192:19, 1199:22, 1218:16, 1218:17, 1218:20, 1218:21, 1218:23, 1223:18
**CIVIL** [2] - 1167:3, 1167:8
**claim** [21] - 1175:23, 1186:15, 1188:13, 1189:7, 1190:3, 1195:24, 1196:13, 1196:24, 1197:4, 1197:10, 1215:10, 1219:9, 1219:19, 1221:20, 1223:4, 1225:11, 1226:7, 1226:15, 1226:25, 1227:7, 1227:8
**claimed** [19] - 1185:18, 1187:9, 1187:24, 1196:19, 1197:4, 1197:20, 1201:18, 1204:8, 1208:4, 1218:16, 1218:17, 1218:24, 1219:10, 1219:11, 1219:12, 1220:13, 1220:16, 1221:3, 1221:12
**claims** [28] - 1173:15, 1173:24, 1178:6, 1186:1, 1186:5, 1186:8, 1186:22, 1188:12, 1188:24, 1191:1, 1192:23, 1192:25, 1195:25, 1196:1, 1196:12, 1197:5, 1197:15, 1199:3, 1200:9, 1203:24, 1203:25, 1208:3, 1209:15, 1223:17, 1224:12, 1224:15, 1226:16
**clear** [2] - 1189:2, 1193:13
**clearly** [2] - 1192:13, 1217:25
**client** [4] - 1195:7,

1214:8, 1228:22, 1229:5
**clinician** [4] - 1183:22, 1183:25, 1184:4, 1184:7
**clock** [1] - 1214:25
**closed** [5] - 1198:16, 1198:17, 1198:20, 1213:19, 1228:10
**closing** [13] - 1186:23, 1187:15, 1189:15, 1189:22, 1190:7, 1193:4, 1193:13, 1193:22, 1194:10, 1198:4, 1200:11, 1216:3, 1216:7
**co** [1] - 1206:22
**co-solvent** [1] - 1206:22
**coffin** [1] - 1202:15
**coincidence** [1] - 1224:14
**colleagues** [1] - 1193:9
**collectively** [1] - 1204:4
**colloquially** [1] - 1204:13
**colors** [1] - 1208:23
**Columbia** [1] - 1168:23
**Column** [3] - 1201:17, 1202:3, 1204:5
**column** [4] - 1206:10, 1206:13, 1206:14, 1206:20
**combination** [4] - 1202:9, 1204:2, 1212:8, 1223:20
**combined** [1] - 1174:21
**coming** [1] - 1229:2
**commercial** [8] - 1172:25, 1173:13, 1173:23, 1174:20, 1175:18, 1181:8, 1181:10, 1181:14
**commercially** [2] - 1174:14, 1199:17
**common** [6] - 1170:20, 1185:16, 1186:2, 1189:19, 1201:24, 1204:2
**community's** [1] - 1218:11
**companies** [1] - 1178:12
**company** [1] - 1182:3
**compare** [3] - 1184:13, 1184:18, 1221:13

**compared** [2] - 1172:10, 1176:11
**comparing** [1] - 1221:11
**comparison** [1] - 1186:4
**compete** [3] - 1177:15, 1177:25, 1179:6
**competed** [1] - 1176:24
**competition** [1] - 1177:16
**competitor** [2] - 1188:21, 1188:24
**competitors** [1] - 1187:2
**completely** [1] - 1213:12
**component** [6] - 1219:19, 1226:15, 1226:17, 1227:1, 1227:11, 1227:12
**components** [7] - 1186:9, 1186:15, 1195:20, 1210:23, 1211:13, 1212:15, 1217:3
**compounds** [1] - 1209:12
**CONAWAY** [1] - 1168:17
**conceded** [4] - 1200:12, 1200:16, 1205:14, 1218:4
**concentration** [10] - 1219:23, 1219:25, 1220:3, 1220:4, 1220:13, 1220:15, 1220:19, 1220:25, 1221:2, 1221:16
**concentrations** [1] - 1186:9
**concerned** [1] - 1222:3
**conclusion** [1] - 1176:3
**conclusions** [2] - 1181:3, 1209:8
**conclusive** [1] - 1226:19
**confer** [2] - 1191:22, 1214:3
**conferred** [1] - 1214:2
**confirmed** [2] - 1199:24, 1211:1
**conjunction** [1] - 1206:13
**connection** [9] - 1191:17, 1191:18, 1199:3, 1200:5,

1201:7, 1204:24, 1206:6, 1209:9, 1209:10
**consider** [1] - 1209:21
**consistent** [2] - 1184:22, 1188:25
**consistently** [1] - 1205:23
**constitutes** [1] - 1205:9
**construct** [1] - 1184:8
**construction** [3] - 1197:4, 1197:10, 1197:13
**consultation** [1] - 1193:8
**contain** [5] - 1196:1, 1203:13, 1219:14, 1219:17, 1228:14
**contained** [1] - 1169:4
**containing** [1] - 1180:15
**contains** [3] - 1196:9, 1196:22, 1228:16
**contention** [1] - 1196:11
**context** [2] - 1188:6, 1193:22
**continue** [5] - 1177:24, 1177:25, 1189:16, 1216:3
**continued** [2] - 1177:14, 1186:8
**contrast** [5] - 1191:2, 1199:14, 1199:24, 1201:1, 1219:3
**contrasted** [1] - 1218:15
**control** [2] - 1177:9, 1227:13
**controlled** [1] - 1177:22
**conversion** [2] - 1171:10, 1171:22
**conversions** [1] - 1171:25
**convert** [3] - 1171:15, 1172:25, 1173:19
**converted** [1] - 1196:19
**conveyed** [2] - 1214:3, 1214:7
**convincing** [1] - 1193:12
**copy** [1] - 1194:15
**cordial** [1] - 1214:3
**correct** [20] - 1174:6, 1181:2, 1183:3, 1183:12, 1183:13, 1183:17, 1183:20, 1183:23, 1184:2,

1184:6, 1184:8, 1184:11, 1184:14, 1184:19, 1187:19, 1196:2, 1210:1, 1215:17
**correctly** [1] - 1200:12
**CORTLAN** [1] - 1168:11
**costs** [5] - 1181:21, 1181:22, 1182:1, 1182:7, 1182:10
**counsel** [1] - 1224:7
**Counsel** [3] - 1168:8, 1168:15, 1168:24
**counterarguments** [1] - 1202:20
**couple** [1] - 1180:3
**course** [3] - 1170:20, 1194:15, 1210:11
**COURT** [66] - 1167:1, 1169:5, 1173:8, 1182:15, 1182:18, 1185:2, 1185:6, 1185:8, 1185:13, 1187:12, 1189:11, 1190:10, 1190:17, 1191:10, 1192:2, 1193:5, 1193:15, 1193:19, 1193:25, 1194:5, 1194:7, 1194:15, 1194:18, 1195:3, 1195:9, 1195:13, 1198:6, 1198:9, 1198:15, 1198:19, 1198:22, 1204:9, 1204:12, 1205:21, 1206:4, 1207:8, 1207:12, 1207:25, 1208:2, 1208:19, 1209:22, 1210:2, 1211:16, 1212:4, 1212:17, 1212:20, 1212:22, 1213:2, 1213:4, 1213:18, 1214:12, 1214:24, 1215:13, 1215:21, 1215:24, 1216:5, 1222:5, 1222:8, 1222:12, 1222:17, 1222:20, 1222:24, 1228:12, 1228:18, 1228:21, 1229:9
**court** [3] - 1223:4, 1228:10
**Court** [14] - 1167:25, 1169:3, 1170:4, 1171:2, 1193:2, 1194:14, 1198:2, 1202:6, 1214:11, 1221:18, 1229:16, 1229:17

**courtroom** [8] - 1182:14, 1184:25, 1185:5, 1185:12, 1195:2, 1221:25, 1222:16, 1229:11
**cover** [2] - 1197:15, 1225:19
**covered** [2] - 1187:15, 1227:19
**covers** [1] - 1187:21
**creative** [1] - 1211:19
**credibility** [4] - 1189:24, 1200:25, 1211:9, 1223:6
**credibly** [1] - 1201:2
**criticality** [1] - 1223:9
**criticism** [2] - 1203:11, 1204:10
**criticisms** [1] - 1196:5
**cross** [8] - 1186:19, 1190:1, 1203:2, 1203:9, 1217:7, 1217:23, 1220:7, 1225:4
**CROSS** [1] - 1182:22
**cross-examination** [4] - 1186:19, 1190:1, 1217:7, 1217:23
**CROSS-EXAMINATION** [1] - 1182:22
**crossed** [1] - 1205:11
**current** [1] - 1215:7
**cycle** [2] - 1175:21, 1181:11

**D**

**damaged** [1] - 1211:9
**data** [5] - 1170:17, 1171:21, 1184:3, 1184:8, 1184:10
**dataset** [1] - 1184:12
**David** [9] - 1173:15, 1174:3, 1175:5, 1176:23, 1177:7, 1179:9, 1180:22, 1181:25, 1184:15
**David's** [4] - 1174:25, 1175:25, 1178:13, 1179:14
**Davidson's** [1] - 1181:15
**days** [1] - 1229:3
**DDX-401** [1] - 1225:5
**DDX-705** [1] - 1170:2
**DDX-708** [4] - 1182:21, 1182:25, 1183:15, 1184:8
**deadline** [1] - 1214:21
**deal** [2] - 1207:12,

1227:16
**dealing** [1] - 1199:21
**deals** [1] - 1228:4
**decided** [2] - 1220:24, 1229:7
**decision** [5] - 1213:20, 1214:19, 1215:4, 1215:18, 1228:22
**decisions** [1] - 1221:21
**declaration** [3] - 1223:12, 1223:19, 1224:5
**declining** [1] - 1171:9
**dedicated** [1] - 1210:9
**dedication** [5] - 1187:17, 1187:23, 1201:5, 1202:4, 1204:16
**deep** [1] - 1187:15
**defend** [1] - 1225:12
**Defendant** [2] - 1167:7, 1167:11
**defendants** [3] - 1191:20, 1197:22, 1222:3
**defendants'** [2] - 1191:15, 1195:17
**defense** [3] - 1201:5, 1201:6, 1204:25
**defenses** [1] - 1187:4
**defer** [1] - 1215:1
**defies** [1] - 1189:19
**defined** [1] - 1179:22
**defining** [1] - 1197:3
**definition** [4] - 1216:24, 1218:12, 1219:2, 1224:25
**definitions** [1] - 1205:9
**degradants** [2] - 1212:9, 1212:10
**degrade** [2] - 1212:15, 1217:3
**DELAWARE** [1] - 1167:2
**Delaware** [1] - 1167:13
**DELLINGER** [1] - 1167:19
**demand** [10] - 1172:23, 1173:19, 1174:23, 1176:9, 1176:13, 1177:21, 1178:2, 1178:24, 1181:7, 1181:12
**depict** [1] - 1172:19
**depiction** [1] - 1218:15
**deployed** [1] -

1172:25
**deploying** [1] - 1173:23
**derived** [1] - 1197:11
**described** [2] - 1177:7, 1204:2
**describes** [2] - 1176:23, 1201:17
**description** [1] - 1192:23
**design** [1] - 1211:19
**desire** [1] - 1224:12
**destroyed** [1] - 1189:23
**detail** [3] - 1187:15, 1193:18, 1211:22
**detailing** [1] - 1169:14
**details** [1] - 1214:12
**determination** [1] - 1191:19
**determine** [1] - 1183:22
**detract** [1] - 1206:23
**develop** [2] - 1178:6, 1211:25
**development** [1] - 1181:21
**device** [3] - 1195:23, 1197:6, 1197:7
**DEVINE** [14] - 1167:22, 1187:14, 1190:9, 1190:11, 1193:8, 1193:17, 1193:23, 1195:7, 1195:14, 1195:16, 1198:8, 1215:3, 1215:17, 1215:23
**Devine** [10] - 1191:3, 1193:7, 1195:4, 1200:3, 1200:10, 1200:12, 1214:1, 1214:24, 1219:22, 1220:23
**Devine's** [1] - 1220:10
**Diego** [1] - 1168:3
**difference** [6] - 1219:22, 1220:2, 1220:7, 1220:8, 1220:12, 1220:24
**differences** [8] - 1196:12, 1209:10, 1209:18, 1209:19, 1220:20, 1221:10, 1221:15
**different** [16] - 1174:22, 1176:7, 1176:10, 1196:25, 1207:20, 1207:24, 1208:10, 1208:18, 1208:22, 1208:23, 1219:21, 1226:16,

**differently** [3] - 1169:16, 1169:25, 1170:11
**dihydrate** [1] - 1186:5
**direct** [11] - 1172:11, 1203:3, 1203:10, 1203:15, 1203:19, 1206:17, 1210:5, 1210:9, 1217:7, 1217:24, 1220:6
**DIRECT** [1] - 1169:6
**directive** [1] - 1214:1
**directors** [1] - 1171:5
**disagree** [5] - 1176:6, 1179:21, 1181:16, 1187:16, 1193:17
**disavowal** [1] - 1189:2

▮▮▮▮▮▮▮▮

**disclaimer** [6] - 1186:13, 1186:17, 1186:20, 1186:23, 1186:25, 1187:2
**disclose** [1] - 1214:13
**disclosed** [7] - 1185:17, 1187:24, 1188:7, 1197:19, 1202:3, 1202:18, 1226:23
**disclosure** [8] - 1187:17, 1187:23, 1201:5, 1202:4, 1204:5, 1204:6, 1204:16, 1206:14
**discuss** [1] - 1187:18
**discussed** [6] - 1175:22, 1181:11, 1193:13, 1195:21, 1225:5, 1226:24
**discussion** [2] - 1175:10, 1193:3
**display** [1] - 1194:20
**dispute** [5] - 1191:24, 1199:7, 1219:6, 1219:20, 1220:18
**disregard** [3] - 1202:22, 1223:2, 1224:19
**disregarded** [1] - 1203:13
**dissemination** [1] - 1169:15
**dissociated** [3] - 1203:5, 1210:16, 1213:12
**dissolution** [1] - 1196:3
**dissolve** [2] - 1206:19, 1206:21
**distinguish** [2] -

**distinguished** [2] - 1186:1, 1186:8
**distinguished** [2] - 1188:12, 1207:14
**distinguishing** [1] - 1186:11
**District** [2] - 1168:23, 1229:17
**DISTRICT** [2] - 1167:1, 1167:2
**doctrine** [8] - 1192:18, 1202:4, 1204:16, 1224:21, 1225:18, 1226:6, 1226:20, 1227:2
**Doctrine** [2] - 1195:18, 1221:18
**document** [2] - 1170:6, 1171:17
**documentary** [1] - 1205:17
**documentation** [1] - 1170:15
**documents** [2] - 1183:6, 1195:17
**dollars** [1] - 1176:16
**donated** [1] - 1228:7
**donates** [1] - 1228:5
**done** [9] - 1172:17, 1177:3, 1179:12, 1181:12, 1185:8, 1185:23, 1195:10, 1224:17, 1224:18
**DORSNEY** [1] - 1168:10
**double** [1] - 1206:2
**down** [1] - 1226:4
**Dr** [99] - 1173:15, 1174:3, 1174:9, 1174:15, 1174:25, 1175:5, 1175:6, 1175:7, 1175:9, 1175:25, 1176:23, 1177:7, 1178:13, 1179:9, 1179:14, 1180:22, 1181:15, 1181:25, 1189:3, 1189:22, 1189:25, 1190:14, 1190:19, 1190:24, 1191:2, 1191:7, 1196:6, 1196:8, 1196:18, 1197:17, 1197:22, 1199:4, 1199:7, 1199:9, 1199:11, 1199:14, 1199:20, 1199:24, 1200:2, 1200:5, 1200:18, 1201:1, 1201:21, 1202:5, 1202:6, 1202:11, 1202:13, 1203:2, 1203:3, 1203:9, 1203:15,

1203:19, 1205:10, 1205:11, 1205:13, 1205:19, 1206:16, 1210:3, 1210:9, 1210:15, 1210:19, 1210:20, 1210:25, 1211:7, 1211:9, 1211:23, 1216:10, 1216:11, 1216:17, 1216:23, 1217:7, 1217:9, 1217:24, 1218:4, 1218:7, 1218:14, 1218:17, 1219:10, 1220:6, 1220:11, 1220:18, 1223:2, 1223:13, 1223:19, 1223:21, 1223:22, 1223:25, 1224:1, 1224:3, 1224:8, 1224:10, 1224:18, 1225:4, 1227:10, 1227:24, 1228:2
**draw** [1] - 1181:4
**drinks** [1] - 1173:6
**driver** [1] - 1174:5
**driving** [2] - 1174:19, 1175:19
**Drs** [1] - 1195:16
**drug** [2] - 1171:9, 1218:19
**drugs** [2] - 1199:15, 1199:16
**DTX-1123** [1] - 1203:22
**dug** [1] - 1191:3
**during** [14] - 1195:22, 1189:18, 1189:22, 1190:7, 1190:20, 1190:25, 1200:8, 1202:21, 1206:16, 1210:21, 1213:8, 1217:18, 1217:23
**dwell** [1] - 1223:1
**dynamics** [1] - 1176:7

## E

**E5** [1] - 1186:3
**early** [2] - 1172:5, 1201:7
**economic** [1] - 1177:6
**economically** [1] - 1178:3
**EDWARDS** [2] - 1168:20, 1168:21
**effects** [1] - 1207:24
**efforts** [2] - 1172:20, 1173:12
**either** [4] - 1200:19, 1203:14, 1208:7,

1220:19
**elaborate** [1] - 1193:14
**element** [3] - 1192:24, 1221:8, 1226:1
**elements** [2] - 1195:24, 1221:19
**eliminated** [1] - 1176:19
**embodiments** [2] - 1202:8, 1203:21
**employing** [1] - 1206:2
**enablement** [1] - 1192:23
**enalapril** [19] - 1176:2, 1180:10, 1180:12, 1180:15, 1183:10, 1183:12, 1184:1, 1184:5, 1184:11, 1184:13, 1184:18, 1186:16, 1197:11, 1197:16, 1210:17, 1211:12, 1213:13, 1219:17, 1227:7
**encompasses** [2] - 1225:10, 1225:24
**end** [4] - 1171:8, 1198:4, 1212:20, 1226:24
**ended** [1] - 1192:24
**ends** [5] - 1182:16, 1185:9, 1194:24, 1222:18, 1229:12
**English** [4] - 1185:2, 1194:22, 1195:9, 1222:13
**enhance** [1] - 1170:23
**enter** [1] - 1198:2
**entered** [1] - 1191:15
**entire** [2] - 1180:7, 1183:15
**entirely** [1] - 1225:7
**entitled** [1] - 1188:21
**EPA_0092913** [1] - 1171:18
**EPA_0094016** [1] - 1170:13
**Epaned** [40] - 1169:8, 1169:9, 1169:17, 1169:21, 1169:22, 1169:25, 1170:11, 1170:24, 1171:6, 1171:7, 1171:14, 1171:22, 1172:8, 1172:12, 1172:17, 1173:16, 1174:5, 1174:7, 1175:1, 1175:2, 1175:14, 1175:24, 1177:14, 1178:14, 1178:15,

1179:4, 1179:7, 1179:15, 1180:7, 1180:12, 1180:16, 1180:18, 1180:21, 1181:16, 1182:4, 1182:6, 1182:11, 1197:23, 1218:25
**equally** [1] - 1211:11
**equilibrium** [4] - 1196:4, 1205:7, 1216:19, 1216:21
**equivalent** [13] - 1187:23, 1188:18, 1189:7, 1192:16, 1195:20, 1195:24, 1196:3, 1196:15, 1197:18, 1209:13, 1224:23, 1227:6
**equivalents** [7] - 1192:18, 1224:22, 1225:10, 1225:18, 1226:6, 1226:21, 1227:3
**Equivalents** [2] - 1195:18, 1221:19
**especially** [1] - 1228:25
**ESQ** [17] - 1167:19, 1167:22, 1167:22, 1168:3, 1168:6, 1168:6, 1168:10, 1168:11, 1168:13, 1168:14, 1168:17, 1168:18, 1168:21, 1168:21, 1168:22, 1168:22
**essentially** [28] - 1169:11, 1169:15, 1170:23, 1170:24, 1171:6, 1171:13, 1172:7, 1172:18, 1172:21, 1173:14, 1173:18, 1173:21, 1174:10, 1174:19, 1174:22, 1176:19, 1177:20, 1178:8, 1178:22, 1179:2, 1179:10, 1180:20, 1182:4, 1190:23, 1202:14, 1212:2, 1217:10, 1218:14
**estoppel** [10] - 1185:19, 1186:12, 1188:2, 1188:20, 1192:11, 1192:12, 1221:25, 1224:21, 1226:5, 1227:4
**evaluated** [1] - 1176:1
**evening** [1] - 1214:2
**evidence** [16] - 1185:15, 1187:19, 1188:3, 1189:4,

1193:12, 1199:1,
1201:4, 1205:1,
1205:10, 1205:17,
1210:2, 1211:7,
1211:16, 1211:21,
1216:14, 1217:24
**EXAMINATION** [2] -
1169:6, 1182:22
**examination** [6] -
1186:19, 1190:1,
1203:3, 1217:7,
1217:23, 1220:7
**Examiner** [7] -
1185:24, 1185:25,
1186:3, 1187:1,
1188:10, 1188:13,
1223:9
**Examiner's** [1] -
1186:21
**example** [1] - 1183:6
**Example** [6] -
1202:14, 1202:19,
1202:23, 1204:5,
1206:12, 1207:1
**examples** [1] -
1219:16
**except** [1] - 1219:21
**excipients** [6] -
1199:21, 1199:25,
1212:1, 1212:7,
1212:8, 1212:13
**exclusion** [1] -
1181:22
**excuse** [1] - 1223:11
**executed** [2] -
1172:22, 1173:19
**executing** [1] -
1173:25
**exemplified** [1] -
1186:2
**exert** [2] - 1207:23,
1208:11
**exerted** [1] - 1203:8
**exist** [1] - 1181:19
**existed** [1] - 1173:20
**existence** [4] -
1205:20, 1210:13,
1216:11, 1218:8
**existing** [3] - 1170:24,
1171:7, 1173:19
**exists** [2] - 1216:8,
1216:12
**expanded** [1] -
1218:14
**expectation** [1] -
1214:17
**expecting** [1] -
1171:10
**expedited** [1] -
1214:20
**experienced** [1] -

1199:7
**experimentally** [1] -
1211:1
**experimented** [1] -
1202:16
**expert** [11] - 1189:25,
1190:24, 1196:18,
1197:14, 1200:21,
1201:12, 1201:14,
1204:22, 1207:23,
1209:20, 1223:5
**experts** [6] - 1189:21,
1190:12, 1198:24,
1199:2, 1203:2,
1221:7
**expires** [2] - 1213:25,
1228:23
**explain** [4] - 1170:4,
1171:2, 1195:16,
1210:4
**explained** [13] -
1169:15, 1178:20,
1196:8, 1197:17,
1201:21, 1203:15,
1206:16, 1207:23,
1210:19, 1212:2,
1216:18, 1220:11,
1227:15
**explaining** [1] -
1228:3
**explanation** [2] -
1193:1, 1211:11
**exposed** [1] - 1211:5
**extend** [1] - 1226:20
**extent** [4] - 1190:13,
1191:16, 1210:7,
1228:6

### F

**face** [1] - 1188:5
**fact** [9] - 1174:7,
1189:24, 1190:23,
1197:6, 1200:16,
1206:23, 1220:11,
1224:2, 1224:3
**factor** [1] - 1208:5,
1226:19
**factual** [3] - 1187:4,
1204:25, 1213:5
**fail** [2] - 1196:6,
1198:1
**failed** [5] - 1174:3,
1187:5, 1187:10,
1192:17, 1210:13
**failing** [1] - 1189:24
**fair** [2] - 1209:16,
1209:17
**fairly** [1] - 1169:19
**falling** [1] - 1219:13
**falsely** [1] - 1179:22

**far** [6] - 1171:7,
1182:12, 1188:20,
1193:11, 1205:4,
1220:2
**favor** [2] - 1192:8,
1215:19
**February** [1] - 1167:13
**Federal** [4] - 1186:25,
1195:22, 1197:2,
1221:21
**fell** [1] - 1202:20
**few** [6] - 1171:14,
1182:3, 1198:17,
1207:2, 1207:7,
1213:14
**figured** [1] - 1209:24
**figures** [1] - 1179:8
**file** [1] - 1201:8
**final** [3] - 1209:9,
1210:21, 1213:14
**finally** [4] - 1190:1,
1200:1, 1221:23,
1228:2
**financial** [2] -
1170:17, 1178:22
**fine** [4] - 1194:19,
1198:19, 1229:9
**finish** [1] - 1222:14
**first** [10] - 1176:12,
1177:20, 1198:10,
1201:5, 1202:22,
1204:10, 1217:15,
1218:21, 1219:21,
1226:16
**five** [2] - 1188:22,
1188:25
**flat** [2] - 1172:9,
1172:18
**flawed** [2] - 1178:18,
1211:5
**floating** [3] - 1203:6,
1204:13, 1204:19
**floor** [1] - 1179:3
**flushed** [1] - 1217:23
**focus** [1] - 1209:5
**focused** [1] - 1179:23
**follow** [1] - 1227:5
**followed** [1] - 1211:18
**Following** [1] - 1169:3
**FOR** [1] - 1167:2
**foreclosing** [2] -
1193:24, 1194:4
**foregoing** [1] -
1229:14
**foresaw** [1] - 1226:23
**foreseeability** [2] -
1226:11, 1226:19
**foreseeable** [1] -
1226:12
**foreseen** [2] -
1226:13, 1226:22

**form** [8] - 1183:12,
1184:2, 1184:5,
1210:17, 1210:20,
1213:11, 1213:16
**formal** [1] - 1229:4
**formulate** [1] - 1212:2
**formulated** [3] -
1199:14, 1199:20,
1199:25
**formulating** [2] -
1199:12, 1199:15
**formulation** [25] -
1186:3, 1186:16,
1187:9, 1188:23,
1199:9, 1202:25,
1205:5, 1205:13,
1205:18, 1206:8,
1206:25, 1207:1,
1209:2, 1210:22,
1210:23, 1211:17,
1212:13, 1213:9,
1213:14, 1216:17,
1219:12, 1220:16,
1221:8, 1221:12,
1223:23
**formulations** [17] -
1186:2, 1202:19,
1202:23, 1203:3,
1203:4, 1203:12,
1204:1, 1206:25,
1218:18, 1218:19,
1218:24, 1219:11,
1219:13, 1219:14,
1221:3, 1221:12
**formulator** [1] -
1209:21
**formulators** [1] -
1209:24
**forth** [1] - 1225:9
**forward** [2] - 1201:13,
1211:6
**four** [2] - 1186:15,
1192:20
**framework** [1] -
1175:17
**Francisco** [1] -
1167:23
**frankly** [2] - 1226:6,
1228:24
**free** [3] - 1202:24,
1206:22, 1210:17
**freebase** [1] - 1197:15
**Friday** [1] - 1167:13
**friends** [1] - 1198:12
**front** [1] - 1228:8
**full** [1] - 1171:10
**fully** [6] - 1171:15,
1174:16, 1181:18,
1181:20, 1182:1,
1182:11
**function** [16] - 1208:4,
1208:7, 1208:9,

1208:17, 1208:20,
1208:22, 1209:3,
1209:11, 1209:16,
1219:5, 1219:7,
1219:24, 1224:24,
1225:6, 1225:18,
1225:22
**function-way-result**
[2] - 1219:5, 1221:9
**functioning** [9] -
1187:6, 1189:5,
1205:3, 1205:18,
1216:15, 1216:25,
1217:13, 1218:1,
1218:12
**fundamental** [1] -
1189:19
**future** [1] - 1229:1

### G

**Gaffigan** [2] -
1167:25, 1229:16
**game** [2] - 1209:16,
1209:17
**GAZA** [1] - 1168:17
**Gemeinhart** [1] -
1227:10
**Gemeinhart's** [1] -
1228:3
**general** [1] - 1176:14
**generally** [1] -
1187:18
**generate** [3] -
1197:24, 1208:14,
1212:8
**generated** [2] -
1205:7, 1219:1
**generic** [3] - 1214:5,
1215:6, 1215:9
**George** [3] - 1185:12,
1195:11, 1195:15
**geriatric** [1] - 1180:2
**given** [6] - 1170:22,
1193:17, 1196:23,
1202:1, 1223:23,
1225:6
**glucose** [1] - 1208:14
**GOODRICH** [3] -
1167:21, 1168:2,
1168:5
**GRANVILLE** [1] -
1168:6
**graph** [5] - 1171:3,
1171:10, 1171:24,
1172:19, 1180:9
**great** [2] - 1198:8,
1223:15
**greater** [1] - 1221:4
**grew** [1] - 1172:3
**ground** [1] - 1179:3

group [1] - 1183:23
growth [3] - 1172:9,
  1207:15, 1208:16
guard [1] - 1217:16
guess [1] - 1189:14
gunning [1] - 1167:25
guys [1] - 1201:10

## H

half [1] - 1222:5
hand [3] - 1207:21,
  1207:22, 1225:23
handy [1] - 1209:6
HANSON [1] - 1167:22
happy [3] - 1193:1,
  1193:14, 1214:10
hardly [4] - 1205:5,
  1205:6, 1217:2,
  1218:10
head [1] - 1183:4
heads [1] - 1191:11
hear [13] - 1174:25,
  1175:25, 1176:4,
  1178:13, 1179:14,
  1194:9, 1201:10,
  1201:11, 1210:2,
  1211:16, 1214:15,
  1228:11
heard [12] - 1173:14,
  1174:9, 1174:10,
  1175:6, 1180:1,
  1192:3, 1210:3,
  1211:21, 1219:22,
  1223:21, 1223:24,
  1223:25
hearing [2] - 1175:11,
  1201:9
heart [1] - 1228:3
heels [1] - 1191:3
helpful [2] - 1215:2,
  1215:25
hereby [1] - 1229:14
herein [1] - 1169:4
higher [2] - 1171:8,
  1220:17
highlighted [1] -
  1170:9
himself [3] - 1189:23,
  1199:11, 1200:6
history [4] - 1185:19,
  1188:19, 1192:11,
  1197:12
hit [1] - 1178:11
HITCH [1] - 1168:11
Hofmann [7] - 1169:8,
  1170:4, 1171:2,
  1171:21, 1173:3,
  1180:6, 1181:3
hold [1] - 1185:6
HOLLISTER [1] -

1168:13
Honor [77] - 1182:13,
  1185:1, 1185:14,
  1185:19, 1186:12,
  1186:23, 1187:4,
  1187:11, 1187:14,
  1189:14, 1190:9,
  1190:16, 1190:18,
  1192:1, 1192:5,
  1193:8, 1194:6,
  1194:12, 1194:13,
  1195:20, 1198:4,
  1198:11, 1198:18,
  1198:23, 1199:6,
  1199:19, 1200:1,
  1200:11, 1201:1,
  1201:5, 1201:6,
  1201:10, 1201:14,
  1202:13, 1203:12,
  1203:16, 1204:21,
  1204:22, 1206:1,
  1206:5, 1206:7,
  1206:9, 1207:2,
  1207:5, 1207:6,
  1207:17, 1207:19,
  1208:6, 1208:25,
  1210:3, 1210:7,
  1211:22, 1212:19,
  1212:21, 1213:1,
  1213:8, 1213:23,
  1214:23, 1216:2,
  1216:6, 1216:10,
  1216:13, 1217:5,
  1217:22, 1218:15,
  1219:6, 1220:5,
  1220:22, 1221:6,
  1221:10, 1221:17,
  1221:24, 1222:1,
  1225:20
Honor's [1] - 1214:1
HONORABLE [1] -
  1167:16
hope [1] - 1206:2
hopefully [1] - 1173:7
HOST [5] - 1185:5,
  1185:11, 1195:1,
  1195:11, 1222:16
hour [3] - 1222:4,
  1222:5, 1222:10
huge [1] - 1173:21
humanly [1] - 1191:16
hundreds [1] -
  1199:14
hydrogen [3] -
  1218:21, 1228:5,
  1228:7
hydroxide [7] -
  1210:17, 1210:20,
  1211:13, 1212:17,
  1212:24, 1227:17,
  1228:6
hydroxides [2] -

1225:3, 1228:4
hypothetical [2] -
  1177:15, 1178:1

## I

i.e [1] - 1218:2
idea [2] - 1174:13,
  1177:6
identifies [1] -
  1201:19
identify [2] - 1170:10,
  1183:25
identifying [1] -
  1170:7
ignores [2] - 1195:25,
  1196:16
Illinois [1] - 1168:14
illustrates [1] -
  1171:22
immediately [1] -
  1225:13
imminent [2] - 1229:6
impact [5] - 1173:13,
  1174:8, 1175:15,
  1177:16, 1209:1
impeached [4] -
  1189:23, 1190:23,
  1200:6, 1201:2
implausible [1] -
  1178:2
implications [1] -
  1177:19
important [3] -
  1198:25, 1204:15,
  1209:20
imposed [1] - 1170:22
improper [3] -
  1190:15, 1221:6,
  1221:10
improperly [1] -
  1196:13
IMS [2] - 1184:8,
  1184:10
IN [2] - 1167:1, 1167:2
Inc [2] - 1168:8,
  1168:15
INC [3] - 1167:3,
  1167:6, 1167:8
incentivized [1] -
  1178:6
include [3] - 1186:7,
  1200:14, 1206:11
included [1] - 1184:20
includes [2] -
  1183:15, 1203:23
including [5] -
  1192:11, 1199:16,
  1199:18, 1201:19,
  1209:19
inconsistent [1] -

1191:14
incorrect [1] - 1197:10
increase [2] - 1170:21,
  1171:16
incredible [1] - 1177:5
incremental [2] -
  1178:14, 1179:9
indeed [2] - 1197:14,
  1219:16
independent [4] -
  1186:4, 1186:22,
  1219:9, 1219:19
indicates [1] -
  1195:23
indicative [2] -
  1181:8, 1181:14

indisput [1] - 1185:21
indisputable [1] -
  1185:21
individual [3] -
  1195:4, 1195:5,
  1221:19
influx [1] - 1227:17
information [2] -
  1169:14, 1191:17
infringe [5] - 1200:13,
  1200:15, 1205:25,
  1226:3
infringement [13] -
  1189:9, 1189:21,
  1189:25, 1190:23,
  1192:17, 1195:17,
  1198:3, 1200:20,
  1200:22, 1204:17,
  1222:20, 1222:22,
  1228:25
infringing [1] - 1225:8
ingredient [3] -
  1180:13, 1188:25,
  1219:17
ingredients [4] -
  1188:23, 1223:10,
  1223:20, 1227:18
inherent [1] - 1178:20
inherently [1] - 1226:8
inhibition [1] -
  1207:15
inhibits [2] - 1208:13,
  1208:16
injunction [3] -
  1215:12, 1215:14,
  1215:19
instance [1] - 1176:12
instead [5] - 1169:12,
  1169:17, 1202:25,
  1210:23, 1213:10
insubstantial [1] -
  1197:23
insufficient [1] -

1186:25
intended [1] - 1219:9
intending [1] -
  1190:14
intention [3] -
  1190:19, 1190:21,
  1191:8
interact [1] - 1210:17
interest [1] - 1172:24
interested [1] - 1178:4
internal [1] - 1170:6
interpretation [1] -
  1191:21
invalidity [2] - 1192:9,
  1192:21
invention [6] -
  1201:18, 1221:20,
  1223:14, 1223:17,
  1223:23
inventors [5] - 1176:1,
  1226:12, 1226:13,
  1226:21
investment [1] -
  1179:13
ions [1] - 1218:24
IQVIA [1] - 1184:9
irrelevant [2] -
  1220:21, 1220:22
isolation [2] -
  1203:18, 1206:13
issues [4] - 1193:11,
  1193:12, 1204:17,
  1222:23
issuing [1] - 1215:8

## J

JAMES [1] - 1168:10
Jenkinson [1] -
  1221:18
JEREMY [1] - 1168:21
Judge [1] - 1167:16
judgment [8] -
  1187:11, 1189:8,
  1189:9, 1192:7,
  1192:10, 1192:21,
  1193:10, 1198:2
judicious [1] - 1212:1

## K

KAREN [1] - 1168:18
Katie [1] - 1198:20
KAUFMAN [1] -
  1168:6
Kaveh [1] - 1192:5
KAVEH [1] - 1168:22
keep [3] - 1169:16,
  1170:11, 1171:13
keeping [1] - 1227:18

**keeps** [1] - 1190:5
**KENNETH** [1] - 1168:10
**kept** [2] - 1200:10, 1200:18
**key** [3] - 1170:7, 1170:10, 1181:18
**kill** [5] - 1176:18, 1178:23, 1208:11, 1208:12, 1208:15
**killed** [1] - 1176:24
**killing** [1] - 1177:20
**kind** [5] - 1171:8, 1179:5, 1224:8, 1225:23, 1226:22
**kinds** [1] - 1179:12
**kit** [2] - 1171:12, 1173:19
**Kit** [32] - 1169:8, 1169:12, 1169:17, 1169:22, 1170:19, 1170:24, 1171:7, 1171:22, 1172:2, 1172:8, 1172:10, 1172:12, 1173:1, 1174:7, 1174:10, 1174:23, 1175:2, 1176:9, 1176:17, 1176:18, 1176:20, 1176:24, 1177:3, 1177:14, 1177:20, 1177:23, 1178:15, 1178:23, 1179:6, 1179:7, 1180:19, 1181:12
**knowledge** [2] - 1201:22, 1201:23
**known** [7] - 1174:4, 1174:7, 1174:17, 1175:8, 1175:13, 1175:15, 1175:19
**knows** [1] - 1203:16
**KRISTINA** [1] - 1167:22

## L

**label** [1] - 1184:22
**labeled** [1] - 1180:2
**lack** [2] - 1174:19, 1192:23
**language** [1] - 1188:4
**last** [5] - 1194:13, 1197:3, 1201:7, 1207:2, 1221:1
**launch** [3] - 1171:6, 1172:2, 1214:10
**launched** [1] - 1172:4
**law** [8] - 1186:17, 1187:1, 1187:22, 1189:20, 1195:23,

1209:4, 1209:8, 1209:9
**layer** [1] - 1175:21
**lead** [1] - 1214:18
**leading** [1] - 1211:23
**leads** [1] - 1226:2
**learned** [1] - 1191:17
**least** [4] - 1182:11, 1211:11, 1212:14, 1215:13
**leave** [1] - 1201:7
**left** [2] - 1171:7, 1194:8
**legal** [1] - 1213:4
**LEONARD** [1] - 1167:16
**less** [5] - 1180:18, 1199:8, 1225:9, 1229:5, 1229:6
**level** [3] - 1178:2, 1182:6, 1200:22
**leverage** [2] - 1177:10, 1178:25
**leveraging** [1] - 1177:3
**life** [6] - 1175:21, 1181:11, 1200:17, 1212:10, 1212:11, 1212:14
**lifecycle** [7] - 1170:16, 1170:20, 1172:19, 1172:22, 1173:12, 1173:25, 1174:20
**likely** [1] - 1229:6
**likewise** [1] - 1197:17
**limitation** [12] - 1185:22, 1186:7, 1188:14, 1190:6, 1196:14, 1209:14, 1215:6, 1215:7, 1215:9, 1215:10, 1221:14
**limitations** [7] - 1189:18, 1190:25, 1200:8, 1204:25, 1218:16, 1220:4, 1225:8
**limited** [2] - 1173:20, 1181:7
**line** [4] - 1171:10, 1208:19, 1216:16, 1216:17
**lines** [3] - 1171:10, 1172:14, 1218:18
**lipophilic** [1] - 1206:18
**lipophilicity** [1] - 1209:19
**liquid** [5] - 1184:2, 1184:5, 1199:20, 1199:25, 1203:4

**listen** [2] - 1227:12, 1227:15
**literal** [4] - 1190:2, 1191:1, 1200:9, 1200:20
**literally** [1] - 1200:13
**literature** [3] - 1201:3, 1205:10, 1217:24
**litigation** [2] - 1197:25, 1229:1
**LLC** [2] - 1167:10, 1168:24
**LLP** [4] - 1167:19, 1168:10, 1168:13, 1168:17
**load** [1] - 1182:1
**logic** [2] - 1188:15, 1189:19
**look** [15] - 1172:14, 1181:7, 1181:9, 1188:4, 1188:5, 1188:24, 1204:13, 1204:18, 1206:7, 1206:24, 1209:2, 1211:10, 1223:14, 1223:16, 1226:11
**looking** [4] - 1201:15, 1205:24, 1212:24, 1223:3
**looks** [2] - 1201:16, 1219:4
**Los** [1] - 1168:7
**lower** [2] - 1212:12, 1220:3

## M

**ma'am** [1] - 1183:24
**Maddox** [1] - 1222:1
**MADDOX** [11] - 1168:20, 1168:21, 1192:4, 1198:13, 1222:1, 1222:6, 1222:11, 1222:25, 1228:16, 1228:20, 1228:23
**Mahan** [2] - 1174:9, 1175:6
**main** [3] - 1169:10, 1182:4
**maintain** [2] - 1189:16, 1221:14
**maleate** [7] - 1205:8, 1210:14, 1210:25, 1211:2, 1211:14, 1219:17, 1219:18
**maleic** [14] - 1205:4, 1205:6, 1205:14, 1210:23, 1211:2, 1213:16, 1216:16, 1216:20, 1216:22,

1218:5, 1218:10, 1219:15, 1219:18
**malic** [9] - 1210:14, 1210:16, 1210:24, 1211:11, 1211:14, 1213:10, 1213:12, 1217:1, 1228:17
**management** [9] - 1170:16, 1170:21, 1172:20, 1172:22, 1173:12, 1174:1, 1174:21, 1175:21, 1181:11
**manner** [1] - 1212:9
**margin** [1] - 1181:23
**marionette** [1] - 1177:9
**market** [16] - 1173:1, 1175:16, 1176:3, 1176:6, 1176:8, 1176:10, 1176:13, 1176:18, 1176:22, 1177:3, 1177:4, 1177:10, 1178:12, 1179:23, 1181:9, 1183:9
**marketed** [2] - 1199:13, 1199:17
**marketing** [6] - 1170:6, 1177:1, 1178:25, 1179:7, 1181:20, 1182:5
**marketplace** [5] - 1173:16, 1174:5, 1175:23, 1176:1, 1180:24
**matter** [8] - 1171:15, 1186:17, 1187:1, 1188:15, 1196:8, 1197:4, 1215:5, 1221:2
**MATTHEW** [1] - 1168:22
**mean** [7] - 1169:10, 1178:20, 1184:3, 1205:21, 1208:20, 1208:22, 1208:23
**meaning** [1] - 1197:7
**means** [4] - 1204:1, 1218:7, 1220:16, 1225:25
**mechanism** [4] - 1208:13, 1209:5, 1209:13, 1209:14
**meet** [5] - 1189:4, 1191:22, 1209:3, 1214:3, 1214:24
**meeting** [1] - 1171:5
**meets** [2] - 1197:7, 1224:25
**MEGAN** [1] - 1167:19

**memory** [1] - 1207:4
**mentioned** [2] - 1177:12, 1216:15
**merely** [1] - 1208:13
**message** [1] - 1169:23
**met** [2] - 1214:1, 1225:9
**method** [1] - 1207:15
**methods** [1] - 1195:25
**methylparaben** [12] - 1185:17, 1187:8, 1201:20, 1201:23, 1202:24, 1203:5, 1204:7, 1206:11, 1206:18, 1206:24, 1207:20, 1208:10
**metric** [1] - 1179:23
**metrics** [3] - 1180:22, 1181:24, 1182:9
**microorganism** [1] - 1208:14
**microorganisms** [2] - 1208:12, 1208:15
**might** [5] - 1208:22, 1213:6, 1214:20, 1215:15, 1215:25
**migrate** [2] - 1178:24, 1181:12

**mindful** [1] - 1214:13
**minus** [10] - 1196:21, 1196:23, 1205:13, 1205:15, 1217:12, 1217:21, 1218:2, 1218:5, 1218:22, 1220:3
**minute** [1] - 1194:13
**minutes** [2] - 1198:17, 1222:3
**miscalculation** [1] - 1222:6
**misleading** [2] - 1178:18, 1180:23
**misrepresenting** [1] - 1217:10
**missing** [1] - 1209:14
**mixture** [2] - 1203:21, 1203:25
**modeled** [1] - 1197:22
**modification** [1] - 1197:24
**modifiers** [1] - 1196:17
**mold** [1] - 1208:12
**molecular** [1] - 1225:25
**moment** [1] - 1212:18
**moments** [1] - 1207:7
**month** [2] - 1171:8, 1178:9

**months** [3] - 1171:11, 1171:15, 1180:3
**moreover** [2] - 1188:12, 1195:24
**Moretan's** [2] - 1202:11, 1203:19
**Moreton** [19] - 1196:18, 1199:4, 1199:9, 1199:14, 1199:24, 1201:1, 1202:6, 1202:13, 1203:3, 1203:9, 1203:15, 1205:10, 1206:16, 1210:4, 1210:19, 1216:17, 1217:24, 1218:14, 1220:11
**Moreton's** [2] - 1210:9, 1211:23
**MORGAN** [6] - 1168:3, 1182:20, 1182:23, 1184:25, 1185:4, 1185:7
**Morgan** [1] - 1182:19
**MORRIS** [2] - 1167:19, 1168:10
**Morton's** [1] - 1211:10
**Mosher** [6] - 1218:17, 1223:13, 1223:25, 1224:3, 1224:8, 1227:24
**Mosher's** [2] - 1197:22, 1223:19
**most** [3] - 1178:11, 1201:24, 1201:25
**motion** [9] - 1189:12, 1193:9, 1193:20, 1193:21, 1194:1, 1194:2, 1201:7, 1201:8, 1214:20
**motivation** [1] - 1177:6
**mouth** [1] - 1217:18
**move** [7] - 1178:25, 1179:5, 1192:7, 1193:10, 1197:1, 1215:14, 1216:9
**movement** [1] - 1170:19
**MR** [57] - 1169:7, 1170:2, 1170:3, 1170:25, 1171:1, 1171:19, 1171:20, 1173:9, 1173:11, 1180:4, 1180:5, 1182:13, 1185:14, 1189:14, 1190:16, 1190:18, 1192:1, 1192:4, 1192:5, 1194:3, 1194:6, 1194:12, 1194:17, 1198:11, 1198:13,

1198:17, 1198:20, 1198:23, 1204:11, 1204:21, 1206:1, 1206:5, 1207:11, 1207:17, 1208:1, 1208:6, 1208:25, 1210:1, 1210:3, 1211:21, 1212:6, 1212:19, 1212:21, 1213:1, 1213:3, 1213:7, 1213:23, 1214:23, 1216:2, 1216:6, 1222:1, 1222:6, 1222:11, 1222:25, 1228:16, 1228:20, 1228:23
**MS** [18] - 1182:20, 1182:23, 1184:25, 1185:4, 1185:7, 1187:14, 1190:9, 1190:11, 1193:8, 1193:17, 1193:23, 1195:7, 1195:14, 1195:16, 1198:8, 1215:3, 1215:17, 1215:23
**must** [7] - 1188:24, 1189:1, 1195:20, 1204:2, 1205:12, 1218:2, 1221:19

## N

**nail** [1] - 1202:15
**narrow** [4] - 1179:22, 1190:2, 1191:1, 1226:8
**narrowed** [2] - 1186:7, 1200:8
**narrowing** [10] - 1185:21, 1188:3, 1188:8, 1188:9, 1189:18, 1190:6, 1191:4, 1192:14, 1222:25, 1223:6
**NATALIE** [1] - 1168:3
**nature** [1] - 1224:20
**necessarily** [3] - 1172:23, 1176:23, 1208:15
**necessary** [2] - 1204:6, 1210:20
**need** [10] - 1191:24, 1193:5, 1209:25, 1212:3, 1214:12, 1215:11, 1215:19, 1221:13, 1227:16, 1229:10
**needs** [2] - 1195:4, 1202:1
**negated** [1] - 1186:22

**net** [1] - 1181:23
**neutralize** [4] - 1205:6, 1217:3, 1218:25, 1223:19
**neutralizes** [2] - 1225:2, 1225:3
**never** [5] - 1199:11, 1199:20, 1210:15, 1211:3, 1220:6, 1220:7, 1225:11, 1225:12, 1227:25
**next** [8] - 1170:25, 1171:19, 1180:4, 1191:11, 1197:1, 1202:13, 1215:8, 1225:16
**nexus** [7] - 1173:15, 1174:1, 1174:19, 1175:8, 1175:18, 1175:20, 1175:23
**nice** [1] - 1218:23
**nicely** [1] - 1218:18
**niche** [1] - 1179:10
**NICHOLS** [1] - 1167:19
**nights** [1] - 1229:4
**nine** [1] - 1179:24
**NO** [3] - 1167:6, 1167:6, 1167:11
**non** [4] - 1202:24, 1203:6, 1203:7, 1206:15
**non-salts** [4] - 1202:24, 1203:6, 1203:7, 1206:15
**none** [1] - 1220:20
**noninfringement** [2] - 1192:8, 1192:10
**nonobviousness** [2] - 1225:12, 1225:14
**note** [2] - 1187:19, 1189:24
**noted** [2] - 1186:4, 1188:11
**notes** [1] - 1229:14
**nothing** [3] - 1197:12, 1212:7, 1224:10
**notice** [2] - 1214:9, 1229:3
**notion** [1] - 1223:3
**novel** [1] - 1197:21
**November** [1] - 1197:3
**nowhere** [2] - 1188:18, 1224:5
**number** [5] - 1183:1, 1200:21, 1201:19, 1207:20, 1214:10
**numbers** [3] - 1179:8, 1182:24, 1199:15
**numerical** [1] - 1220:8

## O

**objection** [1] - 1223:14
**obvious** [3] - 1188:13, 1223:15, 1225:13
**obviously** [1] - 1229:5
**obviousness** [7] - 1188:15, 1192:22, 1193:10, 1223:11, 1227:24, 1228:9, 1228:25
**oddly** [1] - 1225:24
**OF** [1] - 1167:2
**offering** [1] - 1227:23
**Official** [3] - 1167:25, 1229:16
**official** [2] - 1222:2, 1222:8
**often** [1] - 1201:25
**once** [3] - 1187:2, 1213:14, 1225:21
███████ 1174:2, 1177:8, 1186:2, 1188:4, 1188:7, 1195:23, 1202:22, 1206:5, 1207:21, 1207:22, 1208:4, 1208:18, 1215:5, 1215:6, 1215:15, 1224:2, 1225:16, 1225:20, 1225:23, 1228:8
**ones** [1] - 1199:16
**oOo** [1] - 1169:1
**open** [6] - 1185:5, 1192:24, 1222:16, 1228:10, 1228:13, 1229:11
**open-ended** [1] - 1192:24
**opened** [1] - 1198:16
**opening** [3] - 1200:3, 1209:23, 1211:18
**opinion** [4] - 1181:15, 1210:15, 1211:7, 1223:5
**opinions** [3] - 1174:2, 1191:8, 1201:3
**optimal** [1] - 1218:18
**options** [1] - 1206:20
**oral** [17] - 1169:9, 1169:21, 1171:22, 1172:17, 1174:5, 1174:11, 1174:14, 1174:15, 1174:23, 1175:1, 1175:14, 1178:14, 1179:1, 1180:7, 1181:16, 1199:18
**order** [6] - 1169:21,

1191:14, 1191:22, 1191:24, 1207:10, 1209:16
**ordered** [1] - 1169:3
**originally** [1] - 1225:11
**outer** [1] - 1197:3
**overall** [1] - 1221:7
**overarching** [1] - 1178:8
**overcome** [1] - 1188:15
**overstates** [1] - 1181:24
**own** [6] - 1179:3, 1189:21, 1189:23, 1195:17, 1197:14, 1219:10

## P

**pace** [1] - 1172:3
**page** [2] - 1170:13, 1171:3
**paraben** [5] - 1187:21, 1201:24, 1202:16, 1202:18, 1203:24
**parabens** [7] - 1187:18, 1199:23, 1201:22, 1202:9, 1203:21, 1203:25, 1204:2
**paragraph** [1] - 1186:14
**paraphrased** [1] - 1207:5
**pardon** [3] - 1185:7, 1222:11
**parents** [1] - 1174:11
**part** [2] - 1195:23, 1207:15
**particular** [6] - 1172:11, 1172:23, 1197:8, 1207:10, 1211:19, 1227:13
**parties** [2] - 1177:13, 1194:16
**party** [14] - 1176:7, 1176:10, 1176:22, 1176:25, 1177:1, 1177:8, 1177:15, 1177:22, 1178:1, 1178:3, 1178:5, 1178:21, 1179:1, 1179:11
**party's** [1] - 1177:17
**PASCALE** [1] - 1168:18
**passage** [1] - 1201:16
**passages** [2] - 1202:7, 1203:20

**patent** [8] - 1178:7, 1187:20, 1187:21, 1189:20, 1203:22, 1215:8, 1215:20, 1227:7
**patent-in-suit** [1] - 1178:7
**patentability** [5] - 1188:10, 1188:17, 1192:15, 1223:8, 1224:11
**patents** [9] - 1173:17, 1173:25, 1192:20, 1197:23, 1204:1, 1215:5, 1219:12, 1219:14, 1229:2
**patents-in-suit** [3] - 1173:17, 1173:25, 1204:1
**patents-in-suits** [1] - 1215:5
**path** [2] - 1177:11, 1211:19
**pathways** [1] - 1208:14
**patient** [2] - 1170:22, 1180:7
**patients** [2] - 1171:14, 1174:11
**PDX** [1] - 1217:6
**PDX-243** [1] - 1217:6
**pediatric** [1] - 1183:16
**penalty** [1] - 1224:4
**penetration** [1] - 1180:24
**pent** [1] - 1172:23
**pent-up** [1] - 1172:23
**people** [2] - 1169:25, 1224:6
**percent** [4] - 1180:14, 1180:18, 1180:21, 1180:22
**performance** [5] - 1173:16, 1174:5, 1175:19, 1175:23, 1181:10
**performs** [1] - 1224:24
**perhaps** [2] - 1227:3, 1228:25
**period** [1] - 1180:18
**periods** [1] - 1172:10
**perjury** [1] - 1224:4
**person** [2] - 1188:5, 1197:18
**perspective** [3] - 1196:2, 1197:18, 1214:22
**pertinent** [1] - 1199:19
**pH** [26] - 1205:4, 1205:13, 1205:16, 1212:5, 1212:6,

1212:12, 1212:16, 1216:16, 1216:19, 1217:21, 1218:3, 1218:5, 1218:18, 1218:22, 1218:23, 1221:14, 1223:23, 1223:24, 1224:25, 1225:2, 1225:9, 1226:2, 1227:6, 1227:8, 1227:14, 1228:15
**Ph.D** [1] - 1168:13
**pharmaceutical** [3] - 1176:15, 1178:11, 1181:19
**Pharmaceuticals** [2] - 1168:8, 1168:24
**pharmaceuticals** [2] - 1178:10
**PHARMACEUTICALS** [3] - 1167:3, 1167:8, 1167:10
**pharmacy** [1] - 1174:12
**physicians** [1] - 1169:20
**pick** [1] - 1228:6
**pill** [4] - 1183:11, 1183:20, 1183:23, 1184:5
**pKa** [5] - 1205:15, 1217:20, 1218:2, 1218:5, 1218:20
**Plaintiff** [2] - 1167:4, 1167:9
**plaintiff** [3] - 1187:12, 1190:4, 1192:17
**plaintiffs** [2] - 1189:16, 1191:19
**plaintiffs'** [2] - 1194:1, 1208:20
**plan** [5] - 1174:21, 1181:11, 1193:19, 1193:20, 1215:24
**plausible** [1] - 1211:11
**PLLC** [1] - 1168:20
**plotting** [2] - 1180:11
**plus** [10] - 1186:16, 1197:16, 1205:13, 1205:15, 1217:12, 1217:20, 1218:2, 1218:5, 1218:21, 1221:1
**point** [16] - 1170:10, 1171:17, 1178:8, 1191:12, 1193:18, 1200:2, 1207:6, 1208:24, 1211:6, 1211:8, 1212:22, 1212:25, 1213:5,

1213:7, 1214:13, 1227:24
**pointed** [3] - 1200:12, 1202:7, 1225:20
**points** [2] - 1170:7, 1187:16
**poor** [1] - 1226:21
**population** [8] - 1170:22, 1179:24, 1179:25, 1180:2, 1180:8, 1183:16, 1183:19, 1184:1
**portion** [9] - 1169:3, 1182:16, 1183:19, 1185:9, 1194:24, 1203:18, 1210:9, 1222:18, 1229:12
**Portions** [1] - 1167:14
**POSA** [6] - 1201:16, 1201:21, 1201:23, 1202:2, 1202:12, 1206:23
**position** [9] - 1176:7, 1176:8, 1176:11, 1178:22, 1179:10, 1189:17, 1220:23, 1220:25, 1229:8
**possibilities** [1] - 1227:1
**possible** [2] - 1191:16, 1214:19
**possibly** [1] - 1215:14
**post** [3] - 1190:7, 1209:7, 1223:4
**post-amendment** [1] - 1223:4
**post-trial** [2] - 1190:7, 1209:7
**potassium** [1] - 1203:14
**potential** [3] - 1176:1, 1177:16, 1177:25
**potentially** [2] - 1175:18, 1213:16
**practice** [1] - 1214:20
**pre** [1] - 1223:3
**precluded** [1] - 1224:22
**preponderance** [1] - 1189:4
**prescribe** [1] - 1169:21
**prescribed** [2] - 1184:1, 1184:5
**prescribers** [3] - 1169:15, 1169:24, 1171:13
**prescribing** [2] - 1169:21, 1170:11
**prescription** [9] - 1178:10, 1179:15,

1179:20, 1179:21, 1180:6, 1181:4, 1181:6, 1184:13, 1184:18
**prescriptions** [5] - 1180:14, 1182:24, 1183:1, 1183:9, 1184:11
**present** [1] - 1195:7
**presentation** [1] - 1181:25
**presented** [2] - 1180:22, 1216:7
**presenting** [1] - 1193:11
**preservative** [11] - 1187:21, 1189:6, 1189:7, 1197:19, 1202:9, 1203:13, 1203:21, 1203:24, 1207:14, 1215:6, 1215:10
**preservatives** [7] - 1187:7, 1201:18, 1201:19, 1201:24, 1202:17, 1206:11
**preserve** [2] - 1209:2, 1215:19
**preserved** [1] - 1202:18
**presumably** [1] - 1177:24
**presume** [2] - 1198:11, 1211:4
**pretrial** [1] - 1209:9
**pretty** [3] - 1172:25, 1176:15, 1180:23
**previously** [2] - 1174:24, 1175:12
**price** [5] - 1170:21, 1171:16, 1176:25, 1177:25, 1179:7
**primary** [2] - 1199:11, 1199:15
**priority** [1] - 1203:25
**problem** [1] - 1227:21
**proceed** [2] - 1169:5, 1173:9
**proceeding** [1] - 1229:14
**process** [2] - 1210:22, 1213:14
**produces** [2] - 1227:5, 1227:6
**product** [59] - 1175:1, 1176:3, 1176:14, 1176:15, 1177:10, 1177:17, 1179:4, 1179:16, 1179:25, 1182:2, 1182:4, 1184:11, 1187:6,

1189:5, 1189:7, 1196:3, 1196:7, 1196:9, 1196:13, 1196:15, 1196:22, 1196:24, 1197:19, 1199:12, 1200:13, 1200:14, 1204:23, 1205:2, 1205:16, 1205:20, 1209:13, 1210:8, 1210:12, 1210:15, 1210:16, 1210:25, 1211:15, 1211:23, 1211:25, 1212:3, 1212:5, 1213:17, 1216:9, 1216:12, 1216:19, 1216:23, 1217:14, 1218:6, 1218:25, 1219:3, 1220:1, 1220:15, 1221:4, 1221:5, 1225:8, 1228:14, 1228:16, 1228:19
**products** [7] - 1180:12, 1181:20, 1182:4, 1197:21, 1197:22, 1199:20, 1199:25
**profit** [3] - 1177:7, 1178:14
**profitability** [5] - 1177:12, 1177:16, 1179:9, 1182:8, 1182:9
**profits** [3] - 1179:12, 1179:16, 1181:16
**promote** [1] - 1177:24
**promotion** [2] - 1170:8, 1181:21
**proof** [1] - 1223:9
**proper** [3] - 1205:10, 1217:10, 1219:7
**properly** [3] - 1205:17, 1216:14, 1218:1
**properties** [1] - 1207:20
**property** [2] - 1221:7, 1221:13
**propose** [1] - 1191:23
**proposed** [2] - 1209:8, 1225:11
**propylparaben** [12] - 1185:17, 1187:8, 1201:20, 1201:24, 1202:24, 1203:6, 1204:7, 1206:11, 1206:18, 1206:25, 1207:21, 1208:10
**prosecution** [1] - 1185:19, 1185:22, 1188:19, 1188:22, 1189:18, 1190:25,

1192:11, 1197:12, 1200:8, 1224:7
**prospect** [1] - 1177:7
**protons** [3] - 1225:2, 1227:17, 1228:4
**prove** [2] - 1187:10, 1192:17
**provide** [4] - 1169:13, 1189:3, 1193:1, 1214:9
**provided** [1] - 1225:8
**providers** [1] - 1169:12
**proving** [2] - 1187:5, 1210:12
**PTX-034** [1] - 1180:25
**PTX-251** [1] - 1181:1
**PTX-254** [1] - 1173:3
**PTX-255** [1] - 1173:4
**PTX-257** [1] - 1170:12
**PTX-328** [1] - 1171:18
**public** [5] - 1185:11, 1194:21, 1195:1, 1222:14, 1222:15
**purposes** [3] - 1188:10, 1188:17, 1214:16
**pursuant** [1] - 1214:1
**push** [2] - 1190:5, 1200:18
**pushed** [1] - 1201:6
**put** [8] - 1179:23, 1191:11, 1194:12, 1195:1, 1207:3, 1207:9, 1211:17, 1217:23
**PX** [1] - 1217:13

## Q

**qualified** [1] - 1199:8
**questioned** [1] - 1224:13
**questions** [5] - 1198:5, 1207:9, 1225:20, 1228:10, 1229:10
**quick** [1] - 1207:18
**quickly** [3] - 1171:25, 1207:3, 1222:23
**quoted** [1] - 1207:4

## R

**R&D** [7] - 1177:2, 1179:1, 1179:3, 1182:5, 1202:16, 1206:23, 1211:22
**radar** [1] - 1178:11
**raise** [2] - 1212:12,

1212:15
**raised** [1] - 1213:13
**ramped** [1] - 1176:20
**ran** [1] - 1226:24
**range** [6] - 1196:17, 1196:19, 1196:20, 1196:23, 1197:4, 1220:3
**rapidly** [3] - 1171:9, 1171:25, 1172:7
**rather** [2] - 1169:22, 1172:1
**ratio** [2] - 1211:2, 1227:19
**reached** [2] - 1176:2, 1196:4
**reaches** [1] - 1197:3
**react** [3] - 1210:22, 1213:15, 1213:16
**reacts** [2] - 1211:13, 1213:10
**read** [4] - 1202:2, 1203:17, 1206:12, 1206:13
**Ready** [7] - 1176:2, 1176:9, 1176:21, 1177:4, 1177:17, 1177:21, 1178:24
**ready** [12] - 1169:13, 1169:18, 1170:1, 1170:8, 1170:19, 1171:12, 1172:4, 1172:8, 1172:24, 1173:1, 1173:16, 1173:22
**Ready-to-Use** [7] - 1176:2, 1176:9, 1176:21, 1177:4, 1177:17, 1177:21, 1178:24
**ready-to-use** [12] - 1169:13, 1169:18, 1170:1, 1170:8, 1170:19, 1171:12, 1172:4, 1172:8, 1172:24, 1173:1, 1173:16, 1173:22
**real** [1] - 1207:18
**reality** [2] - 1204:15, 1204:18
**realize** [1] - 1226:18
**realized** [1] - 1179:12
**really** [16] - 1169:23, 1171:24, 1172:9, 1173:24, 1175:22, 1177:8, 1182:7, 1182:11, 1193:15, 1202:14, 1205:24, 1206:19, 1211:14, 1215:10, 1217:16, 1220:1

**reason** [9] - 1174:18, 1197:24, 1206:17, 1213:13, 1214:14, 1218:17, 1220:21, 1224:13, 1224:17
**reasonable** [2] - 1175:22, 1197:7
**reasons** [7] - 1178:5, 1192:13, 1192:14, 1214:8, 1214:10, 1223:7, 1224:10
**rebuttal** [1] - 1198:7
**recant** [1] - 1186:25
**received** [2] - 1199:12, 1199:16
**recently** [1] - 1197:2
**recess** [1] - 1194:7
**record** [1] - 1190:12
**referred** [2] - 1180:1, 1212:18
**referring** [1] - 1180:25
**reflect** [2] - 1172:23, 1195:17
**reflected** [2] - 1173:2, 1184:3
**reflection** [2] - 1172:21, 1173:24
**reflects** [2] - 1170:17, 1180:14
**refreshing** [1] - 1229:2
**refused** [1] - 1191:3
**refusing** [1] - 1200:6
**regarding** [10] - 1170:15, 1174:25, 1175:25, 1178:13, 1179:14, 1181:15, 1188:2, 1188:22, 1189:3, 1204:22
**regardless** [3] - 1215:4, 1215:11, 1215:17
**regulatory** [2] - 1199:13, 1199:16
**rehash** [1] - 1192:12
**reject** [2] - 1223:1, 1224:19
**rejected** [2] - 1186:3, 1188:13
**rejection** [2] - 1188:15, 1223:11
**related** [1] - 1192:14
**relatedly** [1] - 1210:19
**relating** [1] - 1223:8
**relative** [4] - 1175:1, 1180:12, 1216:20, 1227:14
**relented** [1] - 1190:1
**relevance** [1] - 1213:4
**relevant** [6] - 1208:3, 1208:6, 1208:7, 1208:20, 1208:24,

1221:13
**relied** [1] - 1187:1, 1205:11, 1217:24
**rely** [8] - 1171:17, 1187:3, 1188:21, 1190:12, 1190:14, 1190:22, 1191:7, 1205:22
**relying** [4] - 1173:3, 1190:19, 1191:7, 1204:22
**remaining** [1] - 1197:9
**remember** [2] - 1183:8, 1217:6
**remind** [1] - 1213:21
**removed** [4] - 1185:11, 1186:21, 1195:12, 1195:15
**replaced** [1] - 1177:21
**Reporter** [3] - 1167:25, 1229:16
**represent** [1] - 1183:9
**representation** [1] - 1191:7
**represented** [1] - 1182:25
**representing** [1] - 1198:12
**represents** [1] - 1183:11
**request** [4] - 1185:23, 1187:10, 1191:15, 1215:12
**requests** [3] - 1192:10, 1192:21, 1198:2
**require** [1] - 1186:5
**required** [2] - 1192:19, 1203:24
**requirement** [1] - 1196:6
**requires** [2] - 1187:22, 1197:10
**research** [1] - 1181:21
**reserve** [2] - 1193:23, 1194:3
**reserving** [1] - 1215:14
**resolve** [1] - 1191:25
**resources** [1] - 1178:25
**respect** [13] - 1173:13, 1175:16, 1177:2, 1181:4, 1181:15, 1181:19, 1192:18, 1193:20, 1204:18, 1209:23, 1210:13, 1223:20, 1224:4
**respectfully** [17] - 1185:15, 1187:10, 1187:16, 1198:2,

1199:2, 1199:6, 1199:8, 1200:4, 1200:6, 1200:24, 1201:13, 1204:4, 1205:1, 1208:8, 1208:25, 1209:3, 1216:13
**respond** [4] - 1187:13, 1190:9, 1190:16, 1193:7
**response** [8] - 1184:16, 1186:6, 1193:16, 1194:1, 1204:10, 1223:10, 1223:14, 1229:5
**responsibility** [2] - 1199:12, 1199:15
**responsible** [1] - 1189:1
**rest** [1] - 1198:7
**result** [12] - 1208:9, 1208:17, 1208:18, 1209:3, 1209:11, 1209:17, 1219:5, 1221:9, 1225:6, 1225:19, 1225:22
**results** [4] - 1223:16, 1223:22, 1224:15, 1228:24
**return** [1] - 1179:12
**reveals** [1] - 1202:15
**revenues** [1] - 1170:23
**review** [1] - 1170:15
**reviewing** [1] - 1185:16
**rights** [1] - 1215:19
**risk** [1] - 1214:9
**room** [2] - 1195:2, 1227:3
**rooted** [1] - 1197:9
**ROSATI** [3] - 1167:21, 1168:2, 1168:5
**ROSHAN** [1] - 1168:13
**roughly** [1] - 1218:23
**RTU** [2] - 1179:6, 1181:13
**RUEDY** [13] - 1168:22, 1169:7, 1170:2, 1170:3, 1170:25, 1171:1, 1171:19, 1171:20, 1173:9, 1173:11, 1180:4, 1180:5, 1182:13
**Rule** [6] - 1187:11, 1192:8, 1192:22, 1193:10, 1200:5, 1201:8

# S

**SABA** [4] - 1168:22, 1192:5, 1194:3, 1194:6
**Saba** [3] - 1192:4, 1192:5, 1193:25
**Sage** [1] - 1226:9
**sales** [9] - 1169:9, 1170:18, 1170:24, 1171:23, 1172:8, 1174:20, 1177:12, 1177:16, 1177:23
**salt** [1] - 1197:11
**salts** [11] - 1201:20, 1202:24, 1203:1, 1203:4, 1203:6, 1203:7, 1206:12, 1206:15, 1206:17, 1206:20
**SAMANTHA** [1] - 1168:18
**San** [2] - 1167:23, 1168:3
**satisfy** [1] - 1218:11
**save** [1] - 1198:6
**saw** [7] - 1179:9, 1180:22, 1203:19, 1203:22, 1204:5, 1217:15, 1225:10
**schedule** [1] - 1214:18
**scientific** [1] - 1218:11
**scope** [6] - 1188:24, 1190:2, 1191:1, 1200:9, 1219:13, 1226:6
**Sealed** [6] - 1167:14, 1182:16, 1185:9, 1194:24, 1222:18, 1229:12
**sealed** [6] - 1169:3, 1185:12, 1195:2, 1207:9, 1215:25, 1229:10
**seamless** [2] - 1169:19, 1171:12
**seamlessly** [2] - 1172:1, 1178:24
**see** [15] - 1170:9, 1171:4, 1172:3, 1172:7, 1173:18, 1180:9, 1180:13, 1181:8, 1181:25, 1186:23, 1206:24, 1224:7, 1224:8, 1224:12, 1229:7
**seem** [1] - 1193:3
**segment** [1] - 1184:1
**sell** [1] - 1177:14

**sense** [1] - 1189:19
**sensitive** [1] - 1222:23
**separate** [4] - 1186:10, 1197:16, 1215:5, 1219:19
**serve** [3] - 1217:13, 1217:20, 1217:25
**served** [1] - 1200:21
**severely** [2] - 1200:25, 1211:9
**share** [10] - 1179:15, 1179:20, 1179:21, 1180:7, 1180:11, 1181:5, 1181:6, 1181:9, 1184:18, 1194:8
**shares** [1] - 1184:14
**SHEA** [1] - 1168:17
**shelf** [3] - 1212:9, 1212:11, 1212:14
**shifted** [2] - 1205:8, 1218:9
**shifts** [1] - 1216:21
**shipped** [2] - 1172:13, 1172:16
**showed** [3] - 1185:15, 1216:14, 1217:25
**showing** [1] - 1184:10
**shown** [1] - 1187:25
**shows** [7] - 1171:6, 1171:24, 1172:24, 1181:6, 1199:1, 1201:4, 1205:2
**SHRESTHA** [1] - 1168:13
**shy** [2] - 1172:14, 1172:18
**shying** [1] - 1204:21
**side** [2] - 1200:22, 1214:6
**signed** [1] - 1191:14
**significantly** [1] - 1196:25
**Silvergate** [35] - 1168:8, 1169:8, 1169:24, 1170:7, 1170:16, 1170:22, 1176:8, 1176:11, 1176:17, 1176:23, 1177:2, 1177:8, 1177:14, 1177:23, 1178:22, 1178:23, 1179:11, 1182:3, 1182:10, 1182:11, 1185:23, 1185:25, 1186:6, 1186:19, 1198:1, 1199:4, 1202:16, 1204:3, 1206:17, 1206:22, 1210:11, 1213:9, 1214:9, 1219:8,

1225:11
**SILVERGATE** [2] - 1167:3, 1167:8
**Silvergate's** [10] - 1172:19, 1173:12, 1189:25, 1197:23, 1199:3, 1202:20, 1220:23, 1223:10, 1224:6, 1224:23
**similar** [1] - 1187:9
**similarly** [1] - 1196:11
**simply** [4] - 1172:24, 1188:7, 1195:22, 1227:17
**single** [7] - 1196:14, 1226:14, 1226:23, 1227:12, 1227:19, 1227:25, 1228:3
**single-component** [1] - 1227:12
**Sinko** [4] - 1174:15, 1175:7, 1175:9, 1224:1
**situ** [1] - 1213:11
**situation** [4] - 1179:1, 1213:22, 1214:18, 1216:4
**six** [1] - 1196:12
**skill** [2] - 1188:5, 1197:18
**skilled** [1] - 1185:15
**slide** [15] - 1170:5, 1170:25, 1171:5, 1171:19, 1173:4, 1174:3, 1180:4, 1180:25, 1183:15, 1197:1, 1202:11, 1206:6, 1217:11, 1217:15, 1225:5
**slides** [5] - 1186:24, 1194:13, 1194:14, 1207:2, 1207:18
**slightly** [1] - 1229:8

**slower** [1] - 1172:9
**SLVGT** [2] - 1170:13, 1171:18
**SLVGT-EPA_ 0092913** [1] - 1171:18
**SLVGT-EPA_ 0094016** [1] - 1170:13
**small** [2] - 1170:22, 1176:16
**sodium** [33] - 1185:18, 1186:5, 1186:7, 1187:25, 1188:11, 1189:17, 1190:2, 1190:24, 1192:19,

1197:20, 1199:22, 1200:7, 1200:14, 1201:20, 1203:1, 1203:14, 1204:8, 1205:8, 1207:21, 1208:13, 1210:14, 1210:17, 1210:19, 1210:25, 1211:2, 1211:13, 1212:17, 1212:24, 1216:21, 1218:9, 1223:18, 1225:7
**sold** [1] - 1223:19
**solution** [38] - 1169:9, 1169:13, 1169:22, 1170:1, 1170:8, 1170:19, 1171:12, 1171:23, 1172:17, 1172:24, 1173:1, 1173:22, 1174:5, 1174:11, 1174:14, 1174:15, 1174:23, 1175:1, 1175:14, 1176:9, 1176:21, 1177:4, 1177:21, 1178:14, 1178:25, 1179:15, 1180:7, 1181:16, 1196:1, 1196:4, 1199:18, 1204:14, 1204:19, 1205:24, 1212:25, 1227:7, 1227:22
**solutions** [1] - 1169:18
**solvent** [1] - 1206:22
**SONSINI** [3] - 1167:21, 1168:2, 1168:5
**sorbate** [1] - 1203:14
**sorry** [7] - 1185:20, 1198:20, 1198:21, 1202:6, 1208:18, 1222:7, 1222:11
**sort** [4] - 1194:13, 1198:25, 1211:19, 1216:7
**sounds** [1] - 1215:13
**source** [1] - 1183:5
**sparing** [1] - 1223:23
**spec** [2] - 1202:1, 1203:18
**species** [10] - 1196:20, 1219:23, 1219:25, 1220:4, 1220:13, 1220:14, 1220:19, 1220:24, 1221:2, 1221:16
**specific** [4] - 1186:9, 1209:4, 1212:13, 1227:4
**specifically** [4] - 1187:20, 1187:24,

1210:4, 1221:8
**specification** [12] - 1185:16, 1186:3, 1187:18, 1187:22, 1188:6, 1197:12, 1201:17, 1202:7, 1202:8, 1204:3, 1204:6, 1226:15
**specious** [1] - 1190:5
**split** [1] - 1218:23
**spontaneous** [1] - 1224:11
**stability** [7] - 1186:11, 1192:24, 1221:7, 1221:11, 1221:12, 1226:3, 1227:6
**stabilizes** [2] - 1224:25, 1225:2
**stabilizing** [3] - 1212:4, 1212:6, 1228:15
**stable** [1] - 1221:5
**stages** [1] - 1210:21
**standard** [7] - 1172:25, 1189:4, 1205:14, 1206:2, 1209:1, 1209:2, 1217:9
**standpoint** [1] - 1202:2
**STARGATT** [1] - 1168:17
**STARK** [1] - 1167:16
**start** [6] - 1179:2, 1179:20, 1198:15, 1198:23, 1222:20, 1222:22
**started** [1] - 1194:9
**state** [1] - 1203:20
**statement** [2] - 1186:24, 1189:15
**statements** [3] - 1188:22, 1193:13, 1209:9
**STATES** [1] - 1167:1
**States** [1] - 1199:18
**states** [1] - 1206:10
**stay** [3] - 1213:22, 1213:25, 1228:23
**stays** [1] - 1211:12
**stenographic** [1] - 1229:14
**step** [4] - 1178:22, 1210:6, 1212:17, 1213:9
**steps** [1] - 1213:14
**STETTINIUS** [1] - 1168:13
**Steve** [1] - 1222:1
**STEVEN** [1] - 1168:21
**still** [5] - 1171:8,

1189:15, 1200:16, 1221:5, 1225:7
**stipulation** [1] - 1191:14
**stopped** [1] - 1169:11
**straightened** [1] - 1225:21
**strategies** [1] - 1173:23
**strategy** [7] - 1170:21, 1172:22, 1173:18, 1174:1, 1174:20, 1175:21, 1181:10
**stream** [1] - 1229:2
**strength** [5] - 1205:4, 1205:12, 1216:16, 1217:12, 1218:1
**strings** [1] - 1177:9
**strong** [4] - 1205:15, 1216:18, 1216:20, 1219:9
**strongly** [1] - 1176:6
**stuff** [3] - 1213:15, 1221:24, 1221:25
**submission** [1] - 1224:7
**submit** [16] - 1185:15, 1188:23, 1189:8, 1194:16, 1199:6, 1199:8, 1200:4, 1200:7, 1200:24, 1201:13, 1204:4, 1205:1, 1208:8, 1209:1, 1209:4, 1216:13
**submitted** [1] - 1194:14
**subsequent** [1] - 1221:21
**substantial** [6] - 1209:10, 1209:18, 1219:24, 1220:12, 1220:25, 1221:10
**substantially** [5] - 1187:8, 1207:24, 1219:21, 1220:14, 1220:17
**substantive** [2] - 1190:19, 1191:8
**success** [5] - 1173:13, 1175:16, 1175:18, 1181:8, 1181:14
**successful** [1] - 1180:23
**sucralose** [1] - 1186:21
**sufficient** [1] - 1189:4
**suggest** [6] - 1206:2, 1216:3, 1217:11, 1223:6, 1225:22, 1226:3

**suggested** [2] - 1209:23, 1224:8
**suggesting** [1] - 1211:18
**suggestion** [1] - 1186:21
**suit** [4] - 1173:17, 1173:25, 1178:7, 1204:1
**suitable** [3] - 1185:17, 1204:7, 1217:20
**suits** [1] - 1215:5
**summarizes** [1] - 1202:11
**summary** [1] - 1174:3
**supplanted** [1] - 1172:7
**supplied** [1] - 1169:17
**supply** [3] - 1171:11, 1176:19, 1176:20
**supplying** [2] - 1169:12, 1171:13
**support** [2] - 1199:10, 1210:2
**supported** [2] - 1187:22, 1210:15
**supporting** [1] - 1197:13
**suppose** [3] - 1191:11, 1194:20, 1215:16
**Supreme** [1] - 1221:18
**surprise** [2] - 1183:8, 1214:4
**surprised** [4] - 1183:5, 1223:22, 1223:25, 1224:1
**suspected** [1] - 1216:2
**swallow** [2] - 1183:20, 1183:23
**swapping** [1] - 1188:7
**swear** [1] - 1224:4
**switch** [1] - 1173:22
**system** [7] - 1210:25, 1211:3, 1211:15, 1216:8, 1219:15, 1219:18, 1228:5
**systems** [2] - 1188:7, 1227:2

### T

**table** [2] - 1186:14, 1201:22
**tablet** [2] - 1180:20, 1183:12
**tactics** [1] - 1172:25
**TAFT** [1] - 1168:13
**tangential** [2] - 1188:17, 1192:15

**tastes** [1] - 1208:23
**TAYLOR** [1] - 1168:17
**technological** [1] - 1197:6
**ten** [1] - 1206:14
**terms** [7] - 1170:7, 1173:15, 1176:8, 1178:21, 1179:7, 1180:23, 1181:11
**terribly** [1] - 1222:7
**test** [9] - 1196:6, 1208:8, 1209:3, 1209:11, 1219:6, 1221:9, 1221:10, 1225:22
**testified** [4] - 1196:18, 1197:14, 1199:3, 1201:1
**testimony** [25] - 1174:25, 1175:5, 1175:11, 1175:25, 1176:4, 1176:5, 1178:13, 1178:17, 1179:14, 1179:18, 1190:14, 1190:20, 1199:10, 1201:12, 1201:14, 1202:12, 1204:22, 1207:4, 1211:23, 1217:18, 1220:9, 1223:21, 1223:24, 1223:25, 1228:3
**THE** [74] - 1167:1, 1167:2, 1169:5, 1173:6, 1173:8, 1173:10, 1182:15, 1182:18, 1185:2, 1185:5, 1185:6, 1185:8, 1185:11, 1185:13, 1187:12, 1189:11, 1190:10, 1190:17, 1191:10, 1192:2, 1193:5, 1193:15, 1193:19, 1193:25, 1194:5, 1194:7, 1194:15, 1194:18, 1195:1, 1195:3, 1195:9, 1195:11, 1195:13, 1198:6, 1198:9, 1198:15, 1198:19, 1198:22, 1204:9, 1204:12, 1205:21, 1206:4, 1207:8, 1207:12, 1207:25, 1208:2, 1208:19, 1209:22, 1210:2, 1211:16, 1212:4, 1212:17, 1212:20, 1212:22, 1213:2, 1213:4, 1213:18, 1214:12, 1214:24,

1215:13, 1215:21, 1215:24, 1216:5, 1222:5, 1222:8, 1222:12, 1222:16, 1222:17, 1222:20, 1222:24, 1228:12, 1228:18, 1228:21, 1229:9
**theoretical** [1] - 1176:25
**theory** [4] - 1205:19, 1211:5, 1218:8, 1219:10
**therefore** [4] - 1205:5, 1205:16, 1208:4, 1210:22
**thinking** [1] - 1226:9
**third** [17] - 1176:7, 1176:10, 1176:22, 1176:25, 1177:1, 1177:8, 1177:13, 1177:15, 1177:17, 1177:22, 1178:1, 1178:2, 1178:5, 1178:21, 1179:1, 1179:11
**thoughts** [1] - 1222:15
**three** [1] - 1179:24
**throughout** [1] - 1221:1
**tidy** [1] - 1224:12
**tidying** [2] - 1224:14, 1224:16
**tied** [1] - 1221:8,
⬛⬛⬛ 1176:13, 1178:2, 1178:12, ⬛⬛⬛1183:9
**today** [1] - 1175:10
**together** [8] - 1191:11, 1194:12, 1201:25, 1207:1, 1207:3, 1207:9, 1211:17, 1214:6
**took** [4] - 1200:22, 1202:13, 1225:6, 1225:17
**top** [3] - 1175:21, 1180:17, 1183:4
**touch** [3] - 1189:15, 1200:2, 1221:23
**touched** [1] - 1219:6
**touching** [1] - 1204:24
**towards** [1] - 1212:20
**traditional** [2] - 1216:24, 1218:10
**trajectory** [2] - 1172:10, 1229:1
**transcript** [1] - 1229:14
**transition** [2] - 1169:8, 1169:19

**Trial** [1] - 1167:14
**trial** [5] - 1190:7, 1190:20, 1191:17, 1202:21, 1209:7
**TRIALanywhere** [5] - 1185:5, 1185:11, 1195:1, 1195:11, 1222:16
**tried** [3] - 1185:25, 1217:9, 1227:25
**trigger** [1] - 1202:3
**true** [8] - 1182:8, 1195:22, 1205:20, 1211:3, 1216:12, 1216:23, 1218:8, 1229:14
**try** [4] - 1177:23, 1186:19, 1192:6, 1207:12
**trying** [4] - 1190:5, 1191:13, 1200:17, 1207:17
**TUNNELL** [1] - 1167:19
**turn** [3] - 1214:25, 1224:22, 1228:9
**turning** [1] - 1174:2
**turns** [2] - 1215:11, 1217:22
**two** [19] - 1179:24, 1195:20, 1195:24, 1199:2, 1202:20, 1206:20, 1212:9, 1212:11, 1212:14, 1220:2, 1221:1, 1226:15, 1226:16, 1227:1, 1227:11, 1227:12, 1227:25, 1228:5, 1229:4
**two-buffer** [1] - 1228:5
**two-component** [4] - 1226:15, 1226:17, 1227:1, 1227:11
**two-year** [3] - 1212:9, 1212:11, 1212:14
**TY** [1] - 1168:6
**type** [1] - 1203:17
**types** [1] - 1203:17
**Tyzeka** [1] - 1199:18

### U

**U.S** [2] - 1183:16, 1229:17
**ultimate** [1] - 1188:6
**unable** [1] - 1214:20
**uncredible** [1] - 1177:5
**undeniable** [2] - 1191:4, 1200:7

**under** [17] - 1186:25, 1187:11, 1189:12, 1192:8, 1192:18, 1192:21, 1193:10, 1193:20, 1195:18, 1205:14, 1208:7, 1208:9, 1219:5, 1219:10, 1221:9, 1224:4
**undercut** [1] - 1200:25
**undermines** [1] - 1173:14
**underneath** [1] - 1186:14
**understood** [3] - 1191:15, 1192:1
**undisputed** [2] - 1200:16, 1228:18
**unequivocal** [1] - 1205:11
**unequivocally** [4] - 1202:8, 1203:10, 1203:20, 1206:10
**unexpected** [5] - 1223:15, 1223:22, 1224:3, 1224:6, 1224:15
**unique** [1] - 1179:10
**unit** [1] - 1170:18
**United** [1] - 1199:17
**UNITED** [1] - 1167:1
**units** [9] - 1171:7, 1171:8, 1172:8, 1172:12, 1172:15, 1172:17, 1172:18, 1178:9, 1183:2
**unmistakable** [1] - 1189:2
**unseal** [4] - 1182:13, 1184:25, 1207:6, 1221:24
**unsubstantial** [1] - 1220:8
**unsupported** [2] - 1211:7, 1220:5
**unsurprising** [1] - 1181:13
**up** [21] - 1172:23, 1176:20, 1179:23, 1183:20, 1190:6, 1193:15, 1193:21, 1196:13, 1200:3, 1201:2, 1213:7, 1215:1, 1216:16, 1218:18, 1221:21, 1222:15, 1224:12, 1227:17, 1228:6, 1228:13, 1229:11
**upped** [1] - 1227:21
**upward** [1] - 1171:9
**urgency** [2] - 1213:20,

1228:22
**useful** [1] - 1201:18

## V

**Valerie** [1] - 1167:25
**various** [1] - 1174:14
**Vasotec** [1] - 1180:20
**versa** [1] - 1190:13
**versed** [1] - 1214:8
**version** [2] - 1174:22, 1225:15
**versions** [1] - 1223:4
**versus** [1] - 1184:5
**vertical** [1] - 1217:17
**veteran** [1] - 1203:16
**viable** [1] - 1217:13
**vice** [1] - 1190:13
**vice-versa** [1] - 1190:13
**view** [6] - 1193:9, 1204:12, 1205:23, 1208:21, 1224:23, 1228:21
**voice** [1] - 1173:7
**volume** [1] - 1176:14
**Volume** [1] - 1167:14
**volumes** [1] - 1173:21

## W

**waged** [1] - 1228:7
**waiting** [1] - 1195:2
**walked** [2] - 1202:5, 1202:6
**war** [1] - 1228:7
**Warner** [1] - 1221:18
**Warner-Jenkinson** [1] - 1221:18
**Washington** [1] - 1168:23
**water** [3] - 1173:6, 1186:16, 1206:19
**ways** [2] - 1207:24
**weak** [9] - 1181:7, 1181:9, 1205:12, 1216:18, 1217:12, 1217:19, 1217:25, 1218:2
**Wednesday** [1] - 1214:2
**week** [3] - 1180:1, 1191:11, 1215:8
**well-executed** [1] - 1172:22
**WENDY** [1] - 1167:22
**whatsoever** [1] - 1220:20
**whereas** [2] - 1177:22, 1208:12

**whole** [3] - 1182:10, 1182:11, 1221:20
**widely** [1] - 1183:10
**widespread** [1] - 1177:18
**wiggle** [1] - 1227:3
**Wilmington** [1] - 1167:13
**WILSON** [4] - 1167:21, 1168:2, 1168:5, 1168:18
**wise** [1] - 1224:3
**wish** [1] - 1187:12
**withdraw** [1] - 1177:13
**WITNESS** [2] - 1173:6, 1173:10
**Witness** [1] - 1173:6
**witnesses** [2] - 1174:10, 1180:1
**world** [3] - 1208:17, 1216:9, 1225:1
**write** [1] - 1169:25
**writing** [1] - 1169:16
**written** [2] - 1180:15, 1192:23

## Y

**year** [5] - 1197:3, 1201:7, 1212:9, 1212:11, 1212:14
**years** [1] - 1221:1
**yeast** [1] - 1208:12
**yellow** [1] - 1170:9
**yesterday** [2] - 1173:15, 1174:9
**YOUNG** [1] - 1168:17

## Z

**zero** [1] - 1179:24